# 24-1241

## In the
## United States Court of Appeals for the Second Circuit

CASE LEROY,

*Plaintiff - Appellant*,

v.

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of Schools of
Livingston Manor Central School District,

*Defendants – Appellees.*

On Appeal from the United States District Court
for the Southern District of New York, 7:21-cv-06008-NSR-AEK

**JOINT APPENDIX OF APPELLANT CASE LEROY
Volume 2 of 2 (Pages A-297 to A-593)**

CHELSEA WEISBORD
STEVEN C. STERN
SOKOLOFF STERN LLP
179 Westbury Avenue, Suite 201
Carle Place, New York 11514
(516) 334-4500
*Attorneys for Defendants-Appellees*

ADAM EZRA SCHULMAN
HAMILTON LINCOLN LAW
INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
(610) 457-0856

– and –

JEROME T. DORFMAN
LAW OFFICES OF
JEROME T. DORFMAN
8 Breezy Hill Road
Parksville, New York 12768
(845) 747-9403

*Attorneys for Plaintiff-
Appellant Case Leroy*

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Notice of Removal, by Defendants, filed
    July 13, 2021.......................................................... A-15

Exhibit A to Notice -
Summons and Verified Complaint, dated
June 16, 2021 ......................................................... A-18

Exhibit B to Notice -
Amended Verified Complaint, dated July 1, 2021 . A-33

Verified Answer, filed August 13, 2021 .................... A-48

Notice of Motion, by Defendants, for an Order
    granting Summary Judgment, dated
    March 24, 2023, filed June 12, 2023 .................... A-57

Declaration of Chelsea Weisbord, for Defendants, in
    Support of Motion, dated March 24, 2023, filed
    June 12, 2023 ........................................................ A-59

Exhibit A to Weisbord Declaration -
Amended Verified Complaint, dated July 1, 2021
(Reproduced herein at pp. A-33-A-47)

Exhibit B to Weisbord Declaration -
Verified Answer, filed August 13, 2021
(Reproduced herein at pp. A-48-A-56)

Exhibit C to Weisbord Declaration -
Excerpts of Deposition Transcript of Case Leroy,
dated August 5, 2022 ............................................. A-66

Exhibit D to Weisbord Declaration -
Excerpts of Deposition Transcript of Case Leroy,
dated September 16, 2022...................................... A-137

ii

**Page**

Exhibit E to Weisbord Declaration -
Excerpts of Deposition Transcript of Gordon
Leroy, dated September 20, 2022 ......................... A-160

Exhibit F to Weisbord Declaration -
Excerpts of Deposition Transcript of Amy Leroy,
dated October 21, 2022............................................ A-173

Exhibit G to Weisbord Declaration -
Excerpts of Deposition Transcript of Student A,
dated November 8, 2022........................................ A-186

Exhibit H to Weisbord Declaration -
Excerpts of Deposition Transcript of Student B,
dated November 8, 2022........................................ A-232

Exhibit I to Weisbord Declaration -
Hearing Transcript, dated April 27, 2021 .............. A-256

Exhibit J to Weisbord Declaration -
Photograph posted on Snapchat Account, dated
April 19, 2021........................................................ A-288

Exhibit K to Weisbord Declaration -
Photograph posted by Student A, on Snapchat
Account, dated April 19, 2021 .............................. A-290

Exhibit L to Weisbord Declaration -
Photograph taken March 25, 2021......................... A-292

Exhibit M to Weisbord Declaration -
Email from Jillian Hoag to Shirlee Davis, dated
April 20, 2021........................................................ A-294

Exhibit N to Weisbord Declaration -
Email to Shirlee Davis, dated April 19, 2021 ........ A-297

Exhibit O to Weisbord Declaration -
Email to Christian Towsley, dated April 19, 2021 . A-302

iii

**Page**

Exhibit P to Weisbord Declaration -
Email to Shirlee Davis, dated April 19, 2021 ........ A-302

Exhibit Q to Weisbord Declaration -
Email from Stand Against Racism in Education
("SARE") to Christopher Hubert and others,
dated April 19, 2021 ............................................... A-306

Exhibit R to Weisbord Declaration -
Email from Student to Shirlee Davis, dated
April 19, 2021 ........................................................ A-309

Exhibit S to Weisbord Declaration -
Email from Student to Shirlee Davis, dated
April 19, 2021 ........................................................ A-312

Exhibit T to Weisbord Declaration -
Various Emails from Students to Shirlee, Davis.... A-316

Exhibit U to Weisbord Declaration -
Email from Payton Powell to John Evans and
Shirlee Davis, dated April 19, 2021 ...................... A-327

Exhibit V to Weisbord Declaration -
Email from Courtney Lambert to John Evans and
Shirlee Davis, dated April 19, 2021 ...................... A-331

Exhibit W to Weisbord Declaration -
Email from Jaspreet Gill to John Evans and
Shirlee Davis, dated April 19, 2021 ...................... A-337

Exhibit X to Weisbord Declaration -
Email from Meagan Edwards to John Evans and
Shirlee Davis, dated April 20, 2021 ...................... A-340

Exhibit Y to Weisbord Declaration -
Email from Student to Shirlee Davis, dated
April 20, 2021 ........................................................ A-343

iv

**Page**

Exhibit Z to Weisbord Declaration -
Email from Hannah Tuso to John Evans and
Shirlee Davis, dated April 20, 2021 ...................... A-345

Exhibit AA to Weisbord Declaration -
Email from Grady Park to John Evans, dated
April 20, 2021 ........................................................ A-347

Exhibit BB to Weisbord Declaration -
Email from Sophia Xiomara to John Evans and
Shirlee Davis, dated April 20, 2021 ...................... A-351

Exhibit CC to Weisbord Declaration -
Email from Mykenzi Williams to John Evans,
dated April 20, 2021 .............................................. A-353

Exhibit DD to Weisbord Declaration -
Email from Dylan Parks to John Evans, Shirlee
Davise and others, dated April 20, 2021 ............... A-355

Exhibit EE to Weisbord Declaration -
Email from Joya Maritza to John Evans and
Shirlee Davis, dated April 20, 2021 ...................... A-362

Exhibit FF to Weisbord Declaration -
Email from Kelsie Nolan to John Evans and
Shirlee Davis, dated April 20, 2021 ...................... A-364

Exhibit GG to Weisbord Declaration -
Email from Catherine Skalda to John Evans,
Shirlee Davise and others, dated April 20, 2021 ... A-366

Exhibit HH to Weisbord Declaration -
Email from Elena Haskins to John Evans and
Shirlee Davis, dated April 21, 2021 ...................... A-368

Exhibit II to Weisbord Declaration -
Email Chain between John Evans, Jay Quintance
and Robert Dufour, dated April 20, 2021 .............. A-372

v

**Page**

Exhibit JJ to Weisbord Declaration -
Letter from John P. Evans to Livington Manor
Central School District, dated April 20, 2021........ A-375

Exhibit KK to Weisbord Declaration -
Scripts prepared for District Secretaries ............... A-377

Exhibit LL to Weisbord Declaration -
Letter from Shirlee Davis to Mr. and Mrs. Leroy,
dated April 21, 2021 ............................................. A-379

Exhibit MM to Weisbord Declaration -
Confidential Investigation Report prepared by
Bethany A. Centrone............................................. A-381

Exhibit NN to Weisbord Declaration -
Letter from John P. Evans to Gordon and Amy
Leroy, dated April 23, 2021 .................................. A-455

Exhibit OO to Weisbord Declaration -
Finding of Fact and Recommendation to the
Superintendent of Schools Livingston Manor
Central School District .......................................... A-458

Exhibit PP to Weisbord Declaration -
Letter from John P. Evans to Gordon and Amy
Leroy, dated April 28, 2021 .................................. A-463

Exhibit QQ to Weisbord Declaration -
Holding of Long-Term Suspension in Abeyance
and Contract of Conduct, signed May 9, 2021 ...... A-466

Affidavit of John Evans, Defendant, in Support of
Motion, sworn to March 24, 2023, filed
June 12, 2023 ........................................................ A-472

Affidavit of Shirlee Davis, for Defendants, in
Support of Motion, sworn to March 24, 2023,
filed June 12, 2023................................................ A-480

vi

                                                                    **Page**

Affidavit of Christian Towsley, for Defendants, in
    Support of Motion, sworn to March 23, 2023,
    filed June 12, 2023 ................................................... A-484

Defendants' Local Rule 56.1 Statement of
    Undisputed Material Facts, dated March 24,
    2023, filed June 12, 2023 ...................................... A-487

Defendants' Response to Plaintiff's Statement of
    Material Facts, dated March 24, 2023 .................. A-515

Declaration of Chelsea Weisbord, for Defendants, in
    Further Support of Motion, dated June 9, 2023,
    filed June 12, 2023 ................................................ A-519

    Exhibit VV to Weisbord Declaration -
    Excerpts from Telephone Conference Transcript,
    dated May 5, 2022 ................................................. A-528

    Exhibit WW to Weisbord Declaration -
    Excerpt from the Livingston Manor Central
    School District's Code of Conduct ....................... A-532

Declaration of Steven C. Stern, for Defendants, in
    Support of Motion, dated June 9, 2023, filed
    June 12, 2023 ......................................................... A-533

Reply Declaration of Jerome T. Dorfman, for
    Plaintiff, in Support of Motion and in Reply to
    Opposition, dated May 19, 2023, filed
    June 12, 2023 (Omitted herein)

    Exhibit 1 to Dorfman Reply Declaration -
    Use of Force Essay by Case Leroy ....................... A-536

Statement of Material Facts, by Plaintiff, filed
    June 23, 2023 ......................................................... A-538

**vii**

|  | **Page** |
|---|---|
| Declaration of Jerome T. Dorfman, for Plaintiff, in Support of his Motion for Summary Judgment, dated January 30, 2023, filed June 23, 2023.......... | A-541 |
| Exhibit 1 to Dorfman Declaration - Amended Verified Complaint, dated July 1, 2021 (Reproduced herein at pp. A-33-A-47) | |
| Notice of Appeal, filed May 3, 2024 ........................ | A-547 |
| Plaintiff's Response to Defendant's Statement of Material Facts, dated May 19, 2023, filed June 3, 2024 ........................................... | A-549 |
| Bench Decision, dated June 25, 2021, filed June 3, 2024 ........................................... | A-584 |

A-297

# EXHIBIT N

A-298

4/20/2021       Livingston Manor Central School Mail - Offensive Content Posted to Snapchat

 Gmail

**Shirlee Davis <shirlee.davis@lmcs.us>**

## Offensive Content Posted to Snapchat
3 messages

To: Shirlee Davis <shirlee.davis@lmcs.us>

Mon, Apr 19, 2021 at 8:52 PM

Good evening Mrs. Davis, I would just like to bring to your attention something that I saw on snapchat that I thought was really inappropriate. I was sent this screenshot from ██ Student A ██'s snapchat story and I was extremely disturbed by it. I find this extra inappropriate because in Global II, a class both Student A and I attend, we were discussing how 316 people have been killed by police since 2021 started, and even more facts about the current policing system. In my opinion, it seems like it's coming from a place of hate when he knows the facts behind police brutality and continues to joke people dying everyday. It makes me extremely uncomfortable that I share a school with people who joke about black American deaths, and I hope that there is some type of castigation. Thank you, and have a good night.



D000032

**A-299**



**Shirlee Davis** <shirlee.davis@lmcs.us>
To: John Evans <john.evans@lmcs.us>

Mon, Apr 19, 2021 at 8:54 PM

This is the 4th student who sent this to me.
[Quoted text hidden]
--
Shirlee Davis

## A-300

High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

---

**Shirlee Davis** <shirlee.davis@lmcs.us>                              Mon, Apr 19, 2021 at 8:57 PM
To:

Thank you for reporting. I will be following up on this tomorrow.

On Mon, Apr 19, 2021 at 8:53 PM                                   wrote:

> Good evening Mrs. Davis, I would just like to bring to your attention something that I saw on snapchat that I thought
> was really inappropriate. I was sent this screenshot from **Student A**'s snapchat story and I was extremely
> disturbed by it. I find this extra inappropriate because in Global II, a class both          and I attend, we were
> discussing how 316 people have been killed by police since 2021 started, and even more facts about the current
> policing system. In my opinion, it seems like it's coming from a place of hate when he knows the facts behind police
> brutality and continues to joke people dying everyday. It makes me extremely uncomfortable that I share a school with
> people who joke about black American deaths, and I hope that there is some type of castigation. Thank you, and have
> a good night.



D000034

A-301



[Quoted text hidden]

A-302

# EXHIBIT O

A-303

 **Gmail**

Shirlee Davis <shirlee.davis@lmcs.us>

## (no subject)
4 messages

Mon, Apr 19, 2021 at 9:04 PM

To: Christian Towsley <christian.towsley@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>

Hello again,

Sorry to bother you this late at night again, people were coming to me to talk about this situation, and it is circulating on snapchat, which means this is offending people from multiple schools. As I was having a conversation with a roscoe student she had sent me this picture which shows **Student D** and **Student E** making a similar joke, and she told me that Case Leroy had posted multiple things like this in the past. Clearly it's offending multiple students from multiple schools and I just thought I should let you know.

Thank you again



D000036

**A-304**



**Shirlee Davis** <shirlee.davis@lmcs.us>                                    Mon, Apr 19, 2021 at 9:05 PM
To:
Cc: Christian Towsley <christian.towsley@lmcs.us>

D000037

A-305

4/20/2021                          Livingston Manor Central School Mail - (no subject)

Thank you for letting us know.
[Quoted text hidden]
--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

████████████████████████                                    Mon, Apr 19, 2021 at 9:05 PM

To: Shirlee Davis <shirlee.davis@lmcs.us>
Cc: Christian Towsley <christian.towsley@lmcs.us>

No problem, thank you!
[Quoted text hidden]

**Shirlee Davis** <shirlee.davis@lmcs.us>                    Tue, Apr 20, 2021 at 8:51 AM
████████████████████████

Thank you for letting us know.

On Mon, Apr 19, 2021 at 9:04 PM ████████████████████████
[Quoted text hidden]

D000038

A-306

# EXHIBIT P

A-307

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Harmful Behavior Should Not Be Ignored
2 messages

████████████████████                                        Mon, Apr 19, 2021 at 9:12 PM
To: Shirlee Davis <shirlee.davis@lmcs.us>

Hello Mrs. Davis. I apologize for emailing you so late in the evening. I unfortunately opened my snapchat after work and saw an atrocious photo taken of two students by the name of Case Leroy and Student A. The photo shows Case lying on the ground with ████'s knee on his neck, with the caption "Cops got another." This photo is very obviously mocking the murder of ████ Floyd, which is absolutely sickening to see by students of Livingston Manor. All POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students in the attached photo. I am a firm believer LMCS is, and should remain, a safe and compassionate place for all of it's students and staff. With that being said, in order to keep that environment, it is in LMCS's best interest overall that the students in the attached photo are punished for absolutely disgusting, disturbing, and heartless actions. They will never understand what it was like for George Floyd's family and loved ones to lose their family member wrongfully at the hands of the law. I beg of you, on behalf of your POC students, and POC everywhere, take action toward this behavior. It is truly despicable. Thank you for taking your time to read my email.
With respect and concern,



D000045

**A-308**



**Shirlee Davis** <shirlee.davis@lmcs.us>
To:

Mon, Apr 19, 2021 at 9:13 PM

Thank you for informing me. I will investigate this in the morning.
[Quoted text hidden]

--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

D000046

A-309

# EXHIBIT Q

**A-310**

 Gmail           John Evans <john.evans@lmcs.us>

## In Response to Recent Photos Posted Online
3 messages

**Stand Against Racism In Education** <nysare2020@gmail.com>      Mon, Apr 19, 2021 at 9:53 PM
To: John Evans <John.Evans@lmcs.us>
Cc: Christopher Hubert <christopher.hubert@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>, Christian Towsley
<christian.towsley@lmcs.us>, Danielle DalCero <danielle.dalcero@lmcs.us>, Lauren Marerro <lauren.marrero@lmcs.us>,
James Buck <james.buck@lmcs.us>, gs1174@gmail.com, gemamberh@aol.com, ameliamartin1996@gmail.com

Good evening,

It has come to our attention that there are students from the Livingston Manor Central School circulating pictures of
themselves openly mocking the death of George Floyd who was a victim of police brutality. This is a disgusting display as
the man who killed him is currently on trial. We have attached the pictures that we have seen. One of them appears to be
a class room. We have potential identifications of the students in the pictures: **Student B**, **Student A, Student D**
and Case Leroy.

We are asking for your full attention to be given to this matter. It is clear from this display that the culture of racism spills
from the home and into school life and you are obligated to address it.

We are asking for a swift and severe punishment. This display is outrageous and disgusting. We are asking for a clear
message from you all that this will not be tolerated by the school.

Signed,
Members of Stand Against Racism in Education

**John Evans** <john.evans@lmcs.us>      Mon, Apr 19, 2021 at 10:07 PM
To: Stand Against Racism In Education <nysare2020@gmail.com>
Cc: Christopher Hubert <christopher.hubert@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>, Christian Towsley
<christian.towsley@lmcs.us>, Danielle DalCero <danielle.dalcero@lmcs.us>, Lauren Marerro <lauren.marrero@lmcs.us>,
James Buck <james.buck@lmcs.us>, gs1174@gmail.com, gemamberh@aol.com, ameliamartin1996@gmail.com

Yes the school district administration is aware of the recent posts on social media.

I can assure you these incidents will be thoroughly investigated and dealt with quickly and appropriately.

Respectfully,
John
[Quoted text hidden]

**Stand Against Racism In Education** <nysare2020@gmail.com>      Mon, Apr 19, 2021 at 10:17 PM
To: John Evans <john.evans@lmcs.us>
Cc: Christopher Hubert <christopher.hubert@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>, Christian Towsley
<christian.towsley@lmcs.us>, Danielle DalCero <danielle.dalcero@lmcs.us>, Lauren Marerro <lauren.marrero@lmcs.us>,
James Buck <james.buck@lmcs.us>, gs1174@gmail.com, gemamberh@aol.com, ameliamartin1996@gmail.com

Hi,

I apologize I will attach, now.

Signed,
Members of SARE
[Quoted text hidden]

D000007

A-311

**2 attachments**



Image 1.jpg
10K



Image 2.jpg
56K

A-312

# EXHIBIT R

A-313

4/20/2021

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Offensive Content
2 messages

████████████  To: Shirlee Davis <shirlee.davis@lmcs.us>

Mon, Apr 19, 2021 at 10:12 PM

Hi Mrs. Davis, Although I never write emails concerning about what happens in the ██████ school especially when it comes to "drama" I think this is a complete different story. As you may know from the picture ████ and Case Leroy have made in my opinion a very inappropriate joke that should not be joked about and as someone who has faced discrimination and racism in their life I find this very disgusting and inappropriate because no matter the intention they still knew what they were doing and even had a smile on their face as they did it. As a person of color who had often felt like I had to watch what I said around certain people in the school because they might act hostile because of their opinions or views even though police brutality is not a political opinion/belief it is something that I feel strongly about and that many other people of color do as well and to see ████ and Case be able to smile and joke about it so freely hurts not only me but many other people as well especially since they will never feel or face the discrimination I have felt and might even face in the future is extremely disheartening to say the least even if they thought it was a "funny joke". The post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people lives and should not be treated as a running joke. I genuinely hope you can see why this picture is extremely disrespectful to a person of color and I hope they have consequences to their actions. Attached below is the picture thank you and i hope you have a good night.



D000039

A-314

A-315

**Shirlee Davis** <shirlee.davis@lmcs.us>                    Mon, Apr 19, 2021 at 10:14 PM

Thank you for reaching out and reporting. I will investigate in the morning.
[Quoted text hidden]
--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

A-316

# EXHIBIT S

A-317

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Case and M████

3 messages

To: Shirlee Davis <shirlee.davis@lmcs.us>

Mon, Apr 19, 2021 at 10:50 PM

Hello ,

So as you may already know there has been things going around about Case LeRoy and **Student A** ████ . I feel strongly disgusted and sick that they have thought to make fun and quote on quote joke about ⎯orge Floyds tragic death ( shown in the pictures below). There were also  another set of students who have also made a  joke" about this type of situation below.  This topic of these two pictures

have been flooding social media and I strongly believe that this is far from okay and that serious matter and actions are need to be taken place. Sorry for emailing you this late but I felt that this needed to be said.

Thank you ,



D000063

A-318





A-320

# EXHIBIT T

A-321

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## the racist photos
2 messages

███████████████████                                              Mon, Apr 19, 2021 at 10:56 PM
To: Shirlee Davis <shirlee.davis@lmcs.us>

youve already been informed i ██████ but i have to put in my 2 cents. this isnt a one off event with case and ▊Student A▊ this
happens frequently along with ▊Student D▊       and now learned with ▊Student B▊    and ▊Student C▊    So far this year ive
totaled close to 20 different incidents with this group making racist "jokes" like this

**Shirlee Davis** <shirlee.davis@lmcs.us>                        Tue, Apr 20, 2021 at 6:25 AM
To: John Evans <john.evans@lmcs.us>

[Quoted text hidden]
--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

D000047

A-322

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

**Proof**
1 message

████ To: Shirlee Davis <shirlee.davis@lmcs.us>

Tue, Apr 20, 2021 at 12:43 AM

One is the picture Student A posted of him and case, the second is of Student D saying he and Student E were there, and the last is a picture of other students in the friend group making the same picture



A-323



D000059

A-324

D000060

# Gem's Post



D000061

A-326



A-327

# EXHIBIT U

**A-328**

 Gmail

John Evans <john.evans@lmcs.us>

## Racist, inappropriate pictures
4 messages

**Payton Powell** ▮▮▮▮▮▮▮▮▮▮▮▮▮                                    Mon, Apr 19, 2021 at 11:09 PM
To: shirlee.davis@lmcs.us, john.evans@lmcs.us

Hello,
I hope this email finds you well.

I'm a former RCS alumni, and I came across these horrible and unacceptable pictures across many social media platforms. Both of these pictures are very clearly mocking the death of George Floyd, and the Black Lives Matter Movement. As someone who is a part of this community, and has dedicated time and effort in supporting this community, this type of behavior is absolutely unacceptable and quite frankly, disgusting. The people of color who attend schools in this county should feel accepted and safe. These kids have made it public that they are condoning police brutality and racism. Making it public, like they have, is absolutely appalling.

Many former and current students of both Roscoe Central School, and Livingston Manor have come forward exclaiming that they have experienced prejudice in both schools from students to faculty. One of these pictures below happened today, April 19th, 2021. This is inhumane and deeply saddens me. I am not a member of the black community, nor am I coming to you speaking on behalf of them. I'm coming to you solely based on the fact that times have changed and this behavior is unacceptable.

It looks as though one of these pictures was taken in a Livingston Manor classroom. I have a Livingstong Manor Alumni, Gem Helper saying that one of these pictures were taken inside the school. That picture is the one with the boy in the red shirt. The picture posted today was the one with student Case Leroy and I am unaware of who the other boy is. My family is horrified seeing this type of behavior go unnoticed, and condoned. My brother plays football with Case Leroy and was sickened by these photos. The first picture, with the kid in the red shirt was posted quite a while ago, and nothing was done about it. This email is not to cast any blame on any of the faculty, but to bring awareness to this type of behavior. Again, the picture with Case Leroy was posted today, April 19th, 2021. This disgusts me, in so many ways, and is absolutely unacceptable. Many people are aware of this and it is circulating through facebook. I really do hope there is some consideration in recognizing this, and something being done. Any child attending our schools in Sullivan County should feel safe, and accepted. Unfortunately, this is not the case for Livingston Manor from what I have seen. This type of behavior that is being swept under the rug, is hateful. I do hope that I shed some light on a very serious issue in schools around this county. Communities like this should spread positivity and acceptance, and lately... that is anything but true.

I do understand you only have so much control over students attending your schools. I respect and appreciate your time and commitment you devote. I hope moving forward things will only get better, and these issues will not surface again. Thank you for your time, and I hope you both have a great night.

D000009

A-329



**John Evans** <john.evans@lmcs.us>      Mon, Apr 19, 2021 at 11:24 PM
To: Payton Powell
Cc: Shirlee Davis <shirlee.davis@lmcs.us>, Janice Phillips <jphillips@roscoe.k12.ny.us>, Robin Francisco
<rfrancisco@roscoe.k12.ny.us>

Payton,

Thank you for your email and sharing your concerns. The LMCS administration was just made aware of both of these posts earlier this evening and an investigation is currently underway.

These incidents will be dealt with promptly and appropriately and all those involved will be held accountable.

Both the LMCS & RCS administrations take matters like this very seriously. The health, safety and wellbeing of all of our students is very important to us and racist behaviour has no place in our schools.

Respectfully,
John Evans

[Quoted text hidden]

--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758
(845) 439-4400 x1204

**Payton Powell**      Mon, Apr 19, 2021 at 11:26 PM
To: John Evans <john.evans@lmcs.us>

D000010

A-330

7/22/2021     Case 7:21-cv-06008-NSR-AEK Document 64-21 Filed 06/12/23 Page 4 of 4

Great, thank you. Have a great rest of your night, and sorry for the late email!

[Quoted text hidden]

**John Evans** <john.evans@lmcs.us>                  Mon, Apr 19, 2021 at 11:29 PM
To: Payton Powell

No worries have a great night.

[Quoted text hidden]

A-331

# EXHIBIT V

**A-332**

 Gmail                                    John Evans <john.evans@lmcs.us>

## Concern
3 messages

**Courtney Lambert** █████████████████████    Mon, Apr 19, 2021 at 11:44 PM
To: "john.evans@lmcs.us" <john.evans@lmcs.us>, "shirlee.davis@lmcs.us" <shirlee.davis@lmcs.us>

Hello,
 I am writing this email as a parent of a 5th grade student at LMCS. As I was scrolling through social media last night I stumbled across some disturbing pictures. I will say that I understand that you cannot control what students do outside of school. However the imagines that are being posted one of them is in a classroom setting. The world we are living in is quite scary. To say I'm scared to send my daughter to school with the world we live in is a understatement. I chose my daughter to go to LMCS for its small town, close knit community. As everybody in the world is watching the trial of George Floyd I think this is a sensitive matter. One thing that should not be mocked, laughed at or even joke about is the death that occurred of George Floyd. Students that are in your high school are posting pictures mocking George Floyd. Alarming to say the least. This is not a joking matter and I hope that some serious action is taken against these students. I have attached the pictures as I'm sure I'm not the first email to send. To mock somebody's death, post racist jokes are completely unacceptable and I do not believe that LMCS would tolerate that. I ask you as a concerned 5th grade students mother that some action be taken. Thank you in advance for reading my email and I look forward to a reply back. Thank you.

Courtney Lambert (parent of Kara McGrath 5th grade)



A-333



## Juliette's Post



D000013

7/22/2021     Case 7:21-cv-06008-NSR-AEK   Document 64-22   Filed 06/12/23   Page 4 of 6



A-335

# Juliette's Post



**A-336**



**John Evans** <john.evans@lmcs.us>                                         Tue, Apr 20, 2021 at 6:46 AM
To: Courtney Lambert
Cc: Shirlee Davis <shirlee.davis@lmcs.us>

Ms. Lambert,

Yes we are aware of the recent posts on social media involving what appears to be some LMCS students.

The administration is currently investigating the incident and will be addressing any and all students who may be involved.

This type of behavior is completely unacceptable and inappropriate in any setting and will be addressed.

Thank you for sharing your concerns.

Respectfully,
John Evans
[Quoted text hidden]

**Courtney Lambert**                                                        Tue, Apr 20, 2021 at 6:55 AM
To: John Evans <john.evans@lmcs.us>

Mr. Evans,
I appreciate the response. Thank you for looking into this. Racism is not ok in any setting and I hope the boys are held fully accountable for their actions. Have a great day.

Courtney Lambert
[Quoted text hidden]

A-337

# EXHIBIT W

A-338

4/20/2021     Case 7:21-cv-06008-NSR-AEK    Livingston Manor Central School Mail - Incident    Document 64-23    Filed 06/12/23    Page 2 of 3

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Incident
2 messages

**Jaspreet Gill**                                                                        Mon, Apr 19, 2021 at 11:44 PM
To: shirlee.davis@lmcs.us, john.evans@lmcs.us

Shirlee and John,

I'm writing this to you as a former LMCS student. I'm sure you've already received several emails about this, but I want to bring it to your attention that there are screenshots posted on Facebook of students who allegedly attend your high school taking part in disgusting, racist behavior. I'm sure we can all suspect this isn't an isolated incident.

I've attached screenshots of the FB post in this email if you haven't already seen them.

I know far too well the rampant racism that runs through Livingston Manor and that does not stop when you enter LMCS. When I was a student, no one was reprimanded for their racist insults and racial microaggressions toward me. I still remember it eight years later.

As leaders of LMCS, I ask you not to let this behavior continue and hold those students, if they do attend your high school, accountable. Do not let your students of color down as my teachers and peers did.

I look forward to hearing your thoughts.

### Jaspreet Gill
Associate Editor, *Inside Defense*
Inside Washington Publishers
Twitter:
c:
e:

**3 attachments**

 **IMG_5878.jpg**
122K

 **IMG_5879.jpg**
188K

**IMG_5880.jpeg**

D000048

**A-339**

249K



**Shirlee Davis** <shirlee.davis@lmcs.us>                      Tue, Apr 20, 2021 at 6:24 AM
To:

Thank you for contacting me. The incident is being investigated.
[Quoted text hidden]
--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

D000049

A-340

# EXHIBIT X

**A-341**

 Gmail

John Evans <john.evans@lmcs.us>

## Fwd:
1 message

Meagan Edwards <meagan.edwards@lmcs.us>       Tue, Apr 20, 2021 at 7:33 AM
To: John Evans <john.evans@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>

Good morning,

I know you're already aware of this incident, but I wanted you both to have this info as well. I'm not sure who Balvina Garcia is. I wanted to check with you both before I reply to make sure it is okay to let them know that we got the info.

Thanks,

Meagan

---------- Forwarded message ----------
From: **Balvina Garcia** ▉▉▉
Date: Tue, Apr 20, 2021 at 12:15 AM
Subject:
To: meagan.edwards@lmcs.us <meagan.edwards@lmcs.us>

Hello! I am emailing you tonight to let you know that two boys attending Livingston Manor High School made a post that is very concerning and very offensive. As you may know, last summer a man named George Floyd was murdered by police when they kneeled on his neck and suffocated him, in a brutal act of racism. He begged them to stop, and repeated that he couldn't breathe, while the police man ignored him. He became the face of the black lives matter movement. Two students, one by the name of Case Leroy and the other named ▉Student A▉ made an incredible offensive post in mockery of that tragic event and that is completely unacceptable I've attached the post to this email.



A-342



The boy kneeling is **Student A** and the boy laying down is Case Leroy. This is unacceptable on every level that exists, and this kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism. I hope you choose to take action and to confront them about their actions because that kind of behavior should not be tolerated and should be condemned.

--
Meagan Edwards
School Counselor K-12
Livingston Manor Central School District
(845) 439 - 4400 ext. 3119
meagan.edwards@lmcs.us

A-343

# EXHIBIT Y

A-344

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Disturbing photo
1 message

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇                                Tue, Apr 20, 2021 at 7:54 AM
To: Shirlee Davis <shirlee.davis@lmcs.us>

Good morning Mrs.Davis, I'm sure this has been sent to you already but I found the photo of ▇Student A▇▇ and Case
LeRoy mocking George Floyd's death very disturbing. I don't feel comfortable being around classmates who happily make
light of murder.


Screenshot_20210420-072647_Snapchat.jpg
279K

D000071

A-345

# EXHIBIT Z

A-346

 Gmail

John Evans <john.evans@lmcs.us>

## Concerns
1 message

Hannah Tuso ▇▇▇▇▇▇▇▇▇▇▇▇▇▇                                Tue, Apr 20, 2021 at 7:55 AM
To: Christian Towsley <christian.towsley@lmcs.us>, John Evans <john.evans@lmcs.us>, Shirlee Davis
<shirlee.davis@lmcs.us>

Good morning! I hope this email finds all of you well.

It's been brought to my attention, and the attention of almost everyone in Sullivan and Orange County that Case Leroy, Student A, Student D, Student E ▇▇▇▇▇▇▇▇▇▇▇ have been caught making several jokes fueled by the death of a black man, one of these incidents quite clearly being in the school setting.

I'm sure you've all been made aware, and I appreciate your time in reading this so that I can adequately express my deep level of concern and fear for our school.

I know the history that our town has as a Sundown town. I am well aware of the legacy Livingston Manor has left as being intolerant and discriminatory toward minorities. I really hope that you all can find a way to act on this matter that facilitates growth and inclusivity; the people of color that attend our school deserve better than to see the blatant disregard for their lives being mocked on social media. Black people being killed by the police will never be a joke, and it seems as through Case, Student A, Student D, and Student E have forgotten that.

As someone with a dead father, these posts did affect me very deeply. The dead people that these boys are mocking had a family. They were human beings, with hopes and dreams and passions. They didn't get to achieve all they had planned, and now their unjust death is being joked about by your students.

I strongly urge you to make our counselors available for anyone that may need them after seeing these posts. I hope that appropriate action is taken to demonstrate our school's dedication to inclusivity and overcoming our history of discrimination.

Thank you for your time.
Hannah Tuso
--
Hannah Tuso

D000019

A-347

# EXHIBIT AA

**A-348**

 Gmail

John Evans <john.evans@lmcs.us>

## Student Behavior / Online Misconduct

3 messages

**Grady Parks** ▉▉▉▉▉▉▉▉▉▉                                    Tue, Apr 20, 2021 at 8:43 AM
To: John.Evans@lmcs.us

Hello!

I come to you with this email about two of your current students, Case LeRoy, and, **Student A** ▉▉. In the photos attached below, you can see the two men reenacting the scene in which George Floyd was brutally murdered by the police. This act is absolutely DISGUSTING, and must have some sort of disciplinary action taken at once. What is shown in this photo not only creates a bad look for them and their families, but also for their community as well. As a white person who currently resides in Livingston Manor this photo makes me feel extremely uncomfortable, but think for a second about the BIPOC (Black and Indigenous People Of Color) community and the trauma that this brings up and how unsafe many of them may feel seeing this photo, this is NOT okay and many people have expressed how unsafe they may feel in their OWN COMMUNITIES due to active displays of racism like this. I hope you take the time as superintendent to read this email and think and reflect upon how seriously things like this effect the daily lives of POC. I'm not sure what you can do to address this but we must not forget that this is not just limited to these two men, many in rural area such as Livingston Manor, are extremely racist but do not display it so openly on social media / in public, so not only should measures be taken to punish Case and **Student A** but to also speak to the White population in your school district as well. I hope this email finds you in good health and safety among this very uncertain time, and I hope that you, once again, reflect upon this email. Have a great day!

Thank you,
    Grady Parks

**A-349**



John Evans <john.evans@lmcs.us>                                          Tue, Apr 20, 2021 at 9:13 AM
To: Grady Parks
Cc: Shirlee Davis <shirlee.davis@lmcs.us>

Grady,

Thank you for your email and sharing your thoughts and concerns with me. The District is aware of the social media posts and is actively involved in investigating the incidents and addressing it with the students involved.

As a school district we take these matters very seriously. These behaviours have no place in our school and as a district, we are taking steps to address this important issue throughout our school community.

Thank you,
John Evans
[Quoted text hidden]
--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758

D000021

**A-350**

(845) 439-4400 x1204

---

**Grady Parks** ▮▮▮▮▮▮▮▮▮▮▮                                    Tue, Apr 20, 2021 at 10:57 AM
To: John Evans <john.evans@lmcs.us>

John,

Thank you for responding, I'm glad to hear you're taking action against the two students involved in the incident. Much faith is being put into you and the administration to take the correct line of action, and to create a safer environment for all. It is very reassuring to hear that such matters are actively discouraged and taken care of.
Once again, I'd like to thank you for responding. Have a great day and stay safe.

From,
Grady Parks
[Quoted text hidden]

D000022

A-351

# EXHIBIT BB

**A-352**

 Gmail

John Evans <john.evans@lmcs.us>

## Case Leroy, Student A +more Racist Posts
2 messages

**Sophia Xiomara** _____                                              Tue, Apr 20, 2021 at 12:32 PM
To: "john.evans@lmcs.us" <john.evans@lmcs.us>, "shirlee.davis@lmcs.us" <shirlee.davis@lmcs.us>

Hello,

I recently came across photos of some of your students posing in a way that is very disrespectful to the BIPOC+ community and quite frankly should be disrespectful to all of us. Acting in a way that picks fun at a murder of another human being is not a joke and cannot be brushed aside. Racist and hateful behavior cannot and will not be tolerated in our community. Our youth are the future of this country and it is up to their teachers and mentors to show them what is right and what is not. The Livingston Manor School district needs to hold these students accountable and create policies that no longer condone any racist/hateful behavior from its students or community members.

The world is watching. Take action now.

Thank you for your time.

--
Sophia Medina
My pronouns are She, Her, Hers.

**John Evans** <john.evans@lmcs.us>                                              Tue, Apr 20, 2021 at 12:41 PM
To: Sophia Xiomara _____
Cc: "shirlee.davis@lmcs.us" <shirlee.davis@lmcs.us>

Sophia,

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]

--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758
(845) 439-4400 x1204

A-353

# EXHIBIT CC

**A-354**

 Gmail

John Evans <john.evans@lmcs.us>

## Case Leroy, Student A , +more Racist Posts
2 messages

**Williams, Mykenzi**                                                Tue, Apr 20, 2021 at 12:42 PM
To: "john.evans@lmcs.us" <john.evans@lmcs.us>

Hello,

I recently came across photos of some of your students posing in a way that is very disrespectful to the BIPOC+ community and quite frankly should be disrespectful to all of us. Acting in a way that picks fun at a murder of another human being is not a joke and cannot be brushed aside. Racist and hateful behavior cannot and will not be tolerated in our community. Our youth are the future of this country and it is up to their teachers and mentors to show them what is right and what is not. The Livingston Manor School district needs to hold these students accountable and create policies that no longer condone any racist/hateful behavior from its students or community members.

The world is watching. Take action now.

Thank you for your time.

**John Evans** <john.evans@lmcs.us>                                  Tue, Apr 20, 2021 at 12:43 PM
To: "Williams, Mykenzi" <

Mykenzi,

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]

--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758
(845) 439-4400 x1204

D000024

A-355

# EXHIBIT DD

**A-356**

 Gmail

John Evans <john.evans@lmcs.us>

## Case Leory, Student A ▓▓▓ , +more Racist Posts
2 messages

**Dylan Parks** ▓▓▓▓▓▓▓▓                                                    Tue, Apr 20, 2021 at 1:20 PM
To: john.evans@lmcs.us, shirlee.davis@lmcs.us, danielle.dalcero@lmcs.us, jane.mann@lmcs.us, christian.towsley@lmcs.us

Hi,

It has come to my attention that two students, who are members of your school's basketball team (or was) both participated in a "joke". That joke being reinacting the murder of Geroge Floyd at the hands of Derek Chauvin. This type of behavior is repulsive, abhorrent and nauseating. Making fun of a man who died due to a cop is simply unacceptable. This behavior is not new and shocking for residents of Sullivan County, but that doesn't make it unacceptable. In my opinion and many others, however valuable it is, both of these boys should be held accountable immediately. If not, it would send a message to the entire county that this type of racist, white-supremacist behavior is okay. It is not okay. The pictures have spread across social media and there are boys from your school, presumably friends of theirs, who are saying that people are "butthurt" or "it was just a joke". Since when was racism and making fun of a Geroge Floyd a joke? I have contacted the NAACP about this and am reaching out to the director of Health and Human Services for the County. Please hold them accountable.

(I have sent this email to the Principal, Superintendent, both Guidance Counselors and the Superintendent Secretary)



A-357



D000026

A-358



A-359



**A-360**

7/22/2021    Case 7:21-cv-06008-NSR-AEK Central Document 64-30, f... 0 07/22/20 ore Page 6 of 7



--
**My best regards,**
**Dylan Parks**

- **Dylan P. Parks**
- My phone: **+1 (845) 701-0278**
- He/him

**John Evans** <john.evans@lmcs.us>                                           Tue, Apr 20, 2021 at 1:52 PM
To: Dylan Parks
Cc: Shirlee Davis <shirlee.davis@lmcs.us>, Danielle DalCero <danielle.dalcero@lmcs.us>, Jane Mann
<jane.mann@lmcs.us>, Christian Towsley <christian.towsley@lmcs.us>

Dylan,

The school district administration is aware of these posts and an active investigation into these events is currently taking
place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the
part of the school district cannot be discussed.

I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken.

D000029

A-361

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]
--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758
(845) 439-4400 x1204

A-362

# EXHIBIT EE

**A-363**

 Gmail

John Evans <john.evans@lmcs.us>

## Case Leroy, ██████ ██████ (Racist Post)
2 messages

**Maritza Joya** ██████████ ██████████                                    Tue, Apr 20, 2021 at 1:40 PM
To: "john.evans@lmcs.us" <john.evans@lmcs.us>, "shirlee.davis@lmcs.us" <shirlee.davis@lmcs.us>

Hello,

I came across disturbing photos of some of your students mocking/ posing in a way that is very disrespectful to the BIPOC + community and should be to you as well. Acting in a way that picks fun at a murder of another human is not okay. This act is racist and hateful in every type of way. This can not be tolerated with in our community. You people as a district need to hold your students accountable for their actions. I truly hope that you will do right and hold them accountable for their behavior.

This community is depending on you to make this right.

Thank you for your time.

**John Evans** <john.evans@lmcs.us>                                       Tue, Apr 20, 2021 at 1:52 PM
To: Maritza Joya ████████████████████
Cc: "shirlee.davis@lmcs.us" <shirlee.davis@lmcs.us>

Maritza,

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]

--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758
(845) 439-4400 x1204

A-364

# EXHIBIT FF



**A-365**

7/14/2021    Case 7:21-cv-06008-NSR-AEK Central School Mail - Abhorrent Behavior By Your Students    Page 2 of 2

# Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Abhorrent Behavior By Your Students

2 messages

**kelsie nolan** █████████████    Tue, Apr 20, 2021 at 9:52 PM
To: shirlee.davis@lmcs.us, john.evans@lmcs.us

I am ashamed and embarrassed to have any association with a town where people are allowed to behave in such a way as displayed online. If they are willing to post such egregious, horrifying, racist things online, I can only imagine what is said in private and even in school amongst friends. I have heard several reports of people saying these particular three kids have a pattern of saying antisemitic, homophobic, and obviously racist things.

More importantly though, is this really the caliber of people that you are comfortable with producing? I have heard that when confronted with racism on campus, several people have been told "some people just have a difference of beliefs". Racism and a lack of humanity is NOT a difference of beliefs. These 3 students are displaying sociopathic tendencies mixed with classic small town racism veiled as ignorance. It is clear you all on the administrative level are not doing enough to prevent racism and the intense level of moronic behavior displayed here. If this is a repeated problem that is being handled by shunning kids reporting it, you all are failing in shaping the next generation. It is lazy and unethical to continue to allow these students to bully, harass, and demean other students. God help the world if these 3 even dream of working in law enforcement.

I'd hope to see 3 things: swift, severe action against these students. An anti-racism education for all students and faculty. And a plan as to how to properly punish and re-educate students who display racist, homophobic, or anti-Semitic rhetoric or action in the future. I hope you side with the outcome that is best for ALL of your students, not just the white, Christian ones.

**John Evans** <john.evans@lmcs.us>    Tue, Apr 20, 2021 at 10:42 PM
To: kelsie nolan ████████████
Cc: Shirlee Davis <shirlee.davis@lmcs.us>

Kelsie,

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident and any others like it, very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]

D000075

A-366



# EXHIBIT GG

A-367

 Gmail

Shirlee Davis <shirlee.davis@lmcs.us>

## Disturbing Photos

2 messages

**Catherine Skalda**                                    Tue, Apr 20, 2021 at 11:24 PM
To: Christian Towsley <Christian.Towsley@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>, john.evans@lmcs.us

Mr. Evans, Mrs. Davis, Christian Towsley,

You may have heard this from others, but I have to voice my concern over seeing the photos taken by a group of LMCS students (and tagging others who apparently participated) being shared within our own LMCS student community about the Black Live Matter movement and the George Floyd killing by police. These photos were brought to my attention yesterday (Monday) and I cannot say how much they startled and disappointed me, especially after learning that this was done by students from Livingston Manor. Livingston Manor, although small, is a community of many cultures and backgrounds and every person should be respected for those differences, not ridiculed or derided or made to be afraid of safely walking down our own streets.

It is extremely upsetting and disappointing to see that the lack of respect for human lives so close to home. I hope that the school will address this in an appropriate manner.

Thank you for your concern,

Catherine Skalda

**John Evans** <john.evans@lmcs.us>                            Tue, Apr 20, 2021 at 11:32 PM
To: Catherine Skalda
Cc: Christian Towsley <Christian.Towsley@lmcs.us>, Shirlee Davis <shirlee.davis@lmcs.us>

Catherine,

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident and any others like it, very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
John Evans
[Quoted text hidden]

D000076

A-368

# EXHIBIT HH

**A-369**

7/14/2021      Livingston Manor Central School Mail - Disturbing behavior from your students

 Gmail              Shirlee Davis <shirlee.davis@lmcs.us>

## Disturbing behavior from your students

2 messages

**Elena Haskins**                      Wed, Apr 21, 2021 at 10:13 AM
To: john.evans@lmcs.us, shirlee.davis@lmcs.us

Hi Superintendent Evans and Principal Davis,
I saw the images circulating of your students Casey Leroy, Student A   and Student D   being extremely disrespectful and mocking a devastating and racist murder. It is very scary how young this starts. This behavior is alarming and makes me feel unsafe as a citizen that your school is training people. I wanted to voice my concern and frustration.

## Elena Haskins

*UX Designer*

**Shirlee Davis <shirlee.davis@lmcs.us>**           Wed, Apr 21, 2021 at 10:33 AM
To: Elena Haskins

Ms. Haskins:

The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed.

I can assure you that the school district is taking this incident and any others like it, very seriously and appropriate actions will be taken.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community.

Respectfully,
Shirlee Davis
[Quoted text hidden]

--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext.1207
shirlee.davis@lmcs.us

D000050

**A-370**

7/14/2021    Case 7:21-cv-06008-NSR-AEK    Document 64-34    Filed 03/12/23    Page 3 of 4



A-371



D000052

A-372

# EXHIBIT II

**A-373**

 Gmail

John Evans <john.evans@lmcs.us>

## Student behavior concerns
2 messages

**Jay Quaintance** <jquaintance@sunysullivan.edu>                                    Tue, Apr 20, 2021 at 3:11 PM
To: John Evans <john.evans@lmcs.us>, Robert Dufour <robert.dufour@scboces.org>

Hi John and Bob,

I am sure you have both seen the pictures on FB of LMCS/BOCES students ree███ing the George Floyd incident.  From what I gather the students' names are Case Leroy, ███████ and ███████.

I'd like to know if they have been on our campus and what the consequences they are facing for this disgusting display of hate.  Happy to talk any time.

Thanks,
Jay

**Jay Quaintance**
**President**
SUNY Sullivan
112 College Road
Loch Sheldrake, NY 12759
845-434-5750 x 4261

Learn something new today!



**John Evans** <john.evans@lmcs.us>                                                Tue, Apr 20, 2021 at 3:38 PM
To: Jay Quaintance <jquaintance@sunysullivan.edu>
Cc: Robert Dufour <robert.dufour@scboces.org>

Jay,


Yes Bob and I are aware of the photos and the incidents are currently being investigated. What I can tell you is that the photos were taken over a month apart and the context in which they occurred are very different.

These issues are being taken very seriously and appropriate actions will be taken with those involved.

Thank you,

John

[Quoted text hidden]
--
John Evans, Superintendent
Livingston Manor Central School District
19 School Street
Livingston Manor, NY 12758

D000077

A-374

7/22/2021

(845) 439-4400 x1204

D000078

A-375

# EXHIBIT J J

A-376

# Livingston Manor Central School District

### John P. Evans, Superintendent
P.O. Box 947 • 19 School Street
Livingston Manor, NY  12758

BOARD OF EDUCATION
Elliott Madison, President
James Buck, Vice President
Frank Adamse
Dawn D'Auria
Jason Gorr
Jane Mann, District Clerk

April 20, 2021

Dear Livingston Manor School Community:

The purpose of this letter is to acknowledge an incident that had occurred involving several LMCS students and the posting of some inappropriate photos and comments on social media.

LMCS takes matters like this very seriously and immediately after becoming aware of these posts, the school district administration initiated an investigation into this matter. The investigation is ongoing at this time.

All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot and will not be discussed.

On behalf of the Livingston Manor Central School District I apologize for this inappropriate student behaviour.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the entire school community.

Respectfully,

John P. Evans, Superintendent

Phone (845) 439-4400 • Main Office Ext. 1201 • Fax (845) 439-4717 • Website: http://lmcs.k12.ny.us
• HS/MS Office Ext. 1207 • Elementary Office Ext. 1200 • Special Svc Ext. 1203 • Guidance Ext. 1213

D000090

A-377



# EXHIBIT KK

A-378

**Script for LMCS Superintendent Secretary:**

We are aware of the situation and released a statement about it yesterday morning. Because the matter is under investigation, we will have no further comment at this time in order to protect our students' confidentiality and due process. Please refer to the statement, which is available on our website. I can also email it to you.

**Script for Superintendent Secretaries in Shared Districts:**

We are aware of the situation involving Livingston Manor students. The district released a statement about it yesterday morning. Because the matter is under investigation, we will have no further comment at this time in order to protect our students' confidentiality and due process. Please refer to the statement, which is available on our website. I can also email it to you.

D000212

A-379

# EXHIBIT LL

A-380

# LIVINGSTON MANOR CENTRAL SCHOOL

April 21, 2021

Mr. and Mrs. LeRoy
P.O. Box 193
Livingston Manor, NY  12758

Dear Mr. and Mrs. LeRoy:

I regret to inform you that I have found it necessary to propose a suspension of your son, Case LeRoy from school for five days. The circumstances leading to this proposed suspension are as follows: on or about Monday evening, April 19, 2021, your son posted racially offensive material on social media, which has resulted in a substantial disruption to the school environment.

In view of the potential serious nature of this misconduct, I have also referred this matter to the Superintendent of Schools to determine whether a hearing should be scheduled for consideration of an additional suspension in excess of five days.

You and your child were informed of the reasons for this proposed suspension during a conversation with the Superintendent on April 20, 2021. You also have the right to have an informal conference with me to discuss the incident(s) described above and to present your and/or your child's position on the incident(s) before the suspension is imposed. At this conference you also have the right to ask questions of complaining witnesses.

If you wish to have an informal conference, you must call me at the school office at 845-439-4400 x1207 by no later than end of school day on, Thursday, April 22nd to schedule the conference. If the office does not receive a telephone call from you and schedule a conference by that time the proposed suspension of your child will be imposed.

Sincerely,

Shirlee Davis
Middle/High School Principal

P.O. Box 947  ♦ Livingston Manor, NY 12758
Phone (845) 439-4400 ♦ Elementary Office Ext. 1205 ♦ High School Office Ext. 1207
Guidance Office Ext. 1213 ♦ Special Services Ext. 1203 ♦ Fax (845) 439-4717 ♦ http://lmcs.k12.ny.us

D000089

A-381

# EXHIBIT MM

A-382

# Confidential Investigation Report

Investigator:    Bethany A. Centrone, Legal Counsel
Capital Region BOCES

D000111

A-383

### Background Summary

On April 21, 2021, the Superintendent of the Livingston Manor Central School District, John Evans, contacted Capital Region BOCES District Superintendent, Anita Murphy, seeking assistant with regards to a social media incident occurring the evening of April 19, 2021 and April 20, 2021.  This investigator was asked to investigate and provide a report regarding the incident to inform Mr. Evans's with regards to potential discipline.

### Procedural History

Interviews Conducted:

| Witness | Interviewer(s) | Date(s) of Interview |
|---|---|---|
| John Evans, Superintendent | Bethany Centrone | April 21 and 22, 2021 |
| Student F ▮ student | Bethany Centrone | April 22, 2021 |
| Student G ▮ student | Bethany Centrone | April 22, 2021 |
| Gordon Leroy, parent | Bethany Centrone | April 22, 2021 |
| Case Leroy, student accused ("C.L.") | John Evans Shirlee Davis, Principal | April 20, 2021 |
| Student A ▮ student accused ( ▮ ) | John Evans Shirlee Davis, Principal | April 20, 2021 |
| Student B ▮ student accused ▮ ) | John Evans Shirlee Davis, Principal | April 20, 2021 |
| Student D ▮ student accused ▮ ) | John Evans Shirlee Davis, Principal | April 20, 2021 |
| Student E ▮ student accused ▮ ) | John Evans Shirlee Davis, Principal | April 20, 2021 |

### Evidence identified:

- April 19, 2021 posts depicting C.L. and ▮A▮ ., Attachments A and B

Page 2 of 8

**A-384**

- March 25, 2021 post depicting ███ . and ██ Attachment C

- Facebook posts by students Attachment D

- Hudson Valley News clip - https://hudsonvalley.news12.com/4-sullivan-county-hs-students-face-disciplinary-action-for-photos-that-mock-george-floyds-death

- Interview summaries of C.L., Students A,D,E., Attachment E

- Livingston Manor CSD Student Code of Conduct, Attachment F

### Interviews

John Evans

This investigator first spoke with Superintendent Evans at approximately noon on April 21, 2021.  Mr. Evans explained that, the evening of April 19, 2021, racially offensive pictures had been posted on social media (Snap Chat); he and the high school principal had interviewed the students, with a parent/guardian, who appeared in them and allegedly originally posted them to social media.  Mr. Evans expressed that addressing the posts had been all consuming and that he had to work to ward of a student protest against the posts.  Superintendent Evans forwarded copies of the postings and requested that we conduct additional investigation of the incident.

In addition, Superintendent Evans requested investigation of allegations against a teacher making inappropriate comments about C.L. and his girlfriend, which arose due to gossip about the social media postings.

On April 22, 2021, this investigator met with Superintendent Evans on the Livingston Manor CSD campus.  He identified the students in the social media postings as ██ (Attachment A/B student kneeling) and C.L. (Attachment A/B student on ground).  Upon questioning, Mr. Evans stated that ██ was a new student to Livingston Manor this school year.  Mr. Evans also advised that ██ lived with a guardian after his mother passed away.  C.L. has been a student at Livingston Manor since kindergarten.

D000113

A-385

During our conversation, Mr. Evans explained that he spoke with students ▨ C.L. and ▨ the prior day with the building principal and their parent(s) or guardian. The students separately and consistently responded to questions about the posts.

> ▨ and C.L. drove behind a friend who was picking up his sister in another out of town "for something to do." When they arrived at the location, the friend mentioned that there was a noise coming from the front of his car and then went inside to get his sister.

> C.L. went to the front of the friend's car to see if he could identify the problem, placing him on the ground. ▨. then took the opportunity to kneel down as if he was kneeling of C.L.'s neck. ▨. took a picture of the scene. (The students' statements were inconsistent with regards to how ▨. came to take the picture, with C.L. alleging that ▨. "just took it" himself and ▨. stating that the other two students asked him to. M.M. did not admit to asking ▨ to take the picture, but stated he could not remember who asked ▨ to take it, verifying ▨.'s account that he did initiate taking the photo.)

> C.L. and ▨. asked ▨ to send them the photo, which ▨ did. C.L. posted the photo with the caption "another one down." ▨ shared the post. ▨. added a "black lives matter" symbol to the photo and then reposted it. The student's claim that they received negative reactions and took the posts down quickly. They claim that the posts were up no more than 7 minutes.

Mr. Evans identified the students in Attachment C as ▨. (standing) and ▨. (sitting). Mr. Evans stated that when he interviewed ▨. and ▨. the students consistently reported that C.J. asked ▨., who is in the public safety CTE program, to demonstrate a "hold" that was recently taught in class. When ▨. was demonstrating the hold, C.L. took a picture without their consent or knowledge. C.L. then captioned and posted the picture. When ▨ and ▨. saw the post, they demanded that C.L. delete it, which C.L. did. Mr. Evans stated that, when he questioned C.L. about the photo of ▨. and ▨ C.L. confirmed that the other students were not responsible for the photo or its posting. This picture and post were not recent.

A-386

Today, Mr. Evans contacted me to advise that additional information has surfaced with regards to the photo of ▮ and ▮ Therefore, no findings will be made with regards to ▮ and C.J. until these additional allegations are fully investigated.

Student ▮

This investigator interviewed ▮, who reported her concerns about the posts to the administration. ▮ stated that she originally saw the post of C.L. and ▮ on Snap Chat when she came home from work on April 19, 2021, at around 8:00 or so. ▮ stated that a friend had sent her the photo of ▮ and ▮ previously and she, ▮ decided to post them together to condemn the photos. While speaking with this investigator, ▮ found the date that she received the photo of ▮ and ▮ March 25, 2021, in her messages.

In response to questioning, ▮ stated that the text messages she posted on Facebook were sent to her by a friend and were between "friend of the friend," and C.L. ▮ stated was not sure who that person was, but could confirm that the phone number in the texts was that of C.L.

When asked, ▮ was able to recall two other incidents involving C.L. that she believed were discriminatory. She stated that, when discussing current events in economics class, C.L. was disrespectful to LGBTQ issues. She stated that she has heard C.L. use slurs, but stated that she did not hear him direct them to anyone. She also stated that she is not around C.L. and ▮ enough to know whether it is common for them to use slurs. She stated that, at one point, C.L. posted a photo of a Confederate flag on Snap Chat, saying he wanted to paint his car that way, and she commented that it was racist. She then blocked C.L. after he negatively responded to her comment about the flag post.

Student ▮

This investigator interviewed ▮ with respect to a separate incident. During the interview, H.W. volunteered information that was relevant to this matter. ▮ stated that since April 19, 2021, when the posts were uploaded, "everyone has been talking about it." She stated that during a study hall on April 20, 2021, students in the class

A-387

were discussing the posts and the students so much that it was interfering with her abilily lo do work.

█████ stated that she is best friends with C.L.'s girlfriend, █████ ███ stated that █████ has felt ostracized and has been the subject of "looks" and "whispers" since the posts went viral. █████ stated that students have been blaming █████ for C.L.'s conduct and that █████ has been dragged into the situation because of her association with him. █████ stated that █████ has stayed close to her and another friend since the posts were made because she is afraid of being confronted.

<u>Gordon Leroy</u>

Mr. Leroy contacted Superintendent Evans on April 21, 2021 stating that he had information to provide regarding his son. While this investigator was present at the District, Mr. Leroy was contacted and asked if he wanted to speak with me. Mr. Leroy came to the school shortly thereafter.

Mr. Leroy stated that he is concerned that █F█ is "out to get" his son. He stated that he has been contacted by many people in the community, including students, who have told him the that █F█ continues to post about C.L. and that she makes statements about him in group chats. Mr. Leroy stated that he is not on social media, so does not have first hand knowledge of any of these posts. This investigator asked Mr. Leroy to ask any individuals who report concern to him to forward anything that they have to him.

Mr. Leroy also stated that he was disappointed about the situation with █F█, as the family had known her for a long time and she had spent time at his home. He stated that █F█ had dated his son at one point. Mr. Leroy then expressed the opinion that █F█ was part of a group of girls who previously dated C.L. that were after him now. Mr. Leroy stated that people have told him that █F█ stated she "wanted to get C.L. for a long time."

Mr. Leroy stated that he has received over 125 letters in support of his son. He stated that his son was not racists and "had more black friends than white." He noted that █A█ added the black lives matter graphic to the photo, not C.L. Mr. Leroy stated that, when C.L. saw █A█ 's post, C.L. told him to take it down.

Page 6 of 8

A-388

Mr. Leroy asked about next steps.  We advised that the investigation would be completed and a determination would be made about whether additional discipline could be warranted.  If so, a Superintendent's hearing would be scheduled.  Mr. Leroy was advised, if a hearing would be held, it would likely be on April 27, 2021. He was also advised that he would be able to submit the letters of support for C.L. during the hearing.  Later, Mr. Leroy forwarded C.L.'s "original" post, which he got from his daughter, C.L.'s sister, who had not opened it.

During the conversation, Mr. Leroy was apologetic and understanding.

Student Interviews

This investigator studied the interview notes of C.L., **A** , **B** , **D** , and **E** compiled by Mr. Evans and Ms. Davis.  The notes reflected the students' responses to direct questions regarding the posts and were consistent with the Superintendent's recounting of the events.

## **CODE OF CONDUCT**

Based upon the information gathered during the investigation, the following sections of the Code of Conduct are implicated:

Article VI(A)(5) - Engaging in any willful act which disrupts the normal operation of the school community

Article IV(C)(3) – Display or use of personal electronic devices … in a manner that is in violation of district policy

Article IV(E)(4) – Discrimination, which includes using race, color …to deny rights, equitable treatment or access to facilities available to others

Article IV(E)(5) – Harassment, which includes a sufficiently severe action …directed at an identifiable individual or group which [is] intended to be, or which a reasonable person would perceive as ridiculing or demeaning.  Harassment is also the creation of a hostile environment.

D000117

A-389

Article IV(H) -- Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

### INVESTIGATORY FINDINGS

The students involved in the posting of the photos with C.L. and ▮A▮ have admitted to their involvement in the alleged conduct. ▮B▮ admitted to taking and sharing the photo. C.L. and ▮A▮ admitted, at a minimum, asking ▮B▮ to send them the photo so that they could post it. ▮A▮ admitted that he added the black lives matter graphic to the photo and reposted it. C.L. admitted to taking and posting the March 25, 2021 photo without the consent of ▮D▮ or ▮E▮

It is clear from the reaction of the community to the posts that a reasonable person would perceive the post as ridiculing or demeaning. While the students stated that they intended the posts to be funny or a joke, by their nature, the posts are targeted at African Americans and are discriminatory.

Finally, the Superintendent's description of the disruption he was required to address following the posting of these photos sufficiently demonstrates that the educational process has been substantially disrupted since April 19, 2021. Additional disruption was caused to student ▮D▮ and ▮E▮ who have reported harassment since they were identified in the posted photos.

The investigation with regards to ▮D▮ and ▮E▮ is on-going and no findings have been made.

### CONCLUSION

Page 8 of 8

A-390

The investigation revealed sufficient evidence to determine that the students engaged in behaviors that violated the District's Code of Conduct. It is recommended that the students be referred to a Superintendent's Hearing to determine whether additional discipline beyond a short-term suspension is warranted for any or all of these students.

D000119

A-391



D000121

A-393



D000122

A-394



D000123

A-395

Attachment D



D000124

A-396



A-397



D000126

A-398



A-399



D000128

A-400



Case 7:21-cv-06008-NSR-AEK   Document 64-39   Filed 06/12/23   Page 20 of 74

D000129

A-401

Case 7:21-cv-06008-NSR-AEK   Document 64-39   Filed 06/12/23   Page 21 of 74



D000130

A-402



D000131

A-403



A-404



D000133

A-405



D000134

A-406

Student Interview Notes

Interview Date: 4/20/21

**Student Name: Case LeRoy**
Grade: 12
DOB: 2/7/2003
Address: 175 Covered Bridge Rd., Livingston Manor, NY 12758

Parent/Guardian Present: Gordon LeRoy (Father),
Admin present: Shirlee Davis (MS/HS Principal)

1. Have you seen these photos? (Shown photo #1)
   a. Yes, ▮C▮ said something was scraping under his car so I laid on the ground and looked under the car
2. Who is in the picture?
   a. Me and ▮A▮
3. Did you take this photo?
   a. No ▮Student B▮ took it
4. Did you ask him to take it?
   a. No he just got out of the car and took it.
5. Why did he take it?
   a. We didn't think anything of it. ▮B▮ sent the picture to us and we all posted it.
6. Do you still have the post?
   a. No I deleted it
7. Where did it occur?
   a. Main Street dance studio. ▮C▮'s (▮C's▮ sister had dance. We followed them there.
8. Who else was there when the photo was taken?
   a. ▮A▮, ▮B▮ and me. ▮▮ wasn't there. He was in the car or the dance studio. Don't remember?
9. What was your intent?
   a. We deleted the posts.
   b. We didn't mean anything.
   c. Mine didn't have the Black Lives Matter pic on it
   d. We were just joking around
   e. I told ▮A▮ to take it down when I saw the Black Live Matter thing on it.
10. Do you realize the significance of this pose and what this image represents?
    a. At first I wasn't think about the George Floyd thing going on
    b. I didn't realize the trial was going on, I had no idea
11. Have you ever posted anything like this before?
    a. No
12. What do you know about the other photo on the post? (Pic of ▮D▮ & ▮E▮

A-407

    a. ▓ & ▓ were talking about public safety class when they did that.
13. Were you there?
    a. Yes
14. Do you know who took the picture?
    a. Yes, I did
    b. It was in 1st period English
15. Did you send it to anyone?
    a. Yes I sent it to ▓ & ▓
    b. ▓ asked ▓ to show him the hold
    c. It wasn't a racist thing
16. Have you ever made racist comments?
    a. No I'm not racist
17. I have another screen shot here of a conversation between you and someone else with something about your girlfriend. What can you tell me about that?
    a. Some guy was harassing me about my girlfriend being younger
18. In it, this person calls you a racist, pedophile and a "dl fag" and you responded by saying "Don't forget homophobic"
    a. Yeah
19. Why did you say that?
    a. I don't know

I explained the following:
- This was a very serious issue that was completely inappropriate and viewed a racist.
- You admitted to doing this.
- Regardless of your intentions when you took the picture, this incident has caused a pretty significate disruption throughout this school district
- For your actions you are going to be suspended out of school for 5 days.
- Given the level of inappropriateness and the content of the post, we are considering sending this to a Superintendent's hearing.
- We will be using an outside hearing officer in the matter.
- I indicated that since Case was classified that a manifestation hearing would also be help by the CSE and more information about that would be provided by the CSE Director.
- Information about the superintendent's hearing and the actual suspension letter will follow in the next few days.


Update 4/21: Gordon called @ 8am 4/21
- Asked if during the superintendent's hearing they could provide letters of support from students on Case's behalf. He has a lot of support.
- I explained that during the hearing they would have the opportunity to speak and provide evidence on their behalf.

A-408

Update 4/21: Returned a call from Gordon @ 4pm

- Wanted to report to me that a student, ▊Student F▊, was posting things on social meeting "We've waited a long time to get Case" ▊F▊ is bulling and harassing my son and something needs to be done.
- I thanked him for reporting this and told him that we recently made aware of some of these posts and that we are looking into them as well.
- I explained that I have asked for help with the situation and that an impartial outside investigator would be coming out to assist with this incident.
- best for everyone involved that we have an outside impartial party look over everything and help us all get through this
- I will be meeting with the investigator tomorrow and we may be following up with them if any additional information is needed.
- Gordon indicated that he had spoken with a friend who is an attorney and asked for advice and was considering getting a lawyer.
- I explained that if he is retaining the services of an attorney that I could no longer speak with him about this matter and that I will need for his attorney reach to contact our school attorney for all further communications.
- He said he hasn't hired anyone yet but was considering it.

D000137

A-409

Student Interview Notes

Interview Date: 4/20/21

**Student Name:** ███ Student A ███
Grade: 10
DOB: ████
Address: ████████████████

Parent/Guardian Present: Cynthia Miller (guardian),
Admin present: Shirlee Davis (MS/HS Principal)

1. Is this you in photo? (Shown photo #1)
   a. Yes
2. Who is the other student?
   a. Case LeRoy
3. Did you take this photo?
   a. No ███ Student B ███ took it
4. Where there any other students present when this occurred?
   a. Yes, Kevin but I think he was inside
5. What was your intent when you took the photo and why did you post it on Snap Chat?
   a. Funny joke
   b. Didn't mean to offend anyone
   c. We just thought it was a joke
6. Do you still have the post?
   a. No I deleted it
7. Where did it occur?
   a. Hurlyville dance studio. ██C██ had to pick up his sister
8. Who posted it?
   a. ██B██ CL and me.
9. Was it posted anywhere else?
   a. No just snap chat
10. Have you ever posted anything like this before?
    a. No
    b. I posted an apology as right after I took it down
11. Was this it? (1st apology pic)
    a. Yes but I did another one after that
    b. (2nd pic) ████ stated that she helped ██A██ post another apology after he
       told her about the incident.
12. Students have reported that you have made racist comments and joke in school before
    is this true?
    a. No
13. What do you know about the other photo on the post? (Pic of ██D██ & ██E██

A-410

    a.  Yeah it is  **D** &amp; **E**
    b.  That's old
    c.  I think it was in Hoag's room

14. Were you there?
    a.  No I wasn't part of that
    b.  I really don't know anything about that

I explained the following:

- This was a very serious issue that was completely inappropriate and viewed a racist.
- You admitted to doing this.
- Regardless of your intentions when you guys took the picture, this incident has caused a pretty significate disruption throughout this school district

A-411

Student Interview Notes

Interview Date: 4/20/21

Student Name: ▇ Student B ▇
Grade: 11
DOB: ▇▇▇▇
Address: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Parent/Guardian Present: Robert Gould (Father),
Admin present: Shirlee Davis (MS/HS Principal)

1.  Have you seen these photos? (Shown photo #1)
    a.  Yes I was there
2.  Did you take this photo?
    a.  Yes
3.  Whose phone was it?
    a.  Mine
4.  Do you still have the picture?
    a.  No I deleted it
5.  Why did you take this picture?
    a.  They (Case & ▇ B ▇) asked me to
    b.  I had no intention of it going this way
6.  Where did it occur?
    a.  It was by the dance studio where ▇ C ▇'s ( ▇ C's ▇ sister dances. He had to pick her up.
7.  Who else was there?
    a.  Just Case, ▇ A ▇ and ▇ B ▇
8.  What was your intent when you took this photo?
    a.  Case laid on the ground and then ▇ A ▇ kneed on him. ▇ A ▇ asked me to get out and take the picture. ( ▇ B ▇ was in the car, C ▇ and ▇ A ▇ followed them to the dance studio in a different car)
9.  Who posted it?
    a.  ▇ A ▇ posted it to his snap story.
    b.  Case and I posted it after ▇ A ▇
    c.  I reposted it. I'm not sure why. It wasn't intended to be racist.
    d.  ▇ A ▇ added the BLM fist.
10. Have you ever posted anything like this before?
    a.  No
    b.  (Dad) He has never been in trouble before
11. What do you know about the other photo on the post? (Pic of ▇ D ▇ & ▇ E ▇)
    a.  Nothing. I don't have any information on that one.

A-412

I explained the following:

- This was a very serious issue that was completely inappropriate and viewed a racist.
- You admitted to doing this.
- Regardless of your intentions when you took the picture, this incident has caused a pretty significate disruption throughout this school district

A-413

Student Interview Notes

Interview Date: 4/20/21

Student Name: ▆▆Student E▆▆
Grade: 12
DOB: ▆▆▆▆
Address: ▆▆▆▆▆▆▆▆▆▆▆▆

Parent/Guardian Present: Lisa Jones (Mother), (On speaker phone in COVID quarantine)
Admin present: Shirlee Davis (MS/HS Principal)

Mom (Lisa) mentioned that she has concerns over his kid's safety.
▆E▆ has received threats and ▆▆▆(Younger sister) both are being harassed by other students on social media. (She delated and blocked their posts)
I'm considering keeping my kids remote and not sending them back to school. (JE- we can discuss that)

1. Are you aware of recent Social Media posts that contain images of you?
   a. Yes I have seen them. ▆D▆ and I were talking about Public Safety class and routines.
2. What can you tell me about this post?
   a. It was in Ms. Hoag's classroom. It was before 1st period started. It was a while ago.
3. When did it occur?
   a. Not sure but it was a while ago and had nothing to do with what Case posted last night.
   b. (JE- Did the teacher see it?) No I don't think so she was on the other side of the room, she didn't say anything.
4. Who took it?
   a. Case (Leroy) took it. He didn't say anything. We didn't know he was taking it. Then he posted it to his Snap Story. (Did you post it?? No I didn't post anything
   b. (JE- Did Case send you the photos?) No but I saw the post Case did from the 19th
   c. There was nothing malicious about this. This whole thing is taken out of context. We were talking about police holds from Public Safety and I asked ▆D▆ to show me.
   Do you know how the photo of you got on social media?
   d. From Case's post I guess?
5. Has Case ever done or said anything racist towards you?
   a. Yes he has made comments and racial jokes towards me. Case and I are friends and he didn't mean anything by them.
   b. (Lisa) I have told him that doesn't make ok and ▆E▆ and I are working on that.

D000142

A-414

    c. (JE- Can you give me an example of some of the things he has said?)
    d. Yeah he has called me the "N-word" before

I explained to Lisa and CJ:

- The information just shared with us was similar to what others had communicated to us
- It appears the photo of ▉ & ▉ was taken out of context and not part of the other post on social media.
- At this time we are concerned about the comments and threats that are circulating. We don't want to see anything happen to ▉ or your other children.
- We discussed that since ▉ and the other kids are already in quarantine and remote until Monday, keep attending his classes remotely this week.
- I explained that if on zoom or during Google meets any issues arise to notify the teacher and the principal immediately and disconnect from the Zoom/Meet.
- I told them the investigations are all on going on that I would be back in touch soon with them on next steps.

A-415

Student Interview Notes

Interview Date: 4/20/21

Student Name: █████ Student D █████
Grade: 12
DOB: ████████
Address: ████████████████████████████
████████████

Parent/Guardian Present: Alex Gonzales (Father), Christine Gonzalez (Mother),
Admin present: Shirlee Davis (MS/HS Principal)

1. Are you aware of recent Social Media posts that contain images of you?
   a. Yes I have seen them
2. What can you tell me about this post? (shown a copy of the social media post)
   a. It was in Ms. Hoag's classroom before 1st period. It was a while ago.
3. When did it occur?
   a. Not sure but it was a while ago and had nothing to do with what Case posted last night.
4. Who took it?
   a. Case Leroy to it. Didn't know he was taking it. He took it and posted it to his Snap Story. As soon as I found out he posted it I told him to take it down.
   b. This is not what it looks like. █████ Student E █████ and I were talking about police holds that we were doing in Public Safety and he asked me to show him. He asked me to do the hold. We are friends, this wasn't a racist thing or anything like the other post.
5. Do you know how it got on social media?
   a. From Case's post I guess?
6. Has Case ever done or said anything racist towards you?
   a. Not really? (Are you sure? We have received reports from other students that he has made racist comments in school before.)
   b. Yeah he called me a ½ breed once but that was a long time ago.

I explained the following:

- The information just shared with us was similar to what others had communicated to us
- It appears the photo of █E█ & █D█ was taken out of context and not part of the other post on social media.
- At this time we are concerned about the comments and threats that are circulating. And if they are ok with it attending remotely while we work through this might be a good idea.
- The parents agreed and felt attending his classes remotely this week would be a good idea. He we be remote for his Boces classes as well.

A-416

- I explained that if on zoom or during Google meets any issues arise to notify the teacher and the principal immediately and disconnect from the Zoom/Meet.
- I told to them that investigations are all on going on that I would be back in touch soon with them on next steps.

Update: Spoke with Mom on 4/21 who asked about **D** starting baseball --

- I explained that I have asked for help with the situation and that an impartial outside investigator would be coming out to assist with this incident.
- best for everyone involved that we have an outside impartial party look over everything and help us all get through this
- I will be meeting with the investigator tomorrow and we may be following up with them if any additional information is needed.

A-417

 Gmail

John Evans <john.evans@lmcs.us>

## Notes 4/20
1 message

**Shirlee Davis** <shirlee.davis@lmcs.us>                          Wed, Apr 21, 2021 at 1:58 PM
To: John Evans <john.evans@lmcs.us>

--
Shirlee Davis
High School Principal
Livingston Manor Central School
845-439-4400 Ext. 1207
shirlee.davis@lmcs.us

📄 **Investigation Notes Regarding Snap Chat Photo April 19.docx**
   14K

D000146

A-418

Investigation Notes Regarding Snap Chat Photo April 19, 2021 involving LMCS Students

Interviewed by Superintendent and High School Principal (John Evans/Shirlee Davis)

*Mr. Evans indicated that Manifestation Hearings would be held for SWD involved.

Tuesday April 20, 2021

**Picture 1**

Case Leroy Grade 12

Student A Grade 10

Student B Grade 11

**Picture 2 (Students did not post this picture)**

Student D Grade 12

Student E Grade 12

**Case Leroy and father Gordon Leroy in attendance:**

Case was asked about the picture. Is this you in the picture? "Yes." Who else is with you?  inside

He indicated they were in Hurleyville, NY outside the dance studio as they had followed KB there who was picking up his sister.

Case was asked why they took this picture. He said he really didn't know.

Case was looking under the car and ▇▇ kneeled on him.

Joe, who was sitting in the other car was asked to take the picture by one of the boys.

He took the picture and sent it to both ▇▇ and Case.

Case reposted the picture on his snapchat without BLM graphic, but with the words "another one down."

When asked if he knew the representation of that pose, he said he did not know the trial was currently waiting for a verdict.

Case indicated that when he received comments to take it down, he did so and the picture had been up for about 7 minutes.

Case was asked if he had ever posted something like this before, or texted anything like this before.

Case indicated that he did not.

Mr. Evans explained that Case would be suspended for 5 days pending a superintendents hearing.

A-419

**Student A** ████and guardian CJ Millar in attendance:

██ was asked about the picture. Is this you in the picture? ████said yes, that was him.

Who else is with you? CL, ██ and ██

Who took the picture? ██ Did you ask him to take the picture? I don't remember who asked him to take the picture.

Where were you when this picture was taken? Hurleyville, outside the dance studio, cause KB had to pick up his sister.

What was your intent in taking this picture? It was meant to be funny.

Did you put the BLM graphic on the picture when you posted it? Yes, it was supposed to be a joke.

Do you understand what the picture represented? Yes.

Where did you share this photo? Snapchat only.

Do you still have the picture? No, I deleted it.

████████████████████████████████████

**Student B** ████and father Robert Gould in attendance.

██ was asked about the picture. What do you know about this picture? I took the picture with my phone.

Where were you when the picture was taken? Hurleyville. I went with Kevin to pick up his sister from dance.

Who was with you? ██ ██, and CL.

Where was ██? Inside the dance studio. Where were you? Waiting in the car.

When they asked you to take the picture, what were they doing?

Case was on the ground, and ██ was kneeling.

I sent the picture to them. (██ and CL)

Did you know what they were going to do with it? No.

Did you share it? Yes. It didn't have the BLM graphic.

Why did you share it? I don't know.

Have you ever posted anything like this before? No.

████████████  ██████  ██████████████

A-420

**Student C** and mother Bonnie Hoag in attendance

Regarding the picture:

Who was there? **C** stated, **B** **A** and CL.

Where was this? The dance studio in Hurleyville. I was picking up my sister and I don't know why they, CL and ▉ followed them.

What did you do? I went inside to see when my sister would be finished.

When I came back out they were in the car.

Did you see them take the picture? No.

Did you get a copy of the picture or share the picture? No.

▉ showed it to me when we were back in the car. When my sister was done, we left and went to McDonalds.


Picture Number 2

**Student D**

Is this you in the picture? Yes Who else is in the picture? **E** and Case took the picture.

Can you tell us when this picture was taken? About a month ago.

Where was it taken? In my first period class before class started.

Who took the picture? Case

What was the intent of the picture? We were discussing what police do and I showed **E** the hold. Case asked us to recreate it so he could take a picture. I thought it was going to be shown to our teacher.

I asked Case to delete the picture.


**Student E** and mother Lisa on phone

Is this you in the picture?  Yes.

Where was this taken? In first period before class.

What was the intent? There was no intent, we were just talking and I let him demonstrate.

When I found out Case posted it, I told him to take it down.

Have you had any other comments made regarding race or derogatory statements?

Small jokes, but he is my friend, it didn't mean anything.

A-421

**Student C** and mother Bonnie Hoag in attendance

Regarding the picture:

Who was there? **C** stated, **B** **A** and CL.

Where was this? The dance studio in Hurleyville. I was picking up my sister and I don't know why they, CL and MM followed them.

What did you do? I went inside to see when my sister would be finished.

When I came back out they were in the car.

Did you see them take the picture? No.

Did you get a copy of the picture or share the picture? No.

JG showed it to me when we were back in the car. When my sister was done, we left and went to McDonalds.


Picture Number 2

**Student D**

Is this you in the picture? Yes Who else is in the picture? **E** and Case took the picture.

Can you tell us when this picture was taken? About a month ago.

Where was it taken? In my first period class before class started.

Who took the picture? Case

What was the intent of the picture? We were discussing what police do and I showed **E** the hold. Case asked us to recreate it so he could take a picture. I thought it was going to be shown to our teacher.

I asked Case to delete the picture.


**Student E** and mother Lisa on phone

Is this you in the picture? Yes.

Where was this taken? In first period before class.

What was the intent? There was no intent, we were just talking and I let him demonstrate.

When I found out Case posted it, I told him to take it down.

Have you had any other comments made regarding race or derogatory statements?

Small jokes, but he is my friend, it didn't mean anything.

A-422

|  | ADOPTED: | 5/21/01 |
|---|---|---|
|  | AMENDED: | 12/20/04 |
|  |  | 8/20/07 |
|  |  | 11/16/09 |
|  |  | 7/25/12 |

**CODE OF CONDUCT**

## I.   INTRODUCTION

The Board of Education is committed to providing a safe and orderly school environment where students may receive and district personnel may deliver quality educational services without disruption or interference. Responsible behavior by students, teachers, other district personnel, parents and other visitors is essential to achieving this goal.

The district has a long-standing set of expectations for conduct on school property and at school functions.  These expectations are based on the principles of civility, mutual respect, citizenship, character, tolerance, honesty and integrity.

The Board recognizes the need to clearly define these expectations for acceptable conduct on school property, identify the possible consequences of unacceptable conduct, and to ensure that discipline, when necessary, is administered promptly and fairly. To this end, the Board adopts this code of conduct ("code").

Unless otherwise indicated, this code applies to all students, school personnel, parents and other visitors when on school property or attending a school function.

## II.   DEFINITIONS

For purposes of this code, the following definitions apply.

"Disruptive student" means an elementary or secondary student under the age of 21 who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.

"Gender" means actual or perceived sex and shall include a person's gender identity or expression.

"Gender expression" is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyle, activities, voice or mannerisms.

"Gender identity" is one's self-conception as being male or female, as distinguished from actual biological sex or sex assigned at birth.

"Parent" means parent, guardian or person in parental relation to a student.

"School property" means in or within any building, structure, athletic playing field, playground, parking lot or land contained within the real property boundary line of a public elementary or secondary school, or in or on a school bus, as defined in Vehicle and Traffic Law §142.

1

D000151

A-423

Code of Conduct – Continued

"School function" means any school-sponsored extra-curricular event or activity.

"Sexual orientation" means actual or perceived heterosexuality, homosexuality or bisexuality.

Violent student" means a student under the age of 21 whom:

1. Commits an act of violence upon a school employee, or attempts to do so.
2. Commits, while on school property or at a school function, an act of violence upon another student or any other person lawfully on school property or at the school function, or attempts to do so.
3. Possess, while on school property or at a school function, a weapon.
4. Displays, while on school property or at a school function, what appears to be a weapon.
5. Threatens, while on school property or at a school function, to use a weapon.
6. Knowingly and intentionally damages or destroys the personal property of any school employee or any person lawfully on school property or at a school function.
7. Knowingly and intentionally damages or destroys school district property.

"Weapon" means a firearm as defined in 18 USC §921 for purposes of the Gun-Free Schools Act. It also means any other gun, BB gun, pistol, revolver, shotgun, rifle, machine gun, disguised gun, dagger, dirk, razor, stiletto, switchblade knife, gravity knife, brass knuckles, sling shot, metal knuckle knife, box cutters, cane sword, electronic dart gun, Kung Fu star, electronic stun gun, pepper spray or other noxious spray, explosive or incendiary bomb, or other device, instrument, material or substance that can cause physical injury or death when used to cause physical injury or death.

## III.   STUDENT RIGHTS AND RESPONSIBILITIES

A.     Student Rights

The district is committed to safeguarding the rights given to all students under federal and state law and district policy. In addition, to promote a safe, healthy, orderly and supportive school environment, all district students have the right to:

1. Take part in all district activities on an equal basis regardless of race, weight, color, creed, national origin, ethnic group, religion, religious practice, gender or sexual orientation or disability.
2. Present their version of the relevant events to school personnel authorized to impose a disciplinary penalty in connection with the imposition of the penalty.
3. Access school policies, regulations and rules and, when necessary, receive an explanation of those rules from school personnel.

B.     Student Responsibilities

All district students have the responsibility to:

2

D000152

A-424

Code of Conduct – Continued

1. Contribute to maintaining a safe, supportive and orderly school environment that is conducive to learning and to show respect to other persons and to property.
2. Be familiar with and abide by district policies, rules and regulations dealing with student conduct.
3. Attend school every day unless they are legally excused and be in class, on time, and prepared to learn.
4. Work to the best of their ability in all academic and extracurricular pursuits and strive toward their highest level of achievement possible.
5. React to direction given by teachers, administrators and other school personnel in a respectful, positive manner.
6. Work to develop mechanisms to manage their anger.
7. Ask questions when they do not understand.
8. Seek help in solving problems.
9. Dress appropriately for school and school functions.
10. Accept responsibility for their actions.
11. Conduct themselves as representatives of the district when participating in or attending school-sponsored extracurricular events and to hold themselves to the highest standards of conduct, demeanor, and sportsmanship.

## IV.   ESSENTIAL PARTNERS

A.   Parents

All parents are expected to:

1. Recognize that the education of their child(ren) is a joint responsibility of the parents and the school community and collaborate with the district to optimize their child's educational opportunities.
2. Send their children to school ready to participate and learn.
3. Ensure their children attend school regularly and on time.
4. Ensure absences are excused.
5. Ensure their children are dressed and groomed in a manner consistent with the student dress code.
6. Help their children understand that in a democratic society appropriate rules are required to maintain a safe, orderly environment.
7. Know school rules and help their children understand them so that their children can help create a safe, supportive school environment.
8. Convey to their children a supportive attitude toward education and the district.
9. Build positive, constructive relationships with teachers, other parents and their children's friends.
10. Help their children deal effectively with peer pressure.
11. Inform school officials of changes in the home situation that may affect student conduct or performance.
12. Provide a place for study and ensure homework assignments are completed.

3

A-425

Code of Conduct – Continued

B.    Teachers

All district teachers are expected to:

1.  Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex, which will strengthen students' self-concept and promote confidence to learn.
2.  Be prepared to teach.
3.  Demonstrate interest in teaching and concern for student achievement.
4.  Know school policies and rules, and enforce them in a fair and consistent manner.
5.  Maintain confidentiality in conformity with federal and state law.
6.  Communicate to students and parents:
     a.    Course objectives and requirements
     b.    Marking/grading procedures
     c.    Assignment deadlines
     d.    Expectations for students
            Classroom discipline plan.
**7.**  Communicate regularly with students, parents and other teachers concerning growth and achievement.
8.  Participate in school-wide efforts to provide adequate supervision in all school spaces, in conformity with the Taylor Law.
9.  Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee or any person who is lawfully on school property or at a school function.
10. Address personal biases that may prevent equal treatment of all students in the school or classroom setting.

C.    Guidance Counselors, School Psychologists, and Social Workers

All district guidance counselors, school psychologists, and social workers are expected to:

1.  Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2.  Assist students in coping with peer pressure and emerging personal, social and emotional problems.
3.  Initiate teacher /student /counselor conferences and parent/ teacher/ student/ counselor conferences, as necessary, as a way to resolve problems.
4.  Regularly review with students their educational progress and career plans.
5.  Maintain confidentiality in accordance with federal and state law.
6.  Provide information to assist students with career planning.
7.  Encourage students to benefit from the curriculum and extracurricular programs.
8.  Make known to students and families the resources in the community that are available to meet their needs.

4

D000154

A-426

Code of Conduct – Continued

9.  Participate in school-wide efforts to provide adequate supervision in all school spaces.
10. Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
11. Address personal biases that may prevent equal treatment of all students.

D.      Other School Personnel

All other school personnel are expected to:

1.  Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2.  Maintain confidentiality in accordance with federal and state law.
3.  Be familiar with the code of conduct.
4.  Help children understand the district's expectations for maintaining a safe, orderly environment.
5.  Participate in school-wide efforts to provide adequate supervision in all school spaces.
6.  Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
7.  Address personal biases that may prevent equal treatment of all students.

E.      Principals/Administrators

All principals/administrators are expected to:

1.  Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2.  Ensure that students and staff have the opportunity to communicate regularly with the principal/administrators and have access to the principal/administrators for redress of grievances.
3.  Maintain confidentiality in accordance with federal and state law.
4.  Evaluate on a regular basis all instructional programs to ensure infusion of civility education in the curriculum.
5.  Support the development of and student participation in appropriate extracurricular activities.
6.  Provide support in the development of the code of conduct, when called upon. Disseminate the code of conduct and anti-harassment policies.
7.  Be responsible for enforcing the code of conduct and ensuring that all cases are resolved promptly and fairly.
8.  Participate in school-wide efforts to provide adequate supervision in all school spaces.
9.  Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
10. Address personal biases that may prevent equal treatment of all students and staff.

5

A-427

Code of Conduct – Continued

F.   The Dignity Act Compliance Officer

The compliance officer is expected to:

1. Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2. Oversee and coordinate the work of the district-wide and building-level bullying prevention committees.
3. Identify curricular resources that support infusing civility in classroom instruction and classroom management; and provide guidance to staff as to how to access and implement those resources.
4. Coordinate, with the Professional Development Committee, training in support of the bullying prevention committee.
5. Be responsible for monitoring and reporting on the effectiveness of the district's bullying prevention policy.
6. Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
7. Address personal biases that may prevent equal treatment of all students and staff.

G.   Superintendent

The Superintendent is expected to:

1. Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2. Inform the Board about educational trends relating to student discipline.
3. Review with district administrators the policies of the Board of education and state and federal laws relating to school operations and management.
4. Maintain confidentiality in accordance with federal and state law.
5. Work to create instructional programs that minimize incidence of misconduct and are sensitive to student and teacher needs.
6. Work with district administrators in enforcing the code of conduct and ensuring that all cases are resolved promptly and fairly.
7. Participate in school-wide efforts to provide adequate supervision in all school spaces.
8. Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
9. Address personal biases that may prevent equal treatment of all students and staff.

H.   Board of Education

The Board of Education is expected to:

6

D000156

A-428

Code of Conduct – Continued

1. Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender or sex.
2. Maintain confidentiality in accordance with federal and state law.
3. Develop and recommend a budget that provides programs and activities that support achievement of the goals of the code of conduct.
4. Collaborate with student, teacher, administrator, and parent organizations, school safety personnel and other school personnel to develop a code of conduct that clearly defines expectations for the conduct of students, district personnel and visitors on school property and at school functions.
5. Adopt and review at least annually the district's code of conduct to evaluate the code's effectiveness and the fairness and consistency of its implementation.
6. Lead by example by conducting Board meetings in a professional, respectful, courteous manner.
7. Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.
8. Address personal biases that may prevent equal treatment of all students and staff.

## V.   STUDENT DRESS CODE

All students are expected to give proper attention to personal cleanliness and to dress appropriately for school and school functions. Students and their parents have the primary responsibility for acceptable student dress and appearance.  Teachers and all other district personnel should exemplify and reinforce acceptable student dress and help students develop an understanding of appropriate appearance in the school setting.

A student's dress, grooming and appearance while on school property or on school sponsored events, including jewelry (piercings), accessories (wallet chains), make-up, and nails, shall:

1. Be safe, appropriate and not disrupt or interfere with the educational process.
2. Recognize that extremely brief garments such as tube tops, net tops, halter tops, spaghetti straps, plunging necklines (front and/or back) and see-through garments are not appropriate.
3. Ensure that underwear is completely covered with outer clothing.
4. Include footwear at all times.  Footwear that is a safety hazard will not be allowed.
5. Not include the wearing of shoes or sneakers with wheels.
6. Not include the wearing of hats in the classroom except for a medical or religious purpose. Head coverings worn to and from school need to be taken off at the door and stored in the locker during the school day.
7. Not include items that are vulgar, obscene, libelous, or denigrate others on account of race, color, religion, creed, national origin, gender, sexual orientation or disability.
8. Not promote and/or endorse the use of alcohol, tobacco or illegal drugs and/or encourage other illegal or violent activities.

7

A-429

Code of Conduct – Continued

Each Building Principal or his/her designee shall be responsible for informing all students and their parents of the student dress code at the beginning of the school year and any revisions to the dress code made during the school year.

Students who violate the student dress code shall be required to modify their appearance by covering or removing the offending item, and if necessary or practical, replacing it with an acceptable item.  Any student who refuses to do so shall be subject to discipline, up to and including in-school suspension for the day.  Any student who repeatedly fails to comply with the dress code shall be subject to further discipline, up to and including out of school suspension.

## VI.    PROHIBITED STUDENT CONDUCT

The Board of Education expects all students to conduct themselves in an appropriate and civil manner, with proper regard for the rights and welfare of other students, district personnel and other members of the school community, and for the care of school facilities and equipment.

The best discipline is self-imposed, and students must learn to assume and accept responsibility for their own behavior, as well as the consequences of their misbehavior.  District personnel who interact with students are expected to use disciplinary action only when necessary and to place emphasis on educating students so that they may grow in self-discipline.

The Board recognizes the need to make its expectations for student conduct while on school property or engaged in a school function specific and clear. The rules of conduct listed below are intended to do that and focus on safety and respect for the rights and property of others.  Students who will not accept responsibility for their own behavior and who violate these school rules will be required to accept the consequences for their conduct.

Students may be subject to disciplinary action, up to and including suspension from school, when they:

A.    Engage in conduct that is disorderly.  Examples of disorderly conduct include, but are not limited to:

1. Running in hallways.
2. Making unreasonable noise.
3. Using profane, lewd, vulgar or abusive language or gestures.
4. Obstructing vehicular or pedestrian traffic.
5. Engaging in any willful act which disrupts the normal operation of the school community.
6. Trespassing. Students are not permitted in any school building, other than the one they regularly attend, without permission from the administrator in charge of the building.
7. Computer/electronic communications misuse, including any unauthorized use of computers, software, or internet/intranet account; accessing inappropriate websites; or any other violation of the district's acceptable use policy.

B.    Engage in conduct that is insubordinate. Examples of insubordinate conduct include, but are not limited to:

8

D000158

A-430

Code of Conduct – Continued

1. Failing to comply with the reasonable directions of teachers, school administrators or other school employees in charge of students or otherwise demonstrating disrespect.
2. Lateness for, missing or leaving school without permission.
3. Skipping detention.

C.   Engage in conduct that is disruptive.  Examples of disruptive conduct include, but are not limited to:

1. Failing to comply with the reasonable directions of teachers, school administrators or other school personnel in charge of students.
2. Inappropriate public sexual contact.
3. Display or use of personal electronic devices, such as, but not limited to, cell phones, I-pods, digital cameras, in a manner that is in violation of district policy.

D.   Engage in conduct that is violent.  Examples of violent conduct include, but are not limited to:

1. Committing an act of violence (such as hitting, kicking, punching, and scratching) upon a teacher, administrator or other school employee or attempting to do so.
2. Committing an act of violence (such as hitting, kicking, punching, and scratching) upon another student or any other person lawfully on school property or attempting to do so.
3. Possessing a weapon.  Authorized law enforcement officials are the only persons permitted to have a weapon in their possession while on school property or at a school function.
4. Displaying what appears to be a weapon.
5. Threatening to use any weapon.
6. Intentionally damaging or destroying the personal property of a student, teacher, administrator, other district employee or any person lawfully on school property, including graffiti or arson.
7. Intentionally damaging or destroying school district property.

E.   Engage in any conduct that endangers the safety, physical or mental health or welfare of others.  Examples of such conduct include, but are not limited to:

1. Subjecting other students, school personnel or any other person lawfully on school property or attending a school function to danger by recklessly engaging in conduct which creates a substantial risk of physical injury.
2. Stealing or attempting to steal the property of other students, school personnel or any other person lawfully on school property or attending a school function.
3. Defamation, which includes making false or unprivileged statements or representations about an individual or identifiable group of individuals that harm the reputation of the person or the identifiable group by demeaning them.
4. Discrimination, which includes using  race, color, creed, national origin, ethnic group, religion, religious practice, sex, gender (identity and expression), sexual orientation, weight or disability  to deny rights, equitable treatment or access to facilities available to others.

9

A-431

Code of Conduct – Continued

5. Harassment, which includes a sufficiently severe action or persistent pervasive pattern of actions or statements directed at an identifiable individual or group which are intended to be, or which a reasonable person would perceive as ridiculing or demeaning. Harassment is also the creation of a hostile environment.   (See policy, Student Harassment and Bullying Prevention and Intervention for a more complete definition.)
6. Intimidation, which includes engaging in actions or statements that put an individual in fear of bodily harm.
7. Bullying which may be a hostile activity which harms or induces fear through the threat of further aggression and/or creates terror.
8. Hazing which includes an induction, initiation or membership process involving harassment (see policy Student Harassment and Bullying Prevention and Intervention for a more complete definition).
9. Selling, using, distributing or possessing obscene material.
10. Using vulgar or abusive language, cursing or swearing.
11. Smoking a cigarette, cigar, pipe, the use of **e-cigarettes or other vaporizing chemicals**, or using chewing or smokeless tobacco or any other tobacco product.
12. Possessing, consuming, selling, distributing or exchanging alcoholic beverages or illegal substances, or being under the influence of either. "Illegal substances" include, but are not limited to, inhalants, marijuana, cocaine, LSD, PCP, amphetamines, heroin, steroids, look-alike drugs, and any substances commonly referred to as "designer drugs."
13. Inappropriately using or sharing prescription and over-the-counter drugs.
14. Gambling.
15. Indecent exposure, that is, exposure to sight of the private parts of the body in a lewd or indecent manner.
16. Initiating a report warning of fire or other catastrophe without valid cause, misuse of 911, or discharging a fire extinguisher.

F.   Engage in misconduct while on a school bus.   It is crucial for students to behave appropriately while riding on district buses, to ensure their safety and that of other passengers and to avoid distracting the bus driver. Students are required to conduct themselves on the bus in a manner consistent with established standards for classroom behavior.  Excessive noise, pushing, shoving and fighting will not be tolerated.

G.   Engage in any form of academic misconduct.  Examples of academic misconduct include, but are not limited to:

1. Plagiarism.
2. Cheating.
3. Copying.
4. Altering records.
5. Assisting another student in any of the above actions.

H.   Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function. Examples of such misconduct include, but are not limited to:

10

D000160

A-432

Code of Conduct – Continued

1. Cyberbullying (i.e., inflicting willful and repeated harm through the use of electronic text).
2. Threatening or harassing students or school personnel over the phone or other electronic medium.

All students are expected to promptly report violations of the code of conduct to a teacher, guidance counselor, the Building Principal or his or her designee. Any student observing a student possessing a weapon, alcohol or illegal substance on school property or at a school function shall report this information immediately to a teacher, the Principal, the Principal's designee or the Superintendent of Schools.

All district staff authorized to impose disciplinary sanctions are expected to do so in a prompt, fair and lawful manner. District staff not authorized to impose disciplinary sanctions are expected to promptly report violations of the code of conduct to their supervisor, who shall in turn impose an appropriate disciplinary sanction, if so authorized, or refer the matter to a staff member who is authorized to impose an appropriate sanction.

Any weapon, alcohol or illegal substance found shall be confiscated immediately, if possible, followed by notification to the parent of the student involved and the appropriate disciplinary sanction, which may include permanent suspension and referral for prosecution.

The Principal or his/her designee must notify the appropriate local law enforcement agency of those code violations that constitute a crime and substantially affect the order or security of a school as soon as practical, but in no event later than the close of business the day the Principal or his/her designee learns of the violation. The notification may be made by telephone, followed by a letter mailed on same day as the telephone call is made. The notification must identify the student and explain the conduct that violated the code of conduct and constituted a crime.

Discipline is most effective when it deals directly with the problem at the time and place it occurs, and in a way that students view as fair and impartial. School personnel who interact with students are expected to use disciplinary action only when necessary and to place emphasis on the students' ability to grow in self-discipline.

Disciplinary action, when necessary, will be firm, fair and consistent so as to be the most effective in changing student behavior. In determining the appropriate disciplinary action, school personnel authorized to impose disciplinary penalties will consider the following:

1. The student's age.
2. The nature of the offense and the circumstances which led to the offense.
3. The student's prior disciplinary record.
4. The effectiveness of other forms of discipline.
5. Information from parents, teachers and/or others, as appropriate.
6. Other extenuating circumstances.

As a general rule, discipline will be progressive. This means that a student's first violation will usually merit a lighter penalty than subsequent violations.

11

D000161

A-433

Code of Conduct – Continued

If the conduct of a student is related to a disability or suspected disability, the student shall be referred to the Committee on Special Education and discipline, if warranted, shall be administered consistent with the separate requirements of this code of conduct for disciplining students with a disability or presumed to have a disability.  A student identified as having a disability shall not be disciplined for behavior related to his/her disability.

A.       Penalties

Students who are found to have violated the district's code of conduct may be subject to the following penalties, either alone or in combination. The school personnel identified after each penalty are authorized to impose that penalty, consistent with the student's right to due process.

1.  Oral warning – any member of the district staff
2.  Written warning – bus drivers, hall and lunch monitors, coaches, guidance counselors, teachers, Principal, Superintendent
3.  Written notification to parent – bus driver, aides, monitors, coaches, guidance counselors, teachers, Principal, Superintendent
4.  Detention – teachers, Principal, Superintendent
5.  Suspension from transportation – Director of Transportation, Principal, Superintendent
6.  Suspension from athletic participation – coaches, Principal, Superintendent
7.  Suspension from social or extracurricular activities – activity director, Principal, Superintendent
8.  Suspension of other privileges – Principal, Superintendent
9.  In-school suspension – Principal, Superintendent
10. Removal from classroom by teacher – teachers, Principal
11. Short-term (five days or less) suspension from school – Principal, Superintendent, Board
12. Long-term (more than five days) suspension from school –Superintendent, Board
13. Permanent suspension from school – Superintendent, Board.

B.       Procedures

The amount of due process a student is entitled to receive before a penalty is imposed depends on the penalty being imposed. In all cases, regardless of the penalty imposed, the school personnel authorized to impose the penalty must inform the student of the alleged misconduct and must investigate, to the extent necessary, the facts surrounding the alleged misconduct. All students will have an opportunity to present their version of the facts to the school personnel imposing the disciplinary penalty in connection with the imposition of the penalty.

Students who are to be given penalties other than an oral warning, written warning or written notification to their parents are entitled to additional rights before the penalty is imposed. These additional rights are explained below.

1.       Detention

Teachers, Principals and the Superintendent may use after school detention as a penalty for student misconduct in situations where removal from the classroom or suspension would be inappropriate.

12

D000162

A-434

Code of Conduct - Continued

Detention will be imposed as a penalty only after the student's parent has been notified to confirm that there is no parental objection to the penalty and the student has appropriate transportation home following detention.

2.    Suspension from transportation

If a student does not conduct himself/herself properly on a bus, the bus driver is expected to bring such misconduct to the Principal's attention. Students who become a serious disciplinary problem may have their riding privileges suspended by the Principal or the Superintendent or their designees. In such cases, the student's parent will become responsible for seeing that his or her child gets to and from school safely. Should the suspension from transportation amount to a suspension from attendance, the district will make appropriate arrangements to provide for the student's education.

A student subjected to a suspension from transportation is not entitled to a full hearing pursuant to Education Law §3214.  However, the student and the student's parent will be provided with a reasonable opportunity for an informal conference with the Principal or the Principal's designee to discuss the conduct and the penalty involved.

3.    Suspension from athletic participation, extra-curricular activities and other privileges

A student subjected to a suspension from athletic participation, extra-curricular activities or other privileges is not entitled to a full hearing pursuant to Education Law §3214.  However, the student and the student's parent will be provided with a reasonable opportunity for an informal conference with the district official imposing the suspension to discuss the conduct and the penalty involved.

4.    In-school Suspension

The Board recognizes the school must balance the need of students to attend school and the need for order in the classroom to establish an environment conducive to learning. As such, the Board authorizes Principals and the Superintendent to place students who would otherwise be suspended from school as the result of a code of conduct violation in "in-school suspension." The in-school suspension supervisor will be a certified teaching assistant providing under the direction of certified teacher.

A student subjected to an in-school suspension is not entitled to a full hearing pursuant to Education Law §3214.  However, the student and the student's parent will be provided with a reasonable opportunity for an informal conference with the district official imposing the in-school suspension to discuss the conduct and the penalty involved.

5.    Teacher Disciplinary Removal of Disruptive Students

A student's behavior can affect a teacher's ability to teach and can make it difficult for other students in the classroom to learn. In most instances the classroom teacher can control a student's behavior and maintain or restore control over the classroom by using good classroom management techniques.  These techniques may include practices that involve the teacher directing a student to

13

A-435

Code of Conduct - Continued

briefly leave the classroom to give the student an opportunity to regain his or her composure and self-control in an alternative setting. Such practices may include, but are not limited to:

(1) short-term "time out" in an elementary classroom or in an administrator's office;
(2) sending a student to the Principal's office for the remainder of the class time only; or
(3) sending a student to a guidance counselor or other district staff member for counseling.

Time-honored classroom management techniques such as these do not constitute disciplinary removals for purposes of this code.

On occasion, a student's behavior may become disruptive.  For purposes of this code of conduct, a disruptive student is a student who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.  A substantial disruption of the educational process or substantial interference with a teacher's authority occurs when a student demonstrates a persistent unwillingness to comply with the teacher's instructions or repeatedly violates the teacher's classroom behavior rules.

A classroom teacher may remove a disruptive student from class for up to five days.  The removal from class applies to the class of the removing teacher only.

If the disruptive student does not pose a danger or ongoing threat of disruption to the academic process, the teacher must provide the student with an explanation for why he or she is being removed and an opportunity to explain his or her version of the relevant events before the student is removed. Only after the informal discussion may a teacher remove a student from class.

If the student poses a danger or ongoing threat of disruption, the teacher may order the student to be removed immediately.  The teacher must, however, explain to the student why he or she was removed from the classroom and give the student a chance to present his or her version of the relevant events within 24-hours.

The teacher must complete a disciplinary referral form and meet with the Principal or his or her designee as soon as possible, but no later than the end of the school day, to explain the circumstances of the removal and to present the removal form.  If the Principal or designee is not available by the end of the same school day, the teacher must submit the form and meet with the Principal or designee prior to the beginning of classes on the next school day.

Within 24 hours after the student's removal, the Principal or another district administrator designated by the Principal must notify the student's parent, in writing, that the student has been removed from class and why. The notice must also inform the parent that he or she has the right, upon request, to meet informally with the Principal or the Principal's designee to discuss the reasons for the removal.

The written notice must be provided by personal delivery, express mail delivery, or some other means that is reasonably calculated to assure receipt of the notice within 24 hours of the student's removal, at the last known address for the parent. Where possible, notice should also be provided by

14

D000164

A-436

Code of Conduct - Continued

telephone if the school has been provided with a telephone number(s) for the purpose of contacting parents.

The Principal may require the teacher who ordered the removal to attend the informal conference.

If at the informal meeting the student denies the charges, the Principal or the Principal's designee must explain why the student was removed and give the student and the student's parents a chance to present the student's version of the relevant events. The informal meeting must be held within 48 hours of the student's removal. The timing of the informal meeting may be extended by mutual agreement of the parent and Principal.

The Principal or the Principal's designee may overturn the removal of the student from class if the Principal finds any one of the following:

1. The charges against the student are not supported by substantial evidence.
2. The student's removal is otherwise in violation of law, including the district's code of conduct.
3. The conduct warrants suspension from school pursuant to Education Law §3214 and a suspension will be imposed.

The Principal or his/her designee may overturn a removal at any point between receiving the referral form issued by the teacher and the close of business on the day following the 48-hour period for the informal conference, if a conference is requested. No student removed from the classroom by the classroom teacher will be permitted to return to the classroom until the Principal makes a final determination, or the period of removal expires, whichever is less.

Any disruptive student removed from the classroom by the classroom teacher shall be offered continued educational programming and activities until he or she is permitted to return to the classroom.

Each teacher must keep a complete log (on a district provided form) for all cases of removal of students from his/her class. The Principal must keep a log of all removals of students from class.

Removal of a student with a disability, under certain circumstances, may constitute a change in the student's placement. Accordingly, no teacher may remove a student with a disability from his or her class until he or she has verified with the Principal or the chairperson of the Committee on Special Education that the removal will not violate the student's rights under state or federal law or regulation.

6.      Suspension from School

Suspension from school is a severe penalty, which may be imposed only upon students who are insubordinate, disorderly, violent or disruptive, or whose conduct otherwise endangers the safety, morals, health or welfare of others.

15

A-437

Code of Conduct – Continued

The Board retains its authority to suspend students, but places primary responsibility for the suspension of students with the Superintendent and the Principals.

Any staff member may recommend to the Superintendent or the Principal that a student be suspended. All staff members must immediately report and refer a violent student to the Principal or the Superintendent for a violation of the code of conduct. All recommendations and referrals shall be made in writing unless the conditions underlying the recommendation or referral warrant immediate attention.  In such cases a written report is to be prepared as soon as possible by the staff member recommending the suspension.

The Superintendent or Principal upon receiving a recommendation or referral for suspension or when processing a case for suspension shall gather the facts relevant to the matter and record them for subsequent presentation as necessary.

   a.   Short term (five days or less) Suspension from School

When the Superintendent or Principal (referred to as the "suspending authority") proposes to suspend a student charged with misconduct for five days or less pursuant to Education Law §3214(3), the suspending authority must immediately notify the student orally.  If the student denies the misconduct, the suspending authority must provide an explanation of the basis for the proposed suspension.   The suspending authority must also notify the student's parents in writing that the student may be suspended from school. The written notice must be provided by personal delivery, express mail delivery, or some other means that is reasonably calculated to assure receipt of the notice within 24 hours of the decision to propose suspension at the last known address for the parents. Where possible, notice should also be provided by telephone if the school has been provided with a telephone number(s) for the purpose of contacting the parents.

The notice shall provide a description of the charges against the student and the incident for which suspension is proposed and shall inform the parents of the right to request an immediate informal conference with the Principal.  Both the notice and informal conference shall be in the dominant language or mode of communication used by the parents.  At the conference, the parents shall be permitted to ask questions of complaining witnesses under such procedures as the Principal may establish.

The notice and opportunity for an informal conference shall take place before the student is suspended unless the student's presence in school poses a continuing danger to persons or property or an ongoing threat of disruption to the academic process.  If the student's presence does pose such a danger or threat of disruption, the notice and opportunity for an informal conference shall take place as soon after the suspension as is reasonably practicable.

After the conference, the Principal shall promptly advise the parents in writing of his or her decision. The Principal shall advise the parents that if they are not satisfied with the decision and wish to pursue the matter, they must file a written appeal to the Superintendent within five business days, unless they can show extraordinary circumstances precluding them from doing so.   The Superintendent shall issue a written decision regarding the appeal within 10 business days of receiving the appeal.  If the parents are not satisfied with the Superintendent's decision, they must

16

A-438

Code of Conduct - Continued

file a written appeal to the Board of education with the District Clerk within 10 business days of the date of the Superintendent's decision, unless they can show extraordinary circumstances precluding them from doing so. Only final decisions of the Board may be appealed to the Commissioner of Education within 30 days of the decision.

      b.     Long term (more than five days) Suspension from School

When the Superintendent determines that a suspension for more than five days may be warranted, he or she shall give reasonable notice to the student and the student's parents of their right to a fair hearing. At the hearing the student shall have the right to be represented by counsel, the right to question witnesses against him or her and the right to present witnesses and other evidence on his or her behalf.

The Superintendent shall personally hear and determine the proceeding or may, in his or her discretion, designate a hearing officer to conduct the hearing. The hearing officer shall be authorized to administer oaths and to issue subpoenas in conjunction with the proceeding before him or her. A record of the hearing shall be maintained, but no stenographic transcript shall be required. A tape recording shall be deemed a satisfactory record. The hearing officer shall make findings of fact and recommendations as to the appropriate measure of discipline to the Superintendent. The report of the hearing officer shall be advisory only, and the Superintendent may accept all or any part thereof.

An appeal of the decision of the Superintendent may be made to the Board that will make its decision based solely upon the record before it. All appeals to the Board must be in writing and submitted to the district clerk within 10 business days of the date of the Superintendent's decision, unless the parents can show that extraordinary circumstances precluded them from doing so. The Board may adopt in whole or in part the decision of the Superintendent. Final decisions of the Board may be appealed to the Commissioner of Education within 30 days of the decision.

      c.     Permanent suspension

Permanent suspension is reserved for extraordinary circumstances such as where a student's conduct poses a life-threatening danger to the safety and well-being of other students, school personnel or any other person lawfully on school property or attending a school function.

      d.     Procedure after Suspension

The Board may condition a student's early return from a suspension on the student's voluntary participation in counseling or specialized classes, such as anger management or dispute resolution. The Board retains discretion in offering this opportunity. If and when the student and/or parent/guardian agree(s) to this option, the terms and conditions shall be specified in writing.

C.     Minimum Periods of Suspension

      1.     Students who bring or possess a weapon on school property

17

D000167

A-439

Code of Conduct – Continued

Any student, other than a student with a disability, found guilty of bringing a weapon onto school property will be subject to suspension from school for at least one calendar year.  Before being suspended, the student will have an opportunity for a hearing pursuant to Education Law §3214. The Superintendent has the authority to modify the one-year suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the following:

1.   The student's age.
2.   The student's grade in school.
3.   The student's prior disciplinary record.
4.   The Superintendent's belief that other forms of discipline may be more effective.
5.   Input from parents, teachers and/or others.
6.   Other extenuating circumstances.

A student with a disability may be suspended only in accordance with the requirements of state and federal law.

2.   Students who commit violent acts other than bringing or possessing a weapon on school property

Any student, other than a student with a disability, who is found to have committed a violent act, other than bringing a weapon onto school property, shall be subject to suspension from school for at least five days.  If the proposed penalty is the minimum five-day suspension, the student and the student's parent will be given the same notice and opportunity for an informal conference given to all students subject to a short-term suspension. If the proposed penalty exceeds the minimum five-day suspension, the student and the student's parent will be given the same notice and opportunity for a hearing given to all students subject to a long-term suspension. The Superintendent has the authority to modify the minimum five-day suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the same factors considered in modifying a one-year suspension for possessing a weapon.

3.   Students who are repeatedly substantially disruptive of the educational process or repeatedly substantially interferes with the teacher's authority over the classroom

Any student, other than a student with a disability, who repeatedly is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom, will be suspended from school for at least five days. For purposes of this code of conduct, "repeatedly is substantially disruptive" means engaging in conduct that results in the student being removed from the classroom by teacher(s) pursuant to Education Law § 3214 (3-a) and this code on four or more occasions during a semester, or three or more occasions during a trimester. If the proposed penalty is the minimum five-day suspension, the student and the student's parent will be given the same notice and opportunity for an informal conference given to all students subject to a short-term suspension. If the proposed penalty exceeds the minimum five-day suspension, the student and the student's parent will be given the same notice and opportunity for a hearing given to all students subject to a long-term suspension. The Superintendent has the authority to modify the minimum

D000168

A-440

Code of Conduct - Continued

five-day suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the same factors considered in modifying a one-year suspension for possessing a weapon.

D.      Referrals

1.             Counseling -
               The Guidance Office shall handle all referrals of students to counseling.

2.             PINS Petitions

        The district may file a PINS (person in need of supervision) petition in Family Court on any student under the age of 18 who demonstrates that he or she requires supervision and treatment by:

        a.      Being habitually truant and not attending school as required by part one of Article 65 of the Education Law.
        b.      Engaging in an ongoing or continual course of conduct which makes the student ungovernable or habitually disobedient and beyond the lawful control of the school.
        c.      Knowingly and unlawfully possesses marijuana in violation of Penal Law § 221.05.  A single violation of § 221.05 will be a sufficient basis for filing a PINS petition.

3.      Juvenile Delinquents and Juvenile Offenders

        The Superintendent is required to refer the following students to the County Attorney for a juvenile delinquency proceeding before the Family Court:

        a.      Any student under the age of 16 who is found to have brought a weapon to school, or

        b.      Any student 14 or 15 years old who qualifies for juvenile offender status under the Criminal Procedure Law § 1.20 (42).

The Superintendent is required to refer students age 16 and older or any student 14 or 15 years old who qualifies for juvenile offender status to the appropriate law enforcement authorities.

## VII.   ALTERNATIVE INSTRUCTION

When a student of any age is removed from class by a teacher or a student of compulsory attendance age is suspended from school pursuant to Education Law §3214, the district will take immediate steps to provide alternative means of instruction for the student.

19

D000169

A-441

Code of Conduct - Continued

## VIII.   DISCIPLINE OF STUDENTS WITH DISABILITIES

The Board of Education recognizes that it may be necessary to suspend, remove or otherwise discipline students with disabilities who violate the district's student code of conduct, and/or to temporarily remove a student with disabilities from his or her current placement because maintaining the student in that placement is substantially likely to result in injury to the student or to others.  The Board also recognizes that students with disabilities deemed eligible for special education services under the IDEA and Article 89 of New York's Education Law enjoy certain procedural protections that school authorities must observe when they decide to suspend or remove them.  Under certain conditions those protections extend, as well, to students not currently deemed to be a student with a disability but determined to be a student presumed to have a disability for discipline purposes.

Therefore, the Board is committed to ensuring that the district follows suspension and removal procedures that are consistent with those protections.  The code of conduct for students is intended to afford students with disabilities and students presumed to have a disability for discipline purposes the express rights they enjoy under applicable law and regulations.

*Definitions*

For purposes of this portion of the code of conduct, and consistent with applicable law and regulations, the following definitions will apply:

1.  *Behavioral intervention plan* (BIP) means a plan that is based on the results of a functional behavioral assessment and that, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs, and intervention strategies that include positive behavioral supports and services to address the behavior.
2.  *Controlled substance* means a drug or other substance abuse identified under schedule I, II, III, IV, or V in section 202(c) of the Controlled Substances Act (21 USC § 812(c)).
3.  *Disciplinary change in placement* means a suspension or removal from a student's current educational placement that is either:
    a.  For more than 10 consecutive school days; or
    b.  For a period of 10 consecutive school days or less if the student is subjected to a series of suspensions or removals that constitute a pattern because they cumulate to more than 10 school days in a school year, because the student's behavior is substantially similar to the student's behavior in previous incidents that resulted in the series of removals, and because of such additional factors as the length of each suspension or removal, the total amount of time the student has been removed and the proximity of the suspensions or removals to one another.
4.  *Illegal drug* means a controlled substance, but does not include a controlled substance legally possessed or used under the supervision of a licensed health-care professional, or a substance that is otherwise legally possessed or used under the authority of the Controlled Substances Act or under any other provision of federal law.
5.  *Interim alternative educational setting* (IAES) means a temporary educational placement, other than the student's current placement at the time the behavior precipitating the IAES

20

D000170

A-442

Code of Conduct – Continued

6.   placement occurred.  An IAES must allow a student to continue to receive educational services that enable him or her to continue to participate in the general curriculum and progress toward meeting the goals set out in the student's individualized education program; as well as to receive, as appropriate, a functional behavioral assessment and behavioral intervention services and modifications designed to address the behavior violation so that it does not recur.

7.   *Manifestation review* means a review of the relationship between the student's disability and the behavior subject to disciplinary action required when the disciplinary action results in a disciplinary change of placement, and conducted in accordance with requirements set forth later in this policy.

8.   *Manifestation team* means a district representative knowledgeable about the student and the interpretation of information about child behavior, the parent, and relevant members of the committee on special education as determined by the parent and the district.

9.   *Removal* means a removal of a student with a disability for disciplinary reasons from his or her current educational placement, other than a suspension; and a change in the placement of a student with a disability to an IAES.

10.  *School day* means any day, including a partial day, which students are in attendance at school for instructional purposes.

11.  *Serious bodily injury* means bodily injury which involves a substantial risk of death, extreme physical pain, protracted obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ or mental faculty.

12.  *Student presumed to have a disability for discipline purposes* means a student who, under the conditions set forth later in this policy, the district is deemed to have had knowledge was a student with a disability before the behavior that precipitated the disciplinary action.

13.  *Suspension* means a suspension pursuant to §3214 of New York's Education Law.

14.  *Weapon* means the same as the term "dangerous weapon" under 18 USC §930(g)(2) which includes a weapon, device, instrument, material or substance, animate or inanimate, that is used for, or is readily capable of causing death or serious bodily injury, except a pocket knife with a blade of less than two and one-half inches in length.

**Authority of School Personnel to Suspend or Remove Students with Disabilities**

The Board, District Superintendent, Superintendent of Schools or a Building Principal with authority to suspend students under the Education Law may order the placement of a student with a disability into an IAES, another setting or suspension for a period not to exceed five consecutive school days.

The Superintendent may, directly or upon the recommendation of a designated hearing officer, order the placement of a student with a disability into an IAES, another setting or suspension for a period not to exceed ten consecutive school days inclusive of any period in which the student has been suspended or removed for the same behavior pursuant to the above paragraph, if the Superintendent determines that the student's behavior warrants the suspension.    The Superintendent also may order additional suspensions of not more than ten consecutive school days in the same school year for separate incidents of misconduct, as long as the suspensions do not constitute a disciplinary change of placement.

21

D000171

A-443

Code of Conduct – Continued

In addition, the Superintendent may order the placement of a student with a disability into an IAES, another setting or suspension for a period in excess of ten consecutive school days if the manifestation team determines that the student's behavior was not a manifestation of the student's disability.  In such an instance, the Superintendent may discipline the student in the same manner and for the same duration as a non-disabled student.

Furthermore, the Superintendent may, directly or upon the recommendation of a designated hearing officer, order the placement of a student with a disability to an IAES to be determined by the committee on special education for a period of up to 45 school days if the student either:

1.   Carries or possesses a weapon to or at school, on school premises or to a school function, or
2.   Knowingly possesses or uses illegal drugs or sells or solicits the sale of a controlled substance while at school, on school premises or at a school function under the district's jurisdiction, or
3.   Has inflicted serious bodily injury upon another person while at school, on school premises or at a school function under the district's jurisdiction.

The Superintendent may order the placement of a student with a disability to an IAES under such circumstances, whether or not the student's behavior is a manifestation of the student's disability. However, the committee on special education will determine the IAES.

**Procedures for the Suspension or Removal of Students with Disabilities by School Personnel**

1.   In cases involving the suspension or removal of a student with a disability for a period of five consecutive school days or less, the student's parents or persons in parental relation to the student will be notified of the suspension and given an opportunity for an informal conference in accordance with the same procedures that apply to such short term suspensions of non-disabled students.
2.   The suspension of students with disabilities for a period in excess of five school days will be subject to the same due process procedures applicable to non-disabled students, except that the student disciplinary hearing conducted by the Superintendent or a designated hearing officer shall be bifurcated into a guilt phase and a penalty phase.  Upon a finding of guilt, the Superintendent or the designated hearing officer will await notification of the determination by the manifestation team as to whether the student's behavior was a manifestation of his or her disability.  The penalty phase of the hearing may proceed after receipt of that notification.  If the manifestation team determined that the behavior was not a manifestation of the student's disability, the student may be disciplined in the same manner as a non-disabled student, except that he or she will continue to receive services as set forth below.  However, if the behavior was deemed a manifestation of the student's disability, the hearing will be dismissed, unless the behavior involved concerned weapons, illegal drugs or controlled substances, or the infliction of serious bodily injury, in which case the student may still be placed in an IAES.

**Limitation on Authority of School Personnel to Suspend or Remove Students with Disabilities**

22

D000172

A-444

Code of Conduct – Continued

The imposition of a suspension or removal by authorized school personnel may not result in a disciplinary change of placement of a student with a disability that is based on a pattern of suspensions or removals as set forth above in the *Definitions* section of this policy, unless:

1.  The manifestation team determines that the student's behavior was not a manifestation of the student's disability, or
2.  The student is removed to an IAES for behavior involving weapons, illegal drugs or controlled substances, or the infliction of serious bodily injury as set forth above.

School personnel will consider any unique circumstances on a case-by-case basis when determining whether a disciplinary change in placement is appropriate for a student with a disability who violates the district's code of conduct.

In addition, school personnel may not suspend or remove a disability in excess of the amount of time that a non-disabled student would be suspended for the same behavior.

**Parental Notification of a Disciplinary Change of Placement**

The district will provide the parents of a student with a disability notice of any decision to make a removal that constitutes a disciplinary change of placement because of a violation of the student code of conduct.  Such notice will be accompanied by a copy of the procedural safeguards notice.

**Authority of an Impartial Hearing Officer to Remove a Student with a Disability**

An impartial hearing officer may order the placement of a student with a disability to an IAES for up to 45 school days at a time if he or she determines that maintaining the current placement of the student is substantially likely to result in injury to the student or to others.  This authority applies whether or not the student's behavior is a manifestation of the student's disability.

**Manifestation Review**

A review of the relationship between a student's disability and the behavior subject to disciplinary action to determine if the conduct is a manifestation of the student's disability will be made by the manifestation team immediately, if possible, but in no case later than 10 school days after a decision is made by:

1.  The Superintendent to change the placement of a student to an IAES;
2.  An impartial hearing officer to place a student in an IAES; or
3.  The Board, the Superintendent, or Building Principal to impose a suspension that constitutes a disciplinary change in placement.

The manifestation team must determine that the student's conduct was a manifestation of the student's disability if it concludes that the conduct in question was either:

1.  Caused by or had a direct or substantial relationship to the student's disability, or

23

A-445

Code of Conduct – Continued

2.  The direct result of the district's failure to implement the student's individualized education program.

The manifestation team must base its determination on a review all relevant information in the student's file including the student's individualized education program, any teacher observations, and any relevant information provided by the parents.

If the manifestation team determines that the student's conduct is a manifestation of the student's disability, the district will:

1.  Have the committee on special education  conduct a functional behavioral assessment of the student and implement a behavioral intervention plan, unless the district had already done so prior to the behavior that resulted in the disciplinary change of placement occurred. However, if the student already has a behavioral intervention plan, the CSE will review the plan and its implementation, and modify it as necessary to address the behavior.
2.  Return the student to the placement from which he or she was removed, unless the change in placement was to an IAES for conduct involving weapons, illegal drugs or controlled substances or the infliction of serious bodily injury, or the parents and the district agree to a change in placement as part of the modification of the behavioral intervention plan.

If the manifestation team determines that the conduct in question was the direct result of the district's failure to implement the student's individualized education program, the district will take immediate steps to remedy those deficiencies.

**Services for Students with Disabilities during Periods of Suspension or Removal**

Students with disabilities who are suspended or removed from their current educational setting in accordance with the provisions of this policy and applicable law and regulation will continue to receive services as follows:

1.  During suspensions or removals of up to 10 school days in a school year that do not constitute a disciplinary change in placement, the district will provide alternative instruction to students with disabilities of compulsory attendance age on the same basis as non-disabled students.  Students with disabilities who are not of compulsory attendance age will receive services during such periods of suspension or removal only to the same extent as non-disabled students of the same age would if similarly suspended.

2.  During subsequent suspensions or removals of up to 10 school days that in the aggregate total more than 10 school days in a school year but do not constitute a disciplinary change in placement, the district will provide students with disabilities services necessary to enable them to continue to participate in the general education curriculum and to progress toward meeting the goals set out in their respective individualized education program.  School personnel, in consultation with at least one of the student's teachers, will determine the extent to which services are needed to comply with this requirement.

D000174

A-446

Code of Conduct – Continued

In addition, during such periods of suspension or removal the district will also provide students with disabilities services necessary for them to receive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications designed to address the behavior violation so that it does not recur.

3.  During suspensions or removals in excess of 10 school days in a school year that constitute a disciplinary change in placement, including placement in an IAES for behavior involving weapons, illegal drugs or controlled substances, or the infliction of serious bodily injury, the district will provide students with disabilities services necessary to enable them to continue to participate in the general curriculum, to progress toward meeting the goals set out in their respective individualized education program, and to receive, as appropriate, a functional

4.  behavioral assessment, and behavioral intervention services and modifications designed to address the behavior violation so it does not recur.

In such an instance, the committee on special education will determine the appropriate services to be provided.

**Students Presumed to Have a Disability for Discipline Purposes**

The parent of a student who is facing disciplinary action but who was not identified as a student with a disability at the time of misconduct has the right to invoke any of the protections set forth in this policy in accordance with applicable law and regulations, if the district is deemed to have had knowledge that the student was a student with a disability before the behavior precipitating disciplinary action occurred and the student is therefore a student presumed to have a disability for discipline purposes.

If it is claimed that the district had such knowledge, it will be the responsibility of the Superintendent, Building Principal or other authorized school official imposing the suspension or removal in question for determining whether the student is a student presumed to have a disability for discipline purposes.  The district will be deemed to have had such knowledge if:

1.  The student's parent expressed concern in writing to supervisory or administrative personnel, or to a teacher of the student that the student is in need of special education. Such expression may be oral if the parent does not know how to write or has a disability that prevents a written statement; or
2.  The student's parent has requested an evaluation of the student; or
3.  A teacher of the student or other school personnel has expressed specific concerns about a pattern of behavior demonstrated by the student, directly to the district's director of special education or other supervisory personnel.

Nonetheless, a student will not be considered a student presumed to have a disability for discipline purposes if notwithstanding the district's receipt of information supporting a claim that it had knowledge the student has a disability,

1.  The student's parent has not allowed an evaluation of the student; or

25

D000175

A-447

Code of Conduct – Continued

2. The student's parent has refused services; or
3. The District conducted an evaluation of the student and determined that the student is not a student with a disability.

If there is no basis for knowledge that the student is a student with a disability prior to taking disciplinary measures against the student, the student may be subjected to the same disciplinary measures as any other non-disabled student who engaged in comparable behaviors. However, if the district receives a request for an individual evaluation while the student is subjected to a disciplinary removal, the district will conduct an expedited evaluation of the student in accordance with applicable law and regulations. Until the expedited evaluation is completed, the student shall remain in the educational placement determined by the district which can include suspension.

**Expedited Due Process Hearings**

The district will arrange for an expedited due process hearing upon receipt of or filing of a due process complaint notice for such a hearing by:

1. The district to obtain an order of an impartial hearing officer placing a student with a disability in an IAES where school personnel maintain that it is dangerous for the student to be in his or her current educational placement;
2. The district during the pendency of due process hearings where school personnel maintain that it is dangerous for the student to be in his or her current educational placement during such proceedings;
3. The student's parent regarding a determination that the student's behavior was not a manifestation of the student's disability; or
4. The student's parent relating to any decision regarding placement, including but not limited to any decision to place the student in an IAES.

The district will arrange for, and an impartial hearing officer will conduct, an expedited due process hearing in accordance with the procedures established in Commissioner's regulations. Those procedures include but are not limited to convening a resolution meeting, and initiating and completing the hearing within the timelines specified in those regulations.

When an expedited due process hearing has been requested because of a disciplinary change in placement, a manifestation determination, or because the district believes that maintaining the student in the current placement is likely to result in injury to the student or others, the student will remain in the IAES pending the decision of the impartial hearing officer or until the expiration of the period of removal, whichever occurs first unless the student's parent and the district agree otherwise.

**Referral to Law Enforcement and Judicial Authorities**

Consistent with its authority under applicable law and regulations, the district will report a crime committed by a student with a disability to appropriate law enforcement and judicial authorities. In such an instance, The Superintendent will ensure that copies of the special education and disciplinary records of the student are transmitted for consideration to the appropriate authorities to

D000176

A-448

Code of Conduct – Continued

whom the crime is reported, to the extent that the transmission is permitted by the Family Educational Rights and Privacy Act (FERPA).

## IX.   CORPORAL PUNISHMENT

Corporal punishment is any act of physical force upon a student for the purpose of punishing that student.  Corporal punishment of any student by any district employee is strictly forbidden.

However, in situations where alternative procedures and methods that do not involve the use of physical force cannot reasonably be used, reasonable physical force may be used to:

1. Protect oneself, another student, teacher or any person from physical injury.
2. Protect the property of the school or others.
3. Restrain or remove a student whose behavior interferes with the orderly exercise and performance of school district functions, powers and duties, if that student has refused to refrain from further disruptive acts.

The district will file all complaints about the use of corporal punishment with the Commissioner of Education in accordance with Commissioner's regulations.

## X.   STUDENT SEARCHES AND INTERROGATIONS

The Board of Education is committed to ensuring an atmosphere on school property and at school functions that is safe and orderly.  To achieve this kind of environment, any school official authorized to impose a disciplinary penalty on a student may question a student about an alleged violation of law or the district code of conduct.  Students are not entitled to any sort of "Miranda"-type warning before being questioned by school officials, nor are school officials required to contact a student's parent before questioning the student. However, school officials will tell all students why they are being questioned.

In addition, the Board authorizes the Superintendent of Schools, Building Principals, Assistant Principals, the school nurse, and district security officials to conduct searches of students and their belongings if the authorized school official has reasonable suspicion to believe that the search will result in evidence that the student violated the law or the district code of conduct.

An authorized school official may conduct a search of a student's belongings that is minimally intrusive, such as touching the outside of a book bag, without reasonable suspicion, so long as the school official has a legitimate reason for the very limited search.

An authorized school official may search a student or the student's belongings based upon information received from a reliable informant. Individuals, other than the district employees, will be considered reliable informants if they have previously supplied information that was accurate and verified, or they make an admission against their own interest, or they provide the same information that is received independently from other sources, or they appear to be credible and the information they are communicating relates to an immediate threat to safety.  District employees

27

D000177

A-449

Code of Conduct – Continued

will be considered reliable informants unless they are known to have previously supplied information that they knew was not accurate.

Before searching a student or the student's belongings, the authorized school official should attempt to get the student to admit that he or she possesses physical evidence that they violated the law or the district code, or get the student to voluntarily consent to the search. Searches will be limited to the extent necessary to locate the evidence sought.

Whenever practicable, searches will be conducted in the privacy of administrative offices and students will be present when their possessions are being searched.

A.     Student Lockers, Desks and other School Storage Places

The rules in this code of conduct regarding searches of students and their belongings do not apply to student lockers, desks and other school storage places. Students have no reasonable expectation of privacy with respect to these places and school officials retain complete control over them. This means that student lockers, desks and other school storage places may be subject to search at any time by school officials, without prior notice to students and without their consent.

B.     Documentation of Searches

The authorized school official conducting the search shall be responsible for promptly recording the following information about each search:

1. Name, age and grade of student searched.
2. Reasons for the search.
3. Name of any informant(s).
4. Purpose of search (that is, what item(s) were being sought).
5. Type and scope of search.
6. Person conducting search and his or her title and position.
7. Witnesses, if any, to the search.
8. Time and location of search.
9. Results of search (that is, what items(s) were found).
10. Disposition of items found.
11. Time, manner and results of parental notification.

The Principal or the Principal's designee shall be responsible for the custody, control and disposition of any illegal or dangerous item taken from a student. The Principal or his or her designee shall clearly label each item taken from the student and retain control of the item(s), until the item is turned over to the police. The Principal or his or her designee shall be responsible for personally delivering dangerous or illegal items to police authorities.

C.     Police Involvement in Searches and Interrogations of Students

District officials are committed to cooperating with police officials and other law enforcement authorities to maintain a safe school environment. Police officials, however, have limited authority

D000178

A-450

Code of Conduct – Continued

to interview or search students in schools or at school functions, or to use school facilities in connection with police work. Police officials may enter school property or a school function to question or search a student or to conduct a formal investigation involving students only if they have:

1. A search or an arrest warrant; or
2. Probable cause to believe a crime has been committed on school property or at a school function; or
3. Been invited by school officials.

Before police officials are permitted to question or search any student, the Principal or his or her designee shall first try to notify the student's parent to give the parent the opportunity to be present during the police questioning or search. If the student's parent cannot be contacted prior to the police questioning or search, the questioning or search shall not be conducted. The Principal or designee will also be present during any police questioning or search of a student on school property or at a school function.

Students who are questioned by police officials on school property or at a school function will be afforded the same rights they have outside the school. This means:
1. They must be informed of their legal rights.
2. They may remain silent if they so desire.
3. They may request the presence of an attorney.

D.    Child Protective Services Investigations

Consistent with the district's commitment to keep students safe from harm and the obligation of school officials to report to child protective services when they have reasonable cause to suspect that a student has been abused or maltreated, the district will cooperate with local child protective services workers who wish to conduct interviews of students on school property relating to allegations of suspected child abuse, and/or neglect, or custody investigations.

All requests by child protective services to interview a student on school property shall be made directly to Principal or his or her designee. The Principal or designee shall set the time and place of the interview. The Principal or designee shall decide if it is necessary and appropriate for a school official to be present during the interview, depending on the age of the student being interviewed and the nature of the allegations. If the nature of the allegations is such that it may be necessary for the student to remove any of his or her clothing in order for the child protective services worker to verify the allegations, the school nurse or other district medical personnel must be present during that portion of the interview. No student may be required to remove his or her clothing in front of a child protective services worker or school district official of the opposite sex.

A child protective services worker may not remove a student from school property without a court order, unless the worker reasonably believes that the student would be subject to danger of abuse if not he or she were not removed from school before a court order can reasonably be obtained. If the worker believes the student would be subject to danger of abuse, the worker may remove the student without a court order and without the parent's consent.

29

A-451

Code of Conduct – Continued

## XI.   VISITORS TO THE SCHOOLS

The Board encourages parents and other district citizens to visit the district's schools and classrooms to observe the work of students, teachers and other staff. Since schools are a place of work and learning, however, certain limits must be set for such visits.  The Principal or his or her designee is responsible for all persons in the building and on the grounds.  For these reasons, the following rules apply to visitors to the schools:

1.  Anyone who is not a regular staff member or student of the school will be considered a visitor.
2.  All visitors to the school must report to the Front Desk/ Attendance Office upon arrival at the school.  There they will be required to sign the visitor's register and present photo identification.  A visitor's identification badge will be issued which must be worn at all times while in the school or on school grounds.  The visitor must return the identification badge to the Front Desk/ Attendance Office before leaving the building.
3.  Visitors attending school functions that are open to the public, such as concerts, athletic events, parent-teacher organization meetings, or other designated public gatherings are not required to register as determined by the administration.
4.  Parents or citizens who wish to observe a classroom while school is in session are required to arrange such visits in advance with the Principal or his or her designee, in consultation with the classroom teacher, so that class disruption is kept to a minimum.
5.  Teachers are expected not to take class time to discuss individual matters with visitors.
6.  Any unauthorized person on school property will be reported to the Principal or his or her designee.  Unauthorized persons will be asked to leave.  The police may be called if the situation warrants as determined by the administration or designee.
7.  All visitors are expected to abide by the rules for public conduct on school property contained in this code of conduct.

## XII.   PUBLIC CONDUCT ON SCHOOL PROPERTY

The district is committed to providing an orderly, respectful environment that is conducive to learning.  To create and maintain this kind of an environment, it is necessary to regulate public conduct on school property and at school functions. For purposes of this section of the code, "public" shall mean all persons when on school property or attending a school function including students, teachers and district personnel.

The restrictions on public conduct on school property and at school functions contained in this code are not intended to limit freedom of speech or peaceful assembly. The district recognizes that free inquiry and free expression are indispensable to the objectives of the district.  The purpose of this code is to maintain public order and prevent abuse of the rights of others.

All persons on school property or attending a school function shall conduct themselves in a respectful and orderly manner.  In addition, all persons on school property or attending a school function are expected to be properly attired for the purpose they are on school property.

A.   Prohibited Conduct

30

D000180

A-452

Code of Conduct – Continued

No person, either alone or with others, shall:

1. Intentionally injure any person or threaten to do so.
2. Intentionally damage or destroy school district property or the personal property of a teacher, administrator, other district employee or any person lawfully on school property, including graffiti or arson.
3. Disrupt the orderly conduct of classes, school programs or other school activities.
4. Distribute or wear materials on school grounds or at school functions that are obscene, advocate illegal action, appear libelous, obstruct the rights of others, or are
5. disruptive to the school program.
6. Intimidate, harass or discriminate against any person on the basis of
7. actual or perceived race, creed, color, weight, national origin, ethnic group, religion, religious practice, disability, sex, sexual orientation, or gender (including gender identity and expression).
8. Enter any portion of the school premises without authorization or remain in any building or facility after it is normally closed.
9. Obstruct the free movement of any person in any place to which this code applies.
10. Violate the traffic laws, parking regulations or other restrictions on vehicles.
11. Possess, consume, sell, distribute or exchange alcoholic beverages, controlled substances, or be under the influence of either on school property or at a school function
12. Possess or use weapons in or on school property or at a school function, except in the case of law enforcement officers or except as specifically authorized by the school district.
13. Loiter on or about school property.
14. Gamble on school property or at school functions.
15. Refuse to comply with any reasonable order of identifiable school district officials performing their duties.
16. Willfully incite others to commit any of the acts prohibited by this code.
17. Violate any federal or state statute, local ordinance or Board policy while on school property or while at a school function.

B. Penalties

Persons who violate this code shall be subject to the following penalties:

1. *Visitors.* Their authorization, if any, to remain on school grounds or at the school function shall be withdrawn and they shall be directed to leave the premises. If they refuse to leave, they shall be subject to ejection.
2. *Students.* They shall be subject to disciplinary action as the facts may warrant, in accordance with the due process requirements. Tenured faculty members. They shall be subject to disciplinary action as the facts may warrant in accordance with Education Law § 3020-a or any other legal rights that they may have.
3. *Staff members* in the classified service of the civil service entitled to the protection of Civil Service Law § 75. They shall be subject to immediate ejection and to disciplinary action as the facts may warrant in accordance with Civil Service Law §

31

D000181

A-453

Code of Conduct – Continued

4. 75 or any other legal rights that they may have.
5. *Staff members* other than those described in subdivisions 3 and 4. They shall be subject to warning, reprimand, suspension or dismissal as the facts may warrant in accordance with any legal rights they may have.

C. Enforcement

The Principal or his/her designee shall be responsible for enforcing the conduct required by this code.

When the Principal or his or her designee sees an individual engaged in prohibited conduct, which in his or her judgment does not pose any immediate threat of injury to persons or property, the Principal or designee shall tell the individual that the conduct is prohibited and attempt to persuade the individual to stop. The Principal or designee shall also warn the individual of the consequences for failing to stop. If the person refuses to stop engaging in the prohibited conduct, or if the person's conduct poses an immediate threat of injury to persons or property, the Principal or designee shall have the individual removed immediately from school property or the school function. If necessary, local law enforcement authorities will be contacted to assist in removing the person.

The district shall initiate disciplinary action against any student or staff member, as appropriate, with the "Penalties" section above. In addition, the district reserves its right to pursue a civil or criminal legal action against any person violating the code.

## XIII. DISSEMINATION AND REVIEW

A. **Dissemination of Code of Conduct**

The Board will work to ensure that the community is aware of this code of conduct by:

1. Providing copies of an age-appropriate, plain language summary of the code to all students at an assembly to be held at the beginning of each school year.
2. Providing a plain language summary to all parents at the beginning of the school year, and thereafter on request.
1. Posting the complete code of conduct on the district's website.
2. Providing all current teachers and other staff members with a copy of the code and a copy of any amendments to the code as soon as practicable after adoption.
3. Providing all new employees with a copy of the current code of conduct when they are first hired.
4. Making copies of the complete code available for review by students, parents and other community members.

The Board will sponsor an in-service education program for all district staff members to ensure the effective implementation of the code of conduct. The Superintendent may solicit the recommendations of the district staff, particularly teachers and administrators, regarding in-service programs pertaining to the management and discipline of students. On-going professional

D000182

A-454

Code of Conduct – Continued

development will be included in the district's professional development plan, as needed.

**B.      Review of Code of Conduct**

The Board will review this code of conduct every year and update it as necessary.  In conducting the review, the Board will consider how effective the code's provisions have been and whether the code has been applied fairly and consistently.

The Board may appoint an advisory committee to assist in reviewing the code and the district's response to code of conduct violations.  The committee will be made up of representatives of student, teacher, administrator, and parent organizations, school safety personnel and other school personnel.

Before adopting any revisions to the code, the Board will hold at least one public hearing at which school personnel, parents, students and any other interested party may participate.

The code of conduct and any amendments to it will be filed with the Commissioner of Education, in a manner prescribed by the Commissioner, no later than 30 days after adoption.

D000183

A-455

# EXHIBIT NN

**A-456**

# Livingston Manor Central School District

### John P. Evans, Superintendent
P.O. Box 947 ▪ 19 School Street
Livingston Manor, NY  12758

BOARD OF EDUCATION
Elliott Madison, President
James Buck, Vice President
Frank Adamse
Dawn D'Auria
Jason Gorr
Jane Mann, District Clerk

April 23, 2021

Mr. and Mrs. Gordon LeRoy
PO Box 193
Livingston Manor, NY  12758

> Re:  **Case LeRoy** Superintendent's Hearing pursuant to Education Law §3214, regarding the incidents of **April 19, 2021**

Dear Mr. and Mrs. LeRoy:

Please take notice that, in accordance with Section 3214(3) of NYS Education Law, a Superintendent's Hearing will be held concerning your child, **Case LeRoy.** The hearing will take place on **Tuesday, April 27, 2021 at 9:00 am** in the 1st Floor Conference Room of the Livingston Manor Central School District, 19 School Street, Livingston Manor, New York. Please note the date and time and be in attendance with **Case LeRoy.** Ms. Kate Reid will serve as the Hearing Officer.

Following the hearing, it will be decided whether **Case LeRoy** will be suspended out-of-school beyond the five (5) days he has already been suspended. **Case LeRoy** has been charged with:

**Charge 1:** Article VI(A)(5) - Engaging in any willful act which disrupts the normal operation of the school community

**Charge 2:** Article VI (C)(3) – Display or use of personal electronic devices, such as but not limited to, cell phones, I-Pods, digital cameras, in a manner that is in violation of district policy

**Charge 3:** Article VI (E)(4) – Discrimination, which includes using race, color, creed, national origin, ethnic group, religion, religious practice, sex, gender (identity and expression), sexual orientation, weight or disability to deny rights, equitable treatment or access to facilities available to others

**Charge 4:** Article VI (E)(5) – Harassment, which includes a sufficiently severe action or persistent pervasive pattern of actions or statements directed at an identifiable individual or group which are intended to be, or which a reasonable person would perceive as ridiculing or demeaning. Harassment is also the creation of a hostile environment.

**Charge 5:** Article VI (H) – Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

Under the Code of Conduct, the charged acts are posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which have resulted in a substantial disruption to the school environment.

*Revised*

A-457

**Please take further notice** that at the hearing, the student shall be afforded the following rights and privileges:

1. The right to be represented by counsel;
2. The right to receive prior notice of your child's anecdotal record (which may include his/her attendance, disciplinary and performance history) and the opportunity to rebut its effect;
3. The right to question witnesses against your child;
4. The right to testify or refrain from testifying at the hearing;
5. The right to present witnesses and evidence;
6. The right to have the Superintendent, or his designee, issue subpoenas for witnesses;
7. The right to have a record of the hearing maintained;
8. To receive a decision from the Superintendent;
9. The right to appeal to the Livingston Manor Central School District Board of Education from any decision of the Superintendent of Schools: All appeals to the Board must be in writing and submitted to the District Clerk (Jane Mann) within 10 business days of the date of the Superintendent's decision, unless the parents can show that extraordinary circumstances precluded them from doing so.  The Board may adopt in whole or in part of the decision of the Superintendent.
10. The right to appeal the Board's decision to the Commissioner of Education within 30 days of the decision;

    **Please take further notice** that in the event the student is found to have committed any or all of the aforementioned acts or omissions, you are subject to such discipline, as the Superintendent of schools shall direct, including, but not limited to, temporary or permanent suspension form attendance at school.

    **Please take further notice** that in the event you are found to have committed the aforementioned acts or omissions, prior disciplinary referrals, letters, writings and other memorandum, will be offered into evidence at said hearing regarding the mode of discipline to be imposed.

Very Truly Yours,


John P. Evans
Superintendent of Schools

A-458

# EXHIBIT OO

A-459

FINDINGS OF FACT AND RECOMMENDATION
TO THE
SUPERINTENDENT OF SCHOOLS
LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT

STUDENT   LeRoy, Case          PARENTS   Mr. and Mrs. Gordon LeRoy

SUMMARY

On April 27, 2021, a suspension hearing pursuant to Section 3214 of the New York Education Law was held at your direction in regard to Case LeRoy ("Case" or the "Student") at 9:00 AM at the Livingston Manor Central School District (the "District") 19 School Street, Livingston Manor, New York.

In five charges, Case was charged with violating the District's Code of Conduct.  The charges arise out of the allegation that Case posted racially offensive material on social media, which resulted in a substantial disruption to the school environment.  On April 21, 2021, the Principal of the Middle/High School suspended Case for five (5) school days and referred him to a Superintendent's hearing.  On April 23, 2021, the Superintendent of Schools sent Mr. and Ms. Gordon LeRoy (the "Parents") a letter advising them that the Superintendent's hearing would take place on April 27, 2021 and advising them of Case's rights.  At the outset of the hearing, the Parents acknowledged receipt of the April 23, 2021 letter and indicated that they understood the rights outlined therein.

Present on behalf of the school district were:

John P. Evans, Superintendent of Schools
Ms. Bethany Centrone, Esq., Legal Counsel for the District

Present on behalf of the Student were:

Case LeRoy, Student
Mr. and Mrs. Gordon LeRoy, Parents

PHASE I

In its case in chief, the District entered the following exhibits into evidence:

1.  Exhibit 1 - April 21, 2021 Letter to the Parents from the Middle/High School
    suspending Case for five school days
2.  Exhibit 2 - April 23, 2021 Letter to the Parents from the Superintendent of Schools
    scheduling a Superintendent's hearing.
3.  Exhibit 3 – Photograph from "Snap Chat" depicting student M█████ M█████
    kneeling on Case's neck with the caption "cops got another"
4.  Exhibit 4 – The same photograph depicted in Exhibit 3 with the addition of a "Black
    Lives Matter" sticker

12455767.1 4/28/2021

D000184

A-460

5. Exhibit 5 – A photograph depicting a student Devon standing over another student CJ in a classroom. One of Devon's hands is holding CJ's hands behind CJ's back and Devon's other hand is placed on the back of CJ's neck. The photograph has the caption "Looks almost to [sic] realistic."

6. Exhibit 6 – Interview notes taken by Mr. Evans of both Case and the other students depicted in the pictures posted on social media

7. Exhibit 7 – Screenshots depicting social media activity about the pictures depicted in exhibits 1 and 2.[1]

In its case in chief, the District presented testimony from both the Superintendent of Schools and the Student himself. In his direct testimony, Case acknowledged that on or about April 19, 2021, Student J██ G██ ("J██") took the picture of M██ M█████ ("M██") kneeling on Case's neck while Case was lying on the ground next to a car. At the time of this incident, a Minnesota jury was in the process of reaching the verdict that ultimately convicted Derek Chauvin of the murder of George Floyd.

Case testified that J██ sent the picture to Case and M██. All three students then posted the picture on SnapChat. Case testified that he posted the picture along with the caption "Cops got another." M██ posted the picture along with the caption "Another one down" and also added a "Black Lives Matter" image to the picture. Notes entered into evidence by the District reflect that Case was interviewed by the Superintendent on April 20, 2021, at which time he stated that he "didn't mean anything" by posting the picture, and that he did not intend to be racially insensitive. He testified at the hearing that he and the other students quickly removed the picture after he learned that M██ had attached a "Black Lives Matter" sticker to it on SnapChat. He testified that the use of the Black Lives Matter sticker made him realize that the picture could be "read the wrong way" and could be perceived as racially insensitive to the George Floyd murder. Both during his interview with Mr. Evans and during the hearing, Case denied any knowledge that the Derek Chauvin trial was occuring at the same time the picture was posted and denied that he intended to be racially insensitive.

Case further acknowledged in his direct testimony that on or about March 25, 2021, during his first period English class, a student, CJ, asked another student, D██ to demonstrate a "hold." Case testified that CJ and D██ asked him to take a picture of them engaged in the hold; that Case took the picture as directed; and that Case sent copies of the picture to both CJ and D██ through SnapChat. Case denied posting the picture on social media to a broader audience and claimed that either CJ or D██ placed the "Looks almost to [sic] realistic" caption on the photo on SnapChat. The contemporaneous notes from Case's interview with the Superintendent are consistent with Chase's testimony.

The Superintendent testified in great detail regarding the disruption to the school environment created by both of the pictures posted by Case on social media. The posts drew significant attention from the news media (both television and newspaper) and the community that necessitated considerable response from the Superintendent and the Building Principal. The

---

[1] This screenshot is not printed in a large enough format to be legible. Accordingly, it it not being considered with respect to the findings of fact in this report

A-461

Superintendent needed to intervene because students at the Middle/High School planned a demonstration to protest the posts, which they uniformly perceived as racist. The postings necessitated that the Superintendent schedule an assembly for students in grades 7-12 to explain that the District was taking the matter seriously and working to address racism in the District. All told, the posts resulted in substantial interruptions in instruction and required substantial attention and intervention by multiple school administrators.

Based on the above, I find that the District sustained its burden of proof with respect to two of the five charges.[2] Specifically, I find competent and substantial evidence to support that Case violated the following provisions of the District's Code of Conduct:

1. Charge 1: Article VI(A)(5) – Engaging in any wilful act which disrupts the normal operation of the school community.
2. Charges 5: Article VI(H) – Engaging in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

Case admitted that he was depicted in the April 19, 2021 photo and that he posted the photo on social media. He further admitted that he took the picture of D█████ and CK and that he disseminated that picture to others on social media. Any reasonable person would construe the content of both photos as racially insensitive, particularly in light of the close proximity between the posting of the photos and the Derek Chauvin trial. Case's professed ignorance of the trial and the connotations of the photo do not excuse his actions. Any reasonable student of Case's age and maturity should have been aware that the photos would be construed as a racially insensitive mockery of the murder of George Floyd. Case either knew or should have known that posting this picture on social media would create a substantial disruption of the school environment. In fact, the testimony of Mr. Evans established that Case's actions resulted in multiple days of disruption to the school district; considerable interruptions in instruction; great distress on the part of multiple students and community members; and allegations that the District, itself, was condoning racism. These allegations have harmed the District's relationship with its community and will need to continue to be addressed by the District's administration, long after the conclusion of this hearing process.

PHASE II

During Phase II of the hearing, the Parents and Case himself expressed remorse regarding Case's actions. However, I did not find Case's remorse to be entirely credible. Both Case and the Parents attempted to shift blame to a student who "reposted" the racist posts. This blame-shifting appeared to reflect a lack of understanding by Case that when he posts content on social media, that content is available for all the world to see and he is responsible for the repercussions of such postings. I likewise found it not credible that Case failed to understand the racial implications of the content he generated. I find that it is more likely that Case did

_____

[2] As I noted on the record during the hearing, I do not find that the District sustained its burden of proof with respect to the remaining charges in the hearing notice. There is no evidence that Case directed the racist post towards any specific person or that his behavior constituted a violation of any District policy regarding the use of technology on school premises.

12455767.1 4/28/2021

A-462

understand those implications, but merely did not appreciate the enormity of the response that the post would generate. In short, he failed to appreciate that his actions have foreseeable consequences.

In addition to their testimony and the testimony of Case, the Parents also introduced a series of letters from community members that all attest to Case's strong character. When questioned regarding Case's anecdotal record, Superintendent Evans affirmed that Case does not have a history of any prior school-based discipline.

Because this is Case's first documented school disciplinary incident, I do not believe that this incident should define the rest of his school career. Nonetheless, I recommend that the Superintendent impose a penalty that is sufficient to ensure that Case understands the seriousness of his actions and that is sufficient to deter other students from engaging in similarly insensitive conduct. Case has already served a five day suspension from school. I recommend that the Superintendent suspend Case through May 21, 2021, but consider offering Case an option for an earlier return, should he and his parents agree to enter into a disciplinary contract and/or agree to participate in restorative practices in connection with this incident.

Respectfully submitted,

*/s/ Kate I. Reid*
        Kate I. Reid, Esq.

12455767.1 4/28/2021

A-463

# EXHIBIT PP

A-464

# Livingston Manor Central School District

### John P. Evans, Superintendent
P.O. Box 947 • 19 School Street
Livingston Manor, NY  12758

BOARD OF EDUCATION
Elliott Madison, President
James Buck, Vice President
Frank Adamse
Dawn D'Auria
Jason Gorr
Jane Mann, District Clerk

April 28, 2021

STUDENT   LeRoy, Case        PARENTS    Mr. and Mrs. Gordon LeRoy

On April 27, 2021, a suspension hearing pursuant to Section 3214 of the New York Education Law was held at the direction of the Superintendent in regard to Case LeRoy ("Case" or the "Student") at 9:00 AM at the Livingston Manor Central School District (the "District") 19 School Street, Livingston Manor, New York.  Kate I. Reid, Esq. served as the hearing office appointed by the Superintendent.

Attached is a complete copy of the Findings of Fact and Recommendations of the hearing office, Kate I. Reid, Esq.

In the hearing the hearing officer found competent and substantial evidence to support that Case violated the following provisions of the District's Code of Conduct:

1. Charge 1: Article VI(A)(5) – Engaging in any wilful act which disrupts the normal operation of the school community.
2. Charges 5: Article VI(H) – Engaging in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

The hearing officer's recommendation reads as follows: Because this is Case's first documented school disciplinary incident, I do not believe that this incident should define the rest of his school career.  Nonetheless, I recommend that the Superintendent impose a penalty that is sufficient to ensure that Case understands the seriousness of his actions and that is sufficient to deter other students from engaging in similarly insensitive conduct.  Case has already served a five day suspension from school. I recommend that the Superintendent suspend Case through May 21, 2021, but consider offering Case an option for an earlier return, should he and his parents agree to enter into a disciplinary contract and/or agree to participate in restorative practices in connection with this incident

I accept these recommendations and modify them to include that Case is suspended from participation in all extra-curricular activities through the remainder of the school year, up to and including the Class of 2021 graduation ceremony.

Phone (845) 439-4400 • Main Office Ext. 1201 • Fax (845) 439-4717 • Website: http://lmcs.k12.ny.us
• HS/MS Office Ext. 1207 • Elementary Office Ext. 1200 • Special Svc Ext. 1203 • Guidance Ext. 1213

D000091

A-465

While the behavior is unacceptable and warrants a long term suspension, it is important that he receive education and not miss a significant amount of time while suspended. A Contract of Conduct would permit the student to be in attendance while his suspension is held in abeyance and would permit him to continue schooling as long as he complies with the rules provided in the Code of Conduct. Should Case and his parents agree to enter into a disciplinary contract and/or agree to participate in restorative practices in connection with this incident, an early return on or about May 10, 2021 would be considered.

While suspended,  Case is scheduled for daily in-person PM school starting on April 28, 2021 from 3-5 pm Monday – Thursday each week and from 9-11am on Fridays.  Accommodations are also being made for all CTE program work to be made available during PM school.

Your rights and information on how to appeal this decision to the Board of Education are listed on the back of the 3214 hearing letter.

Respectfully,

John P. Evans, Superintendent

A-466

# EXHIBIT QQ

A-467

# Livingston Manor Central School

### John P. Evans, Superintendent

P.O. Box 947 • 19 School Street • Livingston Manor, NY  12758

**HOLDING OF LONG-TERM SUSPENSION IN ABEYANCE**
**AND CONTRACT OF CONDUCT**

On April 27, 2021, a suspension hearing pursuant to Section 3214 of the New York Education Law was held in regard to Case LeRoy ("Case" or the "Student") at 9:00 AM at the Livingston Manor Central School District (the "District") 19 School Street, Livingston Manor, New York.

In five charges, Case was charged with violating the District's Code of Conduct.  The charges arise out of the allegation that Case posted racially offensive material on social media, which resulted in a substantial disruption to the school environment.  On April 21, 2021, the Principal of the Middle/High School suspended Case for five (5) school days and referred him to a Superintendent's hearing.  On April 23, 2021, the Superintendent of Schools sent Mr. and Ms. Gordon LeRoy (the "Parents") a letter advising them that the Superintendent's hearing would take place on April 27, 2021 and advising them of Case's rights.  At the outset of the hearing, the Parents acknowledged receipt of the April 23, 2021 letter and indicated that they understood the rights outlined therein.

At the conclusion of the hearing the hearing officer found competent and substantial evidence to support that Case violated the following provisions of the District's Code of Conduct:

A.     Charge 1: Article VI(A)(5) – Engaging in any willful act which disrupts the normal operation of the school community.

B.     Charges 5: Article VI(H) – Engaging in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

Having been found guilty of the above charges I wish to return to school early and agree to the following terms and conditions:

1      I am above the age of 15 years.

2      I have received from the Superintendent of schools a suspension upon instruction for a period of 18 additional days commencing on **April 28, 2021** and ending on **May 21, 2021** as a result of an incident of **April 19, 2021**.

3.     I desire to return to attendance upon instruction and request the Superintendent of schools to place me on probation, upon the following assurances:

Phone (845)-439-4400 • Main Office Ext. 1201 • Fax (845) 439-4717 • Website:  http://lmcs.k12.ny.us
• HS/MS Office Ext. 1207 • Elementary Office Ext. 1200 • Special Svc Ext. 1203 • Guidance Ext. 1213

D000105

A-468

   a.    I shall apply myself diligently to successfully complete my courses as may be scheduled by and at the discretion of the district.

   b.    I am aware of and shall comply in all respects with the rules and regulations established by the Board of Education and school administration as well as all of the rules of conduct set forth in the student handbook.

   c.    I shall participate in any recommended Restorative Justice, Diversity, Equity and Inclusivity training opportunities offered or coordinated by the district.

4.    In consideration of each of my assurances set forth in paragraph 3, I shall be permitted to resume attendance upon instruction as follows:

   a.    During the remainder of the 2021 school year, ending June 30, 2021, I shall attend such alternate instruction as may be scheduled for me by the district.

   b.    At the complete discretion of the district, based upon the compliance by me of each of my assurances set forth in paragraph 3, I shall be permitted to resume attendance upon instruction beginning on **Monday, May 10, 2021**.

5.    I understand that, if I fail in any of the assurances set forth in paragraph 3, the Superintendent of schools may, at the Superintendent's discretion, on written notice mailed to me and my parents, impose the period of suspension which has been stayed. If I contest the fact that I failed to comply with the contract of conduct, I may request a conference with the Superintendent or his designee, where the basis of the assertion that I violated paragraph 3 will be reviewed. After this conference, the Superintendent shall advise me in writing whether, based on the conference, my suspension shall continue to be stayed or whether the period of my suspension shall be re-imposed.

6.    I understand that, by signing this contract, in the event that it is alleged that I have violated the contract, I am waiving my rights to a hearing under Education Law §3214 which include notice of charges, a hearing with the right to question witnesses and present evidence, appeal to the Board of Education and judicial review.

D000106

A-469

a.  I shall apply myself diligently to successfully complete my courses as may be scheduled by and at the discretion of the district.

b.  I am aware of and shall comply in all respects with the rules and regulations established by the Board of Education and school administration as well as all of the rules of conduct set forth in the student handbook.

c.  I shall participate in any recommended Restorative Justice, Diversity, Equity and Inclusivity training opportunities offered or coordinated by the district.

4.  In consideration of each of my assurances set forth in paragraph 3, I shall be permitted to resume attendance upon instruction as follows:

a.  During the remainder of the 2021 school year, ending June 30, 2021, I shall attend such alternate instruction as may be scheduled for me by the district.

b.  At the complete discretion of the district, based upon the compliance by me of each of my assurances set forth in paragraph 3, I shall be permitted to resume attendance upon instruction beginning on **Monday, May 10, 2021.**

5.  I understand that, if I fail in any of the assurances set forth in paragraph 3, the Superintendent of schools may, at the Superintendent's discretion, on written notice mailed to me and my parents, impose the period of suspension which has been stayed.  If I contest the fact that I failed to comply with the contract of conduct, I may request a conference with the Superintendent or his designee, where the basis of the assertion that I violated paragraph 3 will be reviewed.  After this conference, the Superintendent shall advise me in writing whether, based on the conference, my suspension shall continue to be stayed or whether the period of my suspension shall be re-imposed.

6.  I understand that, by signing this contract, in the event that it is alleged that I have violated the contract, I am waiving my rights to a hearing under Education Law §3214 which include notice of charges, a hearing with the right to question witnesses and present evidence, appeal to the Board of Education and judicial review.

| A-470 |
| --- |

# Livingston Manor Central School

## John P. Evans, Superintendent

P.O. Box 947 • 19 School Street • Livingston Manor, NY  12758

**HOLDING OF LONG-TERM SUSPENSION IN ABEYANCE**
**AND CONTRACT OF CONDUCT**

On April 27, 2021, a suspension hearing pursuant to Section 3214 of the New York Education Law was held in regard to Case LeRoy ("Case" or the "Student") at 9:00 AM at the Livingston Manor Central School District (the "District") 19 School Street, Livingston Manor, New York.

In five charges, Case was charged with violating the District's Code of Conduct.  The charges arise out of the allegation that Case posted racially offensive material on social media, which resulted in a substantial disruption to the school environment.  On April 21, 2021, the Principal of the Middle/High School suspended Case for five (5) school days and referred him to a Superintendent's hearing.  On April 23, 2021, the Superintendent of Schools sent Mr. and Ms. Gordon LeRoy (the "Parents') a letter advising them that the Superintendent's hearing would take place on April 27, 2021 and advising them of Case's rights.  At the outset of the hearing, the Parents acknowledged receipt of the April 23, 2021 letter and indicated that they understood the rights outlined therein.

At the conclusion of the hearing the hearing officer found competent and substantial evidence to support that Case violated the following provisions of the District's Code of Conduct:

A.    Charge 1: Article VI(A)(5) – Engaging in any willful act which disrupts the normal operation of the school community.

B.    Charges 5: Article VI(H) – Engaging in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

Having been found guilty of the above charges I wish to return to school early and agree to the following terms and conditions:

1    I am above the age of 15 years.

2    I have received from the Superintendent of schools a suspension upon instruction for a period of 18 additional days commencing on **April 28, 2021** and ending on **May 21, 2021** as a result of an incident of **April 19, 2021**.

3.        I desire to return to attendance upon instruction and request the Superintendent of schools to place me on probation, upon the following assurances:

Phone (845)-439-4400 • Main Office Ext. 1201 • Fax (845) 439-4717 • Website: http://lmcs.k12.ny.us
• HS/MS Office Ext. 1207 • Elementary Office Ext. 1200 • Special Svc Ext. 1203 • Guidance Ext. 1213

D000108

A-471

DATED: _____ , 2021

_____

**PARENT/LEGAL GUARDIAN (OF A STUDENT UNDER THE AGE OF 18)**

_____

**STUDENT**

John P. Evans, Superintendent

Based upon the assurances of **Case LeRoy** set forth above, the suspension upon instruction of **Case LeRoy** is hereby stayed and he is placed on probation in accordance with the provisions set forth in the student's contract of conduct.

D000109

A-472

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CASE LEROY,

                      Plaintiff,

        -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                      Defendants.

-------------------------------------------------------------------X

**AFFIDAVIT OF
JOHN EVANS**

Docket No: 21-cv-6008
(NSR) (AEK)

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF SULLIVAN   )

      JOHN EVANS, being duly sworn, deposes and states the following under penalty of

perjury:

      1.     I am the Superintendent of Schools of the Livingston Manor Central School District

("District"), a position I have held since 2017. I submit this Affidavit based upon my personal

knowledge of the events described below. The referenced documents are maintained within the

District's files and are attached to the Declaration of Chelsea Weisbord, submitted in support of

Defendants' motion for summary judgment and in opposition of Plaintiff's partial motion for

summary judgment.

      2.     The District maintains only one school building which houses grade pre-K through

12th and approximately 420 students.

      3.     As further discussed below, in April 2021 I became aware of several social media

posts involving Plaintiff, which caused a significant disruption to the District environment.

      4.     One of the photos circulating social media depicted Plaintiff lying on the ground

1

A-473

with another student kneeling on his neck and giving the "thumbs up" symbol. A copy of Plaintiff's April 19, 2021 Snapchat post is attached to the Declaration of Chelsea Weisbord as Exhibit J. Plaintiff admitted to posting this image to his Snapchat account on April 19 with the caption "Cops got another."

5.     I immediately recognized that the photograph was a reference to the events of the ongoing trial of Derick Chauvin for the murder of George Floyd in Minnesota. Other District personnel, students, and community members expressed that same understanding to me. Plaintiff posted the photo the day before the jury returned a verdict in the Chauvin criminal case.

6.     The other photograph circulating social media in April of 2021, which was taken on March 25, 2021, shows one student holding another student of color over a desk with his hands behind his back. This photo is attached to the Declaration of Chelsea Weisbord as Exhibit L. Plaintiff admitted he took the photograph on school grounds during his first period English class.

7.     I became aware of these photos on April 19, 2021. By 9:00 p.m. on April 19, emails flooded into my inbox and continued into the middle of the night. Other District administrators and employees informed me they received similar emails.

8.     The emails called the photos racist and disgusting and identified Case Leroy by name. Some of the senders criticized the District for purportedly tolerating the behavior, and demanded the student be held accountable. Copies of emails we received from students, parents, and community members are attached to the Declaration of Chelsea Weisbord as Exhibits M through II.

9.     Then-Middle and High School Principal Shirlee Davis and I had multiple phone conversations on the evening of April 19 and early in the morning on April 20. We came up with a tentative plan to call the families of the students involved in the morning and ask that they not

2

A-474

come to school the next day, for their own safety. In addition to Plaintiff, three other students, including the two students depicted in the March 25, 2021 photo, were also asked to stay home that day.

10.     The next day, April 20, I, along with several other District administrators and Board members continued to receive emails and phone calls from concerned and angry students, parents, community members, and local organizations, such as SARE (Students Against Racism in Education).

11.     Principal Davis and I responded to most of the emails we received. This was time that took us away from our other responsibilities.

12.     The photos were widely disseminated on social media, and they were also a major topic of discussion in the school building on April 20, 2021.

13.     During the school day on April 20, 2021, I learned that students were discussing the social media posts with the high school teachers and other staff, which interrupted their regular instruction. Several staff members contacted me requesting to know how the District planned to respond to the unrest caused by the photographs.

14.     That same day, I learned of a student protest planned for later in the day. Students were planning to walk out of their classes and livestream a protest in front of the school.

15.     In response to the concerns reported to me and other District personnel, the administrative team planned and coordinated an immediate assembly that day for the Middle School and High School to address the posts and the disruption that resulted from them ("Assembly"). The Assembly was attended by all 7-12 grade students, teachers, guidance counselors, and building administrators who were in the building that day.

16.     I purposefully scheduled the Assembly for the same time the student protest was

A-475

expected to take place, in an effort to prevent students from leaving school grounds without permission, which would have created even more of a disruption and raise security and safety concerns. Approximately 200 students attended the Assembly, which interrupted the regular school day, but I believed it was necessary under the circumstances.

17.     At the Assembly, I stated we were taking the matter seriously and working to address racism, that we were investigating the matter, but we could not discuss student discipline. Neither I nor any other administrator mentioned Plaintiff or any other student by name during the Assembly. I also informed students that school counselors would remain available for anyone who needed counseling in relation to the circulation of the photos.

18.     After the Assembly, several students remained in the gymnasium to participate in a demonstration and knelt in silence for nine minutes to honor George Floyd. After the demonstration ended, a group of students engaged with me and school counselors to discuss the photos, racism, and insensitivity. I supervised the demonstration with the counselors while other staff patrolled the hallways.

19.     Because of the security threat raised by the social media posts and surrounding attention, New York State Troopers and law enforcement officers from the Sheriff's Department remained on school grounds throughout the day. This also prompted inquiries from concerned parents.

20.     Given the large number of complaints we received from students and parents, I addressed the school community directly in a letter that was also posted on the District's website, which stated as follows:

> The purpose of this letter is to acknowledge an incident that had occurred involving several LMCS students and the posting of some inappropriate photos and comments on social media.

4

A-476

LMCS takes matters like this very seriously and immediately after becoming aware of these posts, the school district administration initiated an investigation into this matter. The investigation is ongoing at this time.

All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot and will not be discussed.

On behalf of the Livingston Manor Central School District I apologize for this inappropriate student behavior.

Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the entire school community. (Ex. JJ.)

21.     The District also provided personnel with scripts to read from when fielding phone calls about the social media posts. (Ex. KK.)

22.     While handling the significant disruption to the learning environment on April 20, Principal Davis and I also investigated the circulation of the social media posts. We interviewed several students (in the presence of their parents/legal guardians), including Plaintiff, Student A, and Student B.

23.     Plaintiff appeared for his interview along with his father, Gordon Leroy. During the interview, Plaintiff admitted to posting the April 19, 2021 photo but claimed it was just a joke.

24.     I told him the issue was very serious, it was viewed as racist, and it caused a significant disruption throughout the school district. I also indicated Plaintiff would receive a letter suspending him for five days and possibly have to undergo a Superintendent's hearing.

25.     When Principal Davis and I interviewed Student A, he indicated he added the BLM logo, which was meant to be a joke.

26.     Student B commented during his interview that student A posted the photo with a BLM logo, which he and Plaintiff re-posted on Snapchat.

27.     By April 21, 2021, a News12 story broke about the photos, which prompted various

5

A-477

media requests to the District. The News12 story quoted my statement to the school community from the day before. I never spoke directly to News12 and do not know how they learned about the photos, except that the matter was widely disseminated and discussed throughout the community. I did not participate in any interviews with the media. Rather, I advised news media outlets that because the matter was under investigation the District would have no further comment to protect student confidentiality and due process.

28.     On April 21, 2021, Principal Davis issued a five-day Principal's suspension.

29.     That same day, the District hired attorney Bethany Centrone to investigate the matter, and provide a report regarding potential discipline.

30.     On April 23, 2023, Ms. Centrone issued a Confidential Investigator Report. (Ex. MM.) Ms. Centrone found sufficient evidence to determine the students engaged in behaviors that violated the District's Code of Conduct, and she recommended a Superintendent's hearing to determine whether additional discipline beyond a short-term suspension was warranted. (*Id.* at p. 9.)

31.     Based on this recommendation, on April 23, 2021, I charged Plaintiff with violating the Code of Conduct and scheduled a Superintendent's hearing for April 27 to consider a suspension in excess of five school days. I provided Plaintiff with notice of this in accordance with Education Law § 3214(3)(c). A copy of my April 23, 2021 letter to Plaintiff is attached to the Declaration of Chelsea Weisbord as Exhibit NN.

32.     I designated attorney Kate Reid to serve as a Hearing Officer at Plaintiff's Superintendent's hearing.

33.     I attended the Superintendent's hearing on April 27, 2021. Plaintiff was accompanied by his parents. Plaintiff testified under oath, only after confirming he was willing to

A-478

testify. I also testified at the Superintendent's hearing.

34.     On April 28, 2021, Kate Reid issued her *Findings of Fact and Recommendation*, in which she found Plaintiff guilty of the following charges:

> Charge 1: Article VI(A)(5) – Engaging in any willful act which disrupts the normal operation of the school community.

> Charge 5: Article VI(H) – Engage in off-campus misconduct that interferes with or can reasonably be expected to substantially disrupt the educational process in the school or at a school function. (Ex. OO.)

35.     The Hearing Officer recommended Plaintiff be suspended through May 21 with the option to return early on May 10 if he signs a student contract. (Ex. OO.)

36.     After reviewing the Hearing Officer's recommendations and the full hearing record, I accepted the Hearing Officer's findings, and suspended Plaintiff from instruction through May 21, 2021, as well as all non-academic extracurricular activities, including graduation. I notified Plaintiff of my decision by letter on April 28, 2021. (Ex. PP.)

37.     We allowed Plaintiff to return to classroom instruction from suspension on May 10, instead of May 21, after he signed a contract of conduct.

38.     Plaintiff and his parents appealed my decision the District's Board of Education. The Board heard the appeal on May 19, 2021, and upheld the determination.

39.     I am not aware that Plaintiff ever appealed the decision to the New York State Commissioner of Education, which would have been the next step in the appeals process.

40.     I believe the District has a significant interest in addressing racially offensive student speech and conduct. Federal and State laws. such as Title VI of the Civil Rights Act of 1964 and the Dignity for All Students Act ("DASA"), prohibit discrimination and harassment on the basis of race. The Hearing Officer concluded Plaintiff's photographs were racially insensitive and Plaintiff claim that he did not understand the racial implications was not credible. As

7

A-479

Superintendent, I make efforts to address racial issues with students and staff. In May 2021, we held two days of training regarding implicit bias.

41.    As discussed above, Plaintiff's actions and the dissemination of the photographs through social media created a substantial disruption to the school environment. It threatened the safety and security of the school and disrupted the scheduled classroom activities and other elements of the learning environment.

JOHN EVANS

Sworn to this 2⁴/
day of March 2023

Notary Public

MARLYN PETERS
Notary Public, State of New York
No. 01PE6033037
Qualified in Sullivan County
Commission Expires November 08, 20__

A-480

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CASE LEROY,

                          Plaintiff,

        -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                          Defendants.
-------------------------------------------------------------X

**AFFIDAVIT OF
SHIRLEE DAVIS**

Docket No: 21-cv-6008 (NSR)
(AEK)

STATE OF NEW YORK     )
                                        ss:
COUNTY OF SULLIVAN  )

SHIRLEE DAVIS, being duly sworn, deposes and states the following under penalty of

perjury:

1.        I was the Middle School and High School Principal for the Livingston Manor

Central School District ("District") from 2018 until I retired in June of 2022. I submit this Affidavit

based upon my personal knowledge of the events described below.

2.        On April 19, 2021, I became aware of a photograph posted on social media

depicting Case Leroy and other boys, as well as another photograph taken on March 25, 2021. I

immediately recognized that the photograph was a reference to the events of the ongoing trial of

Derick Chauvin for the murder of George Floyd in Minnesota.

3.        By 9:00 p.m., emails flooded into my inbox and continued through the middle of

the night. Other District administrators and employees received similar emails.

4.        The emails called the photos racist and disgusting, and many identified Case Leroy

by name as one of the students involved. These emails not only criticized the students involved,

1

A-481

but some criticized the District for purportedly tolerating the behavior, and demanded the District take disciplinary action. Copies of emails we received from students, parents, and community members are attached to the Declaration of Chelsea Weisbord as Exhibits M through II.

5.    Some of the emails I received included social media posts and comments from the community reacting to the photos. Members of the community appeared angry and upset about the photos and the students involved, which prompted concerns for student safety. For example, I received an email attaching a re-posted version of Plaintiff's April 19, 2021 photo with the following added caption: "If you think shit like this is funny dead remove me bc I will fucking spit on you. This isn't cute. This isn't funny. This is terro[r]ism and it's not justified on any level. People like this make me sick. Fucking die. I hope you literally eat shit and DIE." (A copy of this email is attached to the Declaration of Chelsea Weisbord as Exhibit X.)

6.    I was immediately concerned and knew this matter needed to be investigated and handled promptly.

7.    That evening, I called District Superintendent John Evans to advise him that I was receiving emails complaining about the photos posted on social media; he indicated he had received similar emails. We came up with a tentative plan to call the families of the students in the photos in the morning and suggest that they not attend classes, for their own safety.

8.    The following morning, April 20, I called the parents of the students involved. I explained that we were aware of the photos on social media and I recommended that the students not attend classes for their own safety.

9.    The photos were a major topic of discussion among high school students that day. While patrolling the hallways in between classes, I observed many students discussing the photographs. Teachers approached me throughout the day to discuss the photos, and indicated

2

A-482

students were talking about the photos during class time. Teachers expressed concern about how to respond to the matter. I assured them that Superintendent Evans and I were addressing it.

10.     That same day, I learned of a student protest that was planned for later in the day. Students planned to walk out of their classes and livestream a protest in front of the school. I informed Superintendent Evans of the anticipated protest.

11.     In response to the concerns reported to me, Superintendent Evans, and other District personnel, the administrative team planned and coordinated an immediate assembly that day for students in grades 7-12 in the school gymnasium to address the photographs and the disruption that resulted from them (the "Assembly"). The Assembly took place during the school day at approximately 1:15 p.m., and was attended by all 7-12 grade students (approximately 200 students), teachers, guidance counselors, and building administrators who were in the building that day. It interrupted their class schedules and interfered with the Middle School and High School teachers' instruction to their students.

12.     During the Assembly, Superintendent Evans stated we were taking the matter seriously and working to address racism, and that we were investigating the matter, but we could not discuss student discipline. Neither Superintendent Evans nor any other administrator mentioned Plaintiff or any other student by name.

13.     Superintendent Evans and I also commenced an investigation into the circulation of the social media posts. We interviewed several students (in the presence of their parents/legal guardians), including Plaintiff, "A", and "B" Superintendent Evans and I both took notes during these student interviews. My investigation notes are attached as an exhibit to the Declaration of Chelsea Weisbord.

14.     Plaintiff's actions and the dissemination of the photographs through social media

3

A-483

created a substantial disruption to the school environment. It threatened the safety and security of

the school and disrupted the classroom and other elements of the learning environment.

SHIRLEE DAVIS

Sworn to this ___
day of March 2023

Notary Public

MARLYN PETERS
Notary Public, State of New York
No. 01PE6033037
Qualified in Sullivan County
Commission Expires November 08, 20__

4

A-484

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CASE LEROY,

                          Plaintiff,

            -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity
as Superintendent of Schools of Livingston Manor
Central School District,

                          Defendants.
-------------------------------------------------------------X

**AFFIDAVIT OF
CHRISTIAN TOWSLEY**

Docket No: 21-cv-6008 (NSR)
(AEK)

STATE OF NEW YORK    )
                                       ss:
COUNTY OF SULLIVAN  )

        CHRISTIAN TOWSLEY, being duly sworn, deposes and states the following under penalty of perjury:

        1.        I am a School Counselor for grades 9th through 12th for the Livingston Manor Central School District ("District"), a position I have held since 2002. I submit this Affidavit based upon my personal knowledge of the events described below.

        2.        Plaintiff Case Leroy was a 12th grade student in the District during the 2020-2021 school year.

        3.        Sometime during the evening of April 19, 2021 or early the following morning, I became aware of photographs posted on social media of Case Leroy. I received emails from community members and students within the District and from neighboring school districts, complaining about these photos. The emails called the photos racist and inappropriate. They emails not only criticized the students involved, but some criticized the District for purportedly tolerating the behavior, and demanded the District take disciplinary action.

1

A-485

4.      I immediately recognized that the photograph was a reference to the events of the ongoing trial of Derick Chauvin for the murder of George Floyd in Minnesota.

5.      The photos were a major topic of discussion in the school building on April 20, 2021. While patrolling the hallways in between classes, I observed many students discussing the photographs and social media attention surrounding them.

6.      That same day, I learned of a student protest that was being planned for later in the day. Students planned to walk out of their classes and livestream a protest in front of the school. I gathered that many students intended to participate in the protest.

7.      The administrative team planned and coordinated an immediate assembly that day for the entire Middle School and High School, in the school gymnasium, to address the matter (the "Assembly"). The Assembly was attended by all 7-12 grade students, teachers, guidance counselors, and building administrators who were in the building that day.

8.      During the Assembly, Superintendent Evans informed the school that the District was taking the matter seriously and working to address racism, that we were investigating the matter, but we could not discuss student discipline. Neither Superintendent Evans nor any other administrator mentioned Plaintiff or any other student by name.

9.      After the Assembly, multiple students remained in the gymnasium to participate in a demonstration, which Superintendent Evans and I supervised; the students in attendance knelt in silence for nine minutes to honor George Floyd. After the demonstration ended, a group of students relocated from the gymnasium to the health room to engage in a discussion about the photos, racism, insensitivity, and George Floyd. I supervised this follow-up discussion while other District personnel patrolled the hallways.

10.     Plaintiff's actions and the dissemination of the photographs through social media

2

A-486

created a substantial disruption to the school. It threatened the safety and security of the school and disrupted the classroom and other elements of the learning environment.

11.     This issue was not short-term gossip. Students continued to discuss the photos for the remainder of the 2020-2021 school year.

CHRISTIAN TOWSLEY

Sworn to this *23*
day of March 2023

Notary Public

MARLYN PETERS
Notary Public, State of New York
No. 01PE6033037
Qualified in Sullivan County
Commission Expires November 08, 20*25*

A-487

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CASE LEROY,

                         Plaintiff,

          -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                        Defendants.
-----------------------------------------------------------------X

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Docket No: 21-cv-6008 (NSR) (AEK)

Defendants LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT and JOHN EVANS, by their attorneys, Sokoloff Stern LLP, submit pursuant to Local Civil Rule 56.1 the following statement of undisputed material facts:

1.      Defendant Livingston Manor Central School District ("District") is a school district located in Sullivan County, New York. (Ex. A, ¶ 1.)

2.      The District is small; there is one school building that houses grades pre-K through 12th and consists of approximately 420 students. (Evans Aff., ¶ 2; *see also* Ex. C at p. 41.)

3.      Defendant John Evans is the Superintendent of Schools for the District. (Evans Aff., ¶ 1.) He has been the Superintendent since 2017. (Evans Aff., ¶ 1.)

4.      Shirlee Davis was the Middle School and High School Principal for the District from 2018 until her retirement in June of 2022. (Davis Aff., ¶ 1.)

5.      Christian Towsley is the High School Counselor for the District. (Towsley Aff., ¶ 1.) He has bene the High School Counselor since 2002. (*Id.*)

6.      Plaintiff Case Leroy was a 12th grade student at the District during the 2020-2021

school year. (Towsley Aff., ¶ 2.)

7.      Plaintiff was also a student in a "public safety program" offered by Sullivan BOCES. (Ex. A, ¶ 12.)

**On April 19, 2021, Plaintiff Along with Two of His Friends Posted a Photograph on Snapchat Mocking the Death of George Floyd, Prompting Angry Messages from the Public Characterizing the Photograph as Racist**

8.      The photograph at issue in this case depicts Plaintiff lying on the ground, as his friend Student A kneels over him (hereinafter "the April 19 photo"). (Ex. J; *see also* Ex. C at pp. 79-80; Ex. E at p. 80; Ex. F at p. 53; Ex. G at p. 23; Ex. H at p. 21.)

9.      This photo was taken on April 19, 2021, sometime in the late afternoon or early evening, in the parking lot of a dance studio in Hurleyville. (Ex. C at pp. 88, 105-106, 123; Ex. G at pp. 17-18.)

10.     Plaintiff, along with his three friends, Student A, Student B, and Student C drove to a dance studio to pick up Student C's sister from dance class. (Ex. C, pp. 80-81, 86; Ex. G at pp. 19, 20; Ex. H at p. 16; Ex. H at pp. 16-17.)

11.     Plaintiff drove his vehicle with Student A as his passenger, and Student C drove another car with Student B as a passenger. (Ex. C at p. 82-83, 87; Ex. G at pp. 19-20.)

12.     Student B took the photo and immediately sent it to Plaintiff and Student A via Snapchat. (Ex. A, ¶ 16; Ex. C at pp. 88, 92; Ex. G at pp. 20, 25-26; Ex. H at pp. 17, 22; Ex. I at pp. 11, 12.)

13.     All three students posted the April 19 photo on their Snapchat stories that same evening, while still in the dance studio parking lot. (Ex. C at pp. 105-106; Ex. G at p. 36.)

14.     Plaintiff posted the April 19 photo to his Snapchat story, with the caption "Cops got another." (Ex. A, ¶ 17; Ex. C at pp. 97, 101-102; Ex. E at p. 80; Ex. F at p. 54; Ex. I at pp. 11,

A-489

13.)

15.    By posting the April 19 photo on his Snapchat stories, it was visible to all of his Snapchat friends, which was approximately 60 to 100 people. (Ex. C at p. 102.)

16.    This largely included students at Livingston Manor High School. (Ex. C at pp. 37-38.)

17.    Student A posted the April 19 photo on his Snapchat story with the caption "Another one down." (Ex. K; *see also* Ex. A, ¶ 18; Ex. C at p. 108-109.)

18.    When Student A posted the photo, he was aware of the similarities between the photo and the death of George Floyd; he intended it as a "joke" relating to Floyd's death. (Ex. G at pp. 33-34, 35-36.)

19.    A Black Lives Matter ("BLM") logo was also added to Student A's post. (Ex. A, ¶ 18; Ex. C at p. 108-109.)

20.    Student A told District administrators that he added the BLM logo himself. (Ex. G at p. 31; Ex. I at p. 26; Ex. MM at p. 38; Evans Aff., ¶ 25.)

21.    Student B also shared the April 19 photo on his Snapchat story, without a caption. (Ex. G at pp. 32, 56; Ex. H at pp. 23, 24.)

22.    Student B realized the photo he took of Plaintiff and Student A shared similarities to George Floyd's death. (Ex. H at pp. 29-30.)

23.    Plaintiff, Student A, and Student B all posted the photo on April 19, the day before the jury returned a verdict in Derick Chavin's trial for the murder of George Floyd. (Evans Aff., ¶ 5.)

24.    All three posted the photo at around the same time. (Ex. C at p. 111; Ex. G at p. 26; Ex. H at p. 28.)

A-490

25.     During an April 20, 2021 interview with Superintendent Evans and Principal Davis, Student B stated that Student A posted the photo with the BLM logo, and he and Plaintiff reposted the photo afterwards. (Evans Aff., ¶¶ 25-26; Ex. MM at p. 30.)

26.     Plaintiff, Student A, and Student B, all deleted their Snapchat posts shortly after posting them. (Ex. C at p. 114; Ex. G at pp. 41, 45; Ex. H at p. 32.)

27.     Plaintiff removed to his Snapchat post because his phone started "blowing up" with messages from other people who were threatening him and cursing him out about what he had posted. (Ex. C at pp. 116-118, 126-127.)

28.     Plaintiff received several death threats on the evening of April 19, 2021, including a threat from someone who said they were going to kill him and put him at the bottom of the ocean. (Ex. C at pp. 147-148, 149; Ex. E at p. 118.)

29.     Plaintiff cannot remember if these messages characterized his Snapchat post as racist or referenced George Floyd by name, but he remembers those who messaged him reacted negatively to his post. (Ex. C at pp. 126-127; Ex. D at p. 238.)

30.     Student A also deleted his post after receiving a lot of negative messages. (Ex. G at pp. 41-43.) For instance, people were calling him a names like "racist scumbag." (*Id.* at p. 43.) Most of the negative posts characterized the photo as racist. (*Id.* at pp. 57-58.)

31.     For the remainder of the drive to Student A's house, Plaintiff and Student A discussed that people were re-posting the photo on several social media platforms, including Snapchat, Facebook, Instagram, and Twitter, and that they were receiving negative, and threatening, comments. (Ex. C at p. 129.)

32.     Student B who was in Student C's vehicle—also deleted the photo shortly after posting it because he was receiving messages from people, both students and adults, telling him to

A-491

take it down. (Ex. H at pp. 32-33, 34.)

33.     Plaintiff spent much of the night crying because he felt like he put his and his family's life in danger. (Ex. C at p. 133.)

34.     Plaintiff told his mother, Amy Leroy, that he was receiving messages from people who were accusing him of being racist for posting the picture. (Ex. F at p. 60.)

35.     Many community members posted on various social media platforms, including Snapchat, Instagram, Facebook, and Twitter, chastising the photo as racist. (Ex. G at pp. 47-48.)

36.     After they posted the photo, Student A, Student B, and Plaintiff received a barrage of phone calls, and people were showing up to their houses and to Plaintiff's parents' places of employment. (Ex. G at p. 39.)

**Starting on April 19, 2021 and Continuing Throughout the Week, the District Received a Flood of Emails and Phone Calls from Angry Students, Parents, and Members of the Community Complaining About the Racist Social Media Photos and Demanding Swift Action**

37.     By 9:00 p.m. on April 19, 2021, emails complaining about racist and inappropriate photos of District students circulating social media began flooding Superintendent Evans and Principal Davis' inboxes and continued into the night. (Evans Aff., ¶¶ 7-8; Davis Aff., ¶¶ 3-4 Ex. MM at p. 3; *see also* Exs. M-II.)

38.     Other District administrators and employees received similar emails. (Evans Aff, ¶ 7; Davis Aff, ¶ 3; Towsley Aff., ¶ 3; Ex. M; Ex. O; Ex. X; Ex. Z; Ex. DD; Ex. GG.)

39.     In addition to the April 19 photo, Plaintiff took another photo which circulated on social media. (Evans Aff., ¶ 6; Ex. D at pp. 202-03, 204-05, 210-11.)

40.     That photo shows one student holding another student of color over a desk in a classroom in the Livingston Manor School District with his hands behind his back (hereinafter "the March 25 photo"). (Ex. L; Evans Aff., ¶ 6.)

A-492

41.     Plaintiff took the March 25 photo of two students, Student D and Student E, during the school day, specifically during his first period English class. (Evans Aff., ¶ 6; Ex. D at pp. 202-03.)

42.     District personnel, students, and community members immediately recognized the April 19 photo was a reference the events of the ongoing trial of Derick Chauvin for the murder of George Floyd in Minnesota. (Evans Aff., ¶ 5; Davis Aff., ¶ 2; Towsley Aff. ¶ 4; *see gen.*, Exs. M-II.)

43.     Members of the community reached out to District administrators, employees, and officials via email to complain about both the April 19 photo and the March 25 photo. (Evans Aff, ¶¶ 7-8; Davis Aff., ¶¶ 3-4; Towsley Aff., ¶ 3; Exs. M-II.)

44.      The emails called the photos racist and disgusting, and many identified Plaintiff by name as one of the students involved. Evans Aff, ¶¶ 7-8; Davis Aff., ¶¶ 3-4; Towsley Aff., ¶ 3; Exs. M-II.)

45.     These emails not only criticized the students involved, but some criticized the District for purportedly tolerating the behavior, and demanded the District take disciplinary action. (Evans Aff., ¶ 8; Davis Aff., ¶ 4; Towsley Aff., ¶ 3; Ex. I at p. 31; Ex. N; Exs. P-S; Exs. U-X; Exs. Z-GG.

46.     At 8:47 p.m., a female student emailed High School English Teacher Jillian Hoag to report an "uncomfortable" post circulating on social media, and attached the April 19 photo. (Ex. M.) This student indicated she felt "posts like these make students feel unsafe in their own school," and she asked her teacher to do something about it. (*Id.*)

47.     At 8:52 p.m., a female student emailed Principal Davis complaining about the April 19 photo, referring to it as "really inappropriate." (Ex. N.) The student commented that it seemed

A-493

to come "from a place of hate," that it made her "extremely uncomfortable … [to] share a school with people who joke about black American deaths," and that she hoped there is "some type of castigation." (*Id.*)

48.    Principal Davis thanked the student for reporting the matter and indicated she would be following up on it the next morning. (*Id.*) She then forwarded the email to Superintendent Evans and advised it was the fourth student who had sent her the photo. (*Id.*)

49.    At 9:04 p.m., another female student emailed Principal Davis and High School Guidance Counselor Christian Towsley to report the March 25 photo was circulating on Snapchat and "offending people from multiple schools." (Ex. O.) She attached a copy of the photo to her email. (*Id.*)

50.    Principal Davis responded to the student's email, thanking her for the information. (*Id.*)

51.    At 9:12 p.m., another female student emailed Principal Davis to complain about the "atrocious photo taken of two students by the name of Case Leroy and [Student A] (Ex. P.) Her email continued:

> "The photo shows Case lying on the ground with [Student A's] knee on his neck, with the caption "Cops got another." This photo is very obviously mocking the murder of George Floyd which is absolutely sickening to see by students of Livingston Manor. All POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students in the attached photo. I am a firm believer LMCS is, and should remain, a safe and compassionate place for all of its students and staff. With that being said, in order to keep that environment, it is in LMCS's best interest overall that the students in the attached photo are punished for absolutely disgusting, disturbing, and heartless actions. They will never understand what it was like for George Floyd's family and loved ones to lose their family member wrongfully at the hands of the law. I beg of you, on behalf of your POS students, and OC everywhere, take action toward this behavior. It is truly despicable. (*Id.*)

52.    This student attached a copy of Plaintiff's Snapchat post with his original caption

A-494

"Cops got another," along with the following caption that appears to have been added by someone who re-posted the photo on social media to criticize it: "Imagine making a ******* mockery of something very traumatizing that happened. You are both ******* disgusting." (*Id.*)

53.    Principal Davis thanked the student for informing her of this and indicated she would investigate in the morning. (*Id.*)

54.    At 9:53 p.m., Superintendent Evans, along with eight other District administrators and employees, received an email from a Stand Against Racism in Education ("SARE") email address complaining about the photos that were circulating on social media; the email was signed by "Members of Stand Against Racism in Education." (Ex. Q.) The email reads,

> It has come to our attention that there are students from the Livingston Manor Central School District Circulating pictures of themselves openly mocking the death of George Floyd who was a victim of police brutality. This is a disgusting display as the man who killed him is currently on trial. We have attached the pictures that we have seen. One of them appears to be taken on school property in a classroom. We have potential identifications of the students in the pictures: [Student A, Student B, Student D] and Case Leroy.
>
> We are asking for your full attention to be given to this matter. It is clear form this display that the culture of racism spills from the home and into school life and you are obligated to address it.
>
> We are asking for a swift and severe punishment. This display is outrageous and disgusting.
>
> We are asking for a clear message from you all that this will not be tolerated by the school.
>
> Signed,
> Members of Stand Against Racism in Education. (*Id.*)

55.    SARE attached the April 19, 2021 photo and March 25, 2021 photo to its email. (*Id.*)

56.    In response to SARE's email, Superintendent Evans indicated the school district

A-495

administration was aware of the recent posts on social media and that the incidents would be thoroughly investigated and dealt with quickly and appropriately. (*Id.*)

57.     The SARE group, in addition to writing directly to the administration, reposted Student A's photo with the caption: "Imagine saying that Livingston Manor has surpassed its dark history of being a Sundown Town with its own KKK chapter. Mind you, these kids are training for criminal justice. The further North you are in New York, the more Southern it gets." (Ex. V.)

58.     At 10:12 p.m., a female student emailed Principal Davis to report the photos circulating on social media, and attached a copy of Plaintiff's April 19 Snapchat post with the caption "Cops got another."  (Ex. R.) In her email, this student wrote:

> Although I never write emails concerning about what happens in the school especially when it comes to "drama" I think this is a complete different story. As you may know from the picture [M] and Case Leroy have made in my opinion a very inappropriate joke that should not be joked about and as someone who has faced discrimination and racism in her life I find this very disgusting and inappropriate because no matter the intention they still knew what they were doing and even had a smile on their face as they did it. As a person of color who had often felt like I had to watch what I said around certain people in the school because they might act hostile because of their opinions or views even though police brutality is not a political opinion/belief it is something that I feel strongly about and that many other people of color do as well and to see [M] and Case be able to smile and joke about it so freely hurts not only me but many other people as well especially since they will never feel or face the discrimination I have felt and might even face in the future is extremely disheartening to say the least even if they thought it was a "funny joke." The post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people lives and should not be treated as a running joke. I genuinely hope you can see why this picture is extremely disrespectful to a person of color and I hope they have consequences to their actions. (*Id.*)

59.     Principal Davis thanked the student for reporting the matter and indicated she would investigate in the morning. (*Id.*)

60.     At 10:50 p.m., another female student emailed Principal Davis to report the photos

A-496

circulating on social media; she attached a copy of Student A's April 19, 2021 Snapchat post and the March 25, 2021 photo. (Ex. S.) She commented she felt "strongly disgusted and sick" that Plaintiff and Student A "thought to make fun and quote on quote joke about Gorge [sic] Floyds tragic death (shown in the pictures below)." (*Id.*) She considered the March 25 post to be making a similar joke. (*Id.*) Her email continued: "The topic of these two pictures have been flooding social media and I strongly believe that this is far form okay and that serious matter and actions are need [sic] to be taken." (*Id.*)

61.     Principal Davis informed the student she would investigate in the morning. (*Id.*)

62.     At 10:56 p.m., a male student emailed Principal Davis to complain about the social media posts. (Ex. T.) He also reported this "was not a one off event with Case and [Student A]," but that it "happens frequently" and that "so far this year [he] totaled close to 20 different incidents with this group making racist 'jokes' like this." (*Id.*) This student followed up with another email entitled "Proof" in which he attached the photos we was referring to. (*Id.*)

63.     At 11:09 p.m., an alumni from a neighboring school district, Payton Powell, emailed Superintendent Evans and Principal Davis to report he came across "horrible and unacceptable pictures across many social media platforms" that "are very clearly mocking the death of George Floyd, and the Black Lives Matter Movement." (Ex. U.) He pointed out many people were aware of the social media posts. (*Id.*) The email continues:

> As someone who is part of this community, and has dedicated time and effort in supporting this community, this type of behavior is absolutely unacceptable and quite frankly, disgusting. The people of color who attend schools in this county should feel accepted and safe. These kids have made it public that they are condoning police brutality and racism. Making it public, like they have, is absolutely appalling. (*Id.*)

64.     In his email, Mr. Powell urged the District to take action: "Any child attending our schools in Sullivan County should feel safe, and accepted. Unfortunately, this is not the case for

Livingston Manor from that I have seen. This type of behavior that is being swept under the rug, is hateful. I do hope that I shed some light on a very serious issue in schools around this country." (*Id.*)

65.    Superintendent Evans promptly responded to Mr. Powell's email. He thanked him for sharing his concerns and explained the District administration was aware of the posts, that they were investigating the matter, and that it would be handled promptly and appropriately. (*Id.*) He also responded: "Both the LMCS and RCS administrations take matters like this very seriously. The health, safety and wellbeing of all of our students is very important to us and racist behavior has no place in our schools." (*Id.*)

66.    At 11:44 p.m., Courtney Lambert, a parent of a 5th grade student in the District, emailed Superintendent Evans and Principal Davis to complain about "some disturbing pictures" she saw on social media. (Ex. V.) She commented the trial of Derick Chauvin was a sensitive matter that the whole world was watching and that the death of George Floyd should not be mocked, laughed at, or joked about. (*Id.*) She indicated she was concerned for her daughter's safety and urged the District to take serious action against the students. (*Id.*)

67.    Superintendent Evans responded to Ms. Lambert's email to explain the District was aware of the social media posts and conducting an investigation, and that such behavior "is completely unacceptable and inappropriate in any setting and will be addressed." (*Id.*)

68.    Also at 11:44 p.m., another community member and former District student, Jaspreet Gill, emailed Superintendent Evans and Principal Davis to complaint about the photos circulating social media, referring tot hem as "disgusting, racist behavior." (Ex. W.) She also recounted her past experiences with racism while attending the District as a student and urged the current administration to handle the matter differently:

I know far too well the rampant racism that runs through Livingston Manor and that does not stop when you enter LMCS. When I was a student, no one was reprimanded for their racist insults and racial microaggressions toward me. I still remember it eight years later.

As leaders of LMCS, I ask you not to let this behavior continue and hold those students, if they do attend your high school, accountable. Do not let your students of color down as my teachers and peers did. (*Id.*)

69.     In response to Ms. Gill's email, Principal Davis thanked her for the information and indicated the District was investigating the matter. (*Id.*)

70.     At 12:15 a.m. on April 20, 2019, another community member, Balvina Garcia, emailed K-8 School Counselor Meagan Edwards to report Plaintiff's April 19 post and the fallout from it. Specifically, she attached a re-posted version of Plaintiff's April 19, 2021 post which included the following comment: "If you think shit like this is funny dead remove me bc I will fucking spit on you. This isn't cute. This isn't funny. This is terro[r]ism and it's not justified on any level. People like this make me sick. Fucking die. I hope you literally eat shit and DIE." (Ex. X.)

71.     In her email, Ms. Garcia identified Plaintiff by name and commented his behavior was "unacceptable on every level that exists." (*Id.*) She further commented, "[T]his kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism." Ms. Garcia asked the District to take action because such behavior "should not be tolerated and should be condemned." (*Id.*) Ms. Edwards forwarded this complaint to Superintendent Evans and Principal Davis. (*Id.*)

72.     At 7:54 a.m., also on April 20, a female student emailed Principal Davis to complain about Plaintiff's April 19 post, which she attached to her own email. (Ex. Y.) She indicated the photo mocking George Floyd's death was very disturbing and that she did not "feel comfortable being around classmates who happy make light of murder." (*Id.*)

A-499

73.     At 7:55 a.m., community member Hannah Tuso emailed Superintendent Evans, Principal Davis, and High School Guidance Counselor Christian Towsley to complain about the photos which were brought to her attention "and the attention of almost everyone in Sullivan and Orange County." (Ex. Z.) She wrote:

> I'm sure you've all been made aware, and I appreciate your time in reading this so that I can adequately express my deep level of concern and fear for our school.
>
> I know the history that our town has as a Sundown town. I am well aware of the legacy Livingston Manor has left as being intolerant and discriminatory toward minorities. I really hope that you all can find a way to act on this matter that facilitates growth and inclusivity: the people of color that attend our school deserve better than to see the blatant disregard for their lives being mocked on social media. Black people being killed by the police will never be a joke…
>
> As someone with a dead father, these posts did affect me very deeply. The dead people that these boys are mocking had a family. They were human beings, with hopes and dreams and passions. They didn't get to achieve all they had planned, and now their unjust death is being joked about by your students.
>
> I strongly urge you to make our counselors available for anyone that may need them after seeing these posts. I hope that appropriate action is taken to demonstrate our school's dedication to inclusivity and overcoming our history of discrimination. (*Id.*)

74.     At 8:43 a.m., community member Grady Parks emailed Superintendent Evans to complain about the April 19 post. (Ex. AA.) In his email, Mr. Parks characterized the photo as a reenactment of "the scene in which George Floyd was brutally murdered by the police." (*Id.*) He described this behavior as "absolutely disgusting" and an active display of racism that may make people of color uncomfortable. (*Id.*) He called for "some sort of disciplinary action" against the students involved. (*Id.*)

75.     In response to Mr. Grady's email, Superintendent Evans thanked him for sharing his thoughts and concerns and explained the District was aware of the social media posts and

conducting an investigation. (*Id.*) Superintendent Evans also indicated: "As a school district we take these matters very seriously. These behaviors have no place in our school and as a district, we are taking steps to address this important issue throughout our school community." (*Id.*)

76.     At 12:32 p.m., community member Sophia Xiomara emailed Superintendent Evans and Principal Davis to report racist posts by District students; she identified Plaintiff by name. (Ex. BB.) In her email, Ms. Xiomara wrote: "Acting in a way that picks fun at a murder or another human being is not a joke and cannot be brushed aside. Racist and hateful behavior cannot and will not be tolerated in our community. Our youth are the future of this country and it is up to their teachers and mentors to show them what is right and what is not." (*Id.*)

77.     Ms. Xiomara urged the District to "hold these students accountable and create policies that no longer condone any racist/hateful behavior from tis students or community members." (*Id.*)

78.     Superintendent Evans received a similar email ten minutes later by Mykenzi Williams. (Ex. CC.)

79.     Superintendent Evans responded to both emails to explain the District was aware of the social media posts and conducting an investigation, and that the District would not tolerate racism and will take steps to address that with the school community. (Ex. BB; Ex. CC.)

80.     At 1:20 p.m., Dylan Parks emailed Superintendent John Evans, Principal Shirlee Davis, K-8 Guidance Counselor Danielle Dalcero, High School Guidance Counselor Christian Towsley, and District Clerk Jane Mann to complain about the March 25 photo and April 19 posts, which he characterized as a reenactment of "the murder of George Floyd at the hands of Derek Chauvin." (Ex. DD.) He described this behavior as "repulsive," "abhorrent," "nauseating," "unacceptable," and racist. (*Id.*) And he asked that the students be held accountable for their

A-501

actions. He identified Plaintiff by name and attached a re-posted version of Plaintiff's April 19 post. (*Id.*) Mr. Parks indicated he had contacted the NAACP and was reaching out to the Director of Health and Human Services for Sullivan County. (*Id.*)

81.     Superintendent Evans responded to Mr. Parks email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (*Id.*) He assured Mr. Parks that the District was taking the matter very seriously and that racism would not be tolerated by the District. (*Id.*)

82.     At 1:40 p.m., community member Maritza Joya emailed Superintendent Evans and Principal Davis to advise she "came across disturbing photos of some [ ] students mocking/posing in a way that is very disrespectful to the BIPOC+ community." (Ex. EE.) Her email continued:

> Acting in a way that picks fun at a murder over another human is not okay.
> This act is racist and hateful in every type of way. This can not [sic] be
> tolerated with in [sic] our community. You people as a district need to hold
> your students accountable for their actions. I truly hope that you will do
> right and hold them accountable for their behavior.
>
> This community is depending on you to make this right. (*Id.*)

83.     Superintendent Evans responded to Ms. Joya's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (*Id.*) He assured Ms. Joya that the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District. (*Id.*)

84.     At 9:52 p.m., Kelsie Nolan emailed Superintendent Evans and Principal Davis to report "abhorrent behavior" by District students. (Ex. FF.) She wrote:

> I am ashamed and embarrassed to have any association with a town where
> people are allowed to behave in such a way as displayed online. If they are
> willing to post such egregious, horrifying, racist things online, I can only
> imagine what is said in private and even in school amongst friends. I have

A-502

heard several reports of people saying these particular three kids have a
pattern of saying antisemitic, homophobic, and obviously racist things….

These 3 students are displaying sociopathic tendencies mixed with classic
small town racism veiled as ignorance. It is clear you all on the
administrative level are not doing enough to prevent racism and the intense
level of moronic behavior displayed here. If this is a repeated problem that
is being handled by shunning kids reporting it, you are all failing in
shaping the next generation. It is lazy and unethical to continue to allow
these students to bully, harass, and demean other students, God help the
word if these 3 even dream of working in law enforcement. (*Id.*)

85.    Ms. Nolan called for three things: (1) swift severe action against these students, (2)
an anti-racism education for all students and faculty; and (3) a plan as to how to properly punish
and re-educate students who display racist, homophobic, or anti-Semitic rhetoric or action in the
future. (*Id.*)

86.    Superintendent Evans responded to Ms. Nolan's email, explaining the District was
aware of the posts and conducting an investigation, and that all cases involving student discipline
are confidential and cannot be discussed. (*Id.*) He assured Ms. Nolan that the District was taking
the matter very seriously, that all students involved would be held accountable, and that racism
would not be tolerated by the District. (*Id.*)

87.    At 11:24 p.m., Catherine Skalda emailed Superintendent Evans, Principal Davis,
and High School Guidance Counselor Christian Towsley to report "disturbing photos" that a group
of students posted on social media. (Ex. GG.) She requested that the District address the matter
appropriately (*Id.*)

88.    Superintendent Evans responded to Ms. Skalda's email, explaining the District was
aware of the posts and conducting an investigation, and that all cases involving student discipline
are confidential and cannot be discussed. (*Id.*) He assured Ms. Skalda that the District was taking
the matter very seriously, that all students involved would be held accountable, and that racism

A-503

would not be tolerated by the District. (*Id.*)

89.    On April 21, Elena Haskins emailed Superintendent Evans and Principal Davis to report "disturbing behavior" from District students, and identified Plaintiff by name. (Ex. HH.) She reported that images were circulating social media and she described them as "extremely disrespectful and mocking a devastating and racist murder." (*Id.*)

90.    Superintendent Evans responded to Ms. Haskin's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (*Id.*) He assured Ms. Haskin that the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District. (*Id.*)

91.    Jay Quintance, the President of SUNY Sullivan community college, also emailed Superintendent Evans to report pictures on social media of District students reenacting the George Floyd incident, and identified Plaintiff by name. (Ex. II.) Mr. Quintance inquired as to whether any of the students involved had visited his campus and what consequences they would be facing for their "disgusting display of hate." (*Id.*)

92.    Superintendent Evans and Principal Davis responded to most of the emails they received, which took their time away from regular District operations. (Evans Aff.)

**The Photos Circulating Social Media Not Only Yielded Angry Phone Calls from the Community; the Substantial Disruption To the School Took Many Other Forms Including Interruptions with Teacher Instruction, A Planned Student Protest, a Police Presence on School Grounds, and Media Inquiries and Attention**

93.    On the evening of April 19, Superintendent Evans and Principal Davis discussed the emails they had received, the comments and threats posted on social media, and safety concerns in their school. (Davis Aff., ¶ 7; Evans Aff., ¶ 9; Ex. I at pp. 22-23.)

A-504

94.     Accordingly, they requested the students involved not come to school the following day, for their safety, and bring them in to be interviewed in connection with the investigation. (Ex. I at pp. 22-23, 29-30; Evans Aff., ¶ 9; Davis Aff., ¶¶ 7-8; *see also* Ex. C at pp. 141-142; Ex. E at pp. 103-104; Ex. F at pp. 78 -79, 80; Ex. G at p. pp. 54-55, 64.)

95.     The photos were widely disseminated throughout the community, and a major topic of discussion throughout the school day, including during class time. (Evans Aff., ¶ 13; Davis Aff., ¶ 9; Towsley Aff., ¶ 5; Ex. G at pp. 72, 73; Ex. I at p. 28.) Students were talking about the photos both during and in between classes. (Evans Aff., ¶ 13; Davis Aff., ¶ 9; Towsley Aff., ¶ 5; Ex. I at p. 28.)

96.     High school staff and teachers were engaging in discussions with students in their classrooms about the social media posts, interrupting their regular periods of instruction. (Evans Aff., ¶ 13.)

97.     District administrators were approached by multiple staff members who requested to know how the District planned to respond to the unrest created by the photos. (Evans Aff., ¶ 13; Davis Aff., ¶ 9.)

98.     District administrators also became aware of a planned student protest, for which students were planning to livestream during the school day and on school grounds to express their disagreement with the images on social media and the connotations that came with it. (Evans Aff,, ¶ 14; Davis Aff, ¶ 10 Towsley Aff., ¶ 6; Ex. I at p. 28; *see also* Ex. G at pp. 72, 74.)

99.     In response to the disruption, as well as the concerns expressed to District administrators and staff, the administrative team planned and coordinated an assembly for students in grades 7-12 in the gymnasium of the District to address the photographs and the disruption that resulted from them. It was attended by all 7-12 grade students, teachers, guidance counselors, and

A-505

building administrators who were in the building that day. (Evans Aff, ¶ 15; Davis Aff, ¶ 11; Towsley Aff., ¶ 7.)

100.    Superintendent Evans purposefully scheduled the assembly at the same time as the planned student protest to avoid the disruption he anticipated it would create, try to prevent students from leaving school grounds, which created various security and safety concerns. (Evans Aff., ¶ 16; Ex. I at p. 28.)

101.    Although District officials believed the assembly was necessary under the circumstances, it still interrupted approximately 200 students' class schedules and interfered with Middle School and High School teachers' ability to provide instruction to their students. (Evans Aff., ¶ 16.)

102.    During the assembly, Superintendent Evans informed students in attendance that the District was aware of the posts, was taking the matter seriously and working to address racism, that an investigation was occurring, and that student discipline is a confidential matter that cannot be discussed. (Evans Aff, ¶ 17; Davis Aff, ¶ 12; Towsley Aff, ¶ 8; Ex. I at pp. 28-29.)

103.    In fact, no confidential student information regarding Plaintiff or any other students was discussed during the assembly. (Evans Aff., ¶ 17; Davis Aff, ¶ 12; Towsley Aff, ¶ 8.)

104.    District administrators also informed students that school counselors would remain available for anyone who needed counseling in relation to the circulation of the photos. (Evans Aff., ¶ 17.)

105.    After the assembly, some students held a demonstration in the gymnasium, during which they knelt for nine minutes to honor George Floyd. Mr. Towsley remained in the gymnasium to supervise. (Evans Aff, ¶ 18; Towsley Aff, ¶ 8; Ex. I at p. 29.)

106.    After the demonstration ended, the remaining students relocated to the school's

A-506

health room where they engaged in a discussion about the photos, racism, insensitivity, and George Floyd. As the demonstration required student supervision, Mr. Towsley remained with the students to supervise it. This also caused a disruption to these students' schedules. (Evans Aff., ¶ 18; Towsley Aff., ¶ 9.)

107.    State trooper and law enforcement officers from the Sheriff's Department remained on school grounds throughout the day, which prompted inquiries from concerned parents. (Evans Aff., ¶ 19.)

108.    Also on April 20, Superintendent Evans released an official statement to the school community, which he posted on the District website. In this statement, he indicated the District was aware some students posted inappropriate photos and comments on social media, and that the District takes such matters very seriously. He explained the District was investigating the matter but all cases involving student discipline are confidential and cannot be discussed. Evans also apologized on behalf of the District for the student behavior and indicated that "racism cannot and will not be tolerated" by the District. (Evans Aff, ¶ 20; Ex. JJ.)

109.    By April 21, 2021, a News12 story broke about the photos, which prompted various media requests to the District. The News12 story quoted the Superintendent's statement to the school community from the day before. (Evans Aff., ¶ 27.)

110.    Evans never spoke directly to News12, and does not know how they learned of the photos or his statement to the school community, although the social media posts were widely circulated. (Evans Aff., ¶ 27)

111.    Despite receiving multiple interview requests, Superintendent Evans did not participate in any interviews. Rather, he advised inquiring news media outlets that because the matter was under investigation the District would have no further comment to protect student

confidentiality and due process. (Evans Aff., ¶ 27.)

112.    A reporter for a local news station, Blaise Gomez, posted a story on Instagram in which she re-posed the photos but blurred out the students faces. (Ex. G at p. 47.) However, viewers commenting on the Instagram post identified Student A and Plaintiff by name. (Ex. G at pp. 48-49.)

113.    Plaintiff does not know how any news media outlets learned of the photos or obtained them. (Ex. D at p. 265.) His parents do not know either. (Ex. E at p. 170.)

114.    In May 2021, the District held two days of training regarding implicit bias. (Evans Aff., ¶ 40.)

**While Managing the Substantial Disruption to the Learning Environment, the District Also Commenced an Investigation on April 20, 2021**

115.    On April 20, 2021, Superintendent Evans and Principal Davis began an investigation. (Evans Aff, ¶ 22; Davis Aff., ¶ 13.)

116.    They interviewed several students (in the presence of their parents/guardians), including Leroy, Student A, and Student B, who all claimed it was just a joke and they had no intention of being racist or offending anyone. (Evans Aff., ¶ 23; Ex. I at pp. 23-24; Ex. MM at pp. 3, 4, 25, 28, 30, 38.)

117.    Plaintiff, along with his father Gordon Leroy, met with Superintendent Evans and Principal Davis in Superintendent Evans' office. (Evans Aff., ¶ 23; Ex. E at pp. 108-109, 110-111.)

118.    During the interview, Plaintiff admitted to posting the April 19 photo as a joke. (Evans Aff, ¶ 23; Ex. I at p. 25; Ex. MM at p. 25.)

119.    Superintendent Evans showed Plaintiff the March 25 and questioned him about it; Plaintiff admitted he took the photo. (Ex. D at pp. 202, 209; Ex. I at p. 26; Ex. MM at pp. 25-26.)

A-508

120.    At the end of Plaintiff's interview, Superintendent Evans explained the issue was very serious, viewed as racist, and caused a significant disruption throughout the school district. He also indicated Plaintiff would receive a letter suspending him for five days and possibly have to undergo a Superintendent's hearing. (Evans Aff., ¶ 24; Ex. MM at p. 26.)

121.    Superintendent Evans and Principal Davis also interviewed Student A, with his legal guardian present. (Evans Aff; Ex. G at p.p. 64-65.) Student A told Superintendent Evans and Principal Davis that he added the BLM Logo. (Evans Aff, ¶¶ 22, 25: Ex. G at pp. 31, 66; Ex. I at p. 26; Ex. MM at p. 38.)

122.    Student B commented during his interview that Student A posted the photo with a BLM logo and that he and Plaintiff re-posted the photo afterwards. (Evans Aff., ¶ 26; Ex. MM at p. 30.)

123.    On April 21, 2021, Principal Davis suspended Plaintiff from school for five days, after conferring with Superintendent Evans. (Davis Aff; Ex. LL; Evans Aff., ¶ 28.)

**The District Hired an Attorney to Investigate the Matter and Provide a Report Regarding Potential Discipline**

124.    On April 21, the District also hired attorney Bethany Centrone to investigate the matter. (Evans Aff., ¶ 29; Ex. MM at p. 2.)

125.    As part of her investigation, Ms. Centrone interviewed Superintendent Evans. (Ex. MM at pp. 2-5.) He shared that addressing the posts had been all consuming and he had to work to ward off a student protest against the posts. (*Id.* at p. 3.)

126.    Ms. Centrone interviewed students as part of her investigation. (Ex. MM at pp. 5-6.) One of the students shared that since the posts were uploaded "everyone has been talking about it." (Ex. MM at p. 5.) She indicated that during study hall on April 20, 2021, students in class were discussing the posts and the student involved "so much so that it was interfering with her ability

A-509

to do work." (*Id.* at p. 6.)

127.    On April 23, Ms. Centrone issued a report that concluded there was sufficient evidence to determine Plaintiff engaged in behaviors that violated the Code of Conduct. (Ex. MM; Evans Aff., ¶ 30.)

128.    She determined the following Code of Conduct provisions were implicated:

> Article Vl(A)(5) - Engaging in any willful act which disrupts the normal operation of the school community
>
> Article IV(C)(3) - Display or use of personal electronic devices ... in a manner that is in violation of district policy
>
> Article IV(E)(4) - Discrimination, which includes using race, color ... to deny rights, equitable treatment or access to facilities available to others
>
> Article IV(E)(5) - Harassment, which includes a sufficiently severe action .. . directed at an identifiable individual or group which [is] intended to be, or which a reasonable person would perceive as ridiculing or demeaning. Harassment is also the creation of a hostile environment.
>
> Article IV(H) - Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

(Ex. MM at pp. 7-8.)

129.    Ms. Centrone's report also sets forth her investigatory findings. (Ex. MM at p. 8.) She found Plaintiff admitted to being involved in the wrongful conduct and, at a minimum, had asked Student B to send him the photo so he could post it. (*Id.*) She also noted that Plaintiff admitted to taking and posting the March 25 photo without Student D or Student E's consent (the students in the photo). (*Id.*)

130.    Ms. Centrone's investigatory findings continued: "It is clear from the reaction of the community to the posts that a reasonable person would perceive the post as ridiculing or demeaning. While the students stated that they intended the posts to be funny or a joke, by their

A-510

nature, the posts are targeted at African Americans and are discriminatory." (*Id.*)

131.    Further, Ms. Centrone found Superintendent Evans' description of the disruption he had to address following the photos being posted "sufficiently demonstrates that the educational process has been substantially disrupted since April 19, 2021." (*Id.*) She also concluded that "additional disruption was caused to student Student D and Student E who have reported harassment since they were identified in the posted photos." (*Id.*)

132.    Ms. Centrone concluded that her "investigation revealed sufficient evidence to determine the students engaged in behaviors that violated the District's Code of Conduct." (*Id.,* at p. 9; Evans Aff., ¶ 30)

133.    Accordingly, she recommended that the students be referred to a Superintendent's hearing to determine if additional discipline was warranted. (Ex. MM at p. 9; Evans Aff, ¶ 30.)

**Based on the Investigator's Recommendation, the Superintendent Charged Plaintiff with Violating the Code of Conduct and Scheduled a Superintendent's Hearing**

134.    Based on the recommendation from Ms. Centrone, Superintendent Evans charged Plaintiff with Code of Conduct violations for "posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which have resulted in a substantial disruption to the school environment." (Ex. NN; Evans Aff., ¶ 31.)

135.    These charges were consistent with those Ms. Centrone recommended in her investigation report. (Ex. MM at pp. 7-8; Ex. NN.)

136.    Superintendent Evans scheduled a Superintendent's hearing for April 27, 2021 to consider a suspension beyond five school days, and designated Kate Reid to serve as a Hearing Officer. (Evans Aff., ¶¶ 31-32; Ex. NN.)

137.    The Superintendent hearing took place on April 27, 2021.  (Ex. I; Evans Aff., ¶ 33)

138.    Plaintiff testified voluntarily and under oath during the hearing. (Ex. D at pp. 229,

A-511

232; Evans Aff., ¶ 33)

139.    Plaintiff admitted he was in the April 19 photo, and that he posted it on social media with the caption "Cops got another." (Ex. I at p. 11.)

140.    Plaintiff also admitted he took the March 25 photo during his first period English class. (Ex. I at pp. 14-15.)

141.    When asked by the hearing officer whether it has been explained to him why the statement might have been insensitive and may have been perceived that way, Plaintiff responded "yea." (Ex. I at p. 18; *see also* Ex. D at p. 232.)

142.    Superintendent Evans also testified at the Superintendent hearing. When asked about disruption, he testified he and other District employees received a lot of emails and communications from staff, students, community members, and people outside of the community. (Ex. I at p. 28.)

143.    During the Superintendent's hearing, the Hearing Officer found Plaintiff guilty of violating Article VI(A)(5) of the Code of Conduct which prohibits engaging in any willful act which disrupts the normal operation of the school community ("Charge 1"). (Ex. I at p. 44-45.) She opined that when Plaintiff posted the April 19, 2021 photo, he should have known, based on what was going on in the word and the community at large, that his post was insensitive and would yield the type of reaction it caused. (*Id.* at p. 45.)

144.    Hearing Officer Reid also sustained the District's fifth, and final, charge, finding that Plaintiff violated Article IV(H) by engaging in off-campus misconduct that interfered with, or can reasonably be expected to substantially disrupt, the educational process in the school or at a school function ("Charge 5"). (*Id.* at pp. 46-47.) She found that given Plaintiff's age and maturity level, he should have realized his behavior would cause a real problem in the school community

A-512

and be very disruptive. (*Id.*)

**After the Superintendent's Hearing, the Hearing Officer Found Plaintiff Guilty of Two Charges and Recommended Additional Suspension; Superintendent Evans Adopted Her Findings and Included a Suspension from Extracurricular Activities**

145.    On April 28, 2021, Hearing Officer Reid issued a *Findings of Fact and Recommendation*, in which she memorialized her findings from the Superintendent's hearing regarding the charges, and recommended Plaintiff be suspended through May 21 with the option to return early on May 10 if he signs a student contract. (Ex. OO; Evans Aff., ¶¶ 34-45.)

146.    Hearing Officer Reid considered the disruption that both photographs had to the school environment, which includes the photograph that Plaintiff took in the school building during school hours, on March 25. (Ex. OO.)

147.    In her Findings of Fact and Recommendation, the Hearing Officer concluded:

> The Superintendent testified in great detail regarding the disruption to the school environment created by both of the pictures posted by Case on social media. The posts drew significant attention from the news media (both television and newspaper) and the community that necessitated considerable response from the Superintendent and the Building Principal. The Superintendent needed to intervene because students at the Middle/High School planned a demonstration to protest the posts, which they uniformly perceived as racist. The postings necessitated that the Superintendent schedule an assembly for students in grades 7-12 to explain that the District was taking the matter seriously and working to address racism in the District. All told, the posts resulted in substantial interruptions in instruction and required substantial attention and intervention by multiple school administrators.

(Ex. OO at pp. 2-3.)

148.    Based on those findings, the Hearing Officer found the District sustained its burden regarding Charges 1 and 5 by providing competent and substantial evidence demonstrating that two Code violations. (Ex. OO at p. 3; Evans FF., ¶ 34.)

149.    She determined:

> Any reasonable person would construe the content of both photos as
> racially insensitive, particularly in light of the close proximity between the
> posting of the photos and the Derek Chauvin trial. Case's professed
> ignorance of the trial and the connotations of the photo do not excuse his
> actions. Any reasonable student of Case's age and maturity should have
> been aware that the photos would be construed as a racially insensitive
> mockery of the murder of George Floyd. Cause either knew or should have
> known that posting this picture would create a substantial disruption of the
> school environment.

(Ex. OO at p. 3.)

150.   The Hearing Officer also concluded that Superintendent Evan's testimony "established Plaintiff's actions resulted in multiple days of disruption to the school district; considerable interruptions in instruction; [and] great distress on the part of multiple students and community members." (*Id.*)

151.   The Hearing Officer further determined Plaintiff's actions "resulted in allegations that the District, itself, was condoning racism" and that "[t]hese allegations have harmed the District's relationship with its community and will need to continue to be addressed by the District's administration, long after the conclusion of this hearing process." (*Id.*)

152.   After reviewing the Hearing Officer's recommendations and the full hearing record, Superintendent Evans accepted the Hearing Officer's findings, and suspended Plaintiff for a period of instruction through May 21, 2021, and from non-academic, extracurricular activities, for the remainder of the 2020-2021 school year, including the graduation ceremony. (Evans Aff, ¶ 36; Ex. PP.)

153.   Superintendent Evans permitted Plaintiff to return from suspension on May 10, 2021, after he signed a contract of conduct. (Evans Aff, ¶ 37; Ex. PP.)

154.   Plaintiff appealed Evans' decision to the Board, which affirmed it. (Evans Aff., ¶ 38.)

A-514

155.    The next step would have been to appeal the Board's decision to the Commissioner of Education, but Plaintiff never took this step; instead he filed the lawsuit. (Evans Aff., ¶ 39.)

156.    Plaintiff attended his high school graduation, after obtaining injunctive relief from Judge Julian Schreibman of the New York State Supreme Court, County of Sullivan. (Ex. A, ¶ 4; Ex. D at p. 249.)

Dated: Carle Place, New York
      March 24, 2023

                                   SOKOLOFF STERN LLP
                                   *Attorneys for Defendants*

                                   *Chelsea Weisbord*

       By:    Steven C. Stern
              Chelsea Weisbord
              179 Westbury Avenue
              Carle Place, NY 11514
              (516) 334-4500
              File No. 210106

TO:    All counsel of record (via ECF)

A-515

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CASE LEROY,

                              Plaintiff,

            -against-

LIVINGSTON   MANOR   CENTRAL   SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                              Defendants.
-------------------------------------------------------------------X

**DEFENDANTS'
RESPONSE TO
PLAINTIFF'S
STATEMENT OF
MATERIAL FACTS**

Docket No: 21-cv-6008 (NSR)

Defendants LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT and JOHN

EVANS, by their attorneys, Sokoloff Stern LLP, respond to Plaintiff's Statement of Material Facts

as follows:

        1.       *On or about April 24, 2021, plaintiff's parents received a letter from John Evans*

*(hereinafter referred to as "Evans") containing five charges that were being brought against him*

*and notifying them that a hearing would be held with respect to them on April 27, 2021. See Exhibit*

*C to affidavit of plaintiff in support of his motion for a preliminary injunction.*

**Response:**        Undisputed.

        2.       *On April 27, 2021, plaintiff attended the hearing along with his parents. He testified*

*consistently with what he had told Evans in an interview on April 20, 2021. See page 25 of the*

*transcript of the hearing.*

**Response:**         Undisputed that the referenced portions of Plaintiff's hearing testimony were

consistent with his statement to Evans. (Ex. I, pp. 25-26.)

        3.       *On April 20, 2021, Evans convened an assembly of all of the students in grade 7 to*

*12 to address the matter and told the students and faculty that "a lot of people viewed [the*

A-516

*photographs] as racist in nature", that "it had no place in our school" and that "it was being*
*addressed and being investigated." See page 25 of the transcript of the hearing.*

**Response:**    Undisputed that this was Superintendent Evans' testimony at Plaintiff's
Superintendent's hearing held on April 27, 2021, but note the testimony is reflected on pages 28-
2929 of the hearing transcript, not page 25. (*See* Ex. I at pp. 28-29.)

4.    *On April 28, 2021, the hearing examiner, Kate Reid, Esq., issued a document*
*entitled "Findings of Fact and Recommendation". In it she found plaintiff guilty of the first charge*
*of "Engaging in any willful act which disrupts the normal operation of the school community"*
*and the fifth charge of "Engage in off-campus misconduct which interferes with, or can reasonably*
*be expected to substantially disrupt the educational process in the school or at a school function."*
*She found plaintiff not guilty of the three other charges. In particular, she did not find that plaintiff*
*discriminated against or harassed anyone and recommended that in addition to the five-day*
*suspension which plaintiff had already served, that he be further suspended from attending classes*
*until May 21, 2021. See Exhibit E to affidavit of plaintiff in support of motion for a preliminary*
*injunction.*

**Response:**    Undisputed that the Hearing Officer recommended Plaintiff be suspended through
May 21 with the option to return early on May 10 if he signed a student contract. (*See* Def. 56., ¶
145 (citing Ex. OO; Evans Aff., ¶¶ 33-45.)

Disputed that the Hearing Officer "did not find that plaintiff discriminated against or
harassed anyone." The Hearing Officer made no such finding, but merely determined that the
District sustained its burden of proof with respect to two of the five charges, but not for the
remaining three charges. (Ex. OO at p. 3.)

5.    *Evans did not fully adopt the recommendation of the hearing examiner and, in*

A-517

*addition to suspending plaintiff from attending classes through May 21, 2021, suspended him from participating in any extracurricular activities for the remainder of the school year, including participation as a member of the school's football team in the championship football game, participation as a member of the school's baseball team, the senior trip, the senior prom and attending graduation ceremonies. See Exhibit F to affidavit of plaintiff in support of motion for a preliminary injunction.*

**Response:**    Disputed that Superintendent Evans "did not fully adopt the recommendation of the hearing examiner," but otherwise undisputed. After reviewing the Hearing Officer's recommendations and the full hearing record, Superintendent Evans accepted the Hearing Officer's findings, and suspended Plaintiff for a period of instruction through May 21, 2021, and from non-academic, extracurricular activities, for the remainder of the 2020-2021 school year, including the graduation ceremony. (*See* Def. 56.1, ¶ 152(citing Evans Aff., ¶ 36; Ex. PP).)

6.    *Plaintiff appealed the decision of the Superintendent to the School Board, which refused to change the findings or the discipline impose. See paragraph 32 of the Amended Verified Complaint, admitted by defendant in its answer.*

**Response:**    Undisputed that the Board upheld the findings and discipline imposed.

7.    *The original photograph which gave rise to plaintiff being disciplined was not taken on or even near school grounds, nor was it posted on any website created or sanctioned by the School District. Its content did not depict or mention the school, any employee or staff member thereof, or any student. See paragraph 33 of the Amended Verified Complaint, admitted by defendant in its answer, and Exhibit A to affidavit of plaintiff in support of his motion for a preliminary injunction.*

**Response:**    Disputed. Although the photograph was not taken on school grounds, and was not

A-518

posted on a school district website, Plaintiff widely disseminated it to the student body through

Snapchat. (Def. 56.1, ¶¶ 13-16 (citing Ex. A, ¶ 17; Ex. CC at pp. 37-38, 97, 101-102, 105-106; Ex.

E at p. 80; Ex. F at p. 54; Ex. G at p. 36; Ex. I at pp. 11, 13.)  Many students, parents, and other

members of the community found it racist and threatening, complained vociferously to the

Defendants about it, and demanded the District take action.  (Def. 56.1, ¶¶ 27-91, 97 (citing Evans

Aff., ¶¶ 6-9, 13; Davis Aff., ¶¶ 3-4, 7-9; Towsley Aff., ¶¶ 3-5; Ex. C at pp. 116-118, 126-127, 129,

147-148, 149; Ex. D at p. 202-203, 204-205, 210-211; 238; Ex. E at p. 118; Ex. G at pp. 39, 41-

43, 57-58, 72, 73; Ex. I at pp. 22-23, 28-31; Ex.s M-II;  Ex. MM at p. 3.)

       8.     *An order was entered granting plaintiff's motion for a preliminary injunction. No*

*appeal was taken by defendant therefrom. See document filed in the New York State Supreme*

*Court.*

**Response:**    Undisputed.

Dated: Carle Place, New York
       March 24, 2023

                    SOKOLOFF STERN LLP
                    *Attorneys for Defendants*

By:    Steven C. Stern
       Chelsea Weisbord
       179 Westbury Avenue
       Carle Place, NY 11514
       (516) 334-4500
       File No. 210106

TO:
All counsel of record (via ECF)

A-519

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CASE LEROY,

                        Plaintiff,

        -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                      Defendants.
--------------------------------------------------------------X

**ATTORNEY DECLARATION**

Docket No: 21-cv-6008 (NSR) (AEK)

CHELSEA WEISBORD, an attorney duly admitted to practice before this Court, declares the following to be true, under penalty of perjury:

      1.     I am a member of Sokoloff Stern LLP, attorneys for Defendants Livingston Manor Central School District and John Evans in the above-captioned action, and I am familiar with the facts of this case.

      2.     I submit this Declaration, the attached exhibits, and the accompanying Memorandum of Law in further support of Defendants' motion for summary judgment.

      3.     Attached as Exhibit VV is an excerpt from excerpt of the transcript of the May 5, 2022 Telephone Conference held before the Honorable Andrew E. Krause.

      4.     Attached as Exhibit WW is an excerpt from the Livingston Manor Central School District's Code of Conduct.

      5.     I also submit this Declaration to address false allegations in paragraph 3 of the May 19, 2023 Reply Declaration of plaintiff's counsel Jerome T. Dorfman, who claims Defendants' moving papers used derogatory terms to describe Plaintiff, including terms such as "despicable," "disgusting," and "racist." Defendants' summary judgment papers say nothing of the sort.

1

A-520

6.      Plaintiff's counsel improperly equates characterizing a photograph as racist to calling a person racist. Plaintiff's counsel pulls the words "despicable," and "disgusting" directly from emails Defendants included as exhibits submitted in connection with the summary judgment motions. (See Def. 56.1 ¶¶ 37-92; Ex. M-II.) These emails demonstrate the substantial disruption caused by Plaintiff's social media post, a primary legal issue in the case.

7.      I also submit this Declaration to address some of Plaintiff's general objections to *Defendants' Local Rule 56.1 Statement of Undisputed Material Facts* (hereinafter "Defendants' 56.1 Statement").

8.      Plaintiff objects to all affidavits submitted by Defendants on the grounds that "plaintiff has not had an opportunity to cross-examine the affiants and until such time as he has that opportunity, they are merely contentions." (*See* Pl. Resp. to Def. 56.1 at p. 1.) But it was Plaintiff's choice to not depose any District administrators or employees. Plaintiff's counsel told me on multiple occasions that he did not intend to take any depositions. He even made this statement at more than one court conference, on the record. For example, at a May 5, 2022 conference Magistrate Judge Andrew Krause and Plaintiff's counsel engaged in the following exchange:

> THE COURT: Now, Mr. Dorfman, have you served your requests for production and interrogatories on the defendants?
>
> MR. DORFMAN: No. And I don't intend to. There is really nothing that I need to discover. This case, I'm sure you've reviewed it, consists of two claims. This case, I'm sure you've reviewed it, consists of two claims. One is a violation of his civil rights. That speaks for itself. He was suspended from school, after-school activities, and we know what those were. It's not a subject of dispute and it's really a question of law on that issue. The only other issue is one regarding a defamation claim, and as far as that's concerned, we have admission on the record that the Superintendent made certain statements, that he called an assembly. So I don't need to depose the superintendent. I have all of the facts immutable and there is -- there are, as far as I know, no documents that I need, but perhaps I might request internal documents that we have not seen.

2

A-521

> THE COURT: Well, right. I mean, I was surprised that you were saying that you wouldn't need any documents because you know the final decision, but you might -- often in cases like this, there are requests for communications that led to that decision. I'm not saying that those are necessarily all producible. There are various objections that might be lodged to those. But, look, I'm not going to tell you how to litigate your case, Mr. Dorfman, but I'm going to set a deadline of May 12th, the same May 12th deadline, for you to serve any document demands or interrogatories on the defendants. Okay?
>
> MR. DORFMAN: That's fine.

(Ex. YY.)

9.      While Plaintiff's counsel ultimately served some written discovery requests, he never served any notices of deposition or otherwise indicated, in writing, verbally, or otherwise, that he had any intention of deposing any District administrators or employees. Without any deposition testimony, Defendants' only option in creating a full summary judgment record was to submit comprehensive affidavits from District personnel.[1] All affiants were timely disclosed as potential witnesses in Defendants' Rule 26(a) Initial Disclosures.

10.      Plaintiff also asserted in his response to Defendants' 56.1 Statement, that he did not have an opportunity to question Student B about what transpired at his April 20, 2021 interview with Superintendent Evans and Principal Davis. (*See* Pl. Resp. to Def. 56.1, ¶ 25.) This is also not true. My office served Student B (as well as Student A) with subpoenas and both appeared for depositions, which Plaintiff's counsel attended. I personally deposed Student B, and asked him about the April 20, 2021 interview. Mr. Dorfman could have questioned the witness as well but did not do so. In fact, at the end of Student A's deposition (who testified before Student B), Mr. Dorfman asked the witness some questions, with no objection from me.

---

[1] Rule 56 of the Federal Rules of Civil Procedure expressly permits a party to submit affidavits in support of a summary judgment motion so long as they are based on personal knowledge, set out facts that would be admissible in evidence, and show the affiant is competent to testify on the matters stated. *See* Fed. R. Civ. P. 56(c) (4); Fed. R. Civ. P. 56(c) (1) ("A party asserting that a fact cannot be or is genuinely disputed must short the assertion by … citing to particular parts of materials in the record, including … affidavits.").

3

A-522

11.    On May 11, 2023, Plaintiff's counsel requested a copy of Defendants' 56.1 Statement in word format. I emailed him a copy that same day.

Dated: Carle Place, New York
        June 9, 2023

                                     *Chelsea Weisbord*

                                     Chelsea Weisbord
                                     SOKOLOFF STERN LLP
                                     *Attorneys for Defendants*
                                     179 Westbury Avenue
                                     Carle Place, NY 11514
                                     (516) 334-4500
                                     File No. 210106

TO:    All counsel of record (via ECF)

4

A-523

202255lerocf

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  --------------------------------x

 3  CASE LEROY,

 4                 Plaintiff,

 5          v.                           21 CV 6008(NSR)

 6                                       TELEPHONE CONFERENCE

 7  LIVINGSTON MANOR CENTRAL
    SCHOOL DISTRICT; JOHN P.
 8  EVANS, in his capacity as
    Superintendent of Schools of
 9  Livingston Manor Central
    School District,

10
                 Defendants.
11
    --------------------------------x
12
                                       United States Courthouse
13                                     White Plains, New York
                                       May 5, 2022
14

15

16

17  Before:  THE HONORABLE ANDREW E. KRAUSE, Magistrate Judge,

18

19                         APPEARANCES

20  LAW OFFICES of JEROME DORFMAN
         Attorneys for Plaintiff
21  JEROME T. DORFMAN

22
    SOKOLOFF STERN, LLP
23       Attorneys for Defendants
    CHELSEA ELLA WEISBORD
24

25  *Proceeding recorded via digital recording device.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

A-524

```
 1            THE DEPUTY CLERK:  This is the matter of Leroy v.

 2    Livingston Manor Central School District, 21 CV 6008, the

 3    Honorable Andrew Krause presiding.

 4            Counsel, state your appearances for the record,

 5    starting with plaintiff's counsel.

 6            MR. DORFMAN:  Jerome Dorfman for the plaintiff.

 7            THE COURT:  Good morning, Mr. Dorfman.

 8            MR. DORFMAN:  Good morning.

 9            MS. WEISBORD:  Chelsea Weisbord with Sokoloff Stern,

10    representing the defendants.

11            THE COURT:  Good morning, Ms. Weisbord.

12            All right, we're here for an initial status

13    conference since this case has been referred to me for general

14    pretrial supervision by Judge Román.  I wanted to cover a few

15    things that I cover at the outset of every case that is

16    referred to me for general pretrial supervision.

17            First, as you hopefully have seen already, I issued

18    my standard discovery protocol order in this case.  It's on the

19    docket at ECF number 14.  The purpose of that order is to let

20    you know my standard procedures for raising discovery disputes

21    as they may arise.  The point of that order and the structure

22    that is laid out in that order is to get disputes resolved as

23    quickly and as efficiently as possible without the need for

24    full-fledged briefing.  My standard practice is to take those

25    letters, review them.  I will frequently call the parties in if
```

**A-525**

2022551Dlocf

```
 1   have, like I said, the bulk of them, probably I'm going to say

 2   at least 80 to 90 percent of them right now.  It may be even a

 3   hundred percent, but I want to make sure of that.  So within a

 4   week I can respond with the answers to the interrogatories and

 5   the responses to the requests for production.

 6              THE COURT:  Okay.  May 12th.  That's fine for the

 7   responses and objections and document production with respect

 8   to the document demands and also the plaintiff's responses to

 9   the interrogatories.

10              Now, Mr. Dorfman, have you served your requests for

11   production and interrogatories on the defendants?

12              MR. DORFMAN:  No.  And I don't intend to.  There is

13   really nothing that I need to discover.  This case, I'm sure

14   you've reviewed it, consists of two claims.  One is a violation

15   of his civil rights.  That speaks for itself.  He was suspended

16   from school, after-school activities, and we know what those

17   were.  It's not a subject of dispute and it's really a question

18   of law on that issue.  The only other issue is one regarding a

19   defamation claim, and as far as that's concerned, we have

20   admission on the record that the Superintendent made certain

21   statements, that he called an assembly.  So I don't need to

22   depose the superintendent.  I have all of the facts immutable

23   and there is -- there are, as far as I know, no documents that

24   I need, but perhaps I might request internal documents that we

25   have not seen.
```

**A-526**

1          THE COURT:  Well, right.  I mean, I was surprised

2     that you were saying that you wouldn't need any documents

3     because you know the final decision, but you might -- often in

4     cases like this, there are requests for communications that led

5     to that decision.  I'm not saying that those are necessarily

6     all producible.  There are various objections that might be

7     lodged to those.  But, look, I'm not going to tell you how to

8     litigate your case, Mr. Dorfman, but I'm going to set a

9     deadline of May 12th, the same May 12th deadline, for you to

10    serve any document demands or interrogatories on the

11    defendants.  Okay?

12          MR. DORFMAN:  That's fine.

13          THE COURT:  So give it some thought and if there are

14    documents of any sort or even documents that memorialize the

15    final decision just so you have them for purposes of an

16    evidentiary record in this case if it were to go to trial.  And

17    I'm not sure how you intend to prove your case, but that's

18    fine, other than through the testimony of your own witnesses.

19    But I leave that to your good judgment.

20          So May 12th will be your deadline to serve any

21    document demands or interrogatories on the defendants.  That

22    will be your date for producing your documents and your

23    interrogatory responses, but also your date for serving any

24    affirmative demands or interrogatories.  Okay?

25          MR. DORFMAN:  Sure.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

A-527

|  | |
|---|---|
| ADOPTED: | 5/21/01 |
| AMENDED: | 12/20/04 |
|  | 8/20/07 |
|  | 11/16/09 |
|  | 7/25/12 |

**CODE OF CONDUCT**

## I.   INTRODUCTION

The Board of Education is committed to providing a safe and orderly school environment where students may receive and district personnel may deliver quality educational services without disruption or interference. Responsible behavior by students, teachers, other district personnel, parents and other visitors is essential to achieving this goal.

The district has a long-standing set of expectations for conduct on school property and at school functions.  These expectations are based on the principles of civility, mutual respect, citizenship, character, tolerance, honesty and integrity.

The Board recognizes the need to clearly define these expectations for acceptable conduct on school property, identify the possible consequences of unacceptable conduct, and to ensure that discipline, when necessary, is administered promptly and fairly. To this end, the Board adopts this code of conduct ("code").

Unless otherwise indicated, this code applies to all students, school personnel, parents and other visitors when on school property or attending a school function.

## II.   DEFINITIONS

For purposes of this code, the following definitions apply.

"Disruptive student" means an elementary or secondary student under the age of 21 who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.

"Gender" means actual or perceived sex and shall include a person's gender identity or expression.

"Gender expression" is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyle, activities, voice or mannerisms.

"Gender identity" is one's self-conception as being male or female, as distinguished from actual biological sex or sex assigned at birth.

"Parent" means parent, guardian or person in parental relation to a student.

"School property" means in or within any building, structure, athletic playing field, playground, parking lot or land contained within the real property boundary line of a public elementary or secondary school, or in or on a school bus, as defined in Vehicle and Traffic Law §142.

1

A-528

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------x

 3   CASE LEROY,

 4                 Plaintiff,

 5        v.                            21 CV 6008(NSR)

 6                                      TELEPHONE CONFERENCE

 7   LIVINGSTON MANOR CENTRAL
     SCHOOL DISTRICT; JOHN P.
 8   EVANS, in his capacity as
     Superintendent of Schools of
 9   Livingston Manor Central
     School District,

10
                 Defendants.
11
     -------------------------------x
12
                                      United States Courthouse
13                                    White Plains, New York
                                      May 5, 2022
14

15

16

17   Before:  THE HONORABLE ANDREW E. KRAUSE, Magistrate Judge,

18

19                        APPEARANCES

20   LAW OFFICES of JEROME DORFMAN
          Attorneys for Plaintiff
21   JEROME T. DORFMAN

22

23   SOKOLOFF STERN, LLP
          Attorneys for Defendants
24   CHELSEA ELLA WEISBORD

25   *Proceeding recorded via digital recording device.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

A-529

1          THE DEPUTY CLERK:  This is the matter of Leroy v.

2    Livingston Manor Central School District, 21 CV 6008, the

3    Honorable Andrew Krause presiding.

4          Counsel, state your appearances for the record,

5    starting with plaintiff's counsel.

6          MR. DORFMAN:  Jerome Dorfman for the plaintiff.

7          THE COURT:  Good morning, Mr. Dorfman.

8          MR. DORFMAN:  Good morning.

9          MS. WEISBORD:  Chelsea Weisbord with Sokoloff Stern,

10   representing the defendants.

11         THE COURT:  Good morning, Ms. Weisbord.

12         All right, we're here for an initial status

13   conference since this case has been referred to me for general

14   pretrial supervision by Judge Román.  I wanted to cover a few

15   things that I cover at the outset of every case that is

16   referred to me for general pretrial supervision.

17         First, as you hopefully have seen already, I issued

18   my standard discovery protocol order in this case.  It's on the

19   docket at ECF number 14.  The purpose of that order is to let

20   you know my standard procedures for raising discovery disputes

21   as they may arise.  The point of that order and the structure

22   that is laid out in that order is to get disputes resolved as

23   quickly and as efficiently as possible without the need for

24   full-fledged briefing.  My standard practice is to take those

25   letters, review them.  I will frequently call the parties in if

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

A-530

2022551Bloc1

```
 1    have, like I said, the bulk of them, probably I'm going to say

 2    at least 80 to 90 percent of them right now.  It may be even a

 3    hundred percent, but I want to make sure of that.  So within a

 4    week I can respond with the answers to the interrogatories and

 5    the responses to the requests for production.

 6                THE COURT:  Okay.  May 12th.  That's fine for the

 7    responses and objections and document production with respect

 8    to the document demands and also the plaintiff's responses to

 9    the interrogatories.

10                Now, Mr. Dorfman, have you served your requests for

11    production and interrogatories on the defendants?

12                MR. DORFMAN:  No.  And I don't intend to.  There is

13    really nothing that I need to discover.  This case, I'm sure

14    you've reviewed it, consists of two claims.  One is a violation

15    of his civil rights.  That speaks for itself.  He was suspended

16    from school, after-school activities, and we know what those

17    were.  It's not a subject of dispute and it's really a question

18    of law on that issue.  The only other issue is one regarding a

19    defamation claim, and as far as that's concerned, we have

20    admission on the record that the Superintendent made certain

21    statements, that he called an assembly.  So I don't need to

22    depose the superintendent.  I have all of the facts immutable

23    and there is -- there are, as far as I know, no documents that

24    I need, but perhaps I might request internal documents that we

25    have not seen.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

2022551Bloci

1          THE COURT:  Well, right.  I mean, I was surprised

2     that you were saying that you wouldn't need any documents

3     because you know the final decision, but you might -- often in

4     cases like this, there are requests for communications that led

5     to that decision.  I'm not saying that those are necessarily

6     all producible.  There are various objections that might be

7     lodged to those.  But, look, I'm not going to tell you how to

8     litigate your case, Mr. Dorfman, but I'm going to set a

9     deadline of May 12th, the same May 12th deadline, for you to

10    serve any document demands or interrogatories on the

11    defendants.  Okay?

12          MR. DORFMAN:  That's fine.

13          THE COURT:  So give it some thought and if there are

14    documents of any sort or even documents that memorialize the

15    final decision just so you have them for purposes of an

16    evidentiary record in this case if it were to go to trial.  And

17    I'm not sure how you intend to prove your case, but that's

18    fine, other than through the testimony of your own witnesses.

19    But I leave that to your good judgment.

20          So May 12th will be your deadline to serve any

21    document demands or interrogatories on the defendants.  That

22    will be your date for producing your documents and your

23    interrogatory responses, but also your date for serving any

24    affirmative demands or interrogatories.  Okay?

25          MR. DORFMAN:  Sure.

A-532

|  | ADOPTED: | 5/21/01 |
|---|---|---|
|  | AMENDED: | 12/20/04 |
|  |  | 8/20/07 |
|  |  | 11/16/09 |
|  |  | 7/25/12 |

**CODE OF CONDUCT**

## I.   INTRODUCTION

The Board of Education is committed to providing a safe and orderly school environment where students may receive and district personnel may deliver quality educational services without disruption or interference. Responsible behavior by students, teachers, other district personnel, parents and other visitors is essential to achieving this goal.

The district has a long-standing set of expectations for conduct on school property and at school functions.  These expectations are based on the principles of civility, mutual respect, citizenship, character, tolerance, honesty and integrity.

The Board recognizes the need to clearly define these expectations for acceptable conduct on school property, identify the possible consequences of unacceptable conduct, and to ensure that discipline, when necessary, is administered promptly and fairly. To this end, the Board adopts this code of conduct ("code").

Unless otherwise indicated, this code applies to all students, school personnel, parents and other visitors when on school property or attending a school function.

## II.   DEFINITIONS

For purposes of this code, the following definitions apply.

"Disruptive student" means an elementary or secondary student under the age of 21 who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.

"Gender" means actual or perceived sex and shall include a person's gender identity or expression.

"Gender expression" is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyle, activities, voice or mannerisms.

"Gender identity" is one's self-conception as being male or female, as distinguished from actual biological sex or sex assigned at birth.

"Parent" means parent, guardian or person in parental relation to a student.

"School property" means in or within any building, structure, athletic playing field, playground, parking lot or land contained within the real property boundary line of a public elementary or secondary school, or in or on a school bus, as defined in Vehicle and Traffic Law §142.

1

A-533

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CASE LEROY,

                    Plaintiff,

      -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor Central
School District,

                  Defendants.
-----------------------------------------------------------------X

**ATTORNEY
DECLARATION**

Docket No: 21-cv-6008 (NSR)
(AEK)

      STEVEN C. STERN, an attorney duly admitted to practice before this Court, declares the

following to be true, under penalty of perjury:

      1.      I am a member of Sokoloff Stern LLP, attorneys for Defendants Livingston Manor

Central School District and John Evans in the above-captioned action, and I am familiar with the

facts of this case.

      2.      I submit this Declaration to address offensive and false allegations in paragraph 4

of the May 19, 2023 Reply Declaration of plaintiff's counsel Jerome T. Dorfman, who claims that

I played a "dirty trick" on him by requesting a three-week extension of time to answer the

Amended Complaint in this case.

      3.      *First*, extensions of time to respond to complaints are routine and necessary for an

attorney who is new to a case to get up to speed and comply with our Rule 11 obligations. In this

case, I did not handle the preliminary injunction motion in state court, and I removed the case to

federal court shortly after I was retained. I needed the extension to afford me sufficient time to

communicate with my client and gather the necessary information from the District so I could

answer the complaint in good faith.

1

A-534

4.      *Second*, Mr. Dorfman's time to serve a Notice of Claim had <u>already expired</u> by the time I requested the extension of time to answer. Plaintiff's defamation claim is alleged to have accrued on April 20, 2021, when Superintendent Evans spoke during a school assembly. Therefore, the 90-day period to file his Notice of Claim <u>expired on July 19, 2021</u>.

5.      Plaintiff filed the Amended Complaint in the Supreme Court, Sullivan County on July 2, 2021. (Ex. A.) On July 13, 2021, we timely removed the case to this Court. (Dkt. No. 1.) I spoke with Mr. Dorfman on July 20, 2021, to request a three-week extension for Defendants' deadline to respond to the Complaint; he consented. I followed-up by email thanking him for the courtesy. Later that day, I wrote to the Court requesting the extension of Defendants' deadline to respond to the Amended Complaint, from July 23 to August 13, 2021. (Dkt. No. 3.) My office filed Defendants' Answer to the Amended Complaint on August 13, 2021. (Ex. B.) Plaintiff's deadline to file the Notice of Claim therefore expired (July 19) the day <u>before</u> I requested the courtesy extension (July 20). Accordingly, my request for the extension had no effect on Mr. Dorfman missing the 90-day filing deadline. That was his own doing.

6.      *Third*, it was Mr. Dorfman's obligation to serve a notice of claim for his client's defamation claim. It is not up to defense counsel to advise him of his professional responsibilities.

7.      *Fourth*, Mr. Dorfman's inflammatory accusation is rendered even more flaccid by the fact he never sought leave to serve a late Notice of Claim after receiving Defendants' Answer on August 13, 2021. Our Answer contained 22 Affirmative Defenses, three of which specifically addressed the Notice of Claim issue (8th – failure to comply with General Municipal Law §§ 50-e, 50-i, 50-h, and Education Law § 3813; 15th – failure to comply with the administrative prerequisites to suit; and 16th – lack of subject matter jurisdiction over Plaintiff's defamation

2

A-535

claim).[1] Yet Mr. Dorfman waited until the summary judgment phase two years later to even raise this issue with the Court, complaining Defendants' three-week extension two years ago was the reason for his failure.

8.      As further discussed in *Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment*, Plaintiff could have sought leave to file a late notice of claim up until July 19, 2022—when the one-year-and-90-day statute of limitations period for his defamation claim expired. He never pursued this option either.

9.      Mr. Dorfman's assertion that "I have no doubt that this tactic of taking advantage of my courtesy was knowingly employed by defendant's counsel" is disingenuous and (perhaps ironically) slanderous.

Dated: Carle Place, New York
       June 9, 2023

                                        Steven C. Stern
                                        SOKOLOFF STERN LLP
                                        *Attorneys for Defendants*
                                        179 Westbury Avenue
                                        Carle Place, NY 11514
                                        (516) 334-4500
                                        File No. 210106

TO:      All counsel of record (via ECF)

---

[1] Defendants were not even required to even include these affirmative defenses, as the failure to comply with the notice of claim requirements goes to the court's subject matter jurisdiction, which cannot be waived and may be raised at any time. *See Fishman v. City of New Rochelle*, 2021 WL 4925518, at *10 (S.D.N.Y. Oct. 19, 2021); *see also Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 786 (2d Cir. 1994).

3

A-536

FILED: SULLIVAN COUNTY CLERK 06/24/2021 11:47 AM INDEX NO. E2021-968
NYSCEF DOC. NO. 30 RECEIVED NYSCEF: 06/24/2021

Case 7:21-cv-06008-NSR-AEK Document 74-1 Filed 06/12/23 Page 4 of 5

6/22/2021 Use of force essay

≡ Patrol Operations 2020-2021 P.M. 
P.M.

Instructions     Student work

# Use of force essay

Dennis Barnett • Sep 30, 2020 (Edited Oct 2, 2020)                                    ⋮

100 points                                                    Due Oct 5, 2020, 2:00 PM

Choose one of the use of force cases that we have discussed for the past week. Create a Google Doc and in a 5 paragraph essay explain wether you feel the use of force used in the police/suspect altercation was justified or not justified. Remember give three paragraphs to back up your thesis statement and use the paragraph organizer provided in the classroom.

 Class comments





A-537

FILED: SULLIVAN COUNTY CLERK 06/24/2021 11:47 AM   INDEX NO. E2021-968
NYSCEF DOC. NO. 30   Case 7:21-cv-06008-NSR-AEK   Document 74-1   Filed 06/12/23   Page 5 of 5   RECEIVED NYSCEF: 06/24/2021

In the George Floyd case I think it was justified until the end. There were 3 things they did wrong, they put their knee on his neck. They let the new guy lead, and they were nervous.

The first thing they did wrong was they let the newer guy lead. This was a big mistake on their part because the new guy was more nervous and it caused him to make a few mistakes and caused everything to go bad in a matter of minutes because of the fact that he used bad tactics and killed this man.

The 2nd reason is because the new guy who was only there for 2 years was in charge so i think he was nervous of a mess up or doing something wrong, but because he was nervous it caused him to mess up big time and even later caused him to serve jail time.

The 3rd reason is they never learned the tactic where you put your knee on someone's neck. This was the whole uprising of why it went bad; it was good until they killed George Floyd. They should have put the cuffs on and sat him up even though he was resisting he should not have been laid down for that long. Also the officers around should of stepped up and say you can't do that because they knew it was wrong and they knew they never learned that at the academy

Therefore this is my personal opinion about the George Floyd case. I think it was going good until the end i dont think it was justified and I do believe that officer deserved jail time.

A-538

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

CASE LEROY,

                                                    Docket No. 21-cv-6008(NSR)

                              Plaintiff,

                                            **STATEMENT OF**
            - against-                      **MATERIAL FACTS**

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his
capacity as Superintendent of Schools of
Livingston Manor Central  School District,

                              Defendants.

- - - - - - - - - - - - - - - - - - - x

        Plaintiff contends that the following facts are not subject to genuine dispute:

        1. On or about April 24, 2021, plaintiff's parents received a letter from John P. Evans

(hereinafter referred to as "Evans") containing five charges that were being brought against him and

notifying them that a hearing would be held with respect to them on April 27, 2021. See Exhibit C

to affidavit of plaintiff in support of his motion for a preliminary injunction.

        2. On April 27, 2021, plaintiff attended the hearing along with his parents. He testified

consistently with what he had told Evans in an interview on April 20, 2023.  See page 25 of the

transcript of the hearing.

        3. On April 20, 2021, Evans convened an assembly of all of the students in grades 7 to 12

to address the matter and told the students and faculty that "a lot of people viewed [the photographs]

as racist in nature", that "it had no place in our school" and that "it was being addressed and being

investigated." See page 25 of the transcript of the hearing.

A-539

4. On April 28, 2021, the hearing examiner, Kate Reid, Esq., issued a document entitled "Findings of Fact and Recommendation". In it she found plaintiff guilty of the first charge of "Engaging in any willful act which disrupts the normal operation of the school community" and the fifth charge of "Engage in off-campus misconduct which interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function." She found plaintiff not guilty of the three other charges. In particular, she did not find that plaintiff discriminated against or harassed anyone and recommended that in addition to the five-day suspension which plaintiff had already served, that he be further suspended from attending classes until May 21, 2021. See Exhibit E to affidavit of plaintiff in support of motion for a preliminary injunction.

5. Evans did not fully adopt the recommendation of the hearing examiner and, in addition to suspending plaintiff from attending classes through May 21, 2021, suspended him from participating in any extracurricular activities for the remainder of the school year, including participation as a member of the school's football team in the championship football game, participation as a member of the school's baseball team. the senior trip, the senior prom, and attending graduation ceremonies. See Exhibit F to affidavit of plaintiff in support of motion for a preliminary injunction.

6. Plaintiff appealed the decision of the Superintendent to the School Board, which refused to change the findings or the discipline imposed. See paragraph 32 of the Amended Verified Complaint, admitted by defendant in its answer.

7. The original photograph which gave rise to plaintiff being disciplined was not taken on or even near school grounds, nor was it posted on any website created or sanctioned by the School

2

A-540

District. Its content did not depict or mention the school, any employee or staff member thereof, or any student. See paragraph 33 of the Amended Verified Complaint, admitted by defendant in its answer, and Exhibit A to affidavit of plaintiff in support of his motion for a preliminary injunction.

8. An order was entered granting plaintiff's motion for a preliminary injunction. No appeal was taken by defendant therefrom. See document filed in the New York State Supreme Court.

A-541

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

CASE LEROY,

                                                    Docket No. 21-cv-6008(NSR)

                                    Plaintiff,      **DECLARATION IN SUPPORT**
                                                    **OF MOTION FOR SUMMARY**
                - against-                           **JUDGMENT**

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his
capacity as Superintendent of Schools of
Livingston Manor Central  School District,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - x

        JEROME T. DORFMAN, an attorney duly admitted to practice before this Court and the

Courts of the State of New York, makes the following declaration in support of plaintiff's motion

for summary judgment.

        1. I am the attorney for the plaintiff in the within action and am fully familiar with all of the

facts set forth herein.

        2. This action was originally commenced in the Supreme Court of the State of New York and

was removed to this Court by defendant following the issuance of a preliminary injunction against

it.

        3. Plaintiff's amended verified complaint, a copy of which is annexed hereto as <u>Exhibit 1</u>,

alleges three causes of action. The first cause of action in plaintiff's original verified complaint

sought a permanent injunction directing 1) immediate reinstatement of his rights and privileges as

a student, 2) a declaration that the acts of the defendants were unconstitutional, 3) for the complete

expungement of any reference to his suspension from attending classes and from participation in

A-542

school activities from his transcripts and student files, and 4) for changes in the policies and procedures of the School District, so that the same does not happen to his sibling or any other student. In view of the granting of a preliminary injunction to plaintiff, his complaint was amended to eliminate the request of reinstatement of his rights and privileges as a student, since the only right that was capable of being remedied was his ability to attend graduation ceremonies, which the preliminary injunction granted.

4. Plaintiff's second cause of action seeks damages and attorney's fees for violation of plaintiff's civil rights under the First Amendment to the United States Constitution, pursuant to 42 U.S.C. §§1983 and 1988 and Article I §8 of the Constitution of the State of New York.

5. Plaintiff's third cause of action seeks damages for defamation of plaintiff's character by reason of the statements made by defendant's Superintendent of Schools to all of the students in grades 7-12 at an assembly called by him, which can only be interpreted as calling plaintiff a "racist."

6. The facts surrounding this action are set forth at length in the Amended Complaint. Accordingly, there is no reason to reiterate them herein.

**The First and Second Causes of Action**

7. As noted above, plaintiff's first and second causes of action are based upon defendant's violation of plaintiff's civil rights. The first cause of action seeks injunctive relief, while the second cause of action seeks monetary damages and attorney's fees. There are no genuine issues of material fact with regard to those causes of action. It is indisputable that plaintiff was suspended from attending classes for a period of time and was barred from attending any extra-curricular activities for the remainder of the school year, including participation on the school's football and baseball

A-543

teams, the senior trip, the senior prom, and attending graduation ceremonies.[1] The only issue is one of law.

8. The issue of law has already been determined by the issuance of a preliminary injunction against defendant. Annexed hereto as <u>Exhibit 2</u> is a transcript of the bench decision of the State Court. In doing so, the Court found that there was a substantial likelihood of success on the merits. Absent a change in facts or law, that "constitutes law of the case" and cannot be relitigated by defendant. The facts have not changed, nor has the law. Moreover, as discussed at length in the accompanying Memorandum of Law, the United States Supreme Court has definitively held that a student cannot be disciplined for his or her out of school speech that has no nexus to the school, its faculty, students, or employees. Accordingly, plaintiff is entitled to summary judgment on his first and second causes of action.

## The Third Cause of Action

9. As with the first and second causes of action, the facts are not in dispute. Plaintiff's Superintendent of Schools admittedly that he called an assembly of all of the students in grades 7-12, at which he stated, "a lot of people viewed [the photograph briefly posted by plaintiff] as racist in nature", that "it had no place in our school" and that "it was being addressed and being investigated." Following that, he suspended plaintiff. That can only be viewed as a statement by him that plaintiff was a racist. It is *per se* defamatory.

---

[1] Although the suspension also included the "senior breakfast", defendant relented on that and allowed plaintiff to attend that event after the commencement of this action. Upon the issuance of a preliminary injunction against defendant, plaintiff's suspension from attending graduation ceremonies became moot.

3

A-544

## Defendant's Affirmative Defenses

10. Defendant's answer to plaintiff's complaint is riddled with frivolous denials and affirmative defenses.[2]

11. Defendant has pleaded 22 affirmative defenses in its answer to the amended verified complaint. Those defenses range from not constituting an affirmative defense to outright frivolous.

12. Defendant's first affirmative defense is that the complaint fails to state a claim upon which relief can be granted. Plainly, it does.

13. Defendant's second, third, fourth, fifth, twelfth, fourteenth, nineteenth, twentieth, twenty-first, twenty-second, and twenty third affirmative defenses are statements, not affirmative defenses.

14. Defendant's sixth affirmative defense, that "plaintiff has unclean hands", is inapplicable to an action at law.

15. Defendant's seventh affirmative defense is that "Any injury alleged to have been sustained resulted from the plaintiff's own a culpable conduct, or the culpable conduct of third parties, and was not the proximate result of any act of the answering defendants." Essentially this is an allegation of contributory negligence, a defense that is applicable to a personal injury lawsuit, but not one alleging a civil rights violation or an intentional tort, such as a defamation action.

---

[2] Defendant denied allegation in paragraph 1, that "At all of the times hereinafter mentioned, plaintiff was and still is a resident of the State of New York, County of Sullivan and a student at Livingston Manor High School."

Defendant denied having knowledge or information sufficient to form a belief as the the allegation in paragraph 12, that "Plaintiff is also a student in a "public safety" program given by BOCES, in connection with which he wrote an essay which he concluded by saying, 'Therefore this is my personal opinion about the George Floyd case. I think it was going good until the end i dont (sic) think it was justified and I do believe that officer deserved jail time.' In fact, defendant subpoenaed plaintiff's records of the BOCES program and included the essay in its opposition papers to the motion for a preliminary injunction.

4

A-545

Plainly, defendant cannot blame plaintiff or any other person for suspending him in violation of his civil rights or for uttering defamatory statements about plaintiff. That is just another way of saying that defendant was justified in suspending him or defaming him. As stated above, as a matter of law, a student cannot be disciplined for his or her out of school speech that has no nexus to the school, its faculty, students, or employees. Justification is not a defense to these causes of action. Significantly, defendant has not pleaded truth as an affirmative defense to the defamation cause of action.

16. Defendant's tenth affirmative defense states that plaintiff failed to identify the defendants defamatory statements, the time they were made, and to whom they were published. Those particulars are clearly pleaded in paragraph 29 of the amended verified complaint.

17. Defendant's eleventh affirmative defense states that plaintiff failed to mitigate his damages. Again, this is a concept that is inapplicable to a civil rights and a defamation action. The damage was complete upon plaintiff's suspension and the utterance of defamatory statements about him. Should plaintiff have gone to the events from which he was barred? Was plaintiff obligated to publish a statement that he wasn't a racist?

18. Defendant's fifteenth affirmative defense states that plaintiff failed to comply with administrative prerequisites to suit. It failed to specify what they are. In fact, defendant admitted the allegation in paragraph 32 of the complaint, that "plaintiff appealed Evans' decision to the School Board, which refused to change the findings or the discipline imposed."

19. Defendant's sixteenth affirmative defense states that this Court lacks jurisdiction of plaintiff's defamation claim. Clearly, this Court has pendent jurisdiction of that claim pursuant to 28 U.S.C. 1367. Indeed, defendant removed the entire action to this Court.

5

A-546

20. In light of the foregoing, it is respectfully requested that the Court grant plaintiff's motion in its entirety, awarding plaintiff summary on both of his causes of action and dismissing the affirmative defenses enumerated above.

Dated: January 30, 2023

s/_____
Jerome T. Dorfman

A-547

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

CASE LEROY,

                                    Plaintiff,              Docket No. 21-cv-6008(NSR)

              - against-                          **NOTICE OF APPEAL**

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his
capacity as Superintendent of Schools of
Livingston Manor Central  School District,

                                    Defendants.

- - - - - - - - - - - - - - - - - - x

        Notice is hereby given that plaintiff Case Leroy hereby appeals to the United States Court

of Appeals for the Second Circuit from the Judgment (Dkt. 87) entered on April 8, 2024, the

Opinion and Order (Dkt. 86) granting Defendants' motion for summary judgment and denying

Plaintiff's motion for summary judgment, entered on April 5, 2024, and all opinions and orders

that merge therein.

Dated: May 3, 2024


                                        /s/ *Jerome T. Dorfman*
                                        Jerome T. Dorfman
                                        *Attorney for Plaintiff Case Leroy*
                                        8 Breezy Hill Road
                                        Parksville, New York 12768
                                        Phone: (845) 747-9403
                                        Email: *jdlawny@verizon.net*

A-548

**Certificate of Service**

The undersigned certifies he electronically filed the foregoing Notice of Appeal via the CM/ECF system for the Southern District of New York, thus sending the Notice of Appeal to the Clerk of the Court and also effecting service on all attorneys registered for electronic filing.

Dated: May 3, 2024

/s/ Jerome T. Dorfman
Jerome T. Dorfman

A-549

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

CASE LEROY,

                              Plaintiff,              Docket No. 21-cv-6008(NSR)

          - against -                                **PLAINTIFF'S RESPONSE TO
                                                     DEFENDANT'S STATEMENT OF
LIVINGSTON MANOR CENTRAL SCHOOL                       MATERIAL FACTS**
DISTRICT and JOHN P. EVANS, in his
capacity as Superintendent of Schools of
Livingston Manor Central  School District,

                              Defendants.

- - - - - - - - - - - - - - - - - - - x

Plaintiff, by his attorney, Jerome T. Dorfman, responds to Defendant's Statement of Material

facts, as follows:

Plaintiff objects to all statements of fact that are supported solely by the affidavits submitted

in opposition to plaintiff's motion for summary judgment, as plaintiff has not had an opportunity to

cross-examine the affiants and until such time as he has that opportunity, they are merely

contentions. Plaintiff also objects to defendant's support of statements based upon self-serving

documents created by persons whom plaintiff has not had the opportunity to cross-examine. Finally,

plaintiff objects to the form of defendant's statements to the extent that they unnecessarily quote the

content of documents rather than state that the document exists, thereby placing an undue burden

upon plaintiff to restate each quotation before responding to it.

*1. Defendant Livingston Manor Central School District ("District") is a school district*

*located in Sullivan County, New York.*

Undisputed

A-550

*2. The District is small; there is one school building that houses grades pre-K through 12th and consists of approximately 420 students.*

Undisputed

*3 . Defendant John Evans is the Superintendent of Schools for the District. He has been the Superintendent since 2017.*

Undisputed

*4. Shirlee Davis was the Middle School and High School Principal for the District from 2018 until her retirement in June of 2022.*

Undisputed

*5. Christian Towsley is the High School Counselor for the District. He has bene the High School Counselor since 2002.*

Undisputed

*6. Plaintiff Case Leroy was a 12th grade student at the District during the 2020-2021 school year.*

Undisputed

*7. Plaintiff was also a student in a "public safety program" offered by Sullivan BOCES.*

Undisputed, except that plaintiff was a student in that program during the 2020-2021 school year.

*8. The photograph at issue in this case depicts Plaintiff lying on the ground, as his friend Student A kneels over him.*

Plaintifff refers to the photo as to its content.

*9. This photo was taken on April 19, 2021, sometime in the late afternoon or early evening, in the parking lot of a dance studio in Hurleyville.*

A-551

Undisputed

10. *Plaintiff, along with his three friends, Student A, Student B, and Student C drove to a dance studio to pick up Student C's sister from dance class.*

Undisputed

11. *Plaintiff drove his vehicle with Student A as his passenger, and Student C drove another car with Student B as a passenger.*

Undisputed

12. *Student B took the photo and immediately sent it to Plaintiff and Student A via Snapchat.*

Undisputed

13. *All three students posted the April 19 photo on their Snapchat stories that same evening, while still in the dance studio parking lot.*

Undisputed

14. *Plaintiff posted the April 19 photo to his Snapchat story, with the caption "Cops got another."*

Undisputed

15. *By posting the April 19 photo on his Snapchat stories, it was visible to all of his Snapchat friends, which was approximately 60 to 100 people.*

Undisputed

16. *This largely included students at Livingston Manor High School.*

Admit that it included such students, but the cited support does not demonstrate that it "largely" did so.

17. *Student A posted the April 19 photo on his Snapchat story with the caption "Another one*

A-552

*down."*

Undisputed

*18. When Student A posted the photo, he was aware of the similarities between the photo and*

*the death of George Floyd; he intended it as a 'joke" relating to Floyd's death.*

Plaintiff refers to the cited testimony for its content.

A-553

*19. A Black Lives Matter ("BLM") logo was also added to Student A's post.*

Undisputed, except that it was not added by plaintiff or the other students and the person who did so is unknown.

*20. Student A told District administrators that he added the BLM logo himself.*

Undisputed that he did so, but farther down on the cited page of his testimony he denied it.

*21. Student B also shared the April 19 photo on his Snapchat story, without a caption.*

Undisputed

*22. Student B realized the photo he took of Plaintiff and Student A shared similarities to George Floyd's death.*

Undisputed

*23. Plaintiff, Student A, and Student B all posted the photo on April 19, the day before the jury returned a verdict in Derick Chavin's trial for the murder of George Floyd.*

Undisputed

*24. All three posted the photo at around the same time.*

Undisputed

*25. During an April 20, 2021 interview with Superintendent Evans and Principal Davis, Student B stated that Student A posted the photo with the BLM logo, and he and Plaintiff reposted the photo afterwards.*

Plaintiff neither admits or denies this statement, as he has not had an opportunity to question Student B about it and it was not raised in his deposition.

*26. Plaintiff, Student A, and Student B, all deleted their Snapchat posts shortly after posting them.*

Undisputed

A-554

*27. Plaintiff removed to his Snapchat post because his phone started "blowing up" with messages from other people who were threatening him and cursing him out about what he had posted.*

Denied. Plaintiff testified that he deleted it "when" his phone started "blowing up", not "because."

*28. Plaintiff received several death threats on the evening of April 19, 2021, including a threat from someone who said they were going to kill him and put him at the bottom of the ocean.*

Undisputed

*29. Plaintiff cannot remember if these messages characterized his Snapchat post as racist or referenced George Floyd by name, but he remembers those who messaged him reacted negatively to his post.*

Admit that plaintiff remembers that the messages he received were negative, but otherwise denies this statement.

*30. Student A also deleted his post after receiving a lot of negative messages. For instance, people were calling him a names like "racist scumbag." Most of the negative posts characterized the photo as racist.*

Undisputed, except that the quoted testimony does not support the statement that most of the negative posts characterized the photo as racist.

*31. For the remainder of the drive to Student A's house, Plaintiff and Student A discussed that people were re-posting the photo on several social media platforms, including Snapchat, Facebook, Instagram, and Twitter, and that they were receiving negative, and threatening, comments.*

Undisputed

A-555

*32. Student B who was in Student C's vehicle—also deleted the photo shortly after posting it because he was receiving messages from people, both students and adults, telling him to take it down.*

Undisputed

*33. Plaintiff spent much of the night crying because he felt like he put his and his family's life in danger.*

Undisputed

*34. Plaintiff told his mother, Amy Leroy, that he was receiving messages from people who were accusing him of being racist for posting the picture.*

Undisputed

*35. Many community members posted on various social media platforms, including Snapchat, Instagram, Facebook, and Twitter, chastising the photo as racist.*

Undisputed, except that the quoted testimony did not say that the photo was characterized as racist.

*36. After they posted the photo, Student A, Student B, and Plaintiff received a barrage of phone calls, and people were showing up to their houses and to Plaintiff's parents' places of employment.*

Undisputed

*37. By 9:00 p.m. on April 19, 2021, emails complaining about racist and inappropriate photos of District students circulating social media began flooding Superintendent Evans and Principal Davis' inboxes and continued into the night.*

Plaintiff refers to the cited support for their content, without admitting the truth thereof.

A-556

*38. Other District administrators and employees received similar emails. (Evans Aff, ¶ 7; Davis Ajf, ¶ 3; Towsley Ajf., ¶ 3; Ex. M; Ex. O; Ex. X; Ex. Z; Ex. DD; Ex. GG.)*

Plaintiff refers to the cited support for their content, without admitting the truth thereof.

*39. In addition to the April 19 photo, Plaint,jf took another photo which circulated on social media. (Evans Ajf., ¶ 6; Ex. D at pp. 202-03, 204-05, 210-11.*

Plaintiff admits that he took the photo, but denies that he circulated it on social media and that it has any relevance to this case.

*40. That photo shows one student holding another student of color over a desk in a classroom in the Livingston Manor School District with his hands behind his back*

Plaintiff refers to the photo for its contents and denies the characterization of one of the students depicted therein as a "student of color" and that it has any relevance to this case.

*41. Plaint,jf took the March 25 photo of two students, Student D and Student E, during the school day, spec,fically during his first period English class.*

Plaintiff denies that it took place "during" his first period English class. In the quoted testimony, plaintiff stated that he did not remember whether it was taken during of after class.

*42. District personnel, students, and community members immediately recognized the April 19 photo was a reference the events of the ongoing trial of Derick Chauvin for the murder of George Floyd in Minnesota.*

Plaintiff denies this statement and it is unsupported in the referenced exhibits.

43. Members of the community reached out to District administrators, employees, and officials via email to complain about both the April 19 photo and the March 25 photo.

Plaintiff denies this statement insofar as it refers to the March 25 photo and it is unsupported in the referenced exhibits.

A-557

*44. The emails called the photos racist and disgusting, and many identified Plaintiff by name as one of the students involved.*

Plaintiff denies this statement.

*45. These emails not only criticized the students involved, but some criticized the District for purportedly tolerating the behavior, and demanded the District take disciplinary action.*

Plaintiff refers to the referenced exhibits for their exact content.

*46. At 8:47 p.m., a female student emailed High School English Teacher Jillian Hoag to report an "uncomfortable" post circulating on social media, and attached the April 19 photo. (Ex. M.) This student indicated she felt "posts like these make students feel unsafe in their own school," and she asked her teacher to do something about it. (Id.)*

Plaintiff denies this statement, inasmuch as no reference is contained therein that supports it.

*47. At 8:52 p.m., a female student emailed Principal Davis complaining about the April 19 photo, referring to it as "really inappropriate." (Ex. N.) The student commented that it seemed to come 'from a place of hate," that it made her "extremely uncomfortable ... [to] share a school with people who joke about black American deaths," and that she hoped there is "some type of castigation."*

Plaintiff denies that this exhibit makes any reference to him.

*48. Principal Davis thanked the student for reporting the matter and indicated she would be following up on it the next morning. (Id.) She then forwarded the email to Superintendent Evans and advised it was the fourth student who had sent her the photo.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*49. At 9:04 p.m., another female student emailed Principal Davis and High School Guidance Counselor Christian Towsley to report the March 25 photo was circulating on Snapchat and "offending people from multiple schools." (Ex. O.) She attached a copy of the photo to her email. (Id.)*

Plaintiff refers the referenced exhibit as to its content and denies that it made any reference to him.

*50. Davis responded to the student's email, thanking her for the information. (Id.)*

Plaintiff refers the referenced exhibit as to its content  without admitting that it was sent.

*51. At 9:12 p.m., another female student emailed Principal Davis to complain about the "atrocious photo taken of two students by the name of Case Leroy and [Student A] (Ex. P.) Her email continued:*

> *"The photo shows Case lying on the ground with [Student A's] knee on his neck, with the caption "Cops got another." This photo is very obviously mocking the murder of George Floyd which is absolutely sickening to see by students of Livingston Manor. All POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students in the attached photo. I am a firm believer LMCS is, and should remain, a safe and compassionate place for all of its students and staff. With that being said, in order to keep that environment, it is in LMCS's best interest overall that the students in the attached photo are punished for absolutely disgusting, disturbing, and heartless actions. They will never understand what it was like for George Floyd's family and loved ones to lose their family member wrongfully at the hands of the law. I beg of you, on behalf of your POS students, and OC everywhere, take action toward this behavior. It is truly despicable. (Id.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*52. This student attached a copy of Plaintiff's Snapchat post with his original caption "Cops got another," along with the following caption that appears to have been added by someone who re-posted the photo on social media to criticize it: "Imagine making a ******* mockery of something very traumatizing that happened. You are both ******* disgusting."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

A-559

*53. Principal Davis thanked the student for informing her of this and indicated she would investigate in the morning.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*54. At 9:53 p.m., Superintendent Evans, along with eight other District administrators and employees, received an email from a Stand Against Racism in Education ("SARE") email address complaining about the photos that were circulating on social media; the email was signed by "Members of Stand Against Racism in Education." (Ex. Q.) The email reads,*

*It has come to our attention that there are students from the Livingston Manor Central School District Circulating pictures of themselves openly mocking the death of George Floyd who was a victim of police brutality. This is a disgusting display as the man who killed him is currently on trial. We have attached the pictures that we have seen. One of them appears to be taken on school property in a classroom. We have potential identifications of the students in the pictures: [Student A, Student B, Student C] and Case Leroy.*

*We are asking for your full attention to be given to this matter. It is clear form this display that the culture of racism spills from the home and into school life and you are obligated to address it.*

*We are asking for a swift and severe punishment. This display is outrageous and disgusting.*

*We are asking for a clear message from you all that this will not be tolerated by the school.*

*Signed,*
*Members of Stand Against Racism in Education. (Id.)*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*55. SARE attached the April 19, 2021 photo and March 25, 2021 photo to its email. (Id.)*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*56. In response to SARE's email, Superintendent Evans indicated the school district administration was aware of the recent posts on social media and that the incidents would be thoroughly investigated and dealt with quickly and appropriately. (Id.)*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

A-560

57. The SARE group, in addition to writing directly to the administration, reposted Student A's photo with the caption: "Imagine saying that Livingston Manor has surpassed its dark history of being a Sundown Town with its own KKK chapter. Mind you, these kids are training for criminal justice. The further North you are in New York, the more Southern it gets." (Ex. V.)

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

58. At 10:12 p.m., a female student emailed Principal Davis to report the photos circulating on social media, and attached a copy of Plaintiff's April 19 Snapchat post with the caption "Cops got another." (Ex. R.) In her email, this student wrote:

Although I never write emails concerning about what happens in the school especially when it comes to "drama" I think this is a complete different story. As you may know from the picture [M] and Case Leroy have made in my opinion a very inappropriate joke that should not be joked about and as someone who has faced discrimination and racism in her life I find this very disgusting and inappropriate because no matter the intention they still knew what they were doing and even had a smile on their face as they did it. As a person of color who had often felt like I had to watch what I said around certain people in the school because they might act hostile because of their opinions or views even though police brutality is not a political opinion/belief it is something that I feel strongly about and that many other people of color do as well and to see [M] and Case be able to smile and joke about it so freely hurts not only me but many other people as well especially since they will never feel or face the discrimination I have felt and might even face in the future is extremely disheartening to say the least even if they thought it was a ' funny joke." The post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people lives and should not be treated as a running joke. I genuinely hope you can see why this picture is extremely disrespectful to a person of color and I hope they have consequences to their actions. (Id.)

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

59. Principal Davis thanked the student for reporting the matter and indicated she would investigate in the morning. (Id.)

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

60. At 10:50 p.m., another female student emailed Principal Davis to report the photos circulating on social media; she attached a copy of Student A's April 19, 2021 Snapchat post and

A-561

*the March 25, 2021 photo. (Ex. S.) She commented she felt "strongly disgusted and sick" that Plaintiff and Student A "thought to make fun and quote on quote joke about Gorge [sic] Floyds tragic death (shown in the pictures below)." (Id.) She considered the March 25 post to be making a similar joke. (Id.) Her email continued: "The topic of these two pictures have been flooding social media and I strongly believe that this is far form okay and that serious matter and actions are need [sic] to be taken." (Id.)*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*61. Principal Davis informed the student she would investigate in the morning.*

Plaintiff refers the referenced exhibit as to its content.

*62. At 10:56 p.m., a male student emailed Principal Davis to complain about the social media posts. (Ex. T.) He also reported this "was not a one of event with Case and [Student A]," but that it "happens frequently" and that "so far this year [he] totaled close to 20 different incidents with this group making racist jokes' like this." (Id.) This student followed up with another email entitled "Proof" in which he attached the photos we was referring to.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*63. At 11:09 p.m., an alumni from a neighboring school district, Payton Powell, emailed Superintendent Evans and Principal Davis to report he came across "horrible and unacceptable pictures across many social media platforms" that "are very clearly mocking the death of George Floyd, and the Black Lives Matter Movement." (Ex. U.) He pointed out many people were aware of the social media posts. (Id.) The email continues:*

> *As someone who is part of this community, and has dedicated time and effort in supporting this community, this type of behavior is absolutely unacceptable and quite frankly, disgusting. The people of color who attend schools in this county should feel accepted and safe. These kids have made it public that they are condoning police brutality and racism. Making it public, like they have, is absolutely appalling. (Id.)*

A-562

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

64. *In his email, Mr. Powell urged the District to take action: "Any child attending our schools in Sullivan County should feel safe, and accepted. Unfortunately, this is not the case for Livingston Manor from that I have seen. This type of behavior that is being swept under the rug, is hateful. I do hope that I shed some light on a very serious issue in schools around this country."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

65. *Superintendent Evans promptly responded to Mr. Powell's email. He thanked him for sharing his concerns and explained the District administration was aware of the posts, that they were investigating the matter, and that it would be handled promptly and appropriately. (Id.) He also responded: "Both the LMCS and RCS administrations take matters like this very seriously. The health, safety and wellbeing of all of our students is very important to us and racist behavior has no place in our schools."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

66. *At 11:44 p.m., Courtney Lambert, a parent of a 5th grade student in the District, emailed Superintendent Evans and Principal Davis to complain about "some disturbing pictures" she saw on social media. (Ex. V.) She commented the trial of Derick Chauvin was a sensitive matter that the whole world was watching and that the death of George Floyd should not be mocked, laughed at, or joked about. (Id.) She indicated she was concerned for her daughter's safety and urged the District to take serious action against the student.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

67. Superintendent Evans responded to Ms. Lambert's email to explain the District was aware of the social media posts and conducting an investigation, and that such behavior "is completely unacceptable and inappropriate in any setting and will be addressed."

A-563

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

68. *Also at 11:44 p.m., another community member and former District student, Jaspreet Gill, emailed Superintendent Evans and Principal Davis to complaint about the photos circulating social media, referring tot hem as "disgusting, racist behavior." (Ex. W.) She also recounted her past experiences with racism while attending the District as a student and urged the current administration to handle the matter differently:*

> *When I was a student, no one was reprimanded for their racist insults and racial microaggressions toward me. I still remember it eight years later.*

> *As leaders of LMCS, I ask you not to let this behavior continue and hold those students, if they do attend your high school, accountable. Do not let your students of color down as my teachers and peers did.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

69. *In response to Ms. Gill's email, Principal Davis thanked her for the information and indicated the District was investigating the matter.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

70. *At 12:15 a.m. on April 20, 2019, another community member, Balvina Garcia, emailed K-8 School Counselor Meagan Edwards to report Plaintiff's April 19 post and the fallout from it. Specifically, she attached a re-posted version of Plaintiff's April 19, 2021 post which included the following comment: "if you think shit like this is funny dead remove me bc I will fucking spit on you. This isn't cute. This isn't funny. This is terro[r]ism and it's not justified on any level. People like this make me sick. Fucking die. I hope you liter* In her email, Ms. Garcia identified Plaintiff by name and commented his behavior was "unacceptable on every level that exists." (*Id.*) She further commented, "[T]his kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism." Ms. Garcia asked the District to take action because such behavior

A-564

"should not be tolerated and should be condemned." (*Id.*) Ms. Edwards forwarded this complaint to Superintendent Evans and Principal Davis. *ally eat shit and DIE."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*71. In her email, Ms. Garcia identified Plaintiff by name and commented his behavior was "unacceptable on every level that exists." (Id.) She further commented, "[T]his kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism." Ms. Garcia asked the District to take action because such behavior "should not be tolerated and should be condemned." (Id.) Ms. Edwards forwarded this complaint to Superintendent Evans and Principal Davis.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*72. At 7:54 a.m., also on April 20, a female student emailed Principal Davis to complain about Plaintiff's April 19 post, which she attached to her own email. (Ex. Y.) She indicated the photo mocking George Floyd's death was very disturbing and that she did not ' feel comfortable being around classmates who happy make light of murder."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*73. At 7:55 a.m., community member Hannah Tuso emailed Superintendent Evans, Principal Davis, and High School Guidance Counselor Christian Towsley to complain about the photos which were brought to her attention "and the attention of almost everyone in Sullivan and Orange County." (Ex. Z.) She wrote:*

*I'm sure you've all been made aware, and I appreciate your time in reading this so that I can adequately express my deep level of concern and fear for our school.*

*I know the history that our town has as a Sundown town. I am well aware of the legacy Livingston Manor has left as being intolerant and discriminatory toward minorities. I really hope that you all can find a way to act on this matter that facilitates growth and inclusivity: the people of color that attend our school deserve better than to see the blatant disregard for their lives being*

A-565

*mocked on social media. Black people being killed by the police will never be a joke…*

*As someone with a dead father, these posts did affect me very deeply. The dead people that these boys are mocking had a family. They were human beings, with hopes and dreams and passions. They didn't get to achieve all they had planned, and now their unjust death is being joked about by your students.*

*I strongly urge you to make our counselors available for anyone that may need them after seeing these posts. I hope that appropriate action is taken to demonstrate our school's dedication to inclusivity and overcoming our history of discrimination.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

74. *At 8:43 a.m., community member Grady Parks emailed Superintendent Evans to complain about the April 19 post. (Ex. AA.) In his email, Mr. Parks characterized the photo as a reenactment of "the scene in which George Floyd was brutally murdered by the police." (Id.) He described this behavior as "absolutely disgusting" and an active display of racism that may make people of color uncomfortable. (Id.) He called for "some sort of disciplinary action" against the students involved.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

75. *In response to Mr. Grady's email, Superintendent Evans thanked him for sharing his thoughts and concerns and explained the District was aware of the social media posts and conducting an investigation. (Id.) Superintendent Evans also indicated: "As a school district we take these matters very seriously. These behaviors have no place in our school and as a district, we are taking steps to address this important issue throughout our school community."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

76. *At 12:32 p.m., community member Sophia Xiomara emailed Superintendent Evans and Principal Davis to report racist posts by District students; she identified Plaintiff by name. (Ex. BB.) In her email, Ms. Xiomara wrote: "Acting in a way that picks fun at a murder or another human*

A-566

*being is not a joke and cannot be brushed aside. Racist and hateful behavior cannot and will not be tolerated in our community. Our youth are the future of this country and it is up to their teachers and mentors to show them what is right and what is not."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*77. Ms. Xiomara urged the District to "hold these students accountable and create policies that no longer condone any racist/hateful behavior from tis students or community members."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*78. Superintendent Evans received a similar email ten minutes later by Mykenzi Williams.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*79. Superintendent Evans responded to both emails to explain the District was aware of the social media posts and conducting an investigation, and that the District would not tolerate racism and will take steps to address that with the school community. (Ex. BB; Ex. CC.)*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*80. At 1:20 p.m., Dylan Parks emailed Superintendent John Evans, Principal Shirlee Davis, K-8 Guidance Counselor Danielle Dalcero, High School Guidance Counselor Christian Towsley, and District Clerk Jane Mann to complain about the March 25 photo and April 19 posts, which he characterized as a reenactment of "the murder of George Floyd at the hands of Derek Chauvin." (Ex. DD.) He described this behavior as "repulsive," "abhorrent," "nauseating," "unacceptable," and racist. (Id.) And he asked that the students be held accountable for their actions. He identified Plaintiff by name and attached a re-posted version of Plaintiff's April 19 post. (Id.) Mr. Parks indicated he had contacted the NAACP and was reaching out to the Director of Health and Human Services for Sullivan County.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

A-567

81. *Superintendent Evans responded to Mr. Parks email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (Id.) He assured Mr. Parks that the District was taking the matter very seriously and that racism would not be tolerated by the District.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

82. *At 1:40 p.m., community member Maritza Joya emailed Superintendent Evans and Principal Davis to advise she "came across disturbing photos of some [ ] students mocking/posing in a way that is very disrespectful to the BIPOC+ community." (Ex. EE.) Her email continued:*

> *Acting in a way that picks fun at a murder over another human is not okay. This act is racist and hateful in every type of way. This can not [sic] be tolerated with in [sic] our community. You people as a district need to hold your students accountable for their actions. I truly hope that you will do right and hold them accountable for their behavior.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

83. *Superintendent Evans responded to Ms. Joya's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (Id.) He assured Ms. Joya that the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

84. *At 9:52 p.m., Kelsie Nolan emailed Superintendent Evans and Principal Davis to report "abhorrent behavior" by District students. (Ex. FF.) She wrote:*

> *I am ashamed and embarrassed to have any association with a town where people are allowed to behave in such a way as displayed online. If they are willing to post such egregious, horrifying, racist things online, I can only imagine what is said in private and even in school amongst friends. I have heard several reports of people saying these particular three kids have a pattern of saying antisemitic, homophobic, and obviously racist things....*

A-568

*These 3 students are displaying sociopathic tendencies mixed with classic small town racism veiled as ignorance. It is clear you all on the administrative level are not doing enough to prevent racism and the intense level of moronic behavior displayed here. If this is a repeated problem that is being handled by shunning kids reporting it, you are all failing in shaping the next generation. It is lazy and unethical to continue to allow these students to bully, harass, and demean other students, God help the word if these 3 even dream of working in law enforcement.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

85. *Ms. Nolan called for three things: (1) swift severe action against these students, (2) an anti-racism education for all students and faculty; and (3) a plan as to how to properly punish and re-educate students who display racist, homophobic, or anti-Semitic rhetoric or action in the future.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

86. *Superintendent Evans responded to Ms. Nolan's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (Id.) He assured Ms. Nolan that the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

87. *At 11:24 p.m., Catherine Skalda emailed Superintendent Evans, Principal Davis, and High School Guidance Counselor Christian Towsley to report "disturbing photos" that a group of students posted on social media. (Ex. GG.) She requested that the District address the matter appropriately.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

88. *Superintendent Evans responded to Ms. Skalda's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (Id.) He assured Ms. Skalda that the District was taking*

A-569

*the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*89. On April 21, Elena Haskins emailed Superintendent Evans and Principal Davis to report "disturbing behavior" from District students, and identified Plaintiff by name. (Ex. HH.) She reported that images were circulating social media and she described them as "extremely disrespectful and mocking a devastating and racist murder."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*90. Superintendent Evans responded to Ms. Haskin's email, explaining the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (Id.) He assured Ms. Haskin that the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District.*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*91. Jay Quintance, the President of SUNY Sullivan community college, also emailed Superintendent Evans to report pictures on social media of District students reenacting the George Floyd incident, and identified Plaintiff by name. (Ex. II.) Mr. Quintance inquired as to whether any of the students involved had visited his campus and what consequences they would be facing for their "disgusting display of hate."*

Plaintiff refers the referenced exhibit as to its content, without admitting that it was sent.

*92. On the evening of April 19, Superintendent Evans and Principal Davis discussed the emails they had received, the comments and threats posted on social media, and safety concerns in their school.*

A-570

Plaintiff has no basis upon which to admit or deny this statement, as he was not present.

*93. Accordingly, they requested the students involved not come to school the following day, for their safety, and bring them in to be interviewed in connection with the investigation.*

Undisputed, except for the word "accordingly."

*94. The photos were widely disseminated throughout the community, and a major topic of discussion throughout the school day, including during class time.  Students were talking about the photos both during and in between classes.*

Plaintiff denies the terms "widely" and "major" in this statement and that this statement is supported by the references therein.

*95. High school staff and teachers were engaging in discussions with students in their classrooms about the social media posts, interrupting their regular periods of instruction.*

Plaintiff denies that the referenced discussions interrupted their regular periods of instruction.

*96. District administrators were approached by multiple staff members who requested to know how the District planned to respond to the unrest created by the photos.*

Plaintiff has no personal knowledge upon which to base his admission or denial of this statement.

*97. District administrators also became aware of a planned student protest, for which students were planning to livestream during the school day and on school grounds to express their disagreement with the images on social media and the connotations that came with it.*

Plaintiff has no personal knowledge upon which to base his admission or denial of this statement.

*98. In response to the disruption, as well as the concerns expressed to District administrators and staff, the administrative team planned and coordinated an assembly for students in grades 7-12*

A-571

*in the gymnasium of the District to address the photographs and the disruption that resulted from them. It was attended by all 7-12 grade students, teachers, guidance counselors, and building administrators who were in the building that day.*

Plaintiff admits that an assembly was held and was attended by all 7-12 grade students, teachers, guidance counselors, and building administrators who were in the building that day, but otherwise denies the remainder of this statement.

*99. Superintendent Evans purposefully scheduled the assembly at the same time as the planned student protest to avoid the disruption he anticipated it would create, try to prevent students from leaving school grounds, which created various security and safety concerns.*

Plaintiff has no basis upon which to know the operation of Superintendent Evans' mind.

*100. Although District officials believed the assembly was necessary under the circumstances, it still interrupted approximately 200 students' class schedules and interfered with Middle School and High School teachers' ability to provide instruction to their students.*

Plaintiff denies this statement.

*101. During the assembly, Superintendent Evans informed students in attendance that the District was aware of the posts, was taking the matter seriously and working to address racism, that an investigation was occurring, and that student discipline is a confidential matter that cannot be discussed.*

Plaintiff has no way of knowing what Superintendent Evans said at the assembly and therefor denies this statement.

*102. In fact, no confidential student information regarding Plaintiff or any other students was discussed during the assembly.*

A-572

Plaintiff has no way of knowing what Superintendent Evans said at the assembly and therefor denies this statement.

*103. District administrators also informed students that school counselors would remain available for anyone who needed counseling in relation to the circulation of the photos.*

Plaintiff has no way of knowing what Superintendent Evans said at the assembly and therefor denies this statement.

*104. After the assembly, some students held a demonstration in the gymnasium, during which they knelt for nine minutes to honor George Floyd. Mr. Towsley remained in the gymnasium to supervise.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

*105. After the demonstration ended, the remaining students relocated to the school's health room where they engaged in a discussion about the photos, racism, insensitivity, and George Floyd. As the demonstration required student supervision, Mr. Towsley remained with the students to supervise it. This also caused a disruption to these students' schedules.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination. Plaintiff denies that this caused a disruption of the students' schedules.

*106. State trooper and law enforcement officers from the Sheriff's Department remained on school grounds throughout the day, which prompted inquiries from concerned parents.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination. Defendant has no way of knowing what allegedly prompted inquiries from concerned parents.

A-573

107. *Also on April 20, Superintendent Evans released an official statement to the school community, which he posted on the District website. In this statement, he indicated the District was aware some students posted inappropriate photos and comments on social media, and that the District takes such matters very seriously. He explained the District was investigating the matter but all cases involving student discipline are confidential and cannot be discussed. Evans also apologized on behalf of the District for the student behavior and indicated that "racism cannot and will not be tolerated" by the District.*

Plaintiff refers to the published statement for its content. Plaintiff does not contest that Superintendent Evans stated that, "racism cannot and will not be tolerated."

108. *By April 21, 2021, a News12 story broke about the photos, which prompted various media requests to the District. The News12 story quoted the Superintendent's statement to the school community from the day before.*

Undisputed, except as to what "prompted various media requests to the district.

109. *Evans never spoke directly to News12, and does not know how they learned of the photos or his statement to the school community, although the social media posts were widely circulated.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

110. *Despite receiving multiple interview requests, Superintendent Evans did not participate in any interviews. Rather, he advised inquiring news media outlets that because the matter was under investigation the District would have no further comment to protect student confidentiality and due process.*

A-574

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

*111. A reporter for a local news station, Blaise Gomez, posted a story on Instagram in which she re-posed the photos but blurred out the students faces. (Ex. G at p. 47.) However, viewers commenting on the Instagram post identified Student A and Plaintiff by name.*

The first sentence is undisputed. The second sentence is not supported by the cited reference.

*112. Plaintiff does not know how any news media outlets learned of the photos or obtained them.*

Undisputed

*113. In May 2021, the District held two days of training regarding implicit bias.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

*114. On April 20, 2021, Superintendent Evans and Principal Davis began an investigation.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

*115. They interviewed several students (in the presence of their parents/guardians), including Leroy, Student A, and Student B, who all claimed it was just a joke and they had no intention of being racist or offending anyone.*

Undisputed

*116. Plaintiff, along with his father Gordon Leroy, met with Superintendent Evans and Principal Davis in Superintendent Evans' office.*

Undisputed

*117. During the interview, Plaintiff admitted to posting the April 19 photo as a joke.*

Undisputed as to the photograph which bore only the caption, "Cops got another" and nothing else.

*118. Superintendent Evans showed Plaintiff the March 25 and questioned him about it; Plaintiff admitted he took the photo.*

Undisputed

*119. At the end of Plaintiff's interview, Superintendent Evans explained the issue was very serious, viewed as racist, and caused a significant disruption throughout the school district. He also indicated Plaintiff would receive a letter suspending him for five days and possibly have to undergo a Superintendent's hearing.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination. Undisputed that plaintiff was suspended for five days.

*120. Superintendent Evans and Principal Davis also interviewed Student A, with his legal guardian present. Student A told Superintendent Evans and Principal Davis that he added the BLM Logo.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

121. *Student B commented during his interview that Student A posted the photo with a BLM logo and that he and Plaintiff re-posted the photo afterwards.*

Plaintiff cannot respond to this statement, as he was not present at the interview and no transcript thereof exists. In addition, Exhibit MM page 30, cited in support of this statement, does not exist Plaintiff denies that he reposted the photo bearing the BLM logo.

*122. On April 21, 2021, Principal Davis suspended Plaintiff from school for five days, after conferring with Superintendent Evans.*

A-576

Undisputed that plaintiff was suspended for five days. Plaintiff neither admits or denies this statement that Davis suspended plaintiff after conferring with Evans and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

123. *On April 21, the District also hired attorney Bethany Centrone to investigate the matter.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination.

124. *As part of her investigation, Ms. Centrone interviewed Superintendent Evans. He shared that addressing the posts had been all consuming and he had to work to ward off a student protest against the posts.*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination. In addition, the term "all consuming" is not quantified.

125. *Ms. Centrone interviewed students as part of her investigation. (Ex. MM at pp. 5-6.) One of the students shared that since the posts were uploaded "everyone has been talking about it." (Ex. MM at p. 5.) She indicated that during study hall on April 20, 2021, students in class were discussing the posts and the student involved "so much so that it was interfering with her ability to do work."*

Plaintiff neither admits or denies this statement and defers to what defendant's witnesses testify to at trial, subject to cross-examination. In addition, the statement contains hearsay.

126. *On April 23, Ms. Centrone issued a report that concluded there was sufficient evidence to determine Plaintiff engaged in behaviors that violated the Code of Conduct.*

Undisputed, without admitting that Ms. Centrone's conclusion was justified.

A-577

*127. She determined the following Code of Conduct provisions were implicated:*

*Article VI(A)(5) - Engaging in any wilful act which disrupts the normal operation of the school community*

*Article IV(C)(3) - Display or use of personal electronic devices ... in a manner that is in violation of district policy*

*Article IV(E)(4) - Discrimination, which includes using race, color ... to deny rights, equitable treatment or access to facilities available to others*

*Article IV(E)(5) - Harassment, which includes a sufficiently severe action ... directed at an identifiable individual or group which [is] intended to be, or which a reasonable person would perceive as ridiculing or demeaning. Harassment is also the creation of a hostile environment.*

*Article IV(H) - Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.*

Plaintiff refers to the cited exhibit for its content.

*128. Ms. Centrone's report also sets forth her investigatory findings. She found Plaintiff admitted to being involved in the wrongful conduct and, at a minimum, had asked Student B to send him the photo so he could post it. She also noted that Plaintiff admitted to taking and posting the March 25 photo without Student D or Student E's consent (the students in the photo)*

Plaintiff refers to the cited exhibit for its content. Plaintiff denies that he took and posted the March 25 photo without the consent of the students pictured therein and asserts that Superintendent Evans admitted at the argument of the motion for a preliminary injunction that the March 25 photo played no part in plaintiff's suspension, which the court found.

*129. Ms. Centrone's investigatory findings continued: "It is clear from the reaction of the community to the posts that a reasonable person would perceive the post as ridiculing or demeaning. While the students stated that they intended the posts to be funny or a joke, by their nature, the posts are targeted at African Americans and are discriminatory."*

Plaintiff refers to the cited exhibit for its content.

A-578

130. Further, Ms. Centrone found Superintendent Evans' description of the disruption he had to address following the photos being posted "sufficiently demonstrates that the educational process has been substantially disrupted since April 19, 2021." She also concluded that "additional disruption was caused to student Student D and Student E who have reported harassment since they were identified in the posted photos."

Plaintiff refers to the cited exhibit for its content and asserts that this statement is conclusory and based on unsupported hearsay.

131. Ms. Centrone concluded that her "investigation revealed sufficient evidence to determine the students engaged in behaviors that violated the District's Code of Conduct."

Plaintiff refers to the cited exhibit for its content.

132. Accordingly, she recommended that the students be referred to a Superintendent's hearing to determine if additional discipline was warranted.

Plaintiff refers to the cited exhibit for its content.

133. Based on the recommendation from Ms. Centrone, Superintendent Evans charged Plaintiff with Code of Conduct violations for "posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which have resulted in a substantial disruption to the school environment."

Plaintiff refers to the cited exhibit for its content.

134 These charges were consistent with those Ms. Centrone recommended in her investigation report.

Plaintiff refers to the cited exhibits for their content.

135. Superintendent Evans scheduled a Superintendent's hearing for April 27, 2021 to consider a suspension beyond five school days, and designated Kate Reid to serve as a Hearing

A-579

*Officer.*

Undisputed

*136. The Superintendent hearing took place on April 27, 2021.*

Undisputed

*137. Plaintiff testified voluntarily and under oath during the hearing.*

Undisputed

*138. Plaintiff admitted he was in the April 19 photo, and that he posted it on social media with the caption "Cops got another."*

Undisputed, to the extent that it refers to the photo that bore that caption and nothing else.

*139. Plaintiff also admitted he took the March 25 photo during his first period English class.*

Undisputed that plaintiff took the photo, but in the cited support for this statement he testified that he did not remember whether it was during or after class.

*140. When asked by the hearing officer whether it has been explained to him why the statement might have been insensitive and may have been perceived that way, Plaintiff responded "yea."*

Plaintiff refers to the cited exhibit for its content.

*141. Superintendent Evans also testified at the Superintendent hearing. When asked about disruption, he testified he and other District employees received a lot of emails and communications from staff, students, community members, and people outside of the community.*

Plaintiff refers to the cited exhibit for its content.

*142. During the Superintendent's hearing, the Hearing Officer found Plaintiff guilty of violating Article VI(A)(5) of the Code of Conduct which prohibits engaging in any wilful act which disrupts the normal operation of the school community ("Charge 1"). (Ex. I at p. 44-45.) She opined*

A-580

*that when Plaintiff posted the April 19, 2021 photo, he should have known, based on what was going on in the word and the community at large, that his post was insensitive and would yield the type of reaction it caused.*

Plaintiff refers to the cited exhibit for its content.

*143. Hearing Officer Reid also sustained the District's fifth, and final, charge, finding that Plaintiff violated Article IV(H) by engaging in off-campus misconduct that interfered with, or can reasonably be expected to substantially disrupt, the educational process in the school or at a school function ("Charge 5"). She found that given Plaintiff's age and maturity level, he should have realized his behavior would cause a real problem in the school community and be very disruptive.*

Plaintiff refers to the cited exhibit for its content.

*144. On April 28, 2021, Hearing Officer Reid issued a Findings of Fact and Recommendation, in which she memorialized her findings from the Superintendent's hearing regarding the charges, and recommended Plaintiff be suspended through May 21 with the option to return early on May 10 if he signs a student contract.*

Plaintiff refers to the cited exhibit for its content.

*145. Hearing Officer Reid considered the disruption that both photographs had to the school environment, which includes the photograph that Plaintiff took in the school building during school hours, on March 25.*

Plaintiff refers to the cited exhibit for its content and further asserts that Superintendent Evans admitted at the argument of the motion for a preliminary injunction that it played no part in plaintiff's suspension, which the court found.

*146. In her Findings of Fact and Recommendation, the Hearing Officer concluded:*

*The Superintendent testified in great detail regarding the disruption to the school*

A-581

*environment created by both of the pictures posted by Case on social media. The posts drew significant attention from the news media (both television and newspaper) and the community that necessitated considerable response from the Superintendent and the Building Principal. The Superintendent needed to intervene because students at the Middle/High School planned a demonstration to protest the posts, which they uniformly perceived as racist. The postings necessitated that the Superintendent schedule an assembly for students in grades 7-12 to explain that the District was taking the matter seriously and working to address racism in the District. All told, the posts resulted in substantial interruptions in instruction and required substantial attention and intervention by multiple school administrators.*

Plaintiff refers to the cited exhibit for its content.

147. Based on those findings, the Hearing Officer found the District sustained its burden regarding Charges 1 and 5 by providing competent and substantial evidence demonstrating that two Code violations.

Plaintiff refers to the cited exhibit for its content.

148. She determined:

*Any reasonable person would construe the content of both photos as racially insensitive, particularly in light of the close proximity between the posting of the photos and the Derek Chauvin trial. Case's professed ignorance of the trial and the connotations of the photo do not excuse his actions. Any reasonable student of Case's age and maturity should have been aware that the photos would be construed as a racially insensitive mockery of the murder of George Floyd. Cause either knew or should have known that posting this picture would create a substantial disruption of the school environment.*

Plaintiff refers to the cited exhibit for its content.

149. The Hearing Officer also concluded that Superintendent Evan's testimony "established Plaintiff's actions resulted in multiple days of disruption to the school district; considerable interruptions in instruction; [and] great distress on the part of multiple students and community members."

Plaintiff refers to the cited exhibit for its content.

150. The Hearing Officer further determined Plaintiff's actions "resulted in allegations that the District, itself, was condoning racism" and that "[t]hese allegations have harmed the District's

A-582

*relationship with its community and will need to continue to be addressed by the District's administration, long after the conclusion of this hearing process."*

Plaintiff refers to the cited exhibit for its content.

*151. After reviewing the Hearing Officer's recommendations and the full hearing record, Superintendent Evans accepted the Hearing Officer's findings, and suspended Plaintiff for a period of instruction through May 21, 2021, and from non-academic, extracurricular activities, for the remainder of the 2020-2021 school year, including the graduation ceremony.*

Undisputed, except that Superintendent Evans did not fully accept the hearing officer's recommendation, which was to suspend plaintiff for a lesser time period.

*152. Superintendent Evans permitted Plaintiff to return from suspension on May 10, 2021, after he signed a contract of conduct.*

Undisputed that plaintiff was allowed to return to class, but his suspension from extra-curricular activities was not lifted.

*153. Plaintiff appealed Evans' decision to the Board, which affirmed it.*

Undisputed

*154. The next step would have been to appeal the Board's decision to the Commissioner of Education, but Plaintiff never took this step; instead he filed the lawsuit.*

Plaintiff denies that he was required to appeal the Board's decision to the Commissioner of Education before commencing this action.

*155. Plaintiff attended his high school graduation, after obtaining injunctive relief from Judge Julian Schreibman of the New York State Supreme Court, County of Sullivan.*

Undisputed

A-583

Dated: May 19, 2023

_____
JEROME T. DORFMAN
Attorney for Plaintiff
8 Breezy Hill Road
Parksville, NY 12768
(845) 747-9403

A-584

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF ULSTER : CIVIL TERM

 3    - - - - - - - - - - - - - - - - - - -x

 4    CASE LeROY,                         :   Index No.
                                              E-2021-968
 5                        Plaintiff,      :

 6             -against-                  :

 7    LIVINGSTON MANOR CENTRAL SCHOOL         BENCH
      DISTRICT and JOHN P. EVANS, in his  :   DECISION
 8    Capacity as Superintendent of
      Schools of Livingston Manor
 9    Central School District,
                        Defendants.       :
10
      - - - - - - - - - - - - - - - - - - -x
11                                    Ulster County Courthouse
                                      285 Wall Street
12                                    Kingston, NY 12401
                                      June 25, 2021
13                                    VIA TEAMS

14    B e f o r e:

15         HON. JULIAN D. SCHREIBMAN, Supreme Court Justice

16    A p p e a r a n c e s:

17             LAW OFFICES of JEROME T. DORFMAN
                    Attorney for Plaintiff
18                  8 Breezy Hill Road
                    Parksville, NY 12768
19             By:  JEROME T. DORFMAN, ESQ.

20             HOGAN, SARZYNSKI, LYNCH, DEWIND & GREGORY, LLP
                    Attorneys for Defendants
21                  520 Columbia Drive
                    Johnson City, NY 13790-3305
22             By:  CAMERON B. DANIELS, ESQ., of Counsel

23

               JOHN P. EVANS, Superintendent
24

25
```

A-585

2

```
 1              THE COURT:  We will go back on the record in the
 2      matter of LeRoy against Livingston Manor Central School
 3      District.
 4              The Court has conducted oral argument over the
 5      past hour-and-a-half regarding the Plaintiff's request for
 6      a Preliminary Injunction prohibiting the School District
 7      from barring the Plaintiff from participating in
 8      graduation ceremonies scheduled for this weekend.
 9              The injunction is granted for the following
10      reasons.  In the first instance, the Court clearly would
11      prefer to have had the opportunity to provide a written
12      decision to digest more deeply the parties' submissions,
13      answers to the Court's questions and the applicable law,
14      particularly in light of the fact that the United States
15      Supreme Court issued extremely relevant precedent just a
16      few days ago.  However, by virtue of the nature of the
17      relief involved here, there is really no alternative but
18      to give you a decision on the record and to explain it as
19      best as I can in this more informal setting.
20              In determining whether or not the Plaintiff is
21      entitled to a Preliminary Injunction, the Court is
22      required to consider three factors:  The Plaintiff's
23      likelihood of success on the merits; the existence of
24      potentially irreparable harm in the absence of an
25      injunction; and a balance of the equities.
```

MARIA GILES, SENIOR COURT REPORTER

A-586

3

```
1              Upon all the evidence presented, the Court
2    believes that all three of these favor the Plaintiff's
3    position.  First, with respect to a likelihood of success
4    on the merit.  The Court agrees that the first photo in
5    the classroom context is not really relevant to the
6    determination here.  It is being used, not in bad faith,
7    but being used, in some sense, to attempt to bootstrap the
8    rules applicable to in-school conduct to what is really
9    happening here which is a regulation of out-of-school
10   conduct.  Neither of the other students in that photo were
11   disciplined.  The photo happened in a context of an actual
12   classroom setting that teaches such conduct.  Essentially,
13   it's being raised as a sort of prior bad act to analogize
14   to a criminal or civil case.  There is no reason to
15   believe that that was intended to be part of or otherwise
16   was a basis for a punishment here which deals with the
17   April 19th incident.
18              With respect to the April 19th photo, and here
19   again I think we can only deal with the photo actually
20   communicated by the plaintiff, not that communicated by
21   any other person.  Whether that speech was intended to be
22   political is disputed by the parties.  That dispute,
23   however, is somewhat less relevant to the extent that the
24   School District takes the position that it is essentially
25   punishing the political content of that speech.
```

A-587

4

```
 1              I want to make it clear that this Court is not

 2       saying that antiracist speech and racist speech are on the

 3       same footing.  They are not.  Indeed, our public schools

 4       have an obligation to teach students antiracism, to be

 5       antiracist and to engage in antiracist conduct.  And they

 6       have an equal duty to proscribe racist acts, to condemn

 7       racism, and to punish racist acts, including potentially

 8       racist remarks and speech that occurred in the school.  At

 9       the same time, as the Supreme Court has recently

10       articulated in the Mahanoy case, schools are also

11       nurseries of democracy, and in that regard are expected to

12       have a wide bound of tolerance for political speech.

13       Using that opportunity to educate kids and in furtherance

14       of that necessarily to allow in some instances to rise and

15       fall and understand the consequences of that speech in

16       terms of how it is received.  In this matter it is clear

17       to the Court that, if the School District is correct in

18       its interpretation of the photographs, then it is

19       punishing protected First Amendment speech.  And there is

20       no question that the Plaintiff here has a First Amendment

21       right to engage in speech of that nature.

22              That does not mean that the School District

23       cannot punish certain speech that would otherwise be

24       protected.  Indeed, that is exactly what the cases that we

25       have been discussing wrestle with, and there is no
```

MARIA GILES, SENIOR COURT REPORTER

A-588

5

```
 1    question as reflected in the Supreme Court's Mahanoy
 2    decision that it is a very difficult case, it's a very
 3    difficult matter to wrestle with, hence the reason that
 4    that decision gives relatively little guidance to other
 5    Courts as to how to implement it.  Nonetheless, one of the
 6    factors significant here is the fact that there is no
 7    nexus whatsoever to the school in this act of speech.
 8    It's not directed at the school.  It doesn't mention the
 9    school.  It didn't happen at the school.  It doesn't
10    relate to any events that were taking place at the school.
11    Indeed, the only reason that the school became involved
12    was that it received communications from persons who
13    believe that by virtue of this Plaintiff's status as a
14    student at the school the school should be, in some sense,
15    responsible for regulating his behavior.  But it is
16    precisely that circumstance that the Mahanoy decision
17    urges caution.  A school does not stand in the place of
18    parents when it comes to regulating out-of-court conduct
19    or speech, and the fact that persons ask the school to do
20    so does not empower the school to do so.  Rather, the
21    school's role in regulating out-of-court speech is, as the
22    Supreme Court has now emphasized, extremely limited.
23         In this matter, moreover, there was very
24    ambiguous proof of actual racial animus by the Plaintiff.
25    I don't disagree with the school's conclusion that the
```

A-589

6

1    photograph is disturbingly similar to that of Officer

2    Chauvin and George Floyd.   Nonetheless, the intent and

3    purpose of posting that photograph is contested by the

4    plaintiff.   And the proof introduced by the school on that

5    subject is ambiguous, particularly in light of the

6    recently discovered evidence that the Plaintiff actually

7    wrote an essay sympathetic to George Floyd, taking the

8    position that the police actions with respect to Mr. Floyd

9    were excessive and indeed criminal and should be

10   sanctioned with imprisonment.

11           And finally, staying on the prong of likelihood

12   of success, the Court expects that the decision of the

13   Supreme Court in Mahanoy will govern this case.   In

14   looking at the facts of Mahanoy, which involved speech

15   directed at the school; vulgar speech directed at the

16   school; directed at personnel of the school; directed at

17   activities and institutions at the school and nonetheless

18   found them to be beyond reach of the school's punishing

19   authority, found them to be protected speech even though

20   it consisted essentially simply of a vulgarity directed at

21   the school.

22           The Court believes that it is likely that

23   Mahanoy governs this case and will probably compel a

24   ruling against the School District in this case.   I do

25   not, by saying that, mean to imply that I am prejudging

A-590

```
 1    the ultimate case.  But I am required to assess the
 2    likelihood of success and it appears to me that Mahanoy
 3    probably governs this case and in a way that is favorable
 4    to the Plaintiff.  Accordingly, I find that the plaintiff
 5    is likely to succeed on the underlying lawsuit.
 6              With respect to irreparable harm.  There is
 7    clearly irreparable harm to the Plaintiff if the
 8    injunction is not granted.  Graduation from high school is
 9    literally a once-in-a-lifetime event.  At the same time,
10    there is essentially no harm to the School District if the
11    injunction is granted.  The Plaintiff has already been
12    punished extensively.  He was unable to attend his prom.
13    He was unable to participate in sports or extracurriculars
14    and he was removed from the school for a period of time.
15    Moreover, if a higher court were ultimately to find my
16    ruling today here to be an error there would be no
17    diminution of the School District's interest in deterring
18    this kind of conduct in the future simply because one
19    portion of its punishment was unable to be enforced.
20    Therefore, I find that there would be irreparable harm to
21    the Plaintiff if the injunction were not granted during
22    the pendency of this action.
23              Finally, the Court must consider the balance of
24    equity in this case.  Again, in a broad sense, the School
25    District has an interest in fostering and inculcating a
```

A-591

8

1    community free of racism, free of racially based discord

2    and animus.  However, as I have indicated under the

3    likelihood of success, it appears that the school

4    overreached in its application of those principles to this

5    particular case.  The record reflects in the

6    recommendations by Attorney Kate Reid that although this

7    student is near the end of his senior year of high school

8    he has no history whatsoever of prior school-based

9    discipline.  This is essentially a first offense.  In

10   addition, the school received a number of letters

11   supporting the Plaintiff's character from the community

12   which, apparently, are not controverted.  As noted, there

13   is, in addition to that, substantial ambiguity about the

14   proof in this matter in terms of the actual mechanisms by

15   which the speech was communicated.  Challenging or not, in

16   cases involving social media, a School District, I

17   believe, is required to be sufficiently fluent in those

18   platforms and those accounts, to be able to describe

19   exactly how they are disseminated, by whom and, to the

20   extent there are modifications to images, how they are

21   done.

22        In this case, while there is no detailed proof

23   on the matter, the Court shares Plaintiff counsel's view

24   that to the extent there was disruption it was almost

25   certainly caused, not by this plaintiff's conduct, but by

A-592

9

```
 1    the other student who took the position of Officer Chauvin
 2    in the photo and added the racially offensive commentary
 3    to the photo.  Overall, in the context of the balancing of
 4    equity, even if this is conduct that may be regulated by
 5    the school, whether the punishments meted out, in
 6    particular denying access to graduation as to which there
 7    is no suggestion that he was anywhere -- anything but
 8    entitled to attend on the basis of his coursework and
 9    record at the school, strikes the Court as excessive,
10    potentially grossly excessive relative to the conduct the
11    School District seeks to proscribe.
12                Accordingly, the Court believes that equities
13    balance in favor of allowing the Plaintiff to attend the
14    graduation.  That is the ruling of the Court.  If either
15    counsel wishes to place anything on the record in regard
16    to the ruling I will give you the opportunity to do that
17    now.
18                MR. DORFMAN:  I just wish to thank the Court for
19    your decision.
20                THE COURT:  Understood, Mr. Dorfman.
21                MR. DANIELS:  Yes, thank you, your Honor.  The
22    District would --
23                THE COURT:  -- respectfully disagree --
24                MR. DANIELS:  -- and object to some of the
25    determinations which we can as long as I can just say we
```

MARIA GILES, SENIOR COURT REPORTER

A-593

10

1    object I don't think we need to put anything else on the

2    record.  I did have a procedural question, your Honor.

3    The Order to Show Cause directed that opposition papers be

4    filed by today.  I did not interpret that to mean an

5    answer to the Plaintiff's complaint.

6              THE COURT:  No, that is correct, only to the

7    Preliminary Injunction Order to Show Cause.  You have

8    whatever time limit would normally be applicable in the

9    matter.  Perhaps, in light of my determination here, maybe

10   there is a basis to reach some kind of accommodation

11   rather than engage in litigation over the course of the

12   summer.  That's up to the parties.

13             MR. DANIELS:  Understood.

14             THE COURT:  I appreciate again the very thorough

15   efforts to litigate this on short notice and in a changing

16   legal context I appreciate everyone's input, including

17   Mr. Evans' assistance in elucidating some of the conduct.

18   Thank you all and be safe out there.

19                   *         *         *

20         Certified to be a true and accurate transcript.

21

22         Maria Giles, Sr. Court Reporter

23

24

25

MARIA GILES, SENIOR COURT REPORTER