# 24-1241

## In the
## United States Court of Appeals for the Second Circuit

CASE LEROY,

*Plaintiff - Appellant,*

v.

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of Schools of
Livingston Manor Central School District,

*Defendants – Appellees.*

On Appeal from the United States District Court
for the Southern District of New York, 7:21-cv-06008-NSR-AEK

### OPENING BRIEF AND SPECIAL APPENDIX
### OF APPELLANT CASE LEROY

JEROME T. DORFMAN
LAW OFFICES OF
JEROME T. DORFMAN
8 Breezy Hill Road
Parksville, New York 12768
(845) 747-9403

ADAM EZRA SCHULMAN
HAMILTON LINCOLN LAW
INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
(610) 457-0856

*Attorneys for Plaintiff-Appellant Case Leroy*

## Corporate Disclosure Statement (FRAP 26.1)

Pursuant to the disclosure requirements of Federal Rule of Appellate Procedure 26.1, Case Leroy, declares that he is an individual and, as such, is not a subsidiary or affiliate of a publicly owned corporation and there is no publicly held corporation that owns ten percent or more of any stock issued by him.

# Table of Contents

Corporate Disclosure Statement (FRAP 26.1) ................................... i

Table of Authorities ................................................................ iv

Statement of Subject Matter and Appellate Jurisdiction............. 1

Statement of the Issues ........................................................... 2

Statutes and Rules ................................................................... 5

Statement of the Case ............................................................. 6

    A.    Livingston Manor senior Case Leroy posts a photo and a caption on his personal Snapchat account, and deletes it seven minutes later.............................................................. 6

    B.    Leroy's former girlfriend, who also attended Livingston Manor, conducts a cancellation campaign against Leroy, and the school district responds by immediately suspending Leroy. .......................................................................... 8

    C.    After a disciplinary hearing, Evans exceeds the hearing officer's recommendation and bans Leroy from school and extracurricular activities, including his graduation ceremony. ........................................................................11

    D.    Leroy brings this case and a New York state court enjoins Leroy's punishment. .........................................................14

    E.    After the state court rules against them, Defendants remove to federal court, and the district court concludes that Leroy's speech is unprotected...........................................................15

Summary of Argument ....................................................... 17

Argument ............................................................................. 19

I.    *Mahanoy* resolves this case in Leroy's favor........................ 19

II.    Pre-*Mahanoy* precedent confirms that Leroy's speech is protected. .............................................................................. 28

III.   **Even if Defendants could satisfy *Mahanoy*'s demanding standard for substantial disruption, they violated Leroy's First Amendment rights by disciplining him based on viewpoint.** ................................................................ 35

**Conclusion** ........................................................................ 52

# Table of Authorities

<u>Cases</u>

*A.H. v. French*,
    985 F.3d 165 (2d Cir. 2020)............................................................3, 4

*Amidon v. Student Ass'n of SUNY Albany*,
    508 F.3d 94 (2d Cir. 2007).............................................................4, 42

*Appeal of G.S.*,
    269 A.3d 718 (Pa. Commonwealth Ct. Jan. 7, 2022) ....................27

*Bailey v. Iles*,
    87 F.4th 275 (5th Cir. 2023)............................................................48

*Burnham v. Ianni*,
    119 F.3d 668 (8th Cir. 1997) (*en banc*)...........................................43

*C1.G ex rel. C.G. v. Siegfried*,
    38 F.4th 1270 (10th Cir. 2022)..................................2, 18, 24-28, 34

*Chandler v. Tech. Coll. of the Lowcountry*,
    2022 WL 2670806, 2022 U.S. Dist. LEXIS 122784 (D.S.C.
    Jul. 11, 2022)..................................................................................27

*Collins v. Putt*,
    979 F.3d 128 (2d Cir. 2020)..........................................................3, 44

*Cuff v. Valley Cent. Sch. Dist.*,
    677 F.3d 109 (2d Cir. 2012).........................................................33-34

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008)........................................................30-32, 44

*Doninger v. Niehoff*,
    642 F.3d 334 (2d Cir. 2011).............................................................30

*Dube v. State Univ. of N.Y.*,
    900 F.2d 587 (2d Cir. 1990).............................................................28

*Frederick Douglass Found. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023) .................................................35, 44

*Friend v. Gasparino*,
  61 F.4th 77 (2d Cir. 2023) ....................................2-3, 4, 48

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992) .........................................................33

*Gerich v. Leath*,
  861 F.3d 697 (8th Cir. 2017) ...........................................37

*Gillman v. Sch. Bd. for Holmes Cnty.*,
  567 F. Supp. 2d 1359 (N.D. Fla. 2008).............................32, 45, 50

*Guiles ex rel. Guiles v. Marineau*,
  461 F.3d 320 (2d Cir. 2006)...........................................34

*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) .......................................................48

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
  993 F.2d 386 (4th Cir. 1993) .........................................36

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) .......................................................36

*Janese v. Fay*,
  692 F.3d 221 (2d Cir. 2012)............................................27

*J.S. v. Blue Mt. Sch. Dist.*,
  650 F.3d 915 (3d Cir. 2011) (*en banc*) ...............................23, 32, 33

*In re Jason W.*,
  837 A.2d 168 (Md. Ct. App. 2003) .................................33

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019)...........................................43

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014).............................................31

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021) ................................................................ *passim*

*Masterpiece Cake Shop v. Colo. Civ. Rts. Comm'n*,
    584 U.S. 617 (2018) ...............................................................3-4, 42

*Matal v. Tam*,
    582 U.S. 218 (2017) ...............................................................36, 48

*Minnesota Voters Alliance v. Mansky*,
    585 U.S. 1 (2018) ...............................................................3, 35-36

*Morse v. Frederick*,
    551 U.S. 393 (2007) ...........................................................28, 34, 49

*N.J. v. Sonnabend*,
    37 F.4th 412 (7th Cir. 2022) .........................................................23

*Nat'l Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024) ....................................................................35

*Norris v. Cape Elizabeth Sch. Dist.*,
    969 F.3d 12 (1st Cir. 2020)......................................................23, 32

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ......................................................................17

*Peck v. Baldwinsville Cent. Sch. Dist.*,
    426 F.3d 617 (2d Cir. 2005).......................................................3, 36

*R.H. v. Borough of Sayreville*,
    2023 WL 3431214, 2023 U.S. Dist. LEXIS 83587 (D.N.J.
    May 12, 2023)...............................................................................26

*Ragbir v. Homan*,
    923 F.3d 53 (2d Cir. 2019).........................................................37

*Seattle Mideast Awareness Campaign v. King Cty.*,
    781 F.3d 489 (9th Cir. 2015) ......................................................42

*Speech First v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) .......................................................36

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ..........................................................................50

*Taylor v. Roswell Indep. Sch. Dist.*,
  713 F.3d 25 (10th Cir. 2013) ..........................................................36

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000) ..............................................................3

*Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*,
  607 F.2d 1043 (2d Cir. 1979 ............................. 29, 30, 32, 33, 35, 51

*Tinker v. Des Moines Independent Community Sch. Dist.*,
  393 U.S. 503 (1969) ......................................... 19, 24, 28, 36-37, 49

*Waln v. Dysart Sch. Dist.*,
  54 F.4th 1152 (9th Cir. 2022) .........................................................44

*Wang v. Bethlehem Cent. Sch. Dist.*,
  2022 WL 3154142, 2022 U.S. Dist. LEXIS 140153 (N.D.N.Y.
  Aug. 8, 2022) ..................................................................................27

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018) ...................................................3, 36, 48

*W. Va. Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..................................................................26, 51

*Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*,
  494 F.3d 34 (2d Cir. 2007) .......................................................33, 34, 51

*Young v. Giles Cnty. Bd. of Educ.*,
  181 F. Supp. 3d 459 (M.D. Tenn. 2015) ...................................32, 50

Constitutional Provisions

U.S. Const. amend. I......................................................................*passim*

U.S. Const. amend. XIV ............................................................... 5

Rules and Statutes

28 U.S.C. § 1291 ....................................................................... 1

28 U.S.C. § 1331 ....................................................................... 1

28 U.S.C. § 1441(a) .................................................................. 1

42 U.S.C. § 1983 ................................................................... 1, 5

Fed. R. App. P. 4(a)(1)(A) ...................................................... 1

Other Authorities

*Edgelord*,
     Wikipedia*,*
     https://en.wikipedia.org/wiki/Edgelord (last visited Aug. 2,
     2024) ............................................................................... 47

FIRE,
     *Taking a knee in sports? For What!?,*
     https://www.youtube.com/watch?v=O67dGv5kIOU (last
     visited Jul. 24, 2024) ..................................................... 47

*How to Be an Antitracist*,
     Wikipedia*,*
     https://en.wikipedia.org/wiki/How_to_Be_an_Antitracist (last
     visited Jul. 31, 2024) ..................................................... 37

Lomonte, Frank D.,
     *Students Do Not Shed Their Constitutional Rights at the
     Login Screen: Slamming the Schoolhouse Gate on School
     Control over Social Media Speech,*
     2 ED. L. & POL'Y REV. 36 (2015) ................................... 50

Lukianoff, Greg & Rikki Schlott,
     THE CANCELING OF THE AMERICAN MIND: CANCEL CULTURE
     UNDERMINES TRUST AND THREATENS US ALL—BUT THERE IS A
     SOLUTION  (2023) ........................................................... 42

Rothman, Noah,
    *Searching for the 'Anti' in 'Antiracism,'*
    COMMENTARY (Dec. 21, 2020), ......................................................38

## Statement of Subject Matter and Appellate Jurisdiction

The district court had removal jurisdiction based on the federal question presented in the complaint. 28 U.S.C. §§ 1331, 1441(a). Plaintiff Case Leroy's state-court complaint alleged a violation of his constitutional rights under 42 U.S.C. § 1983. A-21-22.[1] Defendants' subsequent timely removal to federal court invoked the district court's jurisdiction under 28 U.S.C. § 1441(a). A-15.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. On April 8, 2024, the district court entered judgment. SPA-22. Plaintiff Case Leroy filed a timely notice of appeal on May 3, 2024. A-547; Fed. R. App. P. 4(a)(1)(A).

---

[1] "A" indicates the joint appendix for this appeal and "SPA" indicates the special appendix appended to this brief. "Dkt." indicates docket entries in the underlying district-court case, No. 7:21-cv-06008-NSR-AEK (S.D.N.Y.). The original state-court action in Supreme Court, Sullivan County is indexed as E2021-968. Its docket can be accessed through the New York State Unified Court System portal at https://iapps.courts.state.ny.us/webcivil/FCASMain.

## Statement of the Issues

1.     Public schools have diminished leeway to discipline student speech that occurs off campus, on social media, and on the students' own time, especially when that speech is not directed toward the school. *E.g.*, *Mahanoy Area Sch. Dist. v. B.L*, 594 U.S. 180 (2021); *C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022). Here, Defendants disciplined Plaintiff Case Leroy for a fleeting posting of a photograph, made off school grounds, on Leroy's own time, using his personal cell phone and his personal Snapchat account. Neither the photo nor the post was in any way directed toward or related to the school, its students, or school staff. Yet the district court held that a "barrage of emails" from upset community members, classroom discussion, and an in-school assembly followed by a school-approved 9-minute kneeling student protest together constituted a "substantial disruption" justifying the school's punishment of Leroy. SPA-17-18.

The issue presented is whether the district court erred as a matter of law in concluding that Leroy's speech was unprotected under the First Amendment, and therefore in granting summary judgment to Defendants and denying summary judgment to Leroy.

**Standard of Review**: This Court reviews a decision granting summary judgment *de novo. Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023). "Summary judgment is warranted only upon a showing that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." *Id.* (internal quotation omitted). The court should "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Id.* (internal quotation omitted). "Only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party is summary judgment appropriate." *Id.* (internal quotation omitted). The same standard applies to cross-motions. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000).

In First Amendment cases in particular, this Court reviews the "core constitutional facts," such as the nature of the speech, the government's interests, and so on, *de novo. A.H. v. French*, 985 F.3d 165, 175-76 (2d Cir. 2020).

2. Viewpoint-based discrimination on private speech is "prohibited" by the First Amendment. *E.g.*, *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018); *Wandering Dago*, 879 F.3d at 24. One example of impermissible viewpoint discrimination is when a school official applies a facially neutral rule in a viewpoint discriminatory way. *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 631-33 (2d Cir. 2005); *Collins v. Putt*, 979 F.3d 128, 145 (2d Cir. 2020) (Menashi, J., concurring in the judgment). If the government adopts and acts on the views of those objecting to offensive speech, that too constitutes viewpoint discrimination. *See Masterpiece Cake Shop v. Colo. Civ. Rts. Comm'n*, 584

3

U.S. 617 (2018); *Amidon v. Student Ass'n. of SUNY Albany*, 508 F.3d 94, 102 (2d Cir. 2007). Here, the comments and actions of Defendants reveal that the imposition of punishment on Leroy was based on school administrators' and community members' perception of Leroy's speech as expressing racially offensive and insensitive views.

The issue presented is whether, even if the punishment satisfies *Mahanoy*'s "substantial disruption" standard, Defendants nevertheless violated Leroy's First Amendment rights by imposing discipline based on their perception of his viewpoint.

**Standard of Review**: Summary judgment decisions are reviewed *de novo. Friend*, 61 F.4th at 84. This Court reviews the "core constitutional facts," such as whether defendants have discriminated based on viewpoint, *de novo. A.H.*, 985 F.3d at 175-76.

## Statutes and Rules

42 U.S.C. § 1983. Civil action for deprivation of rights

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

First Amendment, United States Constitution

> Congress shall make no law … abridging the freedom of speech….

Fourteenth Amendment, United States Constitution

> Section 1.
> … No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law….
> …

5

## Statement of the Case

This is an appeal from the district court's order granting Defendants Livingston Manor Central School District and its superintendent John P. Evans' motion for summary judgment and denying Plaintiff Case Leroy's motion for summary judgment. SPA-1. The decision is only reported electronically, by LexisNexis at 2024 U.S. Dist. LEXIS 64182 and by Westlaw at 2024 WL 1484254 (S.D.N.Y. Apr. 5, 2024).

### A. Livingston Manor senior Case Leroy posts a photo and a caption on his personal Snapchat account, and deletes it seven minutes later.

Case Leroy is a private in the United States Army and 2021 graduate of Livingston Manor High School, A-34, where he participated in the school's "special education" program because of several disabilities. A-284. Until the events of this case, Leroy was a student without a disciplinary history. A-464. He engaged thoughtfully on current events, writing an essay for a senior-year class on public safety concluding that the officers in the George Floyd case had used excessive force and that Derek Chauvin "deserved jail time." A-537.

On April 19, 2021, while still a Livingston Manor student, Leroy was socializing with three friends after school hours, away from school property. A-193. The four were in a dance studio parking lot to pick up Leroy's friend's sister. A-193-94. While there, one friend told Leroy that

there had been a noise coming from his car on the drive over and Leroy laid on the ground in front of the car to investigate. A-37. While he was there, another friend knelt on Leroy's back and had the third friend take a picture. *Id.*

The three friends each posted the picture to their personal Snapchat accounts, with Leroy adding the caption, "Cops got another." A-110-12; A-267.



Another posted the same image but with a "Black Lives Matter" logo overlayed. A-203. Upon receiving several disapproving private

messages on the Snapchat platform, Leroy deleted his post and asked the others to do the same, which they did. A-116. All told, the images were accessible to others for around seven minutes. A-95.

**B.    Leroy's former girlfriend, who also attended Livingston Manor, conducts a cancellation campaign against Leroy, and the school district responds by immediately suspending Leroy.**

Within the seven minutes that the posts were available, a fellow Livingston Manor student, Leroy's former girlfriend, "Grace" (referred to as "Student F" in administrative proceedings), captured a screenshot Leroy's post, and reposted it on Facebook and other online platforms to "condemn" Leroy. A-386; *see also* A-38. Apparently to amplify any public response, Grace also jointly posted another, out-of-context photo of two other Livingston Manor students taken by Leroy in March of 2021. A-386.[2] An activist, Gem Amber Sun Helper reposted the images with

------

[2] The second photo, taken by Leroy a month prior on March 25th, features a friend from his public safety program demonstrating a hold they learned on another friend who requested that the other student show him. A-460. Leroy did not publicly post this photograph to social media, but shared it with the other students through Snapchat private messaging. *Id*. However, Grace received the photo directly—through a friend a few weeks before the April 19th incident–and posted it publicly for the first time on Facebook along with the later photo. A-386.  The state court later concluded about this earlier image, "[t]here is no reason to believe that that was intended to be part of or otherwise was a basis for [the] punishment here which deals with April 19th incident." A-586;

commentary asserting that Livingston Manor "surpassed its dark history of being a Sundown Town with its own KKK Chapter." A-332, A-357. Helper or a later commentator shared this post and the phone number for Livingston Manor Central school, telling viewers to "dm"—direct or private message—her for additional contact information. A-357.



*accord* A-467, A-470 (superintendent acknowledging that charges arose out of allegation of "post[ing] racially offensive material on social media"); *compare also* A-488-89 with A-491-92. The district court also predicated its analysis only on the April 19th photo. SPA-2-5.

Grace and Helper's tactics had the apparently-intended effect against Leroy. Several individuals emailed their disapproval to John Evans, Livingston Manor's Superintendent, who responded with brief remarks about an ongoing investigation and disavowing racism in the school. *E.g.*, A-310. The school's principal, Shirlee Davis, and its guidance counselor, Meagan Edwards, also received similar emails. *E.g.*, A-313; A-341. Other school administrators also received emails—an addendum to this brief catalogs all emails and school administration responses contained in the record. The record discloses a total of 23 email exchanges between community members and school district employees. Add. 1, Table 1.

The following morning, Davis instructed Leroy not to attend school but to instead attend a meeting with his parents before her and Evans. During the meeting, Davis and Evans interviewed Leroy about the incident. A-504. On April 21, Davis sent a letter to Leroy's parents informing them that she was suspending Leroy for five days, the maximum permissible under state law without a hearing, for "post[ing] racially offensive material on social media…" and referring the matter to Evans to determine whether such a hearing and additional punishment was warranted. A-380.

Based on a "buzz up the building" and rumors of a student protest in response to the Snapchat posts, Evans scheduled a brief assembly for seventh through twelfth grades "kind of as a counter measure to that."

A-278. At the assembly, Evans preached to the students that racism had no place in their school. A-279. The entire assembly took about 15 to 20 minutes. A-279. A few students stayed afterward for "a few minutes" for a supervised kneeling protest. A-279 & A-284; *see also* A-40, A-505.

The same day, Evans contacted Capital Region Board District Superintendent Anita Murphy to arrange a formal investigation and report on the incident. The investigator, Bethany Centrone, Legal Counsel for Capital Region Board, spoke with Leroy's father, Evans, and two additional students. She relied on a review of the interviews conducted by Davis and Evans and other materials to produce her report.

In her report, Centrone found that regardless of Leroy's intent, his "post[] [was] targeted at African Americans and [was] discriminatory." A-389. She recommended that Leroy and the others involved "be referred to a Superintendent's Hearing to determine whether additional discipline…is warranted for any or all of these students." A-390.

### C. After a disciplinary hearing, Evans exceeds the hearing officer's recommendation and bans Leroy from school and extracurricular activities, including his graduation ceremony.

Evans determined a hearing was warranted and informed Leroy and his parents on April 23, 2021, that he was bringing five charges against him under the school district's code of conduct for "posting racially offensive material on social media…." A-456. The hearing was

held on April 27, 2021, before hearing officer Kate Reid, and attended by Leroy, his parents, Evans, and Capital Region Board attorney Centrone. As noted by Reid, such a hearing "is the most serious hearing that a school district can bring against one of its pupils" under New York law. A-258.

At the hearing, Evans testified that after the post, he "had a couple of phone calls with [Davis]," was "contacted by a couple of students and a couple of parents," and "received a couple of phone calls from school staff" about the post. A-272.

At the conclusion of the hearing, Reid found that Defendants failed to sustain three of the charges brought but found Leroy guilty of Charge I—"engaging in willful conduct which disrupts the normal operation of the school community," and Charge V—"engag[ing] in off-campus conduct that interfered with, or c[ould] reasonably be expected to substantially disrupt the educational process." A-276-79. In dismissing the other charges, Reid found that Leroy did not discriminate or "target[] any particular person based on any protected characteristic." A-277-78. Indeed, the record lacks any evidence that Leroy has ever discriminated against or mistreated any particular person based on race, sex, or other protected characteristic.

When addressing possible additional punishment, Evans stressed to the hearing officer that because the post was "racist in nature" that should "factor into" Leroy's punishment. A-287.

Although Reid stated at the hearing that it was unlikely that she would find that more than a ten-day total suspension justified for Leroy's conduct, A-284-85, in her written Finding of Facts and Recommendation to Evans she recommended he extend Leroy's 5-day suspension almost a full additional month, but with an opportunity to return early should he "enter into a disciplinary contract and/or agree to participate in restorative practices in connection with this incident," A-462.

Evans accepted Reid's recommendation but increased the severity of the punishment to include suspending Leroy "from participation in all extra-curricular activities through the remainder of the school year," including Leroy's graduation ceremony. A-464. Evans also offered to allow Leroy to return to regular school attendance on May 10, 2021, and hold the remainder of his suspension in abeyance, if Leroy and his parents agreed to sign a disciplinary contract. A-465.

The disciplinary contract offered by Evans required Leroy to "participate in any recommended Restorative Justice, Diversity, Equity and Inclusivity training opportunities offered or coordinated by the district" as a condition of returning to school. A-468, A-469. Leroy signed the contract on May 9, allowing him to return to school the next day. A-471. However, all other portions of Leroy's punishment remained: he was unable to play football, including the championship game; to play baseball; to go on the senior class trip; to attend the "senior breakfast"; to go to senior prom; and forbidden from attending his graduation. A-43.

### D. Leroy brings this case and a New York state court enjoins Leroy's punishment.

On June 16, 2021, Leroy sued Defendants in New York state court for violating his First Amendment rights. He sought to restore his rights and privileges as a student, receive a declaration that Defendants' actions were unconstitutional, expunge his records of any punishment relating to his speech, and obtain monetary damages for civil rights and defamation claims. A-30.

Leroy sought to preliminarily enjoin Defendants from preventing him from attending his graduation ceremony. The cause was heard on June 25, 2021, before the Honorable Julian D. Schreibman. After an hour and a half of oral argument, Judge Schreibman issued his findings and ruling from the bench: Leroy's post had "[n]o nexus whatsoever to the school in [his] act of speech." A-588. On the merits, Judge Schreibman concluded that *Mahanoy* would "probably compel a ruling against the School District in this case." A-589. And "the Court share[d] Plaintiff counsel's view that to the extent there was disruption it was almost certainly caused, not by this plaintiff's conduct, but by the other student who took the position of Officer Chauvin in the photo and added the racially offensive commentary to the photo." A-591-92. In granting Leroy an injunction, Judge Schreibman noted that,

> [E]ven if this is conduct that may be regulated by the school, whether the punishments meted out, in particular denying access to graduation as to which

> there is no suggestion that he was … anything but entitled to attend on the basis of his coursework and record at the school, strikes the Court as excessive, potentially grossly excessive relative to the conduct the School District seeks to proscribe.

A-592.

Balancing the equities, the court found in favor of allowing Leroy to attend the graduation. A-592.

### E.    After the state court rules against them, Defendants remove to federal court, and the district court concludes that Leroy's speech is unprotected.

After Leroy's immediate success in state court, Defendants removed his action to the Southern District of New York. A-15. Defendants answered the complaint and discovery ensued. Leroy moved for summary judgment on the issue of liability (requesting a trial be set on damages) and Defendants cross-moved for summary judgment. Dkts. 58, 63.

Without holding a hearing, the district court granted Defendants' cross-motion, denied Leroy's motion, and entered final judgment for Defendants. SPA-1, SPA-22. The court found that Defendants' disciplinary action did not violate Leroy's First Amendment rights. In particular, it held that Defendants had "reasonably foretold a substantial disruption given the barrage of emails they received the night the photo was posted from students and community members alike." SPA-17. The court found further evidence of potential disruption in the fact that

Defendants had directed Leroy and the other students involved to stay home the day after the social media conflagration. SPA-17

The district court also found that actual disruption had occurred, in the form of "a quick and emotional response from students who deemed [the photos] inappropriate and offensive and felt that the photos made them feel unsafe and uncomfortable." SPA-18. Additionally, the day after the incident, students discussed the photos during and between classes, the school held an in-school assembly followed by a planned nine-minute kneeling student protest. SPA-18. Addressing Leroy's point that the assembly and classroom discussion was the "choice" of Defendants, the district court disagreed: it was Defendants' "obligation to teach students antiracism, to be antiracist, and to engage in antiracist conduct"—not their "choice." SPA-18; *accord* SPA-19 (school had "a duty to address" the Snapchat).

According to the court, the off-campus nature of Leroy's speech was "relevant" but not "dispositive" because "the school's regulatory interests remain significant in some off-campus circumstances." SPA-15 (citing and quoting *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021)). But the district court did not assess any of the *Mahanoy* factors, which diminish the school's authority off-campus, nor discuss any of the exemplary circumstances that *Mahanoy* held would allow a school to retain regulatory authority over off-campus speech.

The court entered judgment, and Leroy timely appealed. SPA-22; A-547.

## Summary of Argument

Social media, for better and worse, provides the "quintessential forum for the exercise of First Amendment rights" in modern society. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Students expressing themselves on social media often choose insults over politeness, shock value over sensitivity, outrage farming over nuance, trolling over measured assessment. Yet that reality doesn't give public schools a license to police all insensitive speech that occurs online. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021). When students speak off campus, outside of school hours, using their own private devices and social media accounts, schools "will rarely stand *in loco parentis*." *Id.* at 189. If confronted with reports of insensitive student speech online, school administrators can communicate; they can educate; they can advise; they can mediate; they can cajole. But if they want to discipline a student speaker, if they want to usurp the role of that student's parents, then school administrators have to meet a "demanding standard." *Id.* at 193.

Below, Defendants argued, and the district court accepted, that they had met that standard and had shown a "substantial disruption" based on email complaints from offended community members, classroom

discussion, and an in-school assembly followed by a planned nine-minute kneeling protest the day after Leroy's social media post. SPA-17-18. This purported "disruption,"[3] though, is not meaningfully different from that found insufficient by *Mahanoy* and cases following *Mahanoy*. *See, e.g., C1.G v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022); *see* Section I, *infra.* Even under Second Circuit law as it existed before *Mahanoy*, Leroy's speech—which did not portend violence or even address itself to the school, administrators, or students—was fully protected. *See* Section II, *infra.*

Worse, Defendants largely inflicted the claimed "disruption" on themselves. They chose to invite in-class student discussion about Leroy's post; they took time out of students' normally scheduled classes to host an assembly and supervise a planned demonstration; they distributed several letters to the school community. *E.g.*, A-278-79. Whether or not they felt a pedagogical "obligation" to take those actions, (SPA-18), their choice is not attributable to Leroy's speech.

Defendants' choice highlights a separate independent problem with their discipline of Leroy's speech: they punished Leroy because of their perception of the viewpoint he was expressing. *See* Section III, *infra.* Viewpoint discrimination is anathema to the First Amendment. Thus,

---

[3] The record reflects 23 email exchanges between community members and school district employees. *See* Add. 1, Tbl. 1.

even if Defendants could otherwise satisfy *Mahanoy*'s "demanding standard," their viewpoint discrimination violated Leroy's constitutional rights.

## Argument

### I. *Mahanoy* resolves this case in Leroy's favor.

Just three years ago, the Supreme Court settled the constitutional questions at the heart of this case: what is the scope of high school students' free expression rights off campus on social media? And reciprocally, what is the scope of a school's constitutional authority to punish such speech? *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021). In *Mahanoy*, a school suspended a student from extracurricular activities after she posted an incendiary photo on Snapchat bearing the caption "Fuck school fuck softball fuck cheer fuck everything." *Id.* at 185. After both lower courts concluded that the suspension violated the Constitution, the Supreme Court granted certiorari to decide how *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)—the seminal decision at the intersection of student free speech rights and school disciplinary authority—applies to speech occurring off campus on a student's own time. *Mahanoy*, 594 U.S. at 186-87.

*Mahanoy* answers that "three features of off-campus speech … often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech" and "diminish

the strength of the unique educational characteristics that might call for special First Amendment leeway." 594 U.S. at 189.

"*First*, a school, in relation to off-campus speech, will rarely stand *in loco parentis*." 594 U.S. at 189. "The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Id.* "Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* Justice Alito, concurring with Justice Gorsuch, expands on this point: "enrollment cannot be treated as a complete transfer of parental authority over a student's speech. In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Id.* at 201-02.

"*Second*, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day." 594 U.S. at 189. "That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Id.* at 189-90. "When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.* at 190.

"*Third*, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." 594 U.S. at 190. Again, the concurrence elaborates: "If a school tried to regulate such speech [on "sensitive subjects"], the most that it could claim is offensive off-premises speech on important matters may cause controversy and recriminations among students and may thus disrupt instruction and good order on school premises." *Id.* at 205. "But it is a bedrock principle that speech may not be suppressed simply because it expresses ideas that are offensive or disagreeable." *Id.* (internal quotations omitted).

Thus, Mahanoy's offensive and profane speech was fully protected. This was so even though her snapchats caused "some members of the cheerleading team [to be] 'upset,'" which carried over into subsequent class-time "discussion of the matter." *Mahanoy*, 594 U.S. at 192. "Simple undifferentiated fear or apprehension [of more] is not enough to overcome the right to freedom of expression." *Id.* at 193 (simplified).

Each of these three features fully applies to Leroy's speech here, yet the district court mentioned *none* of them. From its opinion, one could hardly even discern that *Mahanoy* is the pivotal decision about off-campus student speech. Instead, the decision cites *Mahanoy* for only one legal proposition: that the off-campus location of speech is not dispositive (SPA-15 (citing *Mahanoy*, 594 U.S. at 188)); *accord* SPA-14). True enough, *Mahanoy* reasons that the school's regulatory interests do not

"always disappear" off campus. 594 U.S. at 188. But the district court below overlooks *Mahanoy*'s immediate qualification of that statement "list[ing] several types of off-campus behavior that may call for school regulation," including (1) harassment targeting particular individuals; (2) threats aimed at teachers or other students; (3) curricular speech; and (4) speech communicated on school devices. *Id.* While this may not be an exclusive list, Leroy's speech does not fit any of these exceptional categories or implicate any attendant concerns. In other words, there is no regulatory interest in generalized offensive speech or commentary, like the speech in *Mahanoy* and the speech here.

Although the decision below attempts to distinguish *Mahanoy* on its facts (SPA-17-18), no material distinction exists. Leroy's speech, like B.L.'s, "appeared outside of school hours from a location outside the school." 594 U.S. at 191.  He "did not identify the school in h[is] posts or target any member of the school community with vulgar or abusive language." *Id.* Like B.L., he "also transmitted h[is] speech through a personal cellphone, to an audience consisting of h[is] private circle of Snapchat friends." *Id.* As in *Mahanoy*, then, these features "diminish the school's interest in punishing [Leroy's] utterance." *Id.*

Nor were the consequences of Leroy speech meaningfully different from those in *Mahanoy*. The purported disruption here—"a quick and emotional response from students who deemed [the photos] inappropriate and offensive," in-school discussion, and a planned nine

minute kneeling protest (SPA-17-18)—closely resembles that alleged, but insufficient, in *Mahanoy*. *See* 594 U.S. at 192 ("upset" students and in-school "discussion of the matter" that "took, at most 5 to 10 minutes of an Algebra class 'for just a couple of days.'") "[A school] must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 191. (internal quotation omitted).

*Tinker* sets a "demanding standard." *Id.* And it places the burden "squarely" on the school to show a genuine disruption or substantial likelihood thereof. *N.J. v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022); *accord Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (citing Second Circuit among other authorities). *Mahanoy* and *Tinker* do not permit schools to manufacture a disruption by directing the speakers to stay home from school and then claiming that as "evidence[]" of "apprehension" of potential disturbance. *Contra* SPA-17; *see J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 929 n.6 (3d Cir. 2011) (*en banc*) (distinguishing between disruption caused by the speech and by "the direct result of the School District's response" to the speech). Email complaints from offended and upset community members—even a "barrage" of them[4]—do not change the calculus. "The freedom of students

---

[4] SPA-17. The record reveals 23 such email exchanges. *See* Add. 1, Tbl. 1.

to speak would not be worth much if it gave way in the face of such relatively minor complaints. Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting…" *Mahanoy*, 594 U.S. at 210 (Alito, J., concurring). Crediting such complaints would amount to "a heckler's veto." *Id.* at 206. Both here, and in *Mahanoy*, the school district's discipline cannot "meet *Tinker's* demanding standard." *Id.* at 193 (Majority Op.)

No appellate court has interpreted *Mahanoy* the way the court below did. Consider the Tenth Circuit's decision in *C1.G v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022). *Siegfried* involved an off-campus Snapchat selfie of C.G. and three friends posing in WWII era military regalia with the caption "Me and the boys bout to exterminate the Jews." *Id.* at 1274. C.G. spoke off campus outside of school hours, did not target any member of the school community or even identify the school, and transmitted his speech through his personal cellphone to a private circuit of Snapchat friends. *Id.* at 1277-78. These are the "normal circumstances" subject to parental oversight, not to the school acting *in loco parentis*. *Id.* at 1278

Still, the school disciplined C.G., offering several pieces of evidence to justify its forecast of substantial disruption: (1) the principal received emails about the post; (2) the post had been widely circulated throughout the area's Jewish community; (3) the post had scared, angered, and saddened a family whose son was worried about being in C.G.'s class; (4) the principal sent out a message to the community; (5) news outlets

covered the incident; (6) three more families contacted the school; and (7) the school used one advisory period to discuss the post and promote conversation about harmful speech. *Id.* The Tenth Circuit held that after *Mahanoy*, "[t]hese facts fall short of *Tinker*'s demanding standard." *Id.* at 1279 (internal quotation omitted). Neither the emails, nor the news reports, nor the school's "choice to discuss C.G.'s post during an advisory period," nor their combination sufficed to meet the demanding standard. *Id.*

But here, the district court denied that Defendants' decision to host an assembly, discussion sessions, and a nine-minute protest, was even a "choice." SPA-18. According to the district court, it was a pedagogical "obligation." SPA-18. If "providing students the opportunity and space to discuss the photos, its [*sic*] implications, and the topical issue of the murder of George Floyd and police brutality" "directly served" that obligation, though, how could Leroy's speech constitute a substantial disruption? It would be no more than the discharge of the school's duty— in other words, a "teaching moment."

At base, the district court and Defendants misconceive the school district's fundamental "obligation." That obligation isn't inculcating antiracism, or any particular ideology, in the student body. *Contra* SPA-18; Memorandum in support of Summary Judgment, Dkt. 70 at 19; A-469 (requiring Leroy to attest that he "shall participate in any recommended Restorative Justice, Diversity, Equity, and Inclusivity

training opportunities offered or coordinated by the district" as a condition of returning to school). After all, "no official, high or petty" is supposed to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The actual obligation is providing "scrupulous protection of Constitutional freedom of the individual" lest they "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.* at 637. The real civic "duty" is "teach[ing] students that freedom of speech including unpopular speech, is essential to our form of self-government." *Mahanoy*, 594 U.S. at 195 (Alito J., concurring). That means "ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* at 190 (Majority Op.). Livingston Manor Central School District's policies may commit to this duty,[5] but its efforts to extract a pound of flesh from Leroy did not.

Finding community outrage and discomfort to be a substantial disruption is incompatible not only with *Siegfried*, but with a bevy of post-*Mahanoy* decisions. *See R.H. v. Borough of Sayreville*, 2023 WL

---

[5] *See* A-451 ("The district recognizes that free inquiry and free expression are indispensable to the objectives of the district. The purpose of this code is to maintain public order and prevent abuse of the rights of others.")

3431214, 2023 U.S. Dist. LEXIS 83587, at *18-*21 (D.N.J. May 12, 2023) ("racially insensitive" joke on Instagram) ("increased supervision of students" "following complaints regarding the post" did not qualify as a substantial disruption); *Wang v. Bethlehem Cent. Sch. Dist*., 2022 WL 3154142, 2022 U.S. Dist. LEXIS 140153, *46 (N.D.N.Y. Aug. 8, 2022) (internet bracket of "most liked or admired girls") ("mere offense of a group of students is generally not viewed as sufficiently disruptive"); *Chandler v. Tech. Coll. of the Lowcountry,* 2022 WL 2670806, 2022 U.S. Dist. LEXIS 122784, *18 (D.S.C. Jul. 11, 2022) (Facebook posts complaining about failure to honor exceptions to mandatory vaccination policy) ("a few calls from the public to these boards regarding an apparent violation of law cannot reasonably be expected to have disrupted education at TCL"); *Appeal of G.S.*, 269 A.3d 718, 734 (Pa. Commonwealth Ct. Jan. 7, 2022) (Snapchat posting of violent death metal lyrics) ("where a student's properly contextualized, off-campus speech is not distinctly connected to school activities or clearly directed towards members of their educational community, a public school's reach exceeds its constitutional grasp if it seeks to punish that student for any disruption to normal school operations that results from that speech."). Affirming the district court's decision would create an "inadvisable" split with *Siegfried*; there are "no compelling reasons" to do so here. *Janese v. Fay*, 692 F.3d 221, 227 (2d Cir. 2012).

Like *Siegfried*, this case follows seamlessly from *Mahanoy*. Leroy's speech was not "expressly and specifically directed at the school, school administrators, teachers, or fellow students." *Mahanoy*, 594 U.S. at 205 (Alito, J., concurring). Whether or not it touches on a "sensitive subject," his speech is, as it "almost always" is, "beyond the regulatory authority of a public school." *Id.*

## II.   Pre-*Mahanoy* precedent confirms that Leroy's speech is protected.

*Mahanoy*'s rule of decision does not work a sea change; it builds on the "'bedrock principle' that speech may not be suppressed simply because it expresses ideas that are 'offensive or disagreeable.'" 594 U.S. at 205-06 (Alito, J., concurring) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989) and citing other authorities); *see also Dube v. State Univ. of N.Y.*, 900 F.2d 587, 590, 597 (2d Cir. 1990) (no qualified immunity for university officials who bowed to "growing furor" and "community activists" "outraged" at a professor teaching that Zionism is as racist as Nazism). That is the bedrock of *Tinker*: schools may not punish "unpopular" speech to avoid "discomfort," "unpleasantness," or "controversy." 393 U.S. at 509-10. And the Supreme Court has continued to reject the contrary argument that schools may prohibit "any speech that could fit under some definition of 'offensive.'" *Morse v. Frederick*, 551 U.S. 393, 409 (2007).

Still, before *Mahanoy*, there was uncertainty as to the boundaries of student free expression and school authority, especially as social media transitioned from emergent to ubiquitous. This Circuit's law embraced that tension. Its earliest discussion of off-campus free expression rights held that *Tinker* did not authorize administrators to "venture[] out of the school yard into the general community" to punish students for printing, publishing, and distributing a self-avowedly vulgar publication outside of school. *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1050 (2d Cir. 1979). *Thomas* reasoned that allowing administrators to act on the sentiments "of the community-at-large" would "inevitably" "chill…protected expression" "regardless of the intentions of well-meaning school officials." *Id.* at 1051. And, as later emphasized in *Mahanoy*, such freewheeling authority would usurp parents' own "role…in bringing up their children." *Id.*

*Thomas* is not merely the best rule for students and parents, it is the best rule for school districts themselves. Establishing unbridled authority for schools to police off-campus student speech—or even more, a school's "obligation" (SPA-18) to police it—opens up the potential for boundless liability for events beyond the schoolhouse gate. *Thomas*'s rule, by contrast, allows schools "the freedom not to intervene without fear of being sued for their inaction." Amicus Br. of Louisiana, *et al.* at 4, *Mahanoy Area Sch. Dist. v. B.L.*, No. 20-255 (U.S. Mar. 31, 2021). They can then "focus on educating students without risking an inaction-

inspired uproar when they choose to respect, rather than undermine, students' First Amendment rights." *Id.* at 3.

As we entered the internet era, however, this Court retreated from *Thomas*. It held that a school did not violate the free speech rights of a student when it disqualified her from extracurricular student government participation in response to an online blog post criticizing the school administration and soliciting readers to contact the administration to express their displeasure. *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008) ("*Doninger I*"). *Doninger I* listed three factors supporting its conclusion: (1) Doninger had used "incendiary language" "purposely designed…to come onto the campus"; (2) Doninger's post contained misleading or false information "in [an] effort to solicit more calls and emails to [school officials]"; and (3) the school's discipline was limited to disqualification from participation in an extracurricular activity. *Id.* at 50-53. *Doninger I* explicitly left open the question of whether a "more serious consequence than disqualification from student office would raise constitutional concerns." *Id.* at 53. *Doninger I* did not attempt to reconcile *Thomas*, but *Doninger II* (at the summary judgment stage) did. *Doninger v. Niehoff*, 642 F.3d 334, 346-347 (2d Cir. 2011). *Doninger II* held that the distinction is whether the off-campus speech is "deliberately designed to take place away from school" or rather "to "incite[] substantial disruption within the school from some remote

locale." *Id.* Doninger's speech fell into the latter category, at least for purposes of a qualified immunity analysis. *Id.*

*Mahanoy* abrogates *Doninger I*, at least for the only issue that decision resolved. A free speech claim cannot be disposed of because the discipline imposed is merely a suspension from extracurricular participation. *Contrast Mahanoy*, 594 U.S. at 210 (suspension from cheerleading team), *with Doninger I*, 527 F.3d at 52-53. Nor can it be disposed of because the student uses incendiary language. *Contrast* 594 U.S. at 191 (characterizing speech as "crude" and "vulgar"), *with Doninger I*, 527 F.3d at 50-51. More broadly, Justice Alito's concurrence cites *Doninger* as an example of speech criticizing school administrators, a type of speech that students "surely" retain the right to voice "in an appropriate manner." 594 U.S. at 208 & n.22. Even if *Mahanoy* merely "casts doubt," this Court would be within its discretion to overrule *Doninger*. *Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F.3d 395, 405 (2d Cir. 2014) (internal quotation omitted).

Regardless of *Doninger'*s continuing vitality, the decision below does not merely follow *Doninger*, it *extends* it to Leroy's speech here, without appreciation of the distinction. SPA-17. Leroy's speech did not encourage or solicit calls and emails to the administration. *Contrast Doninger*, 527 F.3d at 50-51. It did not contain misleading or false information about the school; it did not reference the school at all. Leroy shared his Snapchat only with a discrete circle of friends, and in fact

pulled his post down after seven minutes when it started to engender controversy. A-38. Simply put, the speech was not "purposely designed" "to come onto the campus." *Compare* 527 F.3d at 50, *with Blue Mt. Sch. Dist.,* 650 F.3d at 930-931 (speech protected when student did not intend for it to reach the school) *and Thomas*, 607 F.2d at 1050 (same). Thus, even before *Mahanoy*, it was incumbent on administrators (and in litigation, on courts) to "attempt to disentangle the harm caused by" the speech at issue from the speech of other students. *Norris*, 969 F.3d 12, 31; *see also Young v. Giles Cnty. Bd. of Educ.,* 181 F. Supp. 3d 459, 464 (M.D. Tenn. 2015) ("The only disruption came at the hands of Defendants themselves"); *Gillman v. Sch. Bd. for Holmes Cnty.,* 567 F. Supp. 2d 1359, 1371 (N.D. Fla. 2008) ("it is clear that [the school administrator], not the innocuous symbols and phrases at issue, bears sole responsibility for any unrest that occurred at" the school).

Under *Doninger*, the solicitation/encouragement/inducement of complaints is necessary to attribute a disruption to student speech. An external "barrage of emails" itself is not sufficient. *Contra* SPA-17. School administrators handling ordinary administrative responsibilities does not amount to *Tinker* disruption. *See Thomas*, 607 F.2d at 1046 (administrators met with "shocked and offended" community members, then investigated and convened a school board meeting); *Blue Mt. Sch. Dist.*, 650 F.3d at 922-23 (administrators fielded reports and complaints from teachers). In other words, "the orderly conduct" of the school "takes

into account and includes within it conduct or circumstances that may momentarily divert attention from the planned classroom activity and that may require some intervention by a school official." *In re Jason W.*, 837 A.2d 168, 174 (Md. Ct. App. 2003). This was true in *Tinker* itself where the armbands caused far-reaching disruption, even diverting classmates' "attention to the wounded and dead of the [Vietnam] war, some of the wounded and dead being their friends and neighbors." *Blue. Mt. Sch. Dist.,* 650 F.3d at 928-29 (citing and quoting *Tinker*).

Worse, under the district court's interpretation of *Doninger*, schools may pass the buck and externalize the decision to censor when third-party complainants issue an "explicit call to action." SPA-17. But when the government gives effect to an outside third party's disagreement with speech, the government censors just as if the complaint came from the government itself. *Cf. Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) (recouping costs incurred due to listeners' reaction to unwelcome speech not permitted by the First Amendment). "[H]ecklers don't get the veto." *Mahanoy*, 594 U.S. at 206 (Alito, J., concurring) (quoting Transcript of Oral Arg. 5-6).

Meanwhile, a third line of pre-*Mahanoy* cases, distinct from *Thomas* and *Doninger*, offers greater leeway to administrators regulating threats of violence. *See Cuff v. Valley Cent. Sch. Dist.*, 677 F.3d 109 (2d Cir. 2012) (cited at SPA-14, SPA-17); *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007). *Cuff* involved in-

*school* speech that "threaten[ed] violence" from a student with "a history of disciplinary issues" and other speech that "embraced violence." 677 F.3d at 113-14. *Wisniewski* involved "potentially threatening" online speech "reasonably understood as urging violent content." 494 F.3d at 38, 39. *Wisniewski* made clear that, "[a]s in *Morse*, the student … was not disciplined for conduct that was merely 'offensive' or merely in conflict with some view of the school's 'educational mission.'" *Id.* at 40 (quoting *Morse*, 551 U.S. at 409 (Majority Op.) and 551 U.S. at 423 (Alito, J., joined by Kennedy, J., concurring)).

Like *Doninger*, *Cuff* and *Wisniewski* are factually inapposite here, where no one interpreted Leroy's social media post as a threat of violence, Leroy has no history of disciplinary issues, and Leroy's post does not even mention the school. *Accord Siegfried*, 38 F.4th at 1279 ("[E]ven pre-*Mahanoy*, this case materially differs from the [] cases Defendants cite to prove that other circuits have applied *Tinker* to off-campus speech…[which] all addressed specific threats directed at a school, its students, or its officials."). Rather, Defendants imposed discipline because they viewed Leroy's speech as antithetical to their didactic "obligation" (SPA-18)—in other words, the sort of perceived inconsistency with their "educational mission" that *Wisniewski* and Alito's concurrence in *Morse* take off the table. *See also Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 330 (2d Cir. 2006) (repudiating the "educational mission" rationale even before *Morse*).

In short, Leroy's claims had merit even before *Mahanoy*.

## III. Even if Defendants could satisfy *Mahanoy*'s demanding standard for substantial disruption, they violated Leroy's First Amendment rights by disciplining him based on viewpoint.

Defendants singled out Leroy for punishment based on the perceived viewpoint of his Snapchat message. Aligning with "antiracist" views advanced by the mob objecting to Leroy's snap, Defendants harshly penalized Leroy for ambiguous speech that, while apparently attacking the impunity with which police engage in violent tactics, did not explicitly condemn racism with "antiracist" platitudes. They did this even though his speech occurred out-of-school, about a non-school topic. Meanwhile, Defendants failed to punish other students who—asserting that Leroy's message was racist—re-posted the same message and intended to disrupt school operations by engaging in a protest and encouraging students and other community members to bombard school administrators with messages about Leroy's snap.

In our constitutional system, "viewpoint discrimination is poison." *Frederick Douglass Found. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). It is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). Thus, while speech "restrictions based on content must satisfy strict scrutiny … those based on viewpoint are prohibited." *Minnesota Voters Alliance v. Mansky*, 585

U.S. 1, 11 (2018); *accord Iancu v. Brunetti,* 588 U.S. 388, 393 (2019) ("unconstitutional"); *Matal v. Tam*, 582 U.S. 218, 243 (2017) ("forbidden"); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) ("prohibited, seemingly as a *per se* matter") (internal quotation omitted); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 24 (2d Cir. 2018) ("prohibited").

This bar on viewpoint discrimination—"a core facet of First Amendment protection"—applies the same to student speech met with school discipline. *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d Cir. 2005); *accord Speech First,* 32 F.4th at 1127 n.6; *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 46 (10th Cir. 2013); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993). Indeed, *Tinker* itself rejects the possibility of viewpoint discrimination. Disciplinary action cannot be rooted in desire to avoid "an unpopular viewpoint." 393 U.S. at 509. It is not "constitutionally permissible for a school to "single[] out" one particular viewpoint using a facially neutral rule. *Id.* at 510-11.

The record reveals that Livingston Manor Central School District did exactly that when it punished Leroy for his off-campus speech. Although the only two rules Leroy was found to have violated are neutral on their face,[6] Defendants applied those rules to target Leroy for what

---

[6] A-464 ("1. Charge 1: Article VI(A)(5)- Engaging in any wilful [sic] act which disrupts the normal operation of the school community. 2.

Defendants considered to be his offensive views. Defendants' viewpoint discrimination is evident in several ways: (1) the express comments and statements of Defendants; (2) the context and circumstances of the imposition of discipline; and (3) the disparate treatment of other students.

*First*, and most directly, school administrators made several statements evincing "their political motives" for Leroy's punishment. *Gerlich v. Leath*, 861 F.3d 697, 706 (8th Cir. 2017); *accord Ragbir v. Homan*, 923 F.3d 53, 70-71 (2d Cir. 2019), *vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020) (statements of government officials evidence unconstitutional viewpoint discrimination). Here, the record includes both expressions condemning the political views that administrators perceived Leroy's "cops got another" post to carry, and expressions of support for a so-called "antiracist" ideology that opposed Leroy's post. Antiracism is an extreme, far-left ideology that asserts that there is no such thing as being "not racist." *See How to Be an Antiracist*, Wikipedia.[7] Rather, "one is either actively confronting racial inequality

---

Charges [*sic*] 5: Article VI(H)- Engaging in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.")

[7] *Available at* https://en.wikipedia.org/wiki/How_to_Be_an_Antiracist (last visited Jul. 31, 2024).

or allowing it to exist through action or inaction."[8] Thus, although Leroy's snap appeared to comment on the impunity with which police engage in brutality and similar misconduct, his lack of express commentary against racism triggered outrage by third parties and school officials' punishment of Leroy for an out-of-school post. Contrast his treatment with that of his fellow students who instigated the actual school disruption yet received no such discipline. Indeed, the school allowed those students to participate in a kneeling protest under the supervision of a guidance counselor.

School officials reacted almost immediately after Leroy's Snapchat on April 19. The next day, district Superintendent John Evans convened an assembly for grades 7-12 where he "[t]alked about…racism and the [fact that the] connotations of the post upset a lot people because they were viewed as racist in nature." A278-79. That same day, Evans addressed a letter to the school community stating much the same message: that "several students" had been involved in "posting…some inappropriate photos and comments on social media" A-376. The letter

_____

[8] *Id.* As leading critical race theorist and author of *How to Be Antiracist*, Ibram X. Kendi, baldly states in his best-selling book: "'The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination…. The only remedy to present discrimination is future discrimination.'" Noah Rothman, *Searching for the 'Anti' in 'Antiracism,'* COMMENTARY (Dec. 21, 2020).

ties Leroy's post to "[r]acism" that "cannot and will not be tolerated." A-376. A few days later, Evans sent a disciplinary charging letter to Leroy's parents describing Leroy's violative conduct as "posting racially offensive material on social media." A-456. Meanwhile, Principal Shirlee Davis echoed Evans' statements to offended community members. *See* A-369. She too described Leroy's conduct as "post[ing] racially offensive material on social media"[9] and stated to Leroy himself that the post was "completely inappropriate and viewed a [*sic*] racist." A-407.

Defendants continued to discriminate against Leroy's speech based on their "antiracist" ideology at his hearing. There, Evans testified that what Leroy's post "depict[ed]" was "racist in nature" and that others' "perception" of his post as such should factor into his punishment. A-287. After the hearing, the hearing officer appointed by Evans found that Leroy's post was "uniformly perceived as racist," that "[a]ny reasonable person would construe the content of both photos as racially insensitive, particularly in light of the close proximity between the posting of the photos and Derek Chauvin trial," that "[a]ny reasonable student of Case's age and maturity should have been aware that the photos would be construed as a racially insensitive mockery of the murder of George Floyd," and that the posting compelled Evans to schedule an assembly assuring students that the district was not condoning those views and

---

[9] A-380.

was working to address racism in the district. A-461. Evans "accept[ed]" the hearing officer's report, but enhanced Leroy's recommended punishment to include a ban on participation in all extracurricular activities including the graduation ceremony. A-464. Evans concluded that such punishment was necessary to "ensure that Case understands the seriousness of his actions" and "to deter other students from engaging in similarly insensitive conduct." A-464.

Evans expressed a willingness to consider allowing Leroy to return to school before the end of his 23-day suspension if he agreed to participate in "restorative practices." A-464. And, indeed, Evans compelled Leroy's agreement to "participate in any recommended Restorative Justice, Diversity, Equity, and Inclusivity training opportunities offered or coordinated by the district" as a condition of that early return to school. A-469. Thus, Leroy might atone for the "racially offensive material [posted] on social media." A-467.

Throughout this litigation, Defendants have continued to openly declare their motives in language couched in antiracist ideology. In his summary judgment declaration, Evans claimed that:

> [T]he District has a significant interest in addressing racially offensive student speech and conduct...The Hearing Officer concluded Plaintiff's photographs were racially insensitive and Plaintiff [sic] claim that he did not understand the racial implications was not credible. As Superintendent, I make efforts to address racial

> issues with students and staff. In May 2021, we held two
> days of training regarding implicit bias.

A-478-79. Defendants' memorandum in support of summary judgment stressed that even the state court judge who had enjoined Leroy's suspension "recognized…public schools[']…obligation to teach students antiracism, to be antiracist and to engage in antiracist conduct." Dkt. 70 at 19. In sum, Defendants' statements show they imposed discipline on Leroy based on the conflict between his perceived ideology and their own.

The district court not only erred in finding otherwise but compounded the harm. The court's imposition on educators of an "obligation to teach students antiracism, to be antiracist, and to engage in antiracist conduct," SPA-18, cements the viewpoint discrimination that government actors imposed on Leroy. School districts don't even have the "choice" to maintain viewpoint neutrality.

*Second,* even if the direct statements of Defendants do not suffice to demonstrate viewpoint bias, the circumstances of Leroy's discipline reveal it. Defendants might well claim that while other community members harbored personal animus toward Leroy's perceived views, they did not. (Here, for example, such offended third parties called the photos "racist and disgusting" or "racist and inappropriate." A-473, A-480, A-484.) But under the First Amendment, it is no excuse for school officials to say that they are merely acting on the views of offended third parties.

41

Adopting the views of those objecting to speech constitutes viewpoint discrimination just the same. *Amidon v. Student Ass'n. of SUNY Albany,* 508 F.3d 94, 102 (2d Cir. 2007) ("Viewpoint discrimination arises because the vote reflects an aggregation of the student body's agreement with or valuation of the message [a student organization] wishes to convey"); *see also Masterpiece Cake Shop v. Colo Civ. Rts. Comm'n,* 584 U.S. 617, 638 (2018) ("A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness."). Ceding to "majoritarian views"—or perhaps worse, a loud politically-savvy minority[10]—is not compatible with viewpoint neutrality. *Amidon,* 508 F.3d at 102. To put a finer point on it, the school can't justify its viewpoint discrimination by the fact that other people inside or outside the school community are clamoring for it: that's an impermissible heckler's veto. *Mahanoy,* 594 U.S. at 206 (Alito, J., concurring); *see also Seattle Mideast Awareness Campaign v. King Cty.,* 781 F.3d 489, 502-03 (9th Cir. 2015) (noting that, even in a limited public forum, a "heckler's veto" may be a form of "viewpoint discrimination" if "asserted fears of hostile audience

---

[10] Online cancellation campaigns—pressuring schools or other institutions to visit negative consequences on affiliated individuals who are deemed to have engaged in offensive speech—are of relatively recent vintage. *See generally* Greg Lukianoff & Rikki Schlott, THE CANCELING OF THE AMERICAN MIND: CANCEL CULTURE UNDERMINES TRUST AND THREATENS US ALL—BUT THERE IS A SOLUTION (2023).

reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed"); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (*en banc*) (similarly holding that it is not "constitutionally valid" to curtail speech in a limited public forum simply because "other persons on the [] campus object[] to [the speaker's] viewpoint").

Because the mob espoused the same "antiracist" views as the administration, Defendants invited the "disruption" of an assembly and a nine-minute kneeling protest. A-505, A-40. If Defendants had stopped with their pedagogical decision to hold an assembly and host a protest, Leroy would not have suffered constitutional injury. "[I]f the First Amendment means anything, it means that the best response to disfavored speech on matters of public concern is more speech, not less." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 240 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). Thus, Defendants had many ways to exercise their pedagogical discretion without violating Leroy's rights. But in acceding to the demands of the mob, they decided not to stop at government speech; they punished the speaker.

***Third***, the disparate treatment that Defendants applied to Leroy confirms their viewpoint animus. "[A] public official engages in viewpoint discrimination when that official applies a facially viewpoint-neutral rule

in a viewpoint discriminatory way." *Collins v. Putt*, 979 F.3d 128, 145 (2d Cir. 2020) (Menashi, J., concurring in the judgment) (citing *Peck*, 426 F.3d at 632-33); *accord Frederick Douglass Found.*, 82 F.4th at 1141 ("It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws"); *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) ("a policy that is viewpoint neutral on its face may still be unconstitutional if not uniformly applied.") (internal quotation omitted).

Recall what offenses Leroy was found to have violated: "a willful act which disrupts the normal operation of the school community" and "off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function." *See supra* at 36 n.6. Here, the record contains undisputed evidence that other students solicited and participated in bringing Leroy's speech on campus for the purpose for opposing Leroy's putative views. During the brief interval when Leroy's Snapchat was published, "another student" "took a 'screen shot,'" "added plaintiff's name" and "language decrying it as racist and urging others to bring it to the attention of school authorities," which she herself did as well. A-38. Ironically, though this student's speech paralleled the intentional school-directed speech of *Doninger* (*see* 527 F.3d at 51), the record reveals no punitive consequences for her "willful act" of disruption or "off-campus misconduct." Nor is there any record evidence of discipline of the other

students who participated in the email barrage or those who organized the in-school protest. A278-79, A-492-97. When Leroy's parents brought this point to the hearing officer's attention, she called it an "attempt[] to shift blame to a student who 'reposted' the racist posts" that "appeared to reflect a lack of understanding by Case" that "he is responsible for repercussions of such postings." A-461. That was mistaken: "the law requires school officials to punish the disruptive student, not the student whose speech is lawful." *Gillman,* 567 F. Supp. 2d at 1374; *accord Mahanoy*, 594 U.S. at 206 (Alito, J., concurring). The school's failure to apply its rules even-handedly confirms the viewpoint discrimination at the heart of its discipline of Leroy.

One of the most revealing aspects of Defendants' viewpoint bias is that the meaning of Leroy's Snapchat and accompanying caption were ambiguous:



A-289.

While there is no doubt that Leroy's post qualifies as provocative, his message is more readily viewed as anti-cop than racist (or conceivably viewed as neither of the two!). But to an antiracist hammer, everything looks like a racist nail. And that is one fundamental problem with allowing schools to discipline offensive views: "offense" is not capable of evenhanded application. Once the internet mob got the snowball rolling, it was easy for school administrators to go along and impute racist views

to Leroy. It did not matter that a few months before the incident, Leroy had written an essay for a class on public safety where he concluded that the officers had used excessive force and that Chauvin "deserved jail time." A-537. Defendants' imputation of racist views to Leroy was a viewpoint-discriminatory projection of their own beliefs. The First Amendment does not abide such litmus tests. *See* FIRE, *Taking a knee in sports? For What!?*, YOUTUBE, https://www.youtube.com/watch?v =O67dGv5kIOU (last visited Jul. 24, 2024).

Defendants were so committed to the notion that Leroy was mocking George Floyd that they used Leroy's denials as fodder for an argument that he wasn't engaged in *any* expressive activity when he posted a captioned photo on social media. *See* Dkt. 70 at 20. That argument is misguided in two ways.

*First*, joking—even "edgelording"[11]—on social media is protected speech even if does not touch on a matter of public concern. *See Mahanoy*, 141 S. Ct. at 2048 ("It might be tempting to dismiss B.L.'s words as unworthy of the robust First Amendment protections discussed herein. But sometimes it is necessary to protect the superfluous in order to preserve the necessary...."). Non-employees "do[] not need to establish

---

[11] "An edgelord is someone, typically on the Internet, who tries to impress or shock by posting exaggerated opinions such as nihilism or extremist views." *Edgelord*, Wikipedia, https://en.wikipedia.org/wiki/Ed gelord (last accessed Aug. 2, 2024).

that [their] speech addressed 'a matter of public significance' in order to receive the protection of the First Amendment." *Friend*, 61 F.4th at 88. "The First Amendment's protections apply to jokes, parodies, satire, and the like, whether clever or in poor taste." *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (Facebook post during early part of pandemic joking that officers were ordered to shoot the infected on sight constitutionally protected).

*Second*, it violates the First Amendment to discriminate against the perceived viewpoint of a speaker even if it is not the speaker's actual viewpoint. *See Heffernan v. City of Paterson*, 578 U.S. 266 (2016). It is the "government's reason" for adverse action that "counts" because it is the government that may not "prescribe what shall be orthodox in politics." *Id.* at 273, 271 (quoting *W. Va. Bd of Educ.*, 319 U.S. at 642). Defendants' "factual mistake does not diminish the risk" of chilling other students' non-conforming speech. *Id.* at 274. Indeed, deterring others was an explicit aim of Leroy's punishment. A-464.

Courts explicitly link regulating subjective offense to viewpoint discrimination: "giving offense is a viewpoint." *Matal*, 582 U.S. at 243; *accord Wandering Dago*, 879 F.3d at 32. Action "reflect[ing] the Government's disapproval of a subset of messages it finds offensive…is the essence of viewpoint discrimination." *Matal*, 582 U.S. at 249 (Kennedy, J., concurring).

Defendants' theory of this case—that they *must* punish student speech that deviates from their "educational mission" and that stokes outrage in the community—"can easily be manipulated in dangerous ways" and creates a recipe for "abuse." *Morse*, 551 U.S. at 423 (Alito, J., concurring). As Livingston Manor has, "some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of these groups." *Id.* But:

> During the *Tinker* era, a public school could have defined its educational mission to include solidarity with our soldiers and their families and thus could have attempted to outlaw the wearing of black armbands on the ground that they undermined this mission. Alternatively, a school could have defined its educational mission to include the promotion of world peace and could have sought to ban the wearing of buttons expressing support for the troops on the ground that the buttons signified approval of war.

*Id.* If educational missions can justify disciplining students who express contrary views, we have returned to the world *Tinker* rejected, with schools as "enclaves of totalitarianism" and students as "closed-circuit recipients." 393 U.S. at 511.

This is not a hypothetical concern. Not long ago, school districts in Tennessee and Florida branded pro-LGBT advocacy as "disruptive" speech because it contradicted school administrators' views and the

mores of the community. *Young*, 181 F. Supp. 3d 459; *Gillman*, 567 F. Supp. 2d 1359. In both cases, district courts held that the viewpoint discriminatory censorship of student speakers was unconstitutional. 181 F. Supp 3d at 464; 567 F. Supp. 2d at 1376-78. Those courts got it right; viewpoint discrimination is "particularly offensive to the Constitution" "[i]n a school setting." *Gillman*, 567 F. Supp. 2d at 1376. Leroy's claims succeed for the same reason.

One final incongruity: under the rule espoused by the district court and Defendants, speech becomes a uniquely *disfavored* activity, despite being an enumerated constitutional right. *Contra Tandon v. Newsom,* 593 U.S. 61 (2021). Imagine that one weekend, a school's 18-year-old homecoming queen and king fly to Las Vegas and elope in a wedding chapel. Or imagine their risky off-campus behavior leads to an unplanned pregnancy. Or imagine that one catches the other cheating with the homecoming jester. Though these scandals would surely provoke significant drama within the school, nobody thinks that such off-campus and private student decisions fall within the school's disciplinary authority. Frank D. Lomonte, *Students Do Not Shed Their Constitutional Rights at the Login Screen: Slamming the Schoolhouse Gate on School Control over Social Media Speech*, 2 ED. L & POL'Y REV. 36, 77-78 (2015) (providing a similar example and distinguishing between teen "drama"

and criminal behavior that "portends dangerousness at school").[12] The "educationally and legally appropriate boundary line" should be no different "for speech." *Id.* at 78. Off-campus speech that portends violence can be proscribed. *See, e.g., Wisniewski*. But what merely portends drama cannot. *See, e.g.*, *Mahanoy; Thomas*.

So why would Defendants act on this off-campus Snapchat drama, but not on ordinary non-expressive off-campus drama? Viewpoint disagreement is the difference; other off-campus drama in students' lives does not implicate such objectionable views in the minds of school administrators. For the school here, speaking out was not enough; Leroy's post demanded bringing to bear every tool in the school's arsenal to reassure community members that Livingston Manor was not "condoning racism." A-461.

The First Amendment prevents the full balkanization of public-school systems in this country into fiefdoms run by the ideological diktats of each superintendent and principal. It prevents the "[c]ompulsory unification of opinion" that "achieves only the unanimity of the graveyard." *Barnette*, 319 U.S. at 641.

---

12 *Available at* https://storage.googleapis.com/wzukusers/user-27240630/documents/58bdd6308c05dtxl1NFT/ELPR%20Vol%202.pdf.

## Conclusion

For the foregoing reasons, the Court should reverse the decision granting summary judgment to Defendants, and remand for entry of summary judgment in Leroy's favor.

Dated: August 15, 2024

Respectfully submitted,

*/s/ Adam E. Schulman*
Adam E. Schulman
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
(610) 457-0856

Jerome T. Dorfman
LAW OFFICES OF JEROME T. DORFMAN
8 Breezy Hill Road
Parksville, NY 12768
(845) 747-9403

*Attorneys for Plaintiff Case Leroy*

# Addendum

Table 1 – Compilation of Record of Emails as set forth in Weisbrod Decl, Dkt.64

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| M | Davis | Original Sender Unknown | Forwarding email from student | None |
| N | Davis | Original Sender Unknown | Forwarding email from student | None |
| O | Davis, Christian Towsley | Unknown | Forwarding email | None other than thanking original sender |
| P | Davis | Unknown | States "All POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrate" in photos. | None other than thanking original sender |
| Q | Davis, Evans, Christopher Hubert, Christian Towsley, Danielle DalCero, Lauren Marerro, and James Buck | Stand Against Racism in Education | Asks for "swift and severe punishment." | "Yes the school district administration is aware of the recent posts on social media. I can assure you these incidents will be thoroughly investigated and dealt with quickly and appropriately." |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| R | Davis | Unknown | "The post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people lives and should not be treated as a running joke." | None other than thanking original sender |
| S | Davis | Unknown | "I feel strongly disgusted and sick that they have thought to make fun and quote on quote joke about Gorge Floyds tragic death…" | None |
| T | Davis | Unknown | Complaining this group frequently makes such jokes. | None; forwarded to Evans |
| T, continued | Davis | Unknown | Identifying students in photos. | None |
| U | Davis and Evans | Former student Payton Powell | "This is inhumane and deeply saddens me. I am not a member of the black | Evans: "Thank you for your email and sharing your concerns. The LMCS |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | community, nor am I coming to you speaking on behalf of them. I'm coming to you solely based on the fact that times have changed and this behavior is unacceptable." | administration was just made aware of both of these posts earlier this evening and an investigation is currently underway. These incidents will be dealt with promptly and appropriately and all those involved will be held accountable. Both the LMCS & RCS administrations take matters like this very seriously. The health, safety and wellbeing of all of our students is very important to us and racist behaviour has no place in our schools." |
| V | Davis and Evans | Courtney Lambert | Sharing several screenshots of posts, including | Evans: "Yes we are aware of the recent posts |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | (parent of 5th grader) | from Gem Amber Sun Helper | on social media involving what appears to be some LMCS students. The administration is currently investigating the incident and will be addressing any and all students who may be involved. This type of behavior is completely unacceptable and inappropriate in any setting and will be addressed. Thank you for sharing your concerns." | |
| W | Davis and Evans | Jaspreet Gill, Associate Editor, Inside Defense and former student | "I know far too well the rampant racism that runs through Livingston Manor and that does not stop | Davis: "Thank you for contacting me. The incident is being investigated." |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | when you enter LMCS. When I was a student, no one was reprimanded for their racist insults and racial microaggressions toward me." | |
| X | Davis and Evans | Meagan Edwards, School Counselor, LMCS (forwarding email from Belvina Garcia) | "This is unacceptable on every level that exists, and this kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism." | None |
| Y | Davis | Unknown | "I don't feel comfortable being around classmates who happily make light of murder." | None |
| Z | Davis, Evans, and Christian Towsley | Hannah Tuso | "I hope that appropriate action is taken to demonstrate our school's dedication to inclusivity and overcoming our | None |

---

Add. 5

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | history of discrimination." | |
| AA | Evans | Grady Parks | "This act is absolutely DISGUSTING, and must have some sort of disciplinary action taken at once." | Evans: "Thank you for your email and sharing your thoughts and concerns with me. The District is aware of the social media posts and is actively involved in investigating the incidents and addressing it with the students involved. As a school district we take these matters very seriously. These behaviours have no place in our school and as a district, we are taking steps to address this important issue throughout our |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | | school community." |
| BB | Davis and Evans | Sophia Xiomara | "The Livingston Manor School district needs to hold these students accountable and create policies that no longer condone any racist/hateful behavior from its students or community members. The world is watching. Take action now." | Evans: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
|  |  |  |  | Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |
| CC | Evans | Mykenzi Williams | Same text as Xiomara email | Evans: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | | I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |
| DD | Evans, Davis, Danielle Dalcero, Jane Mann, and Christian Towsley | Dylan Parks | "In my opinion and many others, however valuable it is, both of these boys should be held accountable immediately. If not, it would send a message to the entire county that this type of racist, white-supremacist | Evans: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | behavior is okay." | nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |
| EE | Davis and Evans | Maritza Joya | "You people as a district need to hold your students accountable for their actions. I truly hope that you will do right | Evans: "The school district administration is aware of these posts and an active investigation into these |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | and hold them accountable for their behavior. This community is depending on you to make this right." | events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| FF | Davis and Evans | Kelsie Nolan | "These 3 students are displaying sociopathic tendencies mixed with classic small town racism veiled as ignorance. It is clear you all on the administrative level are not doing enough to prevent racism and the intense level of moronic behavior displayed here." | Evans: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
|  |  |  |  | Livingston Manor Central School District and steps are being taken to address this with the school community." |
| GG | Davis, Evans, and Christian Towsley | Catherine Skalda | "It is extremely upsetting and disappointing to see that the lack of respect for human lives so close to home. I hope that the school will address this in an appropriate manner." | Evans: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on the part of the school district cannot be discussed. I can assure you that the school district is taking this |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | | incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |
| HH | Davis and Evans | Elena Haskins | "This behavior is alarming and makes me feel unsafe as a citizen that your school is training people." | Davis: "The school district administration is aware of these posts and an active investigation into these events is currently taking place. All cases involving student discipline are confidential in nature and any disciplinary consequences or actions on |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | | the part of the school district cannot be discussed. I can assure you that the school district is taking this incident very seriously and appropriate actions will be taken. Racism cannot and will not be tolerated by the Livingston Manor Central School District and steps are being taken to address this with the school community." |
| II | Evans and Robert Dufour, BOCES | Jay Quaintance, President, SUNY Sullivan | "I'd like to know if they have been on our campus and what the consequences they are facing for this disgusting display of hate." | Evans: "Yes Bob and I are aware of the photos and the incidents are currently being investigated. What I can tell you is that the photos were taken over a month apart |

| Exhibit No. | Recipient | Sender | Email Summary | Response |
|---|---|---|---|---|
| | | | | and the context in which they occurred are very different. These issues are being taken very seriously and appropriate actions will be taken with those involved." |

Table 2 – Breakdown of record emails received and responded to by district recipients

| Recipient | No. of External Emails Received | No. of Emails Responded to | Total Word Count For All Responses | Average Response Length (No. of Words) |
|---|---|---|---|---|
| Evans | 15 | 11 | 939 | 85 |
| Davis | 21 | 5 | 145 | 29 |
| Towsley | 5 | 0 | 0 | 0 |
| Hubert | 1 | 0 | 0 | 0 |
| DalCero | 2 | 0 | 0 | 0 |
| Marerro | 1 | 0 | 0 | 0 |
| Buck | 1 | 0 | 0 | 0 |
| Mann | 1 | 0 | 0 | 0 |

**Certificate of Compliance
with Fed. R. App. 32(a)(7)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 10,081 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook font.

Executed on August 15, 2024.

*/s/ Adam E. Schulman*
Adam E. Schulman

### Certificate of Service

I hereby certify that on August 15, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.


*/s/ Adam E. Schulman*
Adam E. Schulman

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order, filed April 5, 2024 ..................... SPA-1

Judgment, filed April 8, 2024 ................................. SPA-22

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CASE LEROY,

                        Plaintiff,

   -against-

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, *in his capacity as
Superintendent of Schools of Livingston Manor
Central School District,*

                    Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _04/05/2024_

No. 21-CV-6008 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

      Case Leroy ("Plaintiff") brings this action against Livingston Manor Central School District (the "District") and John P. Evans ("Superintendent Evans"), in his capacity as Superintendent of Schools of the District (together, "Defendants") for defamation and violations of Plaintiff's civil rights under the New York State Constitution, the First Amendment to the United States Constitution, and 42 U.S.C. § 1983 ("Section 1983"). Specifically, Plaintiff alleges that Defendants violated his rights and defamed his character when they suspended Plaintiff from school and extracurricular activities after he posted a photograph on a social media platform.

      Before the Court are Defendants' motion for summary judgment (ECF No. 63) and Plaintiff's partial motion for summary judgment (ECF No. 58). For the following reasons, Defendants' motion is granted and Plaintiff's motion is denied.

## BACKGROUND

      The following facts are derived from Defendants' Local Rule 56.1 Statement ("Def. 56.1," ECF No. 68), Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl. 56.1 Resp."), Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1," ECF No. 78), and Defendants' Response to

1

SPA-2

Plaintiff's Rule 56.1 Statement ("Def. 56.1 Resp.," ECF No. 69),[1] the parties' declarations, and the parties' exhibits,[2] and are not in dispute, except where noted.[3]

Defendant John Evans is the Superintendent of Schools for the District, a school district located in Sullivan County, New York. (Def. 56.1 ¶ 1.) The District has one school building that houses grades pre-K through 12th grade and consists of approximately 420 students. (Id. ¶ 2.) Plaintiff Case Leroy was a 12th grade student at the District and a student in a "public safety program" offered by Sullivan BOCES during the 2020–2021 school year. (Id. ¶¶ 6-7; Pl. 56.1 Resp. ¶ 8.)

      a. *The Photograph of Plaintiff and Student A*

On April 19, 2021, Plaintiff, along with his three friends Student A, Student B, and Student C, drove to a dance studio in Hurleyville to pick up Student C's sister. (Def. 56.1 ¶¶ 11-12.)  In the late afternoon or early evening, Student B took a photograph (the "Photo") in the parking lot of the dance studio and then immediately sent it to Plaintiff and Student A via Snapchat. (Id. ¶¶ 9, 12.) The Photo depicts Plaintiff lying on the ground while his friend Student A kneels over him.

---

[1] Plaintiff's response to Defendants' Rule 56.1 statement was not filed electronically on the docket but was submitted to the Court via email.

[2] Citations to "Def. Ex." refer to the Exhibits attached to the Declarations of Chelsea Weisbord in Support of Defendants' Motion for Summary Judgment. (ECF Nos. 64 and 71.) Citations to "Pl. Ex." refer to the Exhibits attached to the Declaration of Jerome T. Dorfman in Support of Plaintiff's Motion for Summary Judgment. (ECF No. 77.) Where applicable, the Court refers to page numbers using the Bates numbers applied by the parties.

Citations to the Deposition of Case Leroy ("C.L. Tr.") refer to Def. Exs. C and D. Citations to the Deposition of Gordon Leroy ("G.L. Tr.") refer to Def. Ex. E. Citations to the Deposition of Amy Leroy ("A.L. Tr.") refer to Def. Ex. F. Citations to the Deposition of Student A ("Student A Tr.") refer to Def. Ex. G. Citations to the Deposition of Student B ("Student B Tr.") refer to Def. Ex. H.

[3] In response to many of the statements in Defendants' Rule 56.1 statement, Plaintiff's response indicates he either "has no personal knowledge" to admit or deny the statement or "neither admits or denies this statement and defers to what [D]efendants' witnesses testify to at trial, subject to cross-examination." (*See generally* Pl. 56.1 Resp.) Pursuant to Local Rule 56.1, each statement of fact "will be deemed admitted for purposes of the motion unless specifically controverted" by the opposing party. Accordingly, the Court deems those statements not explicitly denied by Plaintiff admitted. *Buckman v. Calyon Sec.*, 817 F.Supp.2d 322, 328 n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted.") (citation omitted). The Court further notes that even where Plaintiff explicitly denies a statement in his response, Plaintiff fails to cite to specific admissible evidence in support of its denial in further contravention of the rules. S.D. & E.D. N.Y. R. 56.1(d) (each statement in a Rule 56.1 statement, "including each statement controverting any statement of material fact, must be followed by a citation to evidence which would be admissible.").

2

SPA-3

(*Id.* ¶ 8; Def. Ex. J.) All three students posted the Photo on their Snapchat stories around the same time that evening while they were still in the dance studio parking lot. (Def. 56.1 ¶¶ 13, 24.) Plaintiff posted the Photo to his Snapchat story with the caption "Cops got another" and Student A posted the Photo to his Snapchat story with the caption "Another one down." (*Id.* ¶¶ 14, 16.) Student B shared the Photo to his Snapchat story without a caption. (*Id.* ¶ 21.) When Plaintiff posted the Photo, it was visible to all of his Snapchat friends—approximately 60 to 100 people, including a "good amount" of students at Livingston Manor High School. (*Id.* ¶ 16; Pl. 56.1 Resp. ¶ 16; C.L. Tr. 37:24-38:3.)

Plaintiff and the other two students posted the photos on April 19, the day before the jury returned a verdict in Derek Chauvin's trial for the murder of George Floyd.[4] (Def. 56.1 ¶ 23.) An unknown person added the "Black Lives Matter" logo to Student A's post, although Student A told District administrators that he himself had added the logo. (*Id.* ¶¶ 19-20; Pl. 56.1 Resp. ¶¶ 19-20; Student A Tr. 31:4-24.) Shortly after posting the Photo with the caption, Plaintiff deleted his Snapchat post because his phone started "blowing up" with messages from other people threatening him and cursing him out. (Def. 56.1 ¶ 25; C.L. Tr. 116:2-23, 117:18-24.) Plaintiff also received several death threats that evening. (Def. 56.1 ¶ 28.) Student A and Student B also deleted their Snapchat posts shortly after posting—Student A because he was receiving negative messages and Student B because he was receiving messages telling him to take the Photo down. (*Id.* ¶¶ 25, 30, 32.) After posting the Photo, Plaintiff, Student A, and Student B received a barrage of phone calls, and people were showing up to their homes and Plaintiff's parents' places of employment. (*Id.* ¶ 36.)

---

[4] On April 20, 2021, Dereck Chauvin, a white police officer, was found guilty of the murder of George Floyd, a black man. In May 2020, Chauvin had kneeled on Floyd's neck for over nine minutes during an arrest of Floyd in Minneapolis, Minnesota.

3

SPA-4

     *b.  Immediate Response from District Personnel, Students, and the Community*

By 9:00 pm on April 19, 2021, emails complaining about the photos circulating social media began flooding Superintendent Evans, Principal Shirlee Davis', and other District administrators' and employees' inboxes and continued throughout the night. (Evans Aff. ¶¶ 7-8; Davis Aff. ¶¶ 3-4; Towsley Aff. ¶ 3; Def. Exs. M-II.) Contrary to Plaintiff's contention, District personnel, students, and community members immediately recognized the Photo as referencing the events of the ongoing trial of Derek Chauvin for the murder of George Floyd. (Evans Aff. ¶ 5; Davis Aff. ¶ 2; Towsley Aff. ¶ 4; *see generally* Def. Ex. M-II.) Members of the community sent emails to District administrators, employees, and officials complaining about the photos, calling them racist and disgusting, and identifying Plaintiff by name as one of the students involved. (*Id.*; Def. 56.1 ¶ 43.) The emails further criticized the District for purportedly tolerating the behavior, and demanded the District take disciplinary action. (Def. 56.1 ¶ 45; Evans Aff., ¶¶ 7-8; Davis Aff., ¶¶ 3-4; Towsley Aff., ¶ 3; *see* Def. Exs. N, P-S, U-X, Z-GG.) Superintendent Evans and Principal Davis responded to most of the emails they received, which took their time away from regular District operations. (Def. 56. 1 ¶ 92.)

The following day at school, students discussed the photos during and between classes, and high school staff and teachers discussed the social media posts in their classrooms (*Id.* ¶¶ 95-96.) Multiple staff members also approached district administrators requesting to know how the District planned to respond to the unrest created by the photos. (*Id.* ¶ 97.)

That same day, the school held an assembly attended by all students, teachers, guidance counselors, and building administrators in grades 7th through 12th to address the incident. (*Id.* ¶ 9; Pl. 56.1 ¶ 3.) During the assembly, Evans stated that "a lot of people viewed [the photographs] as racist in nature," that "it had no place in our school" and that "it was being addressed and being

SPA-5

investigated." (Pl. 56.1 ¶ 3; Def. 56.1 Resp. ¶ 3.) District administrators also informed students that school counselors would be available for students who needed counseling in relation to the photos. (Def. 56.1 ¶ 104.) After the assembly, students held a planned demonstration to express their disagreement with the photos and the photos' connotations, during which they knelt for nine minutes to honor George Floyd. (*Id.* ¶ 105.) After the demonstration ended, students relocated to the school's health room to further discuss the photos, racism, insensitivity, and George Floyd. (*Id.* ¶ 106.) Throughout the school day, state trooper and law enforcement officers from the Sheriff's Department remained on school grounds, and the school received multiple media requests regarding the photos. (*Id.* ¶¶ 107, 109.)

Superintendent Evans also released an official statement to the community, which he posted on the District's website on April 20, 2021. (*Id.* ¶108.) In the statement, Superintendent Evans indicated that the District was aware some students posted inappropriate photos and comments on social media. (Def. Ex. JJ.) He further indicated that the District takes such matters very seriously, and that an investigation was ongoing, although cases involving student discipline are confidential and cannot be discussed. (*Id.*) Finally, Superintendent Evans apologized on behalf of the District for the student behavior and stated that "racism cannot and will not be tolerated" by the District. (*Id.*)

### c.  Investigation and Discipline of Plaintiff and the Other Students Involved

On April 20, 2021, Superintendent Evans and Principal Davis launched an investigation and began by interviewing several students, including Plaintiff, Student A, and Student B, who all claimed it was a joke and they had no intention of being racist or offending anyone. (Def. 56.1 ¶ 116.) During the interview with Evans and Davis, Plaintiff admitted to posting the photograph. (*Id.* ¶ 118.) At the end of Plaintiff's interview, Superintendent Evans explained that the issue was

SPA-6

very serious, viewed as racist, and caused a significant disruption through the school district. (*Id.* ¶ 120.) On April 21, 2021, Principal Davis suspended Plaintiff from school for five days. (*Id.* ¶ 123.)

On April 21, 2021, Superintendent Evans contacted Capital Region BOCES District Superintendent Anita Murphy for assistance with regards to a social media incident occurring the evening of April 19, 2021 and April 20, 2021. (Def. Ex. MM. at 1.) The investigator, Bethany A. Centrone, Legal Counsel for Capital Region BOCES, was asked to investigate and provide a report regarding the incident to inform Evans with respect to potential discipline. (*Id.*) As part of her investigation, Centrone interviewed Superintendent Evans as well as students. (*Id.*) On April 23, Centrone issued a report that concluded there was sufficient evidence to determine Plaintiff engaged in behaviors that violated the Code of Conduct. (Def. 56.1 ¶ 126; Pl. 56.1 Resp. ¶ 126.) Centrone thus recommended that Plaintiff and the involved students be referred to a Superintendent's hearing to determine if additional discipline was warranted.[5] (Def. 56.1 ¶ 133.)

On April 27, 2021, Superintendent Evans held a Superintendents hearing to consider suspending Plaintiff beyond five school days, and Kate Reid served as a Hearing Officer. (Def. 56.1 ¶¶ 136-137; Pl. 56.1 Resp. ¶¶ 135-136.) At the hearing, Plaintiff testified voluntarily and under oath that he posted the Photo with the caption "Cops got another" on social media. (Def. 56.1 ¶¶ 138-39; Pl. 56.1 Resp. ¶¶ 137-38.) During the Superintendent's hearing, Reid found Plaintiff guilty of Article VI(A)(5) of the Code of Conduct, which prohibits engaging in any willful

---

[5] Specifically, Centrone determined that the following provisions of the Code of Conduct were implicated: (1) engaging in any willful act which disrupts the normal operation of the school community, Article VI(A)(5); (2) display or use of personal electronic devices . . . in a manner that is in violation of district policy, Article IV(C)(3); (3) discrimination, which includes using race, color . . . to deny rights, equitable treatment or access to facilities available to others, Article IV(E)(4); (4) harassment, which includes a sufficiently severe action . . . directed at an identifiable individual or group which [is] intended to be, or which a reasonable person would perceive as ridiculing or demeaning, and the creation of a hostile environment, Article IV(E)(5); and (5) engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function Article IV(H). (Def. Ex. MM at 117-18.)

SPA-7

act which disrupts the normal operation of the school community ("Charge 1"). (Def. 56.1 ¶143.) Reid also sustained the District's fifth charge, finding that Plaintiff violated VI(H) by engaging in off-campus misconduct that interfered with or can reasonably be expected to substantially disrupt, the educational process in the school or at a school function ( "Charge 5"). (*Id.* ¶ 114.)

On April 28, 2021, Reid issued a finding of fact and recommendation which memorialized her findings from the Superintendent's hearing regarding the charges and recommended Plaintiff be suspended through May 21, 2021, with the option for an earlier return if Plaintiff and his parents agree to enter a disciplinary contract and/or agree to participate in restorative practices in connection with the incident. (Def. 56.1 ¶ 145; Def. Ex. OO at 187.) Reid found the District sustained its burden regarding Charges 1 and 5 by providing competent evidence demonstrating the violations. (Def. 56.1 ¶ 148; Pl. 56.1 ¶ 4; Def. Ex. OO at 185-86.) Reid further concluded that "all told, the posts resulted in substantial interruptions in instruction and required substantial attention and intervention by multiple school administrators." (Def. Ex. OO at 185-86.)

Upon review of Hearing Officer Reid's recommendations, Superintendent Evans suspended Plaintiff for a period of instruction through May 21, 2021, and from non-academic, extracurricular activities for the remainder of the 2020-2021 school year, including the graduation ceremony. (Def. 56.1 ¶ 152; Pl. 56.1 Resp. ¶ 151; Pl. 56.1 ¶ 5.) Plaintiff appealed Superintendent Evan's decision to the School Board, which upheld the findings and discipline imposed. (Pl. 56.1 ¶ 6.)

After Plaintiff signed a contract of conduct, Evans permitted Plaintiff to return from suspension from instruction on May 20, 2021. (Def. 56.1 ¶ 153; Pl. 56.1 Resp. ¶ 152.) Plaintiff attended his high school graduation after obtaining injunctive relief from Judge Julian Schreibman of the New York State Court, County of Sullivan. (Def. 56.1 ¶ 156.)

7

SPA-8

## PROCEDURAL HISTORY

On June 16, 2021, Plaintiff commenced this action by filing a Complaint in the Supreme Court of the State of New York, County of Sullivan before Justice Schreibman. ("Notice of Removal," ECF No. 1, Ex. A.) On June 25, 2021, Justice Schreibman issued an oral order granting a preliminary injunction permitting Plaintiff to attend his school's graduation ceremonies.[6] (Pl. Ex. 2 at 9:12-17.) Upon the granting of the preliminary injunction, Plaintiff filed an Amended Complaint on July 2, 2021. (Amend. Compl. ¶ 4.) On July 13, 2021, Defendants removed the action to this Court. (*See generally* Notice of Removal.)

In his Amended Complaint, Plaintiff asserts causes of action for defamation and violations of his civil rights. Plaintiff seeks money damages as well as (1) a declaration that the acts of Defendants were unconstitutional, (2) the complete expungement from his transcripts and student files of any reference to his suspension from attending classes and from participating in school activities, and (3) for changes in the policies and procedures of the District, so that the same thing does not happen to his siblings or any other student. (Amend. Compl. ¶ 9.)

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse

---

[6] Plaintiff's Exhibit 2, attached to the Declaration of Jerome T. Dorfman, was not filed electronically on the docket, although it was submitted to the Court via email.

SPA-9

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009)

SPA-10

(citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

Plaintiff seeks summary judgment from the Court on her civil rights claim pursuant to Section 1983 and her state law defamation claim. Plaintiff also seeks a judgment from the Court striking Defendants' First through Twenty-Second affirmative defenses to Plaintiff's Amended Complaint.[7] (*See* Pl. Mot.) Defendants seek summary judgment to dismiss the action in its entirety.[8] (*See* Def. Mem.)

As a threshold matter, Plaintiff fails to substantively address Defendants' arguments to dismiss Plaintiff's claims for injunctive relief and punitive damages as well as violations of the New York State Constitution. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Capak v. Epps*, 662 F. Supp. 3d 463, 465 (S.D.N.Y. 2023) (quoting *Xu v. City of New York*, 2020 WL 2088301, at *4 (S.D.N.Y. Apr. 30, 2020)). The Court therefore dismisses Plaintiff's claims for violations of state constitutional law, permanent injunctive relief, and punitive damages as abandoned.

---

[7] Plaintiff filed the following papers for the Court's consideration on the instant motions: Plaintiff's Rule 56.1 Statement ("Pl. 56.1," ECF No. 78); Plaintiff's Rule 56.1 Response ("Pl. 56.1 Resp."); Plaintiff's Motion for Summary Judgment ("Pl. Mot.," ECF No. 58); Memorandum of Law in Support of his Motion for Summary Judgment ("Pl. Mem.," ECF No. 79); Plaintiff's Reply ("Pl. Reply," ECF No. 75); Declaration of Jerome T. Dorfman in Support ("Dorfman Decl." ECF No. 77); and Dorfman's Reply Declaration ("Dorfman Reply Decl.," ECF No. 74).

[8] Defendants filed the following papers for the Court's consideration on the instant motions: Defendants' Rule 56.1 Statement ("Def. 56.1," ECF No. 68); Defendants' Rule 56.1 Response ("Def. 56.1 Resp.," ECF No. 69); Defendants' Motion for Summary Judgment ("Def. Mot.," ECF No. 63); Defendants' Memorandum of Law in Support of their Motion ("Def. Mem.," ECF No. 70); Defendants' Reply ("Def. Reply," ECF No. 73); Declaration of Chelsea Weisbord ("First Weisbord Decl.," ECF No. 64); Declaration of Chelsea Weisbord ("Second Weisbord Decl.," ECF No. 71); Affidavit of John Evans ("Evans Aff.," ECF No. 65); Affidavit of Shirlee Davis ("Davis Aff.," ECF No. 66); Affidavit of Christian Towsley ("Towsley Aff.," ECF No. 67); and Declaration of Steven C. Stern ("Stern Decl.," ECF No. 72).

SPA-11

The Court addresses the remaining issues raised by the parties in turn.

**A.  Defendants' Request to Strike Dorfman's Declaration**

Under Federal Rule of Civil Procedure 56(c)(4), an affidavit or declaration used to support or oppose a summary judgment motion must be made on personal knowledge, set out facts that would be admissible in evidence, and must show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Defendants request the Court to strike, at minimum, portions of the declaration of Jerome T. Dorfman that are not based on his personal knowledge and that contain legal arguments and conclusions. (Def. Reply at 2-3.)

Paragraphs 1 through 6 of Dorfman's declaration restates the procedural history of the case and the causes of action as alleged in the Verified Amended Complaint, both of which are presumably based on his personal knowledge and not placed at issue by either the Court or the parties. (*Id.* ¶¶ 1-6.) Paragraphs 7 through 9 mainly restate the arguments contained within Plaintiff's Memorandum of Law. (*Id.* ¶¶ 7-9.) While the Court declines to strike these statements, the Court will exercise its discretion to disregard these legal arguments and consider them as stated in Plaintiff's Memorandum. *Black v. Buffalo Meat Serv., Inc.*, No. 15-CV-49S, 2021 WL 763723, at *4 (W.D.N.Y. Feb. 26, 2021) (declining to strike attorney declaration but exercising its discretion to disregard repeated legal arguments contained therein).

Paragraphs 10 through 11, however, warrant further discussion. In response to Defendants' arguments, Plaintiff only asserts that the recited facts are within counsel's personal knowledge and that the declaration does not contain any legal conclusions. (Pl. Reply at 11-12.) This is objectively false. In his motion for summary judgment, Plaintiff sought for the Court to "strik[e] [Defendants'] First through Twenty-Second Affirmative Defenses." (Pl. Mot. at 1.) Instead of including his substantive arguments relating to his motion to strike in his memorandum of law, Plaintiff placed

11

SPA-12

all of the arguments on this issue in Dorfman's declaration. These portions of Dorfman's declaration consist entirely of legal argument and conclusory statements. This includes, for example, an assertion that the Complaint "plainly" states a cause of action and that mitigation of damages is inapplicable to a civil rights and defamation action. Moreover, Dorfman's declaration includes no citations to any case law at all.

Given that portions of Dorfman's declaration consist entirely of legal argument and legal conclusions, the Court may properly strike those portions from the record. *Elghossain v. Bank Audi S.A.L.*, No. 21CIV2162PGGBCM, 2023 WL 6390160, at *14 (S.D.N.Y. Sept. 29, 2023) ("A court may disregard legal arguments improperly set forth in a declaration.") (collecting cases); *Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (although declining to strike the attorney affidavit, declining to consider the legal arguments and factual allegations contained therein); *see also Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 213 (S.D.N.Y. 2002) (citing *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir.1983)) ("An attorney's affidavit which is not based on personal knowledge of the relevant facts should be accorded no weight on a motion for summary judgment."). For the reasons stated below, however, whether the Court strikes the legal arguments and conclusions contained in Dorfman's declaration is inconsequential. As discussed in further detail below, the Court dismisses Plaintiff's claims in their entirety and denies Plaintiff's request to strike Defendants' affirmative defenses as moot. *See infra* at 21.

**B.  The Law of the Case Doctrine**

Plaintiff argues the law of the case doctrine prohibits Defendants from relitigating his civil rights claims given that the state court granted Plaintiff a preliminary injunction, which Plaintiff claims constitutes a finding that Defendants violated Plaintiff's civil rights. (Pl. Mem. at 6.) The

12

SPA-13

preliminary injunction granted by Judge Schreibman prohibited the District from barring Plaintiff from participating in graduation ceremonies that were scheduled for that weekend. (Pl. Ex. 2 at 2:4-19.) According to Plaintiff, the Court is bound by the state court's decision because Judge Schreibman found Plaintiff had a substantial likelihood of success on the merits and there has been no intervening change in the facts or the law. (Pl. Mem. at 6.)

A ruling on a temporary or preliminary injunction "does not constitute the law of the case and will not estop the parties or the court as to the merits of the case." *Alharbi v. Miller*, 368 F. Supp. 3d 527, 556 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020) (citing *Sec. & Exch. Comm'n v. N. Am. Research & Dev. Corp.*, 59 F.R.D. 111, 113 (S.D.N.Y. 1972)). "This rule stems from the due process requirement that the parties should not be foreclosed on the merits by a hearing that expressly addressed only preliminary questions, and at which [the] parties may not have presented their best possible case." *Id.*

Plaintiff has not cited any controlling law to the contrary. The two cases cited by Plaintiff are not within the context of a preliminary injunction.[9] (*See* Pl. Mem. at 6.) Accordingly, the law of the case doctrine shall not apply here to bar the Court from considering the merits of Plaintiff's free speech arguments. Moreover, while it is not clear exactly what facts and arguments Defendants orally presented before Judge Schreibman. Defendants argue that they have submitted significant additional evidence, particularly on the issue of disruption. (Def. Reply at 8.) Plaintiff does not challenge this point, but instead implies it is irrelevant. However, Plaintiff's assertion that "there are only two salient facts in this case" establishing a violation of Plaintiff's civil rights is a

---

[9] The two cases cited by Plaintiff are *Martin v. City of Cohoes*, 37 N.Y.2d 162, 332 N.E.2d 867 (1975) and *Erickson v. Cross Ready Mix, Inc.*, 98 A.D.3d 717, 950 N.Y.S.2d 175 (2012). In *Martin*, the New York Court of Appeals held that the law of the case doctrine has no binding force on appeal. 37 N.Y.2d at 165. In *Erickson*, the state court held the law of the case doctrine did not bar the Supreme Court from deciding an issue that had not been previously determined. 98 A.D.3d at 717.

SPA-14

narrow view of the case at hand. (See Pl. Reply at 8.) As further discussed below, the Court must consider more than the facts that Plaintiff posted a photo on Snapchat and then was disciplined for doing so. *Mahanoy*, 141 S. Ct. at 2046-48 (2021) (in determining whether to afford a cheerleader's speech First Amendment protection, the court considered the content of the speech, the context of the speech, and the school's interest in regulating the speech).

Finally, the Court notes that Judge Schreibman himself acknowledged that "the Court clearly would prefer to have had the opportunity to digest the parties' submissions, answers to the Court's questions and the applicable law," particularly considering that *Mahoney Area Sch. Dist. V. B.L. by & through Levy*, 141 S. Ct. 2038 (2021) had been decided only days prior. The Court has had the privilege to thoroughly consider the parties' arguments and the controlling legal precedent, and therefore addresses Plaintiff's First Amendment claim on its merits.

### C. First Amendment Speech

#### a. Applicable Law

"Students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate, however, the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011) (cleaned up). The Supreme Court has made it clear that "courts must apply the First Amendment in light of the special characteristics of the school environment." *Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2044 (citation omitted).

Under *Tinker*, "[s]tudent speech may be curtailed if the speech will 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 112 (2d Cir. 2012) (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). Courts recognize that the administrators should be given

14

SPA-15

leeway to address any potential disruption before it manifests itself. *See Wood v. Strickland*, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L.Ed.2d 214 (1975) ("it is not the role of the federal courts to set aside decision of school administrators which the court may view as lacking a basis in wisdom or compassion."); *Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008) ("[Plaintiff's] argument is misguided insofar as it implies that *Tinker* requires a showing of actual disruption to justify a restraint on student speech"); *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F.Supp.2d 461, 481 (E.D.N.Y. 2009), aff'd, 623 F.3d 71 (2d Cir. 2010), cert. denied, 2011 U.S. LEXIS 1809 (Feb. 28, 2011); *Lavine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001) ("*Tinker* does not require school officials to wait until disruption actually occurs before they may act.").

Whether the speech occurred off school grounds is relevant, though not dispositive. *Mahanoy*, 141 S. Ct. at 2045. While the Court afforded First Amendment protection to a cheerleader's off-campus speech decrying her rejection from the varsity cheerleading squad, it explicitly disagreed with the Third Circuit's conclusion that the *Tinker* standard did not apply to speech occurring off school grounds. *Id.* at 2044-45. When speech occurs off campus, "the leeway the First Amendment grants to schools in light of their special characteristics is diminished." *Id.* at 2046. That said, "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id.* at 2045.

### b. Material Dispute of Fact

At the outset, the Court finds there is no dispute of material fact. The parties do not dispute that there were clear threats to Plaintiff and the other students' safety—Plaintiff received death threats after he posted the photos and Plaintiff and the other students involved were told not to come to school the following day due to concerns for their safety (Def. 56.1 ¶¶ 28, 94.) While Plaintiff steadfastly denies a "substantial" disruption to the school after the photos circulated social

15

SPA-16

media, the following key events are undisputed: high school staff and teachers discussed the social media posts in their classrooms; multiple staff members approached district administrators regarding how the District planned to respond to the unrest created by the photos; the administrative team planned and coordinated an assembly for students in grades 7 through 12 to the address the photos; school counselors made themselves available for students who needed counseling in relation to the photos; after the assembly, students held a planned demonstration to express their disagreement with the photos and the photos' connotations; after the demonstration, students engaged in further discussions about the photos, racism, insensitivity, and George Floyd; state trooper and law enforcement officers from the Sheriff's Department remained on school grounds throughout the day; Superintendent Evans issued a statement to the school community; and there were various media requests to the District regarding the photos.[10] (*Id.* ¶¶ 96-100, 104-109.)

Thus, the parties only dispute whether these events that resulted from Plaintiff's off-campus speech constitute a sufficient "material disruption" so that it was appropriate for the school to take disciplinary action against Plaintiff. Defendants argue that they did not violate Plaintiff's First Amendment rights because the disruption caused by the photos "was so overwhelming and severe that it grounded the regular school day to a halt" sufficient to satisfy the *Tinker* standard. (Def. Mem. at 8-9.) Plaintiff challenges Defendants' contention that Plaintiff's actions "substantially disrupted" the school day and argues that Plaintiff's actions bear no nexus to the school at all. (Pl. Mem. at 4-6.)

---

[10] Again, in response to many of these statements in Defendants' 56.1, Plaintiff indicates he either "has no personal knowledge" to admit or deny the statement or "neither admits or denies this statement and defers to what [D]efendants' witnesses testify to at trial, subject to cross-examination." (*See* Pl. 56.1 Resp. ¶¶ 96-113.) As discussed above, the Court deems these statements admitted. *Buckman*, 817 F.Supp.2d at 328 n.42 ("56.1 statements not explicitly denied by plaintiff are deemed admitted.") (citation omitted).

SPA-17

     *c.  Substantial Disruption*

In applying *Tinker*, the Second Circuit has held that "the relevant inquiry is whether the record demonstrates facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012) (quoting *DeFabio v. E. Hampton Union Free Sch. Dist.,* 623 F.3d 71, 78 (2d Cir.2010)) (cleaned up). The standard is not "actual disruption" but rather "whether school officials might reasonably portend disruption from the student expression at issue." *Id.* at 113 (citing *Doninger*, 527 F.3d at 51) (internal quotation marks omitted). Finally, "[t]he test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Cuff*, 677 F.3d at 113 (collecting cases).

*First*, Defendants reasonably foretold a substantial disruption given the barrage of emails they received the night the photo was posted from students and community members alike. *See Doninger*, 642 F.3d at 348-49 (school officials reasonably concluded student's blog post was potentially disruptive where controversy surrounding the subject of the blogpost "already resulted in a deluge of phone calls and emails, several disrupted schedules, and many upset students" and the disruption continued the next day as upset students met with district personnel to resolve the controversy). This is further supported by the explicit call to action in the emails that demanded a response from the District. Their apprehension of the disturbance potentially caused by the photo is also evidenced by their decision to direct the Plaintiff and the other students involved not to attend school the next day.

*Second*, Defendants have also established *actual* disruption occurred. Here, the facts are distinguishable from *Mahanoy*, in which the Court found "no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might

17

SPA-18

justify the school's action." 1341 S. Ct. 2047. The events following the posting of the photos amounted to more than merely a "buzz" in the building. (*See* Pl. Mem. at 2.) The record establishes that, despite Plaintiff's unwillingness to concede as such, the photos caused a quick and emotional response from students who deemed them inappropriate and offensive and felt that the photos made them feel unsafe and uncomfortable. (*See* Def. Exs. M-P, R-T, Y.) The following day at school, students continued to discuss the photos both during and between class, and students even planned a protest in response to the photos, which they ultimately carried out by kneeling in the gymnasium for nine minutes to honor George Floyd. (Def. 56.1 ¶¶ 98, 105; Student A Tr. 74:11-16.)

Considering these actions taken by the students in response to the photos, the Court further disagrees with Plaintiff that the assembly and discussions in classrooms regarding the photos, its connotations, and George Floyd as a "choice" on behalf of Defendants. (*See* Pl. Reply at 5-6.) As Judge Schreibman put it, "our public schools have an obligation to teach students antiracism, to be antiracist, and to engage in antiracist conduct." (Pl. Ex. 2 at 4:3-5.) In providing students the opportunity and space to discuss the photos, its implications, and the topical issue of the murder of George Floyd and police brutality, the District directly served this purpose.

Plaintiff's strongest argument is that only the response to the photos, and not the photos themselves, had a nexus to the school as they did not occur on school grounds and was not posted on any website created or sanctioned by the School District. (Pl. Mem. at 10-11; Pl. 56.1 ¶ 7.) However, the Court finds that when the impact of a student's speech spills into school grounds in a manner so instantaneous and significant, the speech falls outside of the First Amendment's ordinary protection. *Compare Mahanoy*, 594 U.S. at 2047-48 (no substantial disruption where "discussion of the matter took, at most, 5 to 10 minutes of an Algebra class for just a couple days,

18

SPA-19

and that some members of the cheerleading team were upset about the content of the student's snapchats.") (citation and internal quotation marks omitted); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 929 (3d Cir. 2011) (reversing and remanding district court judgment where school officials could not reasonably forecast substantial disruption and where "beyond general rumblings, a few minutes of talking in class, and some officials rearranging their schedules," no substantial disruption occurred). As Defendants put it, Plaintiff's speech "created a situation that the District had a 'duty to address'" which created a nexus to the school. (Def. Reply at 8.)

The District has an interest in maintaining order within its schools, promoting tolerance and respect, and ensuring students feel comfortable and secure within the school environment. Accordingly, the Court finds not only that District personnel reasonably portended a substantial disruption given the response to the photos the same night they were posted, but also that Defendants have established actual disruption based on the events occurring at the school the day after the photo was posted. Accordingly, the Court finds Defendants did not infringe on Plaintiff's First Amendment free speech rights when they disciplined Plaintiff.

### D.  Plaintiff's State Law Defamation Claim

Defendants argue that the Court should dismiss Plaintiff's state law defamation claims because Plaintiff failed to comply with the Notice of Claim requirement. (Def. Mem. at 12-13.) In response, Plaintiff does not deny that the Notice of Claim requirement applies here or that he failed to file one. (Pl. Reply at 9.) Instead, Plaintiff argues Defendants' counsel "took advantage" of Plaintiff which caused him to miss the 90-day deadline. (*Id.*) Accordingly, Plaintiff requests the Court reserve its decision on his state law defamation claim to permit him to move to file a late notice to claim, without any prejudice to Defendants.

19

SPA-20

Defendants removed the action to this Court on July 13, 2021 and sought an extension of time to respond to the Complaint on July 20, 2021. (Notice of Removal at 3; Stern Decl. ¶ 5; *see also* ECF No. 3.) Plaintiff's defamation claim accrued when Superintendent Evans made the allegedly defamatory statements on April 20, 2021. (Pl. 56.1 ¶ 3.) The deadline for Plaintiff to file a notice of claim was therefore July 19, 2021.  *See* N.Y. Educ. Law § 3813(2) ("[N]o action ... founded upon tort shall be maintained against [the board of education] . . . unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law."); N.Y. Gen. Mun. Law § 50–e (providing that a notice of claim must be filed "within ninety days after the claim arises."). This is only days before Defendants removed the case to federal court and *before* Defendants sought an extension of time for the deadline to respond to the Complaint.

Regardless, Plaintiff should have been prepared to comply with the notice of claim requirement *before* being made aware of it in Defendants' affirmative defenses. Plaintiff counsel's unawareness of the law is no defense. *Gaston v. New York City Dep't of Health Off. of Chief Med. Exam'r*, 432 F. Supp. 2d 321, 326 (S.D.N.Y. 2006) ("[I]gnorance of the law is not an adequate excuse for failure to file a notice of claim.").

Moreover, Plaintiff also failed to timely file a late notice of claim within the one-year and ninety-day period of limitations, or by July 19, 2022. Instead, Plaintiff inserted his request for leave to file a late notice of claim in his Reply Memorandum of Law filed in June 2023. (*See* Pl. Reply.) Given that Plaintiff could have cured the procedural deficiency to save his defamation claim and only sought to do so well after the fact, the Court denies Plaintiff's motion for leave to file a late notice of claim.

Plaintiff has failed to file a notice of claim as well as a late notice of claim, and the Court denies his request to do so. Accordingly, Plaintiff's defamation claim is dismissed.

20

SPA-21

### E.  Plaintiff's Motion to Strike Defendants' Affirmative Defenses

Having granted Defendants' motion for summary judgment and dismissing Plaintiff's claims in their entirety,[11] the Court denies Plaintiff's motion to strike Defendants' affirmative defenses as moot.[12] *Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc.*, 625 F. Supp. 3d 269, 291 (S.D.N.Y. 2022), *reconsideration denied*, No. 18-CV-12255-LTS-KHP, 2022 WL 4484515 (S.D.N.Y. Sept. 27, 2022) (denying motion to strike affirmative defense to quantum meruit claim as moot because court dismissed plaintiff's quantum meruit claim).

### CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is granted and Plaintiff's cross-motion for partial summary judgment is denied. Plaintiff's causes of action are dismissed in their entirety.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 58 and 63, to enter judgment in favor of the Defendants, and to terminate the action.

Dated:    April 5, 2024                              SO ORDERED:
          White Plains, New York

_____
        NELSON S. ROMÁN
     United States District Judge

---

[11] Defendants also argue that all claims against Superintendent Evans should be dismissed as duplicative of the claims against the District. (Def. Mem. at 19-20.) Because the Court dismisses all of Plaintiff's claims, the Court need not address this argument.

[12] Even if the Court were to consider Plaintiff's motion on its merits, the Court would deny it. "Motions to strike affirmative defenses under Rule 12(f) are disfavored, and the standard for a plaintiff to prevail is demanding." *Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. M.C.F. Assocs., Inc.*, 530 F. Supp. 3d 460, 464 (S.D.N.Y. 2021) (citation omitted). Plaintiff included its arguments on its motion to strike in an attorney declaration, rather than its Memorandum of Law. (*See* Dorfman Decl. ¶¶ 10-20.) Those arguments failed to cite to the standard for a motion to strike, to cite any supporting case law, and to include sufficient arguments for the Court to find Plaintiff satisfied the high standard.

21

SPA-22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X
CASE LEROY,

Plaintiff,

     -against-                                           21 **CIVIL** 6008 (NSR)

<u>**JUDGMENT**</u>

LIVINGSTON MANOR CENTRAL SCHOOL
DISTRICT and JOHN P. EVANS, in his capacity as
Superintendent of Schools of Livingston Manor
Central School District,

Defendants.
----------------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated April 5, 2024, the Defendants' motion for summary

judgment is granted and Plaintiff's cross-motion for partial summary judgment is denied. Plaintiff's

causes of action are dismissed in their entirety; accordingly, the case is closed.

**Dated:** New York, New York

      April 8, 2024

                                                   **RUBY J. KRAJICK**
                                       _____
                                        **Clerk of Court**

                      **BY:**      K. Mango

                                         _____
                                         **Deputy Clerk**