# 24-1241

---

In the
### United States Court of Appeals for the Second Circuit

---

CASE LEROY,

*Plaintiff - Appellant,*

v.

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of Schools of
Livingston Manor Central School District,

*Defendants – Appellees.*

---

On Appeal from the United States District Court
for the Southern District of New York, 7:21-cv-06008-NSR-AEK

---

## BRIEF OF FIRST AMENDMENT SCHOLARS AS
## AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT

---

MICHAEL J. GRYGIEL
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
(607) 255-8518
mjg395@cornell.edu

*Attorneys Pro Bono Publico
for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURAE* ................................... 1

SOURCE OF AUTHORITY TO FILE ..................................................... 1

INTRODUCTION ................................................................................... 1

POINT I    THE DISTRICT COURT MISAPPLIED *MAHANOY*'S ANALYSIS
           AND FAILED TO GIVE PLAINTIFF'S SPEECH THE
           REQUISITE FIRST AMENDMENT "LEEWAY" .............................. 2

    A.    Lack of *In Loco Parentis*. .................................................... 4

    B.    Risk of Censorship. ............................................................. 5

    C.    Protecting Unpopular Speech. ............................................. 6

POINT II   THE FIRST AMENDMENT PROHIBITS THE PUNISHMENT
           OF PUBLIC STUDENT SPEECH BY A "HECKLER'S VETO" ......... 8

    A.    The District Court Impermissibly Disciplined Plaintiff's Digital
          Speech Based on an Adverse Community Reaction. ...................... 8

    B.    In Punishing Plaintiff's Speech Because of the Message It Was
          Perceived to Convey, Defendants Violated the First
          Amendment's Viewpoint Neutrality Requirement. ....................... 12

    C.    Defendants' Administrative Responses to Plaintiff's Speech Fail
          to Satisfy *Tinker*'s "Substantial Disruption" Requirement As a
          Matter of Law. .................................................................... 16

    D.    Plaintiff's Offensive Off-Campus Digital Expression Provided
          a "Teachable Moment" For Livingston Manor's Students. ............. 18

POINT III  THE COURT SHOULD ADOPT AN INTENT-BASED
           JURISDICTIONAL STANDARD AS A LIMITATION ON
           THE EXTENSION OF SCHOOL AUTHORITY OVER PUBLIC
           STUDENT EXPRESSION IN THE MODERN PUBLIC
           SQUARE ................................................................................ 21

POINT IV MISFIRED DISCIPLINARY DECISIONS CAUSE IRREPAR-
          ABLE HARM TO THE "ONCE IN A LIFETIME" EXPERIENCE
          REPRESENTED BY HIGH SCHOOL ..................................................25

CONCLUSION ........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alliance for Open Society, International, Inc. v.United States Agency*
  *for International Development*,
  651 F.3d 218 (2d Cir. 2011) ...................................................................13

*Barber ex rel. Barber v. Dearborn Public Schools*,
  286 F.Supp.2d 847 (E.D. Mich. 2003) .............................................20

*Bethel School District No. 403 v. Fraser*,
  478 U.S. 675 (1986)..............................................................................18

*Bible Believers v. Wayne County*,
  805 F.3d 228 (6th Cir. 2015) (*en banc*) .............................................18

*B.L. ex rel. Levy v. Mahanoy Area School District*,
  964 F.3d 170 (3d Cir. 2020) .........................................................22, 23

*Brown v. Louisiana*,
  383 U.S. 131 (1966)..................................................................................8

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940)..................................................................................8

*Cuff ex rel. B.C. v. Valley Central School District*,
  677 F.3d 109 (2d Cir. 2012) (Pooler, J., dissenting) ............................. 14, 20-21

*Forsyth County, Georgia v. Nationalist Movement*,
  505 U.S. 123 (1992)................................................................................14

*Guiles ex rel. Guiles v. Marineau*,
  461 F.3d 320 (2d Cir. 2006), *cert. denied*, 551 U.S. 1162 (2007) .....................14

*Hazelwood School District v. Kuhlmeier*,
  484 U.S. 260 (1988)................................................................................15

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) .........................................................11

*J.C. ex rel. R.C. v. Beverly Hills Unified School District*,
  711 F.Supp.2d 1094 (C.D. Cal. 2010) .............................................17

*J.S. ex rel. Snyder v. Blue Mountain School District*,
  650 F.3d 915 (3d Cir. 2011) (*en banc*) ............................................................ 17

*Leroy v. Livingston Manor Central School District*,
  No. 21-cv-6008, 2024 U.S. Dist. LEXIS 64182
  (S.D.N.Y. Apr. 5, 2024)....................................................................*passim*

*Mahanoy Area School District. v. B.L. ex rel. Levy*,
  594 U.S. 180 (2021)........................................................................*passim*

*Make The Road By Walking, Inc. v. Turner*,
  378 F.3d 133 (2d Cir. 2004) ................................................................ 13

*Morse v. Frederick*, 551 U.S. 393 (2007) ...................................................... 14, 15

*Ponce v. Socorro Independent School District*,
  508 F.3d 765 (5th Cir. 2007) ............................................................... 14

*Rosenberger v. Rector & Visitors of University of Virginia*,
  515 U.S. 819 (1995)........................................................................ 13

*Startzell v. City of Philadelphia*,
  533 F.3d 183 (3d Cir. 2008) ................................................................. 8

*Street v. New York*,
  394 U.S. 576 (1969)........................................................................ 7

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)........................................................................ 9, 12

*Texas v. Johnson*,
  491 U.S. 397 (1989)........................................................................ 7

*Thomas v .Board of Education, Granville Central School District*,
  607 F.2d 1043 (2d Cir.) (1979), *cert. denied*, 444 U.S. 1081 (1980)..........*passim*

*Watson v. City of Memphis*,
  373 U.S. 526 (1963)........................................................................ 8

## State Cases

*In re Jason W.*,
  378 Md. 596 (Ct. App. Md. 2003).......................................................... 17

iv

**Federal Rules**

Federal Rule of Appellate Procedure 29(a)(4)(E)......................................1

Federal Rule of Appellate Procedure 29(b)(3) ......................................1

Local Rule 29.1(b) ......................................1

**Other Authorities**

Clay Calvert, *Off-Campus Speech, On-Campus Punishment: Censorship of the Emerging Internet Underground*, 7 B.U. J. SCI. & TECH. L. 243 (2001)......................................22

Michael J. Grygiel, *Back to the Future: The Second Circuit's First Amendment Lessons for Public Student Digital Speech*, 71 SYRACUSE L. REV. 1 (2021). ......................................20, 24, 25

Amy Gutmann, DEMOCRATIC EDUCATION 51 (1999)......................................18

Michelle Hunt, *Outside Tinker's Reach: An Examination of Mahanoy Area School District v. B.L. and its Implications*, 17 NW. J. L. & SOC. POL'Y 145 (2022)......................................23

Douglas Laycock, *High-Value Speech and the Basic Educational Mission of a Public School: Some Preliminary Thoughts*, 12 LEWIS & CLARK L. REV. 111 (2008)......................................19

Cheryl A. Leanza, *Heckler's Veto Case Law as a Resource for Democratic Discourse*, 35 HOFSTRA L. REV. 1305 (2007) ......................................8

Mary-Rose Papandrea, *Student Speech Rights in the Digital Age*, 60 FLA. L. REV. 1027 (2008) ......................................4

Mary Rose-Papandrea, *Mahanoy v. B.L. & First Amendment "Leeway,"* SUP. CT. REV. 53 (2021) ......................................3, 21

Kenneth R. Pike, *Locating the Mislaid Gate: Revitalizing Tinker by Repairing Judicial Overgeneralizations of Technologically Enabled Student Speech,* 28 B.Y.U. L. REV. (2008)......................................21

v

Katherine M. Portner, *Tinker's Timeless Teaching: Why the Heckler's Veto Should Not Be Allowed in Public High Schools*, 86 MISS. L. J. 409 (2017) .................................................................... 10

Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 WM. & MARY L. REV. 189 (1983) .................................................. 13

Joseph A. Tomain, *Cyberspace is Outside the Schoolhouse Gate: Offensive, Online Student Speech Receives First Amendment Protection*, 59 DRAKE L. REV. 97 (2010) ............................................ 18

Alexander G. Tuneski, *Online, Not on Grounds: Protecting Student Internet Speech*, 89 VA. L. REV. 139 (2003) ...................................... 24

Emily Gold Waldman, *Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions*, 19 WM. & MARY BILL RTS. J. 591 (2011) .................................... 19, 20

R. George Wright, *The Heckler's Veto Today*, CASE W. RSRV. L. REV. 156 (2019) ................................................ 13

## IDENTITY AND INTEREST OF *AMICI CURAE*

*Amici* are scholars of the First Amendment who have a strong interest in promoting the sound interpretation of the First Amendment consistent with the constitutional values that are served by the protection of free expression — including the digital speech rights of public school students.  They are concerned that the decision below impermissibly extends public school authority to penalize off-campus student social media expression based on a hostile audience reaction — a "heckler's veto" prohibited by the First Amendment.  The *Amici* are listed in the Appendix.[1]

## SOURCE OF AUTHORITY TO FILE

*Amici* have moved for leave to file this brief pursuant to Federal Rule of Appellate Procedure 29(b)(3).

## INTRODUCTION

Nearly a half-century ago, this Court recognized that when "school officials have ventured out of the school yard and into the general community where the freedom accorded expression is at its zenith, their actions must be evaluated by the principles that bind government officials in the public arena."  *Thomas v. Bd. of*

---

[1]    Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Local Rule 29.1(b), *Amici* declare that (1) no party's counsel authored the brief in whole or in part; (2) no party or party's counsel contributed money intended to fund the brief's preparation or submission; and (3) no person, other than *Amici* or their counsel, contributed money intended to fund preparing or submitting the brief.

*Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1050 (2d Cir.) (1979), *cert. denied*, 444 U.S. 1081 (1980).  The decision appealed from abdicated these principles by upholding Plaintiff's punishment for engaging in political speech on a social media platform based not on a material disruption caused by the expression in a school-controlled setting or activity, but on the audience's hostile reaction to the speech — a "heckler's veto" disallowed by the First Amendment.  Further, the lower court barely gave lip service to *Mahanoy Area Sch. Dist. v. B.L. ex. rel. Levy*, 594 U.S. 180, 189 (2021), which requires that public schools' regulation of their students' digital speech outside of school hours and away from the school's campus be evaluated based on "three features" that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway." As set forth more fully below, the convergence of these features in the context of this appeal establishes that Plaintiff's off-campus speech is protected by the First Amendment.  It is not a close call.

## POINT I

### THE DISTRICT COURT MISAPPLIED *MAHANOY*'S ANALYSIS AND FAILED TO GIVE PLAINTIFF'S SPEECH THE REQUISITE FIRST AMENDMENT "LEEWAY"

In *Mahanoy Area Sch. Dist. v. B.L.*, the Supreme Court identified "three features" that justify increased constitutional protection for the off-campus social media expression of public secondary school students, even as it declined to adopt

"a broad, highly general First Amendment rule" to govern *Tinker*'s application to such expression.[2]  594 U.S. at 189.  Proper consideration of these features mandates full First Amendment protection for the single Snapchat post at issue on this appeal.  The (1) geographic and temporal remove of Plaintiff's digital speech from the school's environment, (2) controversial political message that was the subject of his Snapchat post, and (3) school district's independent "interest in protecting a student's unpopular expression" require "First Amendment leeway" rather than punishment of Plaintiff's speech.  *Id*. at 189-90.

In *Mahanoy*, a student's vituperative Snapchat post excoriating school officials ("Fuck school fuck softball fuck cheer fuck everything") was deemed First Amendment-protected.  Nothing compels a different outcome here.  Indeed, the facts of the present case are *more* favorable to Plaintiff, whose speech was in no way related to school activity, raises greater risk of censorship, and touches upon controversial issues of broad national political significance.

---

[2]  The *ad hoc* mode of inquiry adopted by Justice Breyer's majority opinion in *Mahanoy* has been criticized for the lack of guidance it provides in potentially allowing the unwarranted expansion of school authority to students' off-campus digital free speech rights:

> Rather than engaging in a careful calibration of the competing interests and a close consideration of First Amendment principles to develop more precise rules to guide schools, students, and judges, the Court simply engages in an ad hoc analysis in its apparent belief that this is a narrow resolution of the issue before it.  Perhaps inadvertently, however, the Court manages to create more problems than it solves with its new approach to student speech rights.

Mary-Rose Papandrea, *Mahanoy v. B.L. & First Amendment "Leeway*," SUP. CT. REV. 53, 62 (2021) (hereinafter "*First Amendment 'Leeway'*").

### A. **Lack of _In Loco Parentis_**.

First, unlike the digital speech in _Mahanoy_, Plaintiff's social media expression has no relationship whatsoever to Livingston Manor, its students, teachers, or administrators, or any school-supervised program or activity. Plaintiff's Snapchat post took place outside of the school environment in the parking lot of a local dance studio, after school hours, on a personal cellphone to a private audience, and was not threatening or harassing. These circumstances diminish any regulatory interest on the part of Livingston Manor, as Plaintiff's Snapchat post should be subject to parental prerogatives rather than school control. 594 U.S. at 189. ("Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility."); _see also Thomas v. Bd. of Educ._, 607 F.2d at 1051 ("While these activities are certainly the proper subjects of parental discipline, the First Amendment forbids public school administrators and teachers from regulating the material to which a child is exposed after he leaves school each afternoon."); Mary-Rose Papandrea, _Student Speech Rights in the Digital Age_, 60 FLA. L. REV. 1027, 1084 (2008) ("government speech restrictions can more often than not actually interfere with the choices some parents have made regarding their children's upbringing") (footnote omitted).

B. **Risk of Censorship**.

Second, *Mahanoy* emphasized that heightened judicial vigilance is called for when a public school attempts to punish off-campus student speech, lest a student be subject to comprehensive government oversight of their expression at all times during the day. 594 U.S. at 189-90. In other words, students would never cease to be regarded as students, rather than citizens, for First Amendment purposes if public schools were routinely allowed to regulate their social media expression that occurs outside the school environment. In *Thomas*, this Court anticipated *Mahanoy*'s cautionary instruction in this regard by determining that when students speak as members of the general political community they are presumptively beyond the reach of schools' disciplinary authority and entitled to the full benefit of their First Amendments rights:

> When school officials are authorized only to punish speech on school property, the student is free to speak his mind when the school day ends. In this manner, the community is not deprived of the salutary effects of expression, and educational authorities are free to establish an academic environment in which the teaching and learning process can proceed free of disruption. Indeed, our willingness to grant school officials substantial autonomy within their academic domain rests in part on the confinement of that power within the metes and bounds of the school itself.

*Thomas*, 607 F.2d at 1052.

The need for judicial skepticism concerning Defendants' disciplinary reaction is reinforced here: Plaintiff posted his Snapchat photo amidst the trial of the

Minneapolis police officer convicted of murder for the killing of George Floyd, an event which triggered a national public outcry over the documented pattern — exposed through repeated fatal police shootings captured on social media — of police violence perpetrated against racial minorities. This tragic history, and the failure of the criminal justice system to provide accountability for lethal police misconduct, unquestionably implicate speech on urgent political and social issues protected at the core of the First Amendment. 594 U.S. at 190 (Breyer, J.) ("When it comes to political . . . speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention."); *see also id*. at 205 (Alito, J., concurring) (speech that "addresses matters of public concern, including sensitive subjects like politics, religion, and social relations" "lies at the heart of the First Amendment's protection").

## C. <u>Protecting Unpopular Speech.</u>

Third, as *Mahanoy* pointedly observed, America's public schools are "nurseries of democracy" and, as such, have a special interest in allowing the ventilation of unpopular student speech, "especially when the expression takes place off campus." *Id*. at 190.

> Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring

that future generations understand the workings in practice of the well known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it."

*Id.*  While posted in jest (or in poor taste), Plaintiff's commentary — as interpreted by school authorities — is no less deserving of First Amendment protection than the crude vulgarities insulated from school punishment in *Mahanoy*.  Indeed, it is a "bedrock principle" that speech may not be suppressed because it expresses ideas that are "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.").

The lower court's cramped conception of Plaintiff's digital First Amendment rights outside of the school environment largely ignored *Mahanoy*'s three-feature analysis and flouted this Court's admonition in *Thomas* that when a public school's disciplinary power is extended to off-campus student speech it "must be cabined within the rigorous confines of the First Amendment, the ultimate safeguard of popular democracy."  607 F.2d at 1045.  If permitted to stand, the ruling below will diminish public students' ability to participate in the democratic process by communicating unpopular, oppositional, and objectionable views on pressing social and political issues. In falling far short of "permit[ting] the maximum degree of

7

unrestrained expression consistent with the maintenance of institutional integrity," the decision on appeal committed reversible constitutional error. *Id*. at 1049.

**POINT II**

**THE FIRST AMENDMENT PROHIBITS THE PUNISHMENT OF PUBLIC STUDENT SPEECH BY A "HECKLER'S VETO"**

A. <u>The District Court Impermissibly Disciplined Plaintiff's Digital Speech Based on an Adverse Community Reaction</u>.

Long established in First Amendment doctrine, the "heckler's veto" prohibits the government from shutting down or punishing a speaker or demonstrator based on a threatened or anticipated hostile reaction from the audience.[3] *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ("constitutional rights may not be denied simply because of hostility to their assertion or exercise") (citations omitted); *Startzell v. City of Phila.*, 533 F.3d 183, 200 (3d Cir. 2008) (stating a "heckler's veto" occurs "where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience"); Cheryl A. Leanza, *Heckler's Veto Case Law as a Resource for Democratic Discourse*, 35 HOFSTRA L. REV. 1305, 1308 (2007) ("Heckler's veto cases do not permit the state to hide behind the unpleasant reaction of some portions of the public in order to silence a speaker."). *See also Cantwell v. Connecticut*, 310 U.S. 296, 308-11 (1940) (overturning a conviction for speech criticizing religion that

---

[3]   The term "heckler's veto" was first used by the Supreme Court in *Brown v. La.*, 383 U.S. 131, 133 n.1 (1966).

8

offended listeners as "unduly suppress[ing] free communication of views . . . under the guise of conserving desirable conditions").  The "heckler's veto" derives from the recognition that "a function of free speech under our system of government is to invite dispute," and that unpopular speech "may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (ordinance outlawing speech that "stirred people to anger" was unconstitutional).

Allowing a bellicose community reaction — even if "instantaneous and significant" (*Leroy v. Livingston Manor Cent. Sch. Dist.*, No. 21-cv-6008, 2024 U.S. Dist. LEXIS 64182, at *26 (S.D.N.Y. Apr. 5, 2024)) — to legitimize censorship of off-campus digital expression would undermine the ability of students to confront opposing ideas with their own speech, thereby stifling public discourse.  *Tinker*, the seminal public student speech case arising from a black armband Vietnam war protest, emphasized that "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is constitutionally insufficient to restrict student speech within the premises of the school.  393 U.S. at 509.  Notably, the *Tinker* Court expressly referred to *Terminiello*'s reasoning in rejecting the logic of a heckler's veto:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.  Any departure from absolute regimentation may cause trouble.  Any variation from the majority's opinion may inspire fear.  Any word

> spoken, in class, in the lunchroom, or on the campus that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . and our history says that it is the sort of hazardous freedom . . . that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id*. at 508-09. While its embrace of the "heckler's veto" doctrine was perhaps implicit, "*Tinker*'s 'substantial disruption' test focuses on the speaker's actions rather than the listener's [re]actions," and enjoins the punishment of student speech based on community outrage or hostility. Katherine M. Portner, *Tinker's Timeless Teaching: Why the Heckler's Veto Should Not Be Allowed in Public High Schools*, 86 Miss. L. J. 409, 443 (2017).

In *Thomas v. Bd. of Ed.*, this Court rejected *Tinker*'s application to an underground student newspaper published off-campus that (predictably) reached school grounds, recognizing that, as a consequence of their "intimate association with the school itself" and "understandable desire to preserve institutional decorum," even well-intentioned school district officials are prone to an inherent overregulation bias that threatens the exercise of students' free speech rights. 607 F.2d at 1051. In memorable language equally applicable in this context, the *Thomas* court renounced the school district's reaction to the newspaper's publication as a stark example of community censorship prohibited by the First Amendment:

> We may not permit school administrators to seek approval of the community-at-large by punishing students for expression that took

10

place off school property.  Nor may courts endorse such punishment because the populace would approve.  The First Amendment will not abide the additional chill on protected expression that would inevitably emanate from such a practice.

*Id*.  *See also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1276 (11th Cir. 2004) (overturning school district's punishment of student who silently raised his fist during daily recitation of Pledge of Allegiance based on disturbance caused by other students aggrieved by his demonstration; "While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement though violence instead of reason.").

What was implicit in the Supreme Court's analysis in *Tinker* and this Court's analysis in *Thomas* was made explicit in *Mahanoy*'s insistence that public school students' rights of expressive liberty may not be held hostage to an adverse community reaction, "especially when the expression takes place off campus" and involves unpopular speech.  594 U.S. at 190.  Even where, as here, such speech is "deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; 'that would be a heckler's veto.'"  *Id*. at 206 (Alito, J., concurring).  The "heckler's veto" problem is especially acute and substantial with respect to off-campus digital speech that provokes controversy and recriminations among students and others in the school community given the likelihood that the offensive message will trigger a tsunami of social media

11

responses that come to the attention of school administrators. In this manner, the anticipation of a material disruption to the school environment attributed to the outpouring of objections flooding social media platforms becomes a self-fulfilling prophecy in virtually every case that involves offensive or objectionable online speech. To use negative social media reaction (often amounting to nothing more than ostentatious online virtue-signaling or splenetic digital posturing) as a basis for shutting down student speech represents a paradigmatic example of the heckler's veto prohibited by the First Amendment.

In derogation of this principle, the lower court reassigned the constitutional "risk" of controversial speech to Plaintiff as the speaker, a step toward the "standardization of ideas" by "dominant political or community groups." *Terminiello*, 337 U.S. at 4, 5. It thereby diminished the "breathing space in which expression may flourish" (*Thomas*, 607 F.2d at 1048), disserved "our deeply held preference for free discourse over enforced silence" (*id*. at 1047), and "discount[ed] important principles of our government as mere platitudes" (*Tinker*, 393 U.S. at 507), with disquieting implications for public student digital speech.

**B. <u>In Punishing Plaintiff's Speech Because of the Message It Was Perceived to Convey, Defendants Violated the First Amendment's Viewpoint Neutrality Requirement</u>.**

While government disapproval of the underlying speech is not necessarily implicated in a heckler's veto situation, here it is clear that Plaintiff's punishment by

12

Livingston Manor was motivated by the school district's condemnation of what Defendants perceived as the particular message conveyed by his Snapchat post. As the District Court found, the school district had an "obligation to teach students antiracism, to be antiracist, and to engage in antiracist conduct." *Leroy*, 2024 U.S. Dist. LEXIS 64182, at *25. Notwithstanding the school district's commendable assumption of this instructional duty, its invocation as a speech-penalty justification confirms that Livingston Manor engaged in viewpoint-based discrimination that violated the First Amendment.[4] R. George Wright, *The Heckler's Veto Today*, 68 CASE W. RSRV. L. REV. 156, 170-71 (2017) ("Government disapproval of the ideas subjected to a heckler's veto, where the government is motivated in some degree by its own disapproval of the underlying speech, would present a relatively clear case of a content-based restriction of speech.") (footnote omitted). In doing so, Defendants misapplied *Tinker*'s "substantial disruption" standard, which turns on the outcome of a student's speech rather than its message. As framed by this Court,

---

[4] This Court has explained that "[v]iewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination,' in which 'the government targets not subject matter but particular views taken by speakers on a subject.'" *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831, 829 (1995)); *see also* Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 WM. & MARY L. REV. 189, 197-200 (1983). Government attempts to regulate speech based on the particular message communicated are presumptively unconstitutional. *Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l. Dev.*, 651 F.3d 218, 235 (2d Cir. 2011) ("It is well established that viewpoint-based intrusions on free speech offend the First Amendment.").

"*Tinker* established a protective standard for student speech under which it cannot be suppressed based on its content, but only because it is substantially disruptive."[5] *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326 (2d Cir. 2006) (Cardamone, J.), *cert. denied*, 551 U.S. 1162 (2007); *see also Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 770 (5th Cir. 2007) ("Instead, *Tinker*'s focus on the result of speech rather than its content remains the prevailing norm. The protection of the First Amendment in public schools is thereby preserved.").

Defendants' expansion of school authority over Plaintiff's out-of-school social media expression runs headlong into Justice Alito's admonition in *Morse v. Frederick* that allowing school officials to rely — as Livingston Manor concededly did here — on a public school district's self-defined "educational mission" as a basis for regulating student speech would amount to an alarming invitation to viewpoint-based censorship that "strikes at the very heart of the First Amendment." 551 U.S. 393, 423 (2007) (Alito, J., concurring). Stated another way, "[i]f mere

---

[5] *Amici* recognize that judicial descriptions of *Tinker*'s "substantial disruption" test as embracing content neutrality may be more theoretical than real given that its application turns on the outcome produced by a particular example of student speech, which encompasses the reaction of recipients. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). Nevertheless, reliance on a school community's adverse reaction — no matter how overblown, idiosyncratic, or unreasonable — as a justification for punishment would in effect cede protection of student speech to the response of others which, as discussed above in the text (*see* Point II A., *supra*), the First Amendment prohibits. *See Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 120 (2d Cir. 2012) (Pooler, J., dissenting) ("The First Amendment's protection of free speech cannot hinge entirely on the reaction of a listener to a person's speech. If that were the case, the First Amendment would only be as strong as the weakest, or at least the most thin-skinned, listener in a crowd.").

incompatibility with the school's pedagogical message were a constitutionally sufficient justification for the suppression of student speech," a wide variety of protected expression could be restricted by school authorities. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 280 (1988) (Brennan, J., dissenting). In short, the First Amendment prohibits public school officials from censoring student social media expression outside the school environment that conveys objectionable or offensive ideas regarded as incompatible with a school's official stance derived from "the inculcation of whatever political and social views" (*Morse*, 551 U.S. at 423 (Alito, J., concurring)) are held by local school boards. The decision below ignores this constitutional imperative.

*Amici* not only endorse but extol Defendants' efforts in instructing Livingston Manor's students about the need to confront and combat the evil of racism in all of its forms. However, Defendants' counterspeech in that regard does not require, let alone justify, their punishment of Plaintiff's speech because of the offensive or unacceptable message it was construed to convey. On this appeal, "the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy" that resulted from Plaintiff's Snapchat post — a violation of the First Amendment's core content-neutrality requirement. *Tinker*, 393 U.S. at 510. In the final analysis, "when those charged with evaluating expression have a vested

15

interest in its regulation, the temptation to expand the otherwise precise and narrow boundaries of punishable speech may prove irresistible." *Thomas*, 607 F.2d at 1048.

## C. Defendants' Administrative Responses to Plaintiff's Speech Fail to Satisfy *Tinker*'s "Substantial Disruption" Requirement As a Matter of Law.

Nor does Defendants' recitation of the standard administrative activities undertaken in response to Plaintiff's off-campus speech — *e.g.*, responding to email complaints, planning a response to the "unrest created by the photos," providing counseling to students, and responding to media inquiries — satisfy *Tinker*'s disruption requirement. *Livingston Manor*, 2024 U.S. Dist. LEXIS 64182, at *22. The Court of Appeals of Maryland has captured the reasons Livingston Manor's administrative intervention does not rise to the level of disruption necessary to justify the punishment of Plaintiff's speech:

> A typical public school deals on a daily basis with hundreds — perhaps thousands — of pupils in varying age ranges and with a variety of needs, problems, and abilities, scores of teachers, also with varying needs, problems, and abilities, and a host of other employees, visitors, and occasional trespassers. The "orderly conduct of the activities, administration, or classes" takes into account and includes within it conduct or circumstances that may momentarily divert attention from the planned classroom activity and that may require some intervention by a school official. Disruptions of one kind or another no doubt occur every day in the schools, most of which, we assume, are routinely dealt with in the school setting by principals, assistant principals, pupil personnel workers, guidance counselors, school psychologists, and others, as part of the jobs and as an aspect of school administration.

*In re Jason W.*, 378 Md. 596, 604-05 (Ct. App. Md. 2003); *see also J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F.Supp.2d 1094, 1118 (C.D. Cal. 2010) (*Tinker* not satisfied as a matter of law where actions taken by school officials "to resolve the situation created by the video were [not] outside the realm of ordinary school activities" because "[t]hat is what school administrators do").

*Tinker*'s strong protection of public students' free speech rights presupposes that some degree of increased administrative burdens may be necessary in order to protect the exercise of those rights. Livingston Manor's discharge of routine administrative duties in this instance does not divest Plaintiff's speech of constitutional protection. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 929 n.6 (3d Cir. 2011) (*en banc*) (summarily rejecting as "irrelevant to the issues before this Court" alleged disruptions that were "the direct result of the School District's response" to student's off-campus website profile mocking school administrator). Taken to its logical endpoint, the lower court's reasoning would permit a school district to manufacture a disruption through its own administrative response to contested digital speech.

Finally, Defendants' "decision to direct the Plaintiff and the other students involved not to attend school the next day" is also unavailing as a basis for penalizing Plaintiff's speech. *Livingston Manor*, 2024 U.S. Dist. LEXIS 64182, at *24. Otherwise, "a heckler's veto . . . will nearly always be susceptible to being

17

reimagined and repackaged as a means for protecting the public, or the speaker himself, from actual or impending harm." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 255 (6th Cir. 2015) (*en banc*).

### D. Plaintiff's Offensive Off-Campus Digital Expression Provided a "Teachable Moment" For Livingston Manor's Students.

There can be no doubt that Livingston Manor, like other public school systems, is entrusted with the important task of instilling in students the "shared values of a civilized social order." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). However, that is not the full measure of its educational responsibility. Equally as important, Defendants must also prepare students to "think critically about authority if they are to live up to the democratic ideal of sharing political sovereignty as citizens." Amy Gutmann, DEMOCRATIC EDUCATION 51 (1999); *see also* Joseph A. Tomain, *Cyberspace is Outside the Schoolhouse Gate: Offensive, Online Student Speech Receives First Amendment Protection*, 59 DRAKE L. REV. 97, 169 (2010) ("If we desire a society in which children grow up equipped to make life-affecting decisions and develop as individuals, they must be allowed to exercise their First Amendment rights outside the schoolhouse gate and in cyberspace."). Plaintiff's participation in an ongoing political debate through an offensive Snapchat post is not inconsonant with this objective.

> But of course civility is only a collateral feature of political debate; the fundamental feature of political debate in a free society is disagreement — disagreement among citizens and disagreement

18

> between citizens and the government. To respond to such
> disagreement with suppression is a far more fundamental violation
> of democratic self-governance than to respond with an uncivil reply.
> It is an essential part of a public school's mission to prepare students
> for a citizen's responsibility to participate in political debates, or at
> least to listen to and evaluate them, and to do so vigorously as well
> as civilly.

Douglas Laycock, *High-Value Speech and the Basic Educational Mission of a Public School: Some Preliminary Thoughts*, 12 LEWIS & CLARK L. REV. 111, 120 (2008).

Rather than disrupting the educational process, Plaintiff's speech actually became a part of that process and provided a teachable moment through which Livingston Manor educated its students about "challenging authority in ways that our society accepts and even sometimes expects of our citizens."  Emily Gold Waldman, *Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions*, 19 WM. & MARY BILL RTS. J. 591, 613 (2011) (hereinafter "*Badmouthing Authority*").  By having teachers supervise classroom discussions about the social media posts (*Livingston Manor*, 2024 U.S. Dist. LEXIS 64182, at *22), conducting a school-wide assembly to address the photos (*id.*), and allowing students to demonstrate "to express their disagreement with the photos and the photos' connotations" (*id.*) followed by "further discussions about the photos, racism, insensitivity, and George Floyd" (*id.*), Livingston Manor did what public schools do best — educate students about the thoughtful exercise of their First

Amendment rights on the pathway to responsible digital citizenship.[6]  That should

have been the end of the story.

> School districts that punish their students' speech are taking the
> easy, and wasteful, way out. Rather than expend resources enforcing,
> and at times litigating, the punishment of off-campus expression, public
> high schools should educate students about the responsible exercise of
> their free speech rights on digital platforms, including the advantages
> of thoughtful and constructive dialogue and the disadvantages of
> intolerant and offensive expression.  Simply put, "[p]unishing students
> for exercising constitutional rights is not as beneficial as educating
> students that discretion is the better part of valor and legal does not
> inherently equal right."  By providing guidance and instruction to
> students as they navigate the electronic marketplace of ideas, schools
> will perform an important role in preparing them for democratic self-
> governance without curtailing their digital speech rights outside the
> school environment.

Michael J. Grygiel, *Back to the Future: The Second Circuit's First Amendment*

*Lessons for Public Student Digital Speech*, 71 SYRACUSE L. REV. 1, 217 (2021)

(footnotes omitted) (hereinafter "*Back to the Future*").

As Judge Pooler observed, students "learn by fumbling their way to finding

the boundaries between socially permissible, and even encouraged, forms of

expression that employ exaggeration for rhetorical effect, and impermissible and

offensive remarks that merely threaten and alienate those around them." *Cuff v.*

---

[6]   *See also* Waldman, *Badmouthing Authority*, 19 WM. & MARY BILL RTS. J. at 654 ("[L]istening
to other students' dissenting speech — and observing the way that school officials respond to it —
can also be an educationally valuable experience that helps prepare students for citizenship.");
*Barber ex rel. Barber v. Dearborn Pub. Schs.*, 286 F.Supp.2d 847, 858 (E.D. Mich. 2003) ("[A]s
the *Tinker* Court and other courts have emphasized, students benefit when school officials provide
an environment where they can openly express their diverging viewpoints and when they learn to
tolerate the opinions of others.").

*Valley Cent. Sch. Dist.*, 677 F.3d at 124 (Pooler, J., dissenting). By punishing Plaintiff, Defendants compromised their ability both to assist students in locating these boundaries and to provide useful instruction in democratic values and the importance of rational public discourse.

**POINT III**

**THE COURT SHOULD ADOPT AN INTENT-BASED JURISDICTIONAL STANDARD AS A LIMITATION ON THE EXTENSION OF SCHOOL AUTHORITY OVER PUBLIC STUDENT EXPRESSION IN THE MODERN PUBLIC SQUARE**

A flaw in *Mahanoy* is the failure to uncouple the threshold "jurisdictional" question of whether the digital speech at issue in a given case qualifies as "on-campus" speech from the application of substantive constitutional principles established under the public student speech framework.[7] Kenneth R. Pike, *Locating the Mislaid Gate: Revitalizing Tinker by Repairing Judicial Overgeneralizations of Technologically Enabled Student Speech*, 2008 B.Y.U. L. REV 971, 973-74 (2008) ("Lower courts challenged by the nuances of technologically enabled speech, or 'cyber-speech,' focus almost by default on whether student speech 'materially and substantially' disrupted the educations process without analyzing whether that

---

[7] Papandrea, *First Amendment "Leeway*," SUP. CT. REV. 61 ("Notably, *Mahanoy* does not require school officials to make any sort of threshold or "jurisdictional" showing to take advantage of the *Tinker* standard, an approach common among lower courts and one that both the school district and federal government supported even though such an approach limited school authority, at least theoretically.").

speech actually occurred within the school's purview.") (footnotes omitted).  In her Third Circuit opinion in *Mahanoy*, Judge Krause insisted on the strict separation of these two inquiries in order to avoid the overbroad regulation of student speech.[8] *B.L. ex rel. Levy v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 188 (3d Cir. 2020) ("it collapses *Tinker*'s scope of application and rule into one analytical step").  The "when, where, and how" (*Mahanoy*, 594 U.S. at 191) a student uses a social media platform entails the consideration of objective factors that in all but exceptional cases will lend themselves to a ready determination of whether the speech is that of a student or that of a member of the general political community.  The Supreme Court had little difficulty in concluding that the cheerleader's Snapchat vulgarities at issue in *Mahanoy* were not on-campus speech based on consideration of such factors, including the ephemerality of the communication method and the geographic location from which they were disseminated.  *Id.*  (Breyer, J.) ("Her posts appeared outside of school hours from a location outside the school. . . . B.L. also transmitted her speech through a personal cellphone, to an audience consisting of her private circle of Snapchat friends."); *id*. at 209 (Alito, J., concurring) ("She sent the message

---

[8]    Professor Calvert has been an early and staunch proponent of distinguishing the threshold jurisdictional determination from *Tinker*'s substantive application in digital free speech cases. *See* Clay Calvert, *Off-Campus Speech, On-Campus Punishment: Censorship of the Emerging Internet Underground*, 7 B.U. J. SCI. & TECH. L. 243, 265 (2001) ("critical" step in threshold jurisdictional determination is whether student "intentionally and knowingly" introduced off-campus speech into campus environment).

and image in question on her own time while at a local convenience store. They were transmitted via a medium that preserved the communication for only 24 hours and she sent them to a select group of 'friends.'"). Justice Breyer found that these factors "diminish[ed] the school's interest in punishing B.L's utterance." *Id*. at 191. *Amici* request that this Court provide the guidance absent in *Mahanoy* that will enable students to determine whether their digital speech is potentially subject to punishment by school authorities through application of the majority's *ad hoc* contextual balancing test, a "mushy attempt at judicial restraint . . . [that] resolves nothing and will continue to cultivate confusion under the cover of evaluating student speech on a case-by-case basis."[9]  Michelle Hunt, *Outside Tinker's Reach: An Examination of Mahanoy Area School District v. B.L. and its Implications*, 17 Nw. J. L. & Soc. Pol'y 145, 169 (2022).

To restore "clarity and predictability" (*Mahanoy*, 964 F.3d at 188) to this unstable area of the law, this Court should clarify that off-campus digital speakers

---

[9]   The *Mahanoy* Court did provide a non-exhaustive inventory of student digital expression that would qualify as "on-campus" speech potentially subject to school regulation through *Tinker*'s application. *Mahanoy*, 594 U.S. at 188 ("These include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breach of school security devices, including material maintained within school computers."). These examples involve either categories of speech traditionally removed from First Amendment protection or speech that "amounts to a temporal or spatial extension of the regular school program" (*id*. at 203 (Alito, J., concurring)) and therefore provide at best limited guidance to students like Plaintiff looking to exercise their free speech rights on digital platforms beyond the "schoolhouse gate."

who, like Plaintiff, take no affirmative steps to introduce their speech within a school setting, to an audience under school supervision, or in the context of a school-supervised activity or event, should be immunized from school punishment under the First Amendment.[10]  Absent the intentional introduction of their off-campus speech into a school-controlled environment, public school students are entitled to full constitutional protection of their free speech rights the same as any other citizen.[11] *See Thomas*, 607 F.2d at 1050 (held, school administrators violated students' First Amendment rights for publishing underground newspaper where their activities were "deliberately designed to take place beyond the schoolhouse gate"). Here, where Plaintiff never disseminated his Snapchat post to a school-supervised audience and deleted his message scant minutes after it was posted, it is clear that he did not intend to introduce it into the school environment.

When courts gloss over the threshold determination of whether digital expression qualifies as "on campus" speech and is therefore subject to a school's disciplinary purview, *Tinker*'s application

---

[10]   To be clear, adopting an intentionality standard as a constitutional limitation on the exercise of public schools' disciplinary authority over student digital speech would not prohibit punishment of off-campus expression that deliberately provokes a disruption within the school environment or at a school-supervised event or activity.  *See* Grygiel, *Back to the Future,* 71 Syracuse L. Rev. at 207-09.

[11]   Alexander G. Tuneski, *Online, Not on Grounds: Protecting Student Internet Speech*, 89 Va. L. Rev. 139, 140 (2003) ("Thus, school officials should be prohibited from punishing students for constitutionally protected speech which originates from and is disseminated from off-campus locations unless the speaker takes additional steps to direct the expression towards the school.").

functions not as a means of accommodating the exercise of students' free speech rights with the legitimate educational interests of the public school system, but as a proxy for *sub rosa* and arbitrary governmental judgments as to the acceptability of their off-campus digital expression. The erasure of any principled dividing line between in-school and out-of-school speech, and the accompanying erosion of public students' First Amendment rights . . . is the inevitable result.

Grygiel, *Back to the Future*, 71 SYRACUSE L. REV. at 166 (footnote omitted).

**POINT IV**

**MISFIRED DISCIPLINARY DECISIONS CAUSE IRREPARABLE HARM TO THE "ONCE IN A LIFETIME" EXPERIENCE REPRESENTED BY HIGH SCHOOL**

It is typically impossible as well as impractical for a student to obtain judicial review and meaningful redress prior to being harmed, often irreparably, by a public school's disciplinary decision. *Thomas*, 607 F.2d at 1052 ("Where, as here, the punishment is virtually terminated before judicial review can be obtained, many students will be content to suffer in silence, a silence that may stifle future expression as well."). The moment Plaintiff was disciplined for his Snapchat message in 2021, he became stigmatized as a disruptor with a formal record of the same. Only now, three years later, and representing one of a select few students who has persisted in seeking to vindicate his First Amendment rights through the burdensome civil litigation process, will he have the opportunity to shed that label. Unfortunately, whatever negative impact Plaintiff's high school record may have

25

had on his immediate educational or employment prospects cannot be meaningfully undone after the fact by this Court.

A perhaps overlooked but nevertheless important point is that we leave to the same school officials who handed down Plaintiff's disciplinary decision the authority to memorialize it in his student record. We expect, perhaps naively, that they will do so fairly. This is a critical part of the process because Plaintiff, or any other student in his position, must answer affirmatively in responding to college or employment applications questioning whether they have ever been disciplined. Unfortunately, it is unlikely that a typical student's disciplinary record is worded in a way that provides them with the benefit of the doubt in the eyes of third-party stakeholders who have a hand in shaping a student's future, such as a college admissions officer or potential employer. In such instances it is fair to assume that the student's disciplinary record will state something along the lines of "violated policy on student conduct" rather than "posted a controversial political message on social media while outside of school, in a non-threatening manner and directed at nobody in particular." While each characterization may arguably be considered accurate, there is a tremendous difference in how each statement is likely to be received by the uninformed reader and, as a consequence, how the student is impacted. It is no stretch to assume that a third-party reviewer is more likely to eliminate the student from consideration if presented with the former given that it

appears, on its face, to denote a more serious violation, whereas that same individual is perhaps more likely to pause and question the gravity or validity of the sanction if presented with the context afforded by the latter.

Leaving these decisions to the same school administrators responsible for imposing the punishment in the first place is a gamble with the student's future that the public student speech framework should not permit. *Thomas*, 607 F.2d at 1050-51. These young people are at a critical point in their formative years, the unique experience of which cannot be recovered by a favorable court decision eventually rendered years down the line. Because judicial redress cannot adequately restore what a school has wrongfully taken away, it is no answer to say that a student punished for off-campus speech can seek correction through the legal process years after the fact. The opportunities lost to the student are irretrievable; he cannot take another crack at a high school sports team, recreate the college admissions or employment application process, or otherwise redo this important part of his life. Thus, the law should robustly protect in the first instance First Amendment rights exercised outside of the public school setting because a student's available remedies are inadequate. The decision below took no account of these inadequacies.

## CONCLUSION

For the reasons stated herein, *Amici* respectfully urge this Court to reverse the District Court's order.

Dated: August 22, 2024

Respectfully submitted

/s/ Michael J. Grygiel
Michael J. Grygiel
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
Email: mjg395@cornell.edu

*Attorneys Pro Bono Publico for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c) because this brief contains 6,935 words, as determined by the word-count function of Microsoft Word.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 22, 2024

Respectfully submitted

/s/ Michael J. Grygiel
Michael J. Grygiel
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
Email: mjg395@cornell.edu

*Attorneys Pro Bono Publico for Amici Curiae*

## APPENDIX

Ari Cohn is Free Speech Counsel at Tech Freedom, a nonprofit, nonpartisan think tank based in Washington, D.C., dedicated to a free and open Internet where vibrant discourse thrives across a multiplicity of diverse forums.

Roy S. Gutterman is the Director of the Newhouse School at Syracuse University's Tully Center for Free Speech.

Heather E. Murray is the Local Journalism Project Managing Attorney at Cornell Law School's First Amendment Clinic.

Jonathan Peters is Chair of the Department of Journalism and also a faculty member at the University of Georgia's School of Law.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system with a resulting electronic notice to all counsel of record on August 22, 2024.

Dated: August 22, 2024

Respectfully submitted

/s/ Michael J. Grygiel
Michael J. Grygiel
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
Email: mjg395@cornell.edu

*Attorneys Pro Bono Publico for Amici Curiae*