No. 24-1241

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CASE LEROY,

PLAINTIFF-APPELLANT,

v.

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT, et al.,

DEFENDANTS–APPELLEES.

On Appeal from the United States District Court
for the Southern District of New York
7:21-cv-6008

Judge Nelson S. Roman

## BRIEF OF AMICUS CURIAE AMERICAN CIVIL LIBERTIES UNION
## IN SUPPORT OF PLAINTIFF–APPELLANT AND REVERSAL

Vera Eidelman
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae American Civil Liberties Union states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

Dated: August 22, 2024        By: _/s/ Vera Eidelman_____
                                     Vera Eidelman

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF INTEREST .............................................................................. 1

INTRODUCTION ............................................................................................... 2

ARGUMENT ...................................................................................................... 4

    I.    Young people have First Amendment rights ....................................... 4

    II.    Schools do not have the same authority to regulate student speech on and off campus ...................................................................................... 8

        A.    *Mahanoy* makes clear that schools cannot simply extend their in-school authority to off-campus speech ................................... 8

        B.    The Supreme Court's prior student speech cases—*Tinker*, *Morse*, *Fraser*, and *Hazelwood*—require the same result ........ 11

    III.    Even when a school has the authority to discipline a student for off-campus speech, *Tinker* is the wrong standard to apply ...................... 12

        A.    Courts must first assess the what, when, where, and how of the student's off-campus speech. ............................................... 13

        B.    Courts must also rigorously evaluate the school's asserted interest ................................................................................... 14

CONCLUSION .................................................................................................. 20

CERTIFICATE OF COMPLIANCE .................................................................... 21

CERTIFICATE OF SERVICE ............................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. American Civil Liberties Union,*
  535 U.S. 564 (2002) ...................................................................4

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) .................................................................11

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ...................................................................4

*Doninger v. Niehoff,*
  642 F.3d 334 (2d Cir. 2011) ............................................... 17, 18

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) ...................................................................4

*Forsyth Cnty. v. Nationalist Movement,*
  505 U.S. 123 (1992) ...................................................................4

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) ............................................................ 11, 12

*Mahanoy Area School District v. B. L. by & through Levy,*
  594 U.S. 180 (2021) ..................... 1, 2, 3, 5, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 19

*Morse v. Frederick,*
  551 U.S. 393 (2007) .................................................................11

*Reno v. American Civil Liberties Union,*
  521 U.S. 844 (1997) ...............................................................4, 9

*Snyder v. Phelps,*
  562 U.S. 443 (2011) .................................................................13

*Terminiello v. Chicago,*
  337 U.S. 1 (1949) .....................................................................14

*Texas v. Johnson,*
  491 U.S. 397 (1989) ...................................................................4

*Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.,*
   607 F.2d 1043 (2d Cir. 1979)...........................................................5, 6

*Tinker v. Des Moines,*
   393 U.S. 503 (1969) ............................................... 1, 3, 8, 12, 17, 18

*United States v. Stevens,*
   559 U.S. 460 (2010) .........................................................................4

*W. Virginia State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) .........................................................................5

*Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.,*
   494 F.3d 34 (2d Cir. 2007).............................................................17

**Other Authorities**

Alexa St. John & Douglas Glass, *High School Students, Frustrated by Lack of Climate Education, Press for Change*, Associated Press (May 8, 2024) ............7

Anna Turns, *Meet Generation Greta: Young Climate Activists Around the World*, The Guardian (June 28, 2019)..............................................................6

Chase DiBenedetto, *Nashville Gun Control Advocates Rally for Reform, Accountability, and Democracy*, Mashable (Apr. 7, 2023) .................................6

Claire Moses, *Louisiana Public School Principal Who Punished Student for Dancing Apologizes*, N.Y. Times (Oct. 10, 2023) .............................................19

David Gelles & Mike Baker, *Judge Rules in Favor of Montana Youths in Landmark Climate Case*, N.Y. Times (Aug. 14, 2023) ........................................6

Dharna Noor & Lois Beckett, *Youth Activists Win 'Unprecedented' Climate Settlement in Hawaii*, The Guardian (June 20, 2024).........................................6

Fortesa Latifi, *Shiva Rajbhandari, Idaho Teen Activist, Won Election to the Boise School Board*, Teen Vogue (Sept. 16, 2022) .....................................................7

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, The Verge (July 27, 2021) ......................................................................6

Laura Crossett, *Meet the Teenager Challenging Iowa's Anti-LGBTQ Legislation*, Truthout (Apr. 19, 2024) ........................................................................7

Lauren Feiner*, The Teens Lobbying Against the Kids Online Safety Act*, The Verge (Aug. 1, 2024) ........................................................................7

Mihir Zaveri, *'I Need People to Hear My Voice': Teens Protest Racism*, N.Y. Times (June 23, 2020) .................................................................6, 9

Oliver Laughland, *How the Parkland Students Took Over Guardian US*, The Guardian (Mar. 31, 2018) ......................................................................6

Perry Stein, *'Undocumented, Unafraid'.: DACA Recipients Storm the U.S. Capitol*, The Wash. Post (Nov. 9, 2017) ...................................................6

Press Release, ACLU Ohio, *ACLU Urges Shaker Heights High School to Reverse Decision to Punish Students for Free Speech* (Nov. 14, 2016) .........................19

Robby Soave, *High School Suspends 2 Students for Posting Gun Range Photos on Snapchat, ACLU Files Suit*, Reason (Apr. 11, 2019) ....................................19

# STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU has represented the students in all five of the Supreme Court's cases regarding student free speech, including *Mahanoy Area School District v. B. L. by & through Levy*, 594 U.S. 180 (2021) and *Tinker v. Des Moines*, 393 U.S. 503 (1969). As an organization committed to protecting the rights to freedom of speech, as well as students' rights to receive an education, the ACLU has a strong interest in the proper resolution of this case.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the ACLU certifies that no person or entity, other than the ACLU, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

**INTRODUCTION**

This case is about the authority of public schools to discipline young people for their speech outside of school—at church, during weekend protests, through op-eds in local newspapers, at home, or, as in this case, in an online Snapchat posted off campus. As the Supreme Court recently cautioned in *Mahanoy Area School District v. B. L. by & through Levy*—the Court's first case considering, and holding unconstitutional, a school's discipline of a student for off-campus, online speech—"courts must be more skeptical of a school's efforts to regulate off-campus speech[.]" 594 U.S. 180, 189–90 (2021). "[W]hen coupled with regulations of on-campus speech," such efforts reach "all the speech a student utters during the full 24-hour day," and applying in-school standards could "mean that . . . student[s] cannot engage in [certain] kind[s] of speech at all." *Id.*

Following *Mahanoy*, to determine whether discipline for off-campus speech violates the First Amendment, courts must engage in a two-step inquiry. First, they must consider the details of the student's speech: what they said (to determine whether the speech would be protected under ordinary First Amendment standards), and when, where, and how they said it (to assess whether those features diminish the school's interest in punishing the student for the speech). *Id.* at 190–91.

Second, courts must rigorously evaluate the school's asserted interest. They must consider whether the specific interest asserted can ever grant a school "license

to regulate [off-campus] student speech," and whether punishing the speech at issue was in fact narrowly tailored to furthering that interest. *Id.* at 188, 191–93. The inquiry cannot turn on the free-floating foreseeable-disruption standard that may justify discipline for in-school speech under *Tinker v. Des Moines*, 393 U.S. 503 (1969).

The court below erred in unquestioningly applying *Tinker* to the off-campus Snapchat post at issue in this case, notwithstanding *Mahanoy*. The post—a photograph of Appellant lying on the ground while his friend kneels over him, with the caption "Cops got another," posted the day before the jury returned its guilty verdict in Derek Chauvin's trial for the murder of George Floyd—appears to make light of police brutality, particularly against Black men. To be clear, school officials were right to offer students the space to "express their disagreement with the photos and the photos' connotations" and to devote class and assembly time to "discuss[ing] the photos, racism, insensitivity, and George Floyd." Op. at 5. They were also right to emphasize that "racism cannot and will not be tolerated" by the District. *Id.* In doing so, the school engaged in the "free exchange" of ideas that "facilitates an informed public opinion." *Mahanoy*, 594 U.S. at 190. But the school was wrong to suspend Appellant for his off-campus post, and the court below erred in upholding the punishment under a foreseeable disruption standard, thereby diluting the speech rights of all young people who attend public school.

This Court should reverse the court below and hold that *Tinker* is not the appropriate standard to apply when schools seek to regulate speech outside of school-supervised settings.

## ARGUMENT

## I.      YOUNG PEOPLE HAVE FIRST AMENDMENT RIGHTS.

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (cleaned up)). It is a bedrock principle that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), nor may it enact a "heckler's veto," suppressing speech because others might react negatively to it, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992).

These bedrock First Amendment principles apply "[e]ven where the protection of children is the object." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804–05 (2011) (invalidating regulation of violent video games for minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) (invalidating restriction on drive-in movies designed to protect children from nudity); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997) (invalidating statute

prohibiting indecent communications available to minors online). And they apply not only to what children can hear, but also to what they can say. *See Mahanoy*, 594 U.S. at 187.

Indeed, the fact that a speaker is young is reason not for the diminution of their rights, but "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Even when children are involved, "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.* at 641.

As *Mahanoy* reaffirmed, these principles apply with special force when it comes to schools—which, as "the nurseries of democracy," "have a strong interest" in educating our youth about, and preparing them for, a polity that values the free exchange of ideas. 594 U.S. at 190. They also have a strong interest in ensuring that people can participate in that exchange, even as children. If "the student is free to speak his mind when the school day ends[,] . . . the community is not deprived of the salutary effects of expression[.]" *Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1052 (2d Cir. 1979).

Young people are often at the forefront of movements, trends, and technologies, including through off-campus speech: commentary they post online,[2] news and op-ed articles they publish,[3] protests they attend in person,[4] and lawsuits they bring to vindicate their rights.[5] They have much to say about public policy that will impact them, from the hypothetical rallies "in support of laws against corporal punishment of children, or laws in favor of greater rights for minors" the Supreme Court discussed in *Brown*, 564 U.S. at 795 n.3, to gun control and school safety,[6] to the current onslaught of book bans and other policies framed as efforts to protect

---

[2] *See, e.g.,* Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, The Verge (July 27, 2021), https://perma.cc/Y357-B32S.

[3] *See, e.g.,* Oliver Laughland, *How the Parkland Students Took Over Guardian US*, The Guardian (Mar. 31, 2018), https://perma.cc/SZ2T-WPGW.

[4] *See, e.g.,* Perry Stein, *'Undocumented, Unafraid'.: DACA Recipients Storm the U.S. Capitol*, The Wash. Post (Nov. 9, 2017), https://perma.cc/3UYJ-SU92; Mihir Zaveri, *'I Need People to Hear My Voice': Teens Protest Racism*, N.Y. Times (June 23, 2020), https://perma.cc/72F9-87LK; Anna Turns, *Meet Generation Greta: Young Climate Activists Around the World*, The Guardian (June 28, 2019), https://perma.cc/NM6Q-GBBE.

[5] *See, e.g.,* David Gelles & Mike Baker, *Judge Rules in Favor of Montana Youths in Landmark Climate Case*, N.Y. Times (Aug. 14, 2023), https://perma.cc/35DD-29PL; Dharna Noor & Lois Beckett, *Youth Activists Win 'Unprecedented' Climate Settlement in Hawaii*, The Guardian (June 20, 2024), https://perma.cc/H8W2-NUNP.

[6] *See, e.g.,* Chase DiBenedetto, *Nashville Gun Control Advocates Rally for Reform, Accountability, and Democracy*, Mashable (Apr. 7, 2023), https://perma.cc/EJD2-SQ5Z.

children from unsuitable ideas and mediums,[7] while ignoring education they say they critically need.[8] "Our representative democracy only works if we protect the 'marketplace of ideas,'" which "facilitates an informed public opinion" and ultimately "helps produce laws that reflect the People's will," including young people. *Mahanoy,* 594 U.S. at 190.

Yet, if the court below is affirmed, what a young person says or advocates for outside of school could be the subject of school discipline if it so much as inspires classroom conversation, offends classmates, sparks debate on critical public issues—or simply has the potential to. *See* Op. at 16 (discussing facts justifying discipline in this case). Such speech often lies at the heart of First Amendment protection, and the fact that the speaker is under eighteen should not change that.

---

[7] *See, e.g.,* Lauren Feiner, *The Teens Lobbying Against the Kids Online Safety Act,* The Verge (Aug. 1, 2024), https://perma.cc/X9ZN-Z3HK; Laura Crossett, *Meet the Teenager Challenging Iowa's Anti-LGBTQ Legislation,* Truthout (Apr. 19, 2024), https://perma.cc/GRK4-LWSS; Fortesa Latifi, *Shiva Rajbhandari, Idaho Teen Activist, Won Election to the Boise School Board,* Teen Vogue (Sept. 16, 2022), https://perma.cc/4LUP-SJ7B.

[8] *See, e.g.,* Alexa St. John & Douglas Glass, *High School Students, Frustrated by Lack of Climate Education, Press for Change,* Associated Press (May 8, 2024), https://perma.cc/5338-HEUY.

## II. SCHOOLS DO NOT HAVE THE SAME AUTHORITY TO REGULATE STUDENT SPEECH ON AND OFF CAMPUS.

### A. *Mahanoy makes clear that schools cannot simply extend their in-school authority to off-campus speech.*

The court below held that *Tinker v. Des Moines*—which allows schools to punish students for in-school speech that merely has the potential to disrupt—applies with equal force to off-campus speech when "the impact of [the] speech spills into school grounds in a manner . . . instantaneous and significant." Op. at 18. In the Internet age—and the age of major news outlets, activists, and other Internet users opining on the online posts of schoolchildren—that is no limiting principle. Instead, it is a rule that exposes any potentially disruptive off-campus speech, particularly if it is uttered or circulated online, to punishment.

In *Mahanoy*, the Supreme Court explained that school officials cannot reflexively extend the rules justifying discipline for on-campus speech to speech uttered outside of the school environment, even where features of the speech "risk[] transmission to the school itself." 594 U.S. 180, 191 (2021). "[W]hen schools regulate speech that occurs under its supervision," they have "a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others,'" and that special interest can call for "special [First Amendment] leeway." *Id.* at 188 (quoting *Tinker*, 393 U.S. at 513). When it comes to "much off-campus speech," however, "the leeway the First Amendment

grants to schools in light of their special characteristics is diminished" for three reasons. *Id.* at 188–89.

First, "from the student speaker's perspective," if schools were able to regulate off-campus speech to the same extent as on-campus speech, young people who attend public school would never have the ability to speak freely. *Id.* at 189. They could never take a position that might be controversial, unpopular, or disruptive in their local community. As discussed above, that would not only rob them of their rights, but it would also deprive adults and other young people of the benefits of hearing from them. *Cf. Reno*, 521 U.S. at 874 (government cannot "suppress[ ] a large amount of speech that adults have a constitutional right to receive" in "order to deny minors access to potentially harmful speech").

Second, when "the expression takes place off campus," the school itself has a "strong interest" in "protecting a student's unpopular expression." *Mahanoy,* 594 U.S. at 190. This interest reflects an obligation to educate students in the civic virtues of free speech, and to do so by setting examples for students to follow. "America's public schools" bear the responsibility of teaching young people that "[o]ur representative democracy only works if we protect the . . . free exchange [of ideas]." *Id.* "That protection must include the protection of unpopular ideas, for popular ideas have less need for protection." *Id.* And what is popular in one school district, whether

that's support for gun control or disbelief in climate change, may be unpopular in another.[9]

Finally, "[g]eographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* at 189. To give schools the same power to regulate young people's speech when they are outside the school environment as they have inside that environment risks intruding on the parents' prerogative. A parent who chooses to bring her daughter to a Black Lives Matter march should not have to worry that the principal might deem the child's participation or speech there potentially disruptive at school, and therefore appropriately subject to discipline under *Tinker*.

Where these three features are present, *Mahanoy* directs, "the leeway the First Amendment grants to schools . . . is diminished" and "the speaker's off-campus location [can] make the critical difference[.]" *Id.* at 190. "When it comes to political or religious speech that occurs outside school . . ., the school will have a heavy burden to justify intervention." *Id.*

---

[9] Moreover, that a school cannot discipline a student for unpopular or offensive speech does not mean that it cannot educate students about the context, meaning, and impact of speech, or give students the ability to counter messages they disagree with, as the school in part did here.

**B.** *The Supreme Court's prior student speech cases—Tinker, Morse, Fraser, and Hazelwood—require the same result.*

*Mahanoy* applied the on/off-campus distinction present in the full body of the Supreme Court's analog student speech cases to the contemporary question of off-campus, online speech. As the Court explained in *Morse v. Frederick*, within the school environment, "schools may regulate some speech 'even though the government could not censor similar speech outside the school.'" 551 U.S. 393, 406 (2007) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)). In *Morse,* the Court upheld a school's discipline of a student for displaying a "Bong Hits 4 Jesus" banner, but only because he displayed it at "an approved social event or class trip" supervised by teachers "during normal school hours." 551 U.S. at 397, 400.

The Court drew this same line when upholding a school's authority to suspend a student for delivering a lewd speech at a "required" student assembly that was "part of a school-sponsored educational program." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 677 (1986). As the Court later noted, "had [the student] delivered the same speech in a public forum outside the school context, it would have been protected." *Morse*, 551 U.S. at 405.

And, even as it upheld a school's authority to regulate the content of a school newspaper produced as part of a "regular classroom activity" and "supervised learning experience" "during regular class hours" for which "[s]tudents received

grades and academic credit," the Court recognized that "the government could not censor similar speech outside the school." *Hazelwood*, 484 U.S. at 266, 268, 270. It expressly distinguished government efforts to control young people's speech in "streets, parks, and other traditional public forums." *Id.* at 267.

Finally, *Tinker* itself applied the "material disruption" standard only to speech within the schoolhouse gates, because of the "special characteristics of the school environment." 393 U.S. at 506. Outside of the school environment, schools cannot rely on in-school rules.

## III. EVEN WHEN A SCHOOL HAS THE AUTHORITY TO DISCIPLINE A STUDENT FOR OFF-CAMPUS SPEECH, *TINKER* IS THE WRONG STANDARD TO APPLY.

That schools have *less* authority to discipline students for off-campus speech does not mean that they have *no* authority to do so. *See Mahanoy,* 594 U.S. at 195 (Alito, J., concurring) ("The Court holds . . . that[ ] the First Amendment permits public schools to regulate *some* student speech that does not occur on school premises during the regular school day.") To determine when such discipline is proper, courts must engage in a multi-step inquiry—assessing both the specifics of the speech at issue and the interest asserted by the school—and the answer cannot turn on applying the *Tinker* standard.

**A.** *Courts must first assess the what, when, where, and how of the student's off-campus speech.*

In *Mahanoy*, the Supreme Court began by "consider[ing the student's] speech," asking whether the words "involve[d] features that would place it outside the First Amendment's ordinary protection." *Id.* at 190–91. After noting that, "while crude," the speech "did not amount to fighting words" and that, while "vulgar[, it] was not obscene," the Court held that it was "the kind of pure speech to which, were [the student] an adult, the First Amendment would provide strong protection." *Id.*

The Court then considered "when, where, and how [the student] spoke." *Id.* at 191. In that case, the Snapchat post "appeared outside of school hours from a location outside the school," "did not identify the school," did not "target any member of the school community with vulgar or abusive language," and was "transmitted . . . through [the student's] personal cellphone, to an audience consisting of [their] private circle of Snapchat friends." *Id.* "These features," the Court held "while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [the student's] utterance." *Id.*

The same is true here. While Appellant's post was ignorant and offended many in the school district, it did not cross the line into any form of unprotected speech. "[T]he First Amendment protects 'even hurtful speech on public issues to ensure that we do not stifle public debate.'" *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 461 (2011)). Indeed, "a function of free speech under our system of government

is to invite dispute" and it may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

And the off-campus timing and location of the post, as well as the facts that it neither targeted any member of the campus community nor relied on school resources for publication, "diminish[es] the school's interest in punish[ment]." *Mahanoy*, 594 U.S. at 191. The timing and location suggest it was "within the zone of parental . . . responsibility" and raise the specter of never allowing the student to freely air his views; the unpopular nature of the speech heightens the school's interest in allowing it. *Id.* at 189–90.

## B.   *Courts must also rigorously evaluate the school's asserted interest.*

After evaluating the student speech—and whether any of its features diminish the school's interest in punishment—courts must comprehensively assess the interest asserted by the school. *Id.* at 192. In particular, courts must consider whether the specific interest invoked by the school qualifies as the kind of "special characteristic" that can ever "give schools additional license to regulate student speech" off campus. *Id.* at 188, 191–93. And it must also consider whether the specific disciplinary response of the school is narrowly tailored to the asserted interest—an inquiry more directed at the specific interest the school invoked than *Tinker*'s "foreseeable disruption" standard. *Id.* at 191–93.

"[T]he special characteristics that give schools additional license to regulate student speech [do not] always disappear when a school regulates speech that takes place off campus." *Id.* at 188. Rather, specific "types of off-campus behavior . . . may call for school regulation"; these include "serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers." *Id.* A court must consider whether any such "type[] of off-campus behavior," or "special characteristic" of the school that remains relevant off-campus, is at issue.[10]

And that alone is not enough. It must also consider whether the discipline at issue in fact addressed the asserted government interest. For example, if the school

---

[10] *Mahanoy* refused to "deny the off-campus applicability of *Tinker*'s highly general statement about the nature of a school's special interests," 594 U.S. at 189, and that is no surprise. Of course, some subset of the school's "highly general" interest in preventing disruption *is* implicated by the examples of off-campus behavior the Court provided: bullying, harassment, threats, cheating, and unsecured school devices may all lead to disruption. But that does not mean that a school's general interest in preventing disruption is enough, on its own, to authorize punishment for off-campus speech, or that *Tinker*'s standard governs whenever a more precise special characteristic is implicated. Indeed, the Court refused to "set forth a broad, highly general First Amendment rule" for addressing school interests that extend off campus, *id.*, rejecting the idea, advanced by the school district in *Mahanoy,* that whenever a school's special interest in student speech is triggered off-campus, *Tinker* is the appropriate standard.

sought to punish a student for off-campus speech that it considered to be "serious or severe bullying or harassment"—something schools not only *can* address off-campus, but sometimes *must*, pursuant to their affirmative obligations under Title VI, Title IX, the Rehabilitation Act of 1973, and the Fourteenth Amendment—a court should ask not whether the speech could have foreseeably disrupted class, per *Tinker*, but instead whether it in fact constituted bullying or harassment. Similarly, if the school's discipline was motivated by concerns about off-campus cheating, the court should assess whether the speech at issue involved, incited, or facilitated cheating, not the broader category of foreseeable disruption.

That is the approach *Mahanoy* followed in assessing the school's asserted interests. In *Mahanoy*, the Supreme Court rigorously considered—and rejected— every articulation of a special characteristic that the school argued justified the discipline, from "teaching good manners" to preventing disruption in an extracurricular to protecting team morale, including by noting that the school failed to justify those interests as a factual matter. *See id.* at 190–93. The Court held that the school's asserted "interest in prohibiting students from using vulgar language to criticize a school team or its coaches," including "when that criticism might well be transmitted to other students, team members, coaches, and faculty," did not suffice to authorize the punishment at issue. 594 U.S. at 191. This was the case even when the school's interest was articulated as "trying to prevent disruption." *Id.* at 192.

While the Appellees may argue that *Mahanoy* itself applied *Tinker* to B.L.'s Snap and merely concluded that the discipline violated the First Amendment because the purported disruption failed to "meet *Tinker*'s demanding standard," *id.* at 193, that would misread *Mahanoy*. By engaging with the facts and not simply dismissing the asserted government interests, the Court did not bless any of those interests as proper. A school can no more discipline a student for off-campus speech merely because the speech causes disruption on campus than it can discipline off-campus speech because it fails to show good manners. Instead, under *Mahanoy*, an asserted interest must not only be valid off-campus, but the challenged discipline must in fact be narrowly tailored to it.[11]

---

[11] If the Court disagrees and concludes that a school's broad and nebulous interest in avoiding disruption is a valid "special characteristic" even when it comes to off-campus speech, it should at a minimum hold that *actual*, and not merely foreseeable, disruption is necessary to justify the punishment. *See Mahanoy*, 594 U.S. at 192 (assessing school's interest in "trying to prevent disruption" in terms of whether disruption actually occurred).

Moreover, the kinds of "disruption" asserted by the school here—the need to devote class time and an assembly to discussing racism, insensitivity, and current events, for example—cannot qualify as the requisite "disruption" in light of the *Mahanoy* Court's conclusion that "the school itself has an interest in protecting a student's unpopular expression" and engaging in the "exchange [of ideas]" necessary to "facilitate[] an informed public opinion[.]" 594 U.S. at 190. Requiring the replacement of a teacher, *see Doninger v. Niehoff*, 642 F.3d 334, 347 (2d Cir. 2011) (discussing disruption that justified discipline in *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007)), or audibly interrupting a school event, *id.* at 353, may well qualify as disruption. But a school cannot punish a student for forcing it to do its job. *Cf. Tinker*, 393 U.S. at 518 (Black, J., dissenting) (noting that majority held that students' black armbands were not

That is for good reason. Extending *Tinker*'s broad—and, in practice, content- and viewpoint-based—rule would fail to serve the school's interests and to protect young people's First Amendment rights. "Many courts have" understood *Tinker* as setting "a standard that allows schools considerable freedom on campus to discipline students for conduct that the First Amendment might otherwise protect." *Mahanoy,* 594 U.S. at 186. Allowing the same thing to happen off campus would ignore the lessons of *Mahanoy*—particularly when it comes to "political . . . speech that occurs outside school or a school program or activity." *Id.* at 190.

As this Court recognized in a set of hypotheticals in 1979, if *Tinker* "is to be the standard," it could lead to absurd and unwanted results: stores adjacent to high schools "could be punished by the Board of Education for selling [potentially disruptive publications] so close to the school," and "educators would . . . be permitted to fail a student in an English course for writing a scurrilous letter to the *New York Times*." *Thomas*, 607 F.2d at 1052 n.18.

The dangers are not merely hypothetical. In recent years, schools have sought to discipline students for posting the following online, outside of school hours and while off campus:

---

potentially disruptive in school even though "a casual reading of the record shows that this armband did divert students' minds from their regular lessons . . . to thoughts about the highly emotional subject of the Vietnam War").

- Criticism of another student for sending racist messages;[12]

- Photos depicting a weekend trip to a gun range, with guns that were legally purchased and properly permitted;[13] and

- A video of a 17-year-old girl dancing at a party over the weekend because she "wasn't living in the Lord's way."[14]

When faced with some speech, "[i]t might be tempting to dismiss [the] words as unworthy of the robust First Amendment protections discussed herein. But sometimes it is necessary to protect [even the despicable] in order to preserve the necessary." *Mahanoy*, 594 U.S. at 193. While we may hope that school officials will teach students the error of some of their views by doing their work as educators, they cannot teach through censorship. The nature of the speech here cannot justify diminishing the First Amendment's protection for all young people, which requires more than *Tinker*'s broadbrush standard for off-campus speech.

---

[12] Press Release, ACLU Ohio, *ACLU Urges Shaker Heights High School to Reverse Decision to Punish Students for Free Speech* (Nov. 14, 2016), https://perma.cc/8WH2-7NAZ.

[13] Robby Soave, *High School Suspends 2 Students for Posting Gun Range Photos on Snapchat, ACLU Files Suit*, Reason (Apr. 11, 2019), https://perma.cc/787K-7LKT.

[14] Claire Moses, *Louisiana Public School Principal Who Punished Student for Dancing Apologizes*, N.Y. Times (Oct. 10, 2023), https://perma.cc/W6HM-VNKN.

## CONCLUSION

For these reasons, this Court should reverse the court below and hold that *Tinker* does not govern schools' discipline of students for off-campus speech.

Dated: August 22, 2024

Respectfully submitted,

*/s/ Vera Eidelman*
Vera Eidelman
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this Brief of Amicus Curiae in Support of Plaintiff–Appellant and Reversal complies with the type-volume limitation, typeface requirements, and type style requirements of Federal Rule of Appellate Procedure 32 because it contains 4,610 words and has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2016.

Dated: August 22, 2024          By:   */s/ Vera Eidelman*
                                       Vera Eidelman

                                       *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

Dated: August 22, 2024            By: */s/ Vera Eidelman*
                                            Vera Eidelman

                                        *Counsel for Amicus Curiae*