# 24-1241-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



CASE LEROY,

*Plaintiff-Appellant,*

*v.*

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of
Schools of Livingston Manor Central School District,

*Defendants-Appellees.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR DEFENDANTS-APPELLEES

Steven C. Stern
Chelsea Weisbord
Mark A. Radi
SOKOLOFF STERN LLP
*Attorneys for Defendants-Appellees*
179 Westbury Avenue, 2nd Floor
Carle Place, New York 11514
516-334-4500


(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF THE ISSUES......................................................1

STATEMENT OF FACTS.............................................................3

    A.  On April 19, 2021, Appellant and Two of His Friends Posted
        a Photograph on Snapchat Mocking the Death of George
        Floyd, Prompting Angry Messages from the Public
        Characterizing the Photograph as Racist ..................................3

    B.  Starting on April 19, 2021 and Continuing Throughout the
        Week, the District Received a Flood of Emails and Phone
        Calls from Angry Students, Parents, and Members of the
        Community Complaining About the Racist Social Media
        Photos and Demanding Swift Action .......................................6

    C.  The Photos Circulating Social Media Not Only Yielded
        Angry Phone Calls from the Community; the Substantial
        Disruption to the School Took Many Other Forms
        Including Interruptions with Teacher Instruction, a Planned
        Student Protest, a Police Presence on School Grounds, and
        Media Inquiries and Attention ...............................................20

    D.  While Managing the Substantial Disruption to the Learning
        Environment, the District Also Commenced an
        Investigation on April 20, 2021 ............................................24

    E.  The District Hired an Attorney to Investigate the Matter and
        Provide a Report Regarding Potential Discipline ...................25

    F.  Based on the Investigator's Recommendation, the
        Superintendent Charged Plaintiff with Violating the Code
        of Conduct and Scheduled a Superintendent's Hearing ........27

G.  After the Superintendent's Hearing, the Hearing Officer Found Plaintiff Guilty of Two Charges and Recommended Additional Suspension; Superintendent Evans Adopted Her Findings and Included a Suspension from Extracurricular Activities ........................................................................28

SUMMARY OF ARGUMENT .........................................................................31

ARGUMENT .................................................................................................35

POINT I:     MAHANOY PERMITS SCHOOLS TO REGULATE OFF-CAMPUS SOCIAL MEDIA SPEECH IF IT CAUSES A SUBSTANTIAL DISRUPTION TO THE EDUCATIONAL ENVIRONMENT ...........................35

POINT II:    APPELLANT'S SNAPCHAT POST CAUSED A SUBSTANTIAL DISRUPTION TO THE EDUCATIONAL ENVIRONMENT ...........................44

POINT III:   THE COURT SHOULD NOT ENTERTAIN APPELLANT'S VIEWPOINT DISCRIMINATION AND HECKLER'S VETO ARGUMENTS THAT WERE NOT RAISED BELOW AND DO NOT APPLY .............................................................................49

A. The Claims Are Unpreserved for Appeal ...................................49

B. Viewpoint Discrimination is Inapplicable ................................50

C. Heckler's Veto is Inapplicable ..................................................55

POINT IV:    THE COURT SHOULD AFFIRM DISMISSAL OF THE CLAIMS AGAINST SUPERINTENDENT JOHN EVANS AS THEY ARE DUPLICATIVE OF APPELLANT'S CLAIMS AGAINST THE SCHOOL ................................................................................59

CONCLUSION ..............................................................................................60

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a) ................................61

ii

# TABLE OF AUTHORITIES

Cases                                                                              Page(s)

*A.M. ex rel. McKay v. Taconic Hills Cent. Sch. Dist.*,
    510 F. App'x 3 (2d Cir. 2013) ................................................................ 51

*Barr v. Lafon*,
    538 F.3d 554 (6th Cir. 2008) ................................................................ 52

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ............................................................................. 55

*Bey v. City of New York*,
    999 F.3d 157 (2d Cir. 2021) ................................................................ 50

*B.L. by & through Levy v. Mahanoy Area Sch. Dist.*,
    964 F.3d 170 (3d Cir. 2020) ................................................................ 37

*Bradford v. Norwich City Sch. Dist.*,
    54 F. Supp. 3d 177 (N.D.N.Y. 2014) ................................................... 39

*C1.G on behalf of C.G. v. Siegfried*,
    38 F.4th 1270 (10th Cir. 2022) ....................................................... 46, 47

*Chandler v. Tech. Coll. of Lowcountry*,
    2022 WL 2670806 (D.S.C. July 11, 2022) ......................................... 47

*Cheadle on behalf of N.C. v. N. Platte R-1 Sch. Dist.*,
    555 F. Supp. 3d 726 (W.D. Mo. 2021) ................................................ 42

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
    356 F.3d 197 (2d Cir. 2004) ................................................................ 42

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ............................................................................. 41

*Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*,
    677 F.3d 109 (2d Cir. 2012) ................................................................ 36

*Dariano v. Morgan Hill Unified Sch. Dist.*,
 767 F.3d 764 (9th Cir. 2014) ........................................................ 57, 58

*DeFabio v. E. Hampton Union Free Sch. Dist.*,
 658 F. Supp. 2d 461 (E.D.N.Y. 2009) ............................................. 36

*Defoe ex rel. Defoe v. Spiva*,
 625 F.3d 324 (6th Cir. 2010) ........................................................ 52

*Doe v. Pulaski Cnty. Special Sch. Dist.*,
 306 F.3d 616 (8th Cir. 2002) ........................................................ 39

*Doe v. Trump Corp.*,
 6 F.4th 400 (2d Cir. 2021) ............................................................ 49

*Doninger v. Niehoff*,
 527 F.3d 41 (2d Cir. 2008) ................................................. 36, 39, 43

*Eisner v. Stamford Bd. of Ed.*,
 440 F.2d 803 (2d Cir. 1971) ......................................................... 55

*Goldman v. Rio*,
 788 F. App'x 82 (2d Cir. 2019) .................................................... 49

*Greater New York Mut. Ins. Co. v. Burlington Ins. Co.*,
 2024 WL 1827249 (2d Cir. Apr. 26, 2024) .................................. 49

*Hardwick ex rel. Hardwick v. Heyward*,
 711 F.3d 426 (4th Cir. 2013) ........................................................ 52

*Hazelwood Sch. Dist. v. Kuhlmeier*,
 484 U.S. 260 (1988) ...................................................................... 55

*Heller v. Bedford Cent. Sch. Dist.*,
 665 F. App'x 49 (2d Cir. 2016) .................................................... 42

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*,
 650 F.3d 915 (3d Cir. 2011) ......................................................... 47

*Kristoffersson on behalf of R.R. v. Port Jefferson Union Free Sch. Dist.*,
  2023 WL 6119710 (E.D.N.Y. Sept. 18, 2023) ................................................ 50

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*,
  69 F.4th 350 (6th Cir. 2023) ................................................................................ 39

*L.M. v. Town of Middleborough, Massachusetts*,
  103 F.4th 854 (1st Cir. 2024) .............................................................................. 52

*LaVine v. Blaine Sch. Dist.*,
  257 F.3d 981 (9th Cir. 2001) .............................................................................. 36

*Locurto v. Giuliani*,
  447 F.3d 159 (2d Cir. 2006) ................................................................................ 57

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
  594 U.S. 180 (2021) ..................................................................................... Passim

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ................................................................................ 50

*Morse v. Frederick*,
  551 U.S. 393 (2007) ............................................................................................ 42

*Peck v. Baldwinsville Cent. School Dist.*,
  426 F. 3d. 617 (2d Cir. 2005) .............................................................................. 51

*Rodriguez v. City of Rochester*,
  624 F. App'x 16 (2d Cir. 2015) .......................................................................... 59

*Rutherford v. Fla. Union Free Sch. Dist.*,
  2019 WL 1437823 (S.D.N.Y. Mar. 29, 2019) .................................................. 59

*Singh v. Mem'l Sloan Kettering Cancer Ctr.*,
  2024 WL 4586396 (2d Cir. Oct. 28, 2024) ........................................................ 50

*Spence v. State of Wash.*,
  418 U.S. 405 (1974) ............................................................................................ 41

*Sullivan v. Houston Indep. Sch. Dist.*,
    475 F.2d 1071 (5th Cir. 1973) ................................................................ 39

*Taylor v. Roswell Indep. Sch. Dist.*,
    713 F.3d 25 (10th Cir. 2013) ................................................................. 58

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................ 41, 42

*Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.*,
    607 F.2d 1043 (2d Cir. 1979) ......................................... 39, 43, 47, 48

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .......................................................... 31, 32, 36, 52

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) ................................................................... 49

*Tripathy v. McKoy*,
    103 F.4th 106 (2d Cir. 2024) ............................................................... 49

*United States v. Gomez*,
    877 F.3d 76 (2d Cir. 2017) ................................................................... 49

*United States v. Joyner*,
    313 F.3d 40 (2d Cir. 2002) ................................................................... 33

*United States v. Keshner*,
    794 F.3d 232 (2d Cir. 2015) ................................................................. 50

*Wang v. Bethlehem Cent. Sch. Dist.*,
    2022 WL 3154142 (N.D.N.Y. Aug. 8, 2022) ............................... 47, 51

*West v. Derby Unified Sch. Dist. No. 260*,
    23 F. Supp. 2d 1223 (D. Kan. 1998) ................................................... 52

*Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*,
    494 F.3d 34 (2d Cir. 2007) ..................................................... 36, 37, 39

*Wood v. Strickland*,
   420 U.S. 308 (1975) ............................................................... 37

*Young v. Selsky*,
   41 F.3d 47 (1994) ................................................................... 5

*Z.F.X. by Vankesteren v. Riverhead Cent. Sch. Dist.*,
   2021 WL 1238842 (E.D.N.Y. Apr. 2, 2021) ....................... 59

*Zalewska v. Cnty. of Sullivan, New York*,
   316 F.3d 314 (2d Cir. 2003)................................................. 42

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
   636 F.3d 874 (7th Cir. 2011)............................................... 37

STATUTES

U.S. Const. amend. I ........................................................ passim

42 U.S.C. § 1983 ..................................................................... 1

42 U.S.C. § 2000d ................................................................. 51

N.Y. Educ. Law § 12............................................................. 51

N.Y. Exec. Law § 296(4) ...................................................... 51

## STATEMENT OF THE ISSUES

1.     Did the district court properly hold that under the *Tinker* standard, Plaintiff-Appellant's off-campus expressive activity was not protected under the First Amendment because it reasonably forecasted, and actually caused, a substantial disruption to the educational environment?

Yes. The district court answered this question in the affirmative and properly dismissed Appellant's 42 U.S.C. § 1983 First Amendment claim.

2.     Were Plaintiff-Appellant's viewpoint discrimination and "heckler's veto" claims preserved for appellate review when he never raised those theories of liability in the court below?

No. The Court may not consider Plaintiff-Appellant's new theories of liability raised for the first time on appeal. These arguments nevertheless fail on the merits because his speech reasonably forecasted, and actually caused, a substantial disruption.

3.     Should the district court have dismissed the claims against Defendant-Appellee John Evans because he was only named in his official capacity and therefore the claims against him were duplicative of those against Defendant-Appellee Livingston Manor Central School District?

Yes. The district court did not need to address this issue after dismissing the claims on other grounds. However, this Court should affirm dismissal of the claims

1

against Superintendent Evans on the ground that official capacity claims are duplicative of the claims asserted against the school district itself.

## STATEMENT OF FACTS

Defendant-Appellee Livingston Manor Central School District (the "District") is a school district located in Sullivan County. (A-34, ¶1; A-487, ¶1.) The District is small; there is one school building that houses grades pre-K through 12 and consists of approximately 420 students. (A-76; A-487, ¶2; A-472, ¶2.) There were approximately 200 students between the 7th and 12th grades (A-505, ¶101), and only about 40 students in Leroy's graduating class. (A-73.)

Defendant-Appellee John Evans is the Superintendent of Schools for the District, a position he has held since 2017. (A-472, ¶1.) Shirlee Davis was the Middle School and High School Principal from 2018 until her retirement in June 2022. (A-480, ¶1.) Christian Towsley is the High School Counselor, a position he has held since 2002. (A-484, ¶1.)

Case Leroy ("Leroy" or "Appellant") was a 12th grade student in the District during the 2020-2021 school year. (A-484, ¶2; A-487-88, ¶6.) Leroy used the social media app called Snapchat, and was Snapchat "friends," *i.e.,* connected via Snapchat, with most of the 40 students in his graduating class, or at least more than half of them, as well as students in other grades in the school. (A-73-74.)

**A. On April 19, 2021, Appellant and Two of His Friends Posted a Photograph on Snapchat Mocking the Death of George Floyd, Prompting Angry Messages from the Public Characterizing the Photograph as Racist**

On April 19, 2021, Leroy and his three friends, Students A, B, and C, staged

3

a photo shoot in a local parking lot. (A-198; A-289.) Leroy placed himself on the ground, with his head on its side, while Student B kneeled on top of him with his knee on Leroy's neck. (the "April 19 Photo"). (A-289; *see also* A-79-80; A-197-198; A-242.) Student A gave the "thumbs-up" and smiled, while Student B took the picture of the scene. (A-289; A-197; A-242.) Student B then sent the photo to the others via Snapchat. (A-93; A-243.)

All three students posted the April 19 Photo on their Snapchat stories shortly after it was taken. (A-105-06; A-210.) Leroy added a caption to his copy of the photo: "**Cops got another.**" He shared it to his Snapchat "story," meaning he transmitted it to the phones of all his Snapchat "friends"—between 60 and 100 people. (A-38, ¶17; A-97; A-101-02.) In doing so, he transmitted the photo to most of his graduating class and several other students at the High School. (A-72-74.)

Student A also posted the April 19 photo on his Snapchat story, but he added the caption: "**Another one down**" with a Black Lives Matter ("BLM") logo. (A291; *see also* A38, ¶18; A-108-09; A-276.) Student A acknowledged the reference to the George Floyd incident, and claimed he intended it to be a "joke" about George Floyd's death. (A-207-08; A-208-09.) Student B also shared the April 19 Photo on his Snapchat story, without a caption. (A-206; A-225; A-244; A-245.) He too knew the photo he and his friends had staged was similar to the photos taken of the George Floyd murder. (A-250-51; A-489, ¶ 22.)

4

 

The Court can take judicial notice that protests and riots broke out in the wake of the George Floyd incident. The day these boys posted the photo—April 19, 2021—it was common knowledge that a jury was deliberating in the trial of Derek Chauvin, the police officer who killed George Floyd. (A-473, ¶5; A-489, ¶23.) The jury returned a verdict the following day, April 20, 2021.

---

[1] The photo to the left is the April 19 Photo Leroy posted to his Snapchat stories. (A-289.) On the right is a photo of Derek Chauvin with his knee on the neck of George Floyd in the moments before Floyd's death. *See* Jordan Hayne, *Why Dereck Chavin Was Found Guilty of Both Murder and Manslaughter over George Floyd's Death*, ABC NEWS, https://www.abc.net.au/news/2021-04-21/derek-chauvin-murder-manslaugher-george-floyd-sentence/100083494 (last visited November 11, 2024). Although this photo was not part of the record, the Court may take judicial notice of this image that was broadcast around the world. *See e.g., Young v. Selsky*, 41 F.3d 47, 50-51 (1994) (under Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute") (internal quotations omitted).

5

After posting the photo, Leroy's phone started "blowing up" with messages from people who were threatening him and cursing him out about what he had posted. (A-116-18; A-126-27.) Student A received messages from people calling him names like "racist scumbag." (A-217.) While driving home, the students received negative and threatening comments as the April 19 Photo spread through various social media platforms, including Snapchat, Facebook, Instagram, and Twitter, and throughout the community. (A-128-29.) The students deleted the photos. Leroy and Students A and B were barraged with phone calls, and people showed up to their houses and Leroy's parents' places of employment. (A-213; A-491, ¶36.) Leroy was concerned he put his family's life in danger. (A-133.)

### B. Starting on April 19, 2021 and Continuing Throughout the Week, the District Received a Flood of Emails and Phone Calls from Angry Students, Parents, and Members of the Community Complaining About the Racist Social Media Photos and Demanding Swift Action

By 9:00 p.m. on April 19, emails complaining about racist and inappropriate photos of District students circulating social media began flooding Superintendent Evans and Principal Davis' inboxes and continued into the night. (A-473, ¶¶7-8; A-480-81.) Other District administrators and employees received similar emails. (A-473, ¶7; A-480, ¶3; A-484, ¶3; *see also* A-295; A-303-305; A-341-42; A-346; A356-61; A-367.)

6

Leroy had taken another photo that also circulated on social media with the April 19 Photo. (A-142-43; A144-45; A-147-48.) It showed one student holding another student of color over a desk in a classroom at Livingston Manor High School, with his hands behind his back (the "March 25 Photo"). (A-293; A-473, ¶6.) Leroy took the March 25 Photo of Students D and E during his first period English class. (A142-43; A-473, ¶6.)

District personnel, students, and community members immediately recognized the April 19 Photo was a reference to the events underlying the ongoing trial of Derek Chauvin for the murder of George Floyd in Minnesota. (A-473, ¶5; A-480, ¶2; A-485, ¶4; *see gen.*, A-294-374.) Members of the community contacted District officials, administrators, and other employees, to complain about the photos. (A-473, ¶¶7-8; A-480-81, ¶¶3-4; A-484, ¶3; *see gen.*, A-294-374.) They called the photos racist and disgusting; many identified Leroy by name as one of the students involved. (A-473, ¶¶7-8; A-480-81, ¶¶3-4; A-484, ¶3; *see gen.*, A-294-374.) Those emails not only criticized the students involved, but some criticized the District for tolerating the behavior and demanded the District take disciplinary action. (A-473, ¶8; A-480-81, ¶4; A-484, ¶3; *see also* A-298-301; A-307-19; A-327-42; A-345-67.)

At 8:47 p.m., a female student emailed High School English Teacher Jillian Hoag to report an "uncomfortable" post circulating on social media and attached the April 19 Photo. (A-295.) This student indicated she felt "posts like these make

7

students feel unsafe in their own school," and she asked her teacher to do something about it. (*Id.*)

At 8:52 p.m., a female student emailed Principal Davis calling the April 19 Photo "really inappropriate." (A-298-301.) The student commented that it seemed to come "from a place of hate," that it made her "extremely uncomfortable … [to] share a school with people who joke about black American deaths," and that she hoped there is "some type of castigation." (*Id.*) Principal Davis thanked the student for reporting the matter and indicated she would follow up on it the next morning. (A-298-301.) She then forwarded the email to Superintendent Evans and advised it was the fourth student who had sent her the photo. (*Id.*)

By 9:04 p.m., a female student emailed Principal Davis and Counselor Christian Towsley to report the photos were circulating on Snapchat and "offending people from multiple schools." (A-303-05.) Principal Davis responded to the student's email, thanking her for the information. (A-303-05.)

At 9:12 p.m., a female student emailed Principal Davis to complain about the "atrocious photo taken of two students by the name of Case Leroy and [Student A]." (A-307-08.) Her email continued:

8

> The photo shows Case lying on the ground with [Student A's] knee on his neck, with the caption "Cops got another." This photo is very obviously mocking the murder of George Floyd which is absolutely sickening to see by students of Livingston Manor. *All POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students in the attached photo. I am a firm believer LMCS is, and should remain, a safe and compassionate place for all of its students and staff. With that being said, in order to keep that environment*, it is in LMCS's best interest overall that the students in the attached photo are punished for absolutely disgusting, disturbing, and heartless actions. They will never understand what it was like for George Floyd's family and loved ones to lose their family member wrongfully at the hands of the law. I beg of you, on behalf of your POS students, and OC everywhere, take action toward this behavior. It is truly despicable. (*Id.* [emphasis supplied.])

This student attached a copy of Leroy's Snapchat post with his original caption "Cops got another," along with the following caption that appears to have been added by someone who re-posted the photo on social media: "Imagine making a ***** mockery of something very traumatizing that happened. You are both ***** disgusting." (A-307-08.) Principal Davis thanked the student for informing her of this and indicated she would investigate in the morning. (A-307-08.)

At 9:53 p.m., Superintendent Evans, along with eight other District administrators and employees, received an email from Stand Against Racism Education ("SARE") complaining about the photos that were circulating on social media, signed by "Members of Stand Against Racism in Education." (A310-11.) The email reads:

9

It has come to our attention that there are students from the Livingston Manor Central School District circulating pictures of themselves openly mocking the death of George Floyd who was a victim of police brutality. This is a disgusting display as the man who killed him is currently on trial. We have attached the pictures that we have seen. One of them appears to be taken on school property in a classroom. We have potential identifications of the students in the pictures: [Student A, Student B, Student D] and Case Leroy.

We are asking for your full attention to be given to this matter. *It is clear from this display that the culture of racism* spills from the home and *into school life and you are obligated to address it.*

We are asking for a swift and severe punishment. This display is outrageous and disgusting.

We are asking for a clear message from you all that this will not be tolerated by the school.

Signed,
Members of Stand Against Racism in Education. (*Id.*[emphasis supplied].)

Superintendent Evans indicated the school district administration was aware of the recent posts on social media, and that they would be thoroughly investigated and dealt with quickly and appropriately. (A-310-11.)

In addition to writing directly to the administration, SARE reposted Student A's photo with the caption: "Imagine saying that Livingston Manor has surpassed its dark history of being a Sundown Town with its own KKK chapter. Mind you, these kids are training for criminal justice. The further North you are in New York, the more Southern it gets." (A-332-36.)

10

At 10:12 p.m., a female student emailed Principal Davis to report the photos circulating on social media and attached a copy of Leroy's April 19 Snapchat post with the caption "Cops got another." (A-313-15.) She wrote:

> Although I never write emails concerning about what happens in the school especially when it comes to "drama" I think this is a complete [sic] different story. As you may know from the picture [Student A] and Case Leroy have made in my opinion a very inappropriate joke that should not be joked about and as someone who has faced discrimination and racism in her life I find this very disgusting and inappropriate because no matter the intention they still knew what they were doing and even had a smile on their face as they did it. *As a person of color who had often felt like I had to watch what I said around certain people in the school* because they might act hostile because of their opinions or views even though police brutality is not a political opinion/belief it is something that I feel strongly about and that many other people of color do as well and to see [Student A] and Case be able to smile and joke about it so freely hurts not only me but many other people as well especially since they will never feel or face the discrimination I have felt and might even face in the future is extremely disheartening to say the least even if they thought it was a "funny joke." *The post had made me feel like it came from a place of hatred and makes me feel unsafe* because at the end of the day these are people [sic] lives and should not be treated as a running joke. I genuinely hope you can see why this picture is extremely disrespectful to a person of color and I hope they have consequences to their actions. (*Id.* [emphasis supplied].)

Principal Davis responded in the same manner as she did to the prior emails. (A-313-15.)

At 10:50 p.m., another female student emailed Principal Davis. (A-317-19.) She commented she felt "strongly disgusted and sick" that Leroy and Student A

11

"thought to make fun and quote on quote joke about Gorge [sic] Floyds tragic death." (A-317-19.) Principal Davis informed the student she would investigate in the morning. (A-317-19.)

At 10:56 p.m., a male student emailed Principal Davis to complain about the social media posts. (A-321-26.) He also reported this "was not a one off event with Case and [Student A]," but that it "happens frequently" and that "so far this year [he] totaled close to 20 different incidents with this group making racist 'jokes' like this." (*Id.*)

At 11:09 p.m., an alumnus from a neighboring school district, Payton Powell, emailed Superintendent Evans and Principal Davis to report he came across "horrible and unacceptable pictures across many social media platforms" that "are very clearly mocking the death of George Floyd, and the Black Lives Matter Movement." (A-328-30.) He pointed out many people were aware of the social media posts. (*Id.*) The email continued:

> As someone who is part of this community, and has dedicated time and effort in supporting this community, this type of behavior is absolutely unacceptable and quite frankly, disgusting. *The people of color who attend schools in this county should feel accepted and safe.* These kids have made it public that they are condoning police brutality and racism. Making it public, like they have, is absolutely appalling. (*Id.* [emphasis supplied].)

Mr. Powell urged the District to take action: "Any child attending our schools in Sullivan County should feel safe, and accepted. Unfortunately, this is not the

12

case for Livingston Manor from that I have seen. This type of behavior that is being swept under the rug, is hateful. I do hope that I shed some light on a very serious issue in schools around this country." (A-328-30.) Superintendent Evans promptly thanked him for sharing his concerns, explained the District administration was aware of the posts, that they were investigating the matter, and that it would be handled promptly and appropriately. (A-328-30.) He also responded: "Both the LMCS and RCS administrations take matters like this very seriously. The health, safety and wellbeing of all of our students is very important to us and racist behavior has no place in our schools." (*Id*.)

At 11:44 p.m., Courtney Lambert, a parent of a 5th grade student in the District, emailed Superintendent Evans and Principal Davis to complain about "some disturbing pictures" she saw on social media. (A-332-36.) She indicated she was concerned for her daughter's safety and urged the District to take serious action against the students. (*Id*.) Superintendent Evans responded to Ms. Lambert's email to explain the District was aware of the social media posts and conducting an investigation, and that such behavior "is completely unacceptable and inappropriate in any setting and will be addressed." (A-332-36.)

Also at 11:44 p.m., another community member and former District student, Jaspreet Gill, emailed Superintendent Evans and Principal Davis to complaint about the photos circulating social media, referring to them as "disgusting, racist

13

behavior." (A-338-39; A-497, ¶68.) She recounted her past experiences with racism while attending the District as a student and urged the current administration to handle the matter differently:

> I know far too well the rampant racism that runs through Livingston Manor and that does not stop when you enter LMCS. When I was a student, no one was reprimanded for their racist insults and racial microaggressions toward me. I still remember it eight years later.
>
> As leaders of LMCS, I ask you not to let this behavior continue and hold those students, if they do attend your high school, accountable. Do not let your students of color down as my teachers and peers did. (A-338-39.)

In response to Ms. Gill's email, Principal Davis responded in a similar fashion to the prior emails. (A-338-39.)

At 12:15 a.m. on April 20, 2019, another community member, Balvina Garcia, emailed K-8 School Counselor Meagan Edwards to report Leroy's April 19 Post and the fallout from it, calling it terrorism that is "not justified on any level." (A341-42.) Ms. Garcia identified Leroy by name and commented his behavior was "unacceptable on every level that exists." (A341-42.) She further commented, "[T]his kind of mockery and behavior just promotes more and more hatred towards minorities and people of color. It's racism." Ms. Garcia asked the District to take action because such behavior "should not be tolerated and should be condemned." (*Id.*) Ms. Edwards forwarded this complaint to Superintendent Evans and Principal Davis. (*Id.*)

14

At 7:54 a.m., also on April 20, a female student emailed Principal Davis to complain about Leroy's April 19 post, which she attached to her own email. (A-344.) She indicated the photo mocking George Floyd's death was very disturbing and that she did not "feel comfortable being around classmates who happy [sic] make light of murder." (*Id.*)

At 7:55 a.m., community member Hannah Tuso emailed Superintendent Evans, Principal Davis, and High School Guidance Counselor Christian Towsley to complain about the photos which were brought to her attention "and the attention of almost everyone in Sullivan and Orange County." (A-346.) She wrote:

> I'm sure you've all been made aware, and I appreciate your time in reading this so that I can adequately express my deep level of concern and fear for our school.
>
> I know the history that our town has as a Sundown town. I am well aware of the legacy Livingston Manor has left as being intolerant and discriminatory toward minorities. I really hope that you all can find a way to act on this matter that facilitates growth and inclusivity: the people of color that attend our school deserve better than to see the blatant disregard for their lives being mocked on social media. Black people being killed by the police will never be a joke….
>
> As someone with a dead father, these posts did affect me very deeply. The dead people that these boys are mocking had a family. They were human beings, with hopes and dreams and passions. They didn't get to achieve all they had planned, and now their unjust death is being joked about by your students.
>
> *I strongly urge you to make our counselors available for anyone that may need them after seeing these posts. I hope that appropriate action is taken to demonstrate our school's*

15

*dedication to inclusivity and overcoming our history of discrimination.* (*Id.* [emphasis supplied].)

At 8:43 a.m., community member Grady Parks emailed Superintendent Evans to complain about the April 19 Post. (A-348-50.) He described this behavior as "absolutely disgusting" and an active display of racism that may make people of color uncomfortable, and he called for "some sort of disciplinary action" against the students involved. (*Id.*) Superintendent Evans thanked him for sharing his thoughts and concerns and explained the District was aware of the social media posts and conducting an investigation. (A-348-50.) Superintendent Evans added: "As a school district we take these matters very seriously. These behaviors have no place in our school and as a district, we are taking steps to address this important issue throughout our school community." (A-348-50.)

At 12:32 p.m., community member Sophia Xiomara emailed Superintendent Evans and Principal Davis to report racist posts by District students and identified Leroy by name. (A-352.) She wrote: "Acting in a way that picks fun at a murder or another human being is not a joke and cannot be brushed aside. Racist and hateful behavior cannot and will not be tolerated in our community. Our youth are the future of this country and it is up to their teachers and mentors to show them what is right and what is not." (*Id.*) Ms. Xiomara urged the District to "hold these students accountable and create policies that no longer condone any racist/hateful behavior from tis [sic] students or community members." (A-352.) Superintendent Evans

16

received a similar email ten minutes later from Mykenzi Williams. (A-354.) He responded to both emails to explain the District was aware of the social media posts and conducting an investigation, and that the District would not tolerate racism and he would take steps to address that with the school community. (A-352; A-354.)

At 1:20 p.m., Dylan Parks emailed Superintendent Evans, Principal Davis, Guidance Counselor Danielle Dalcero, Counselor Towsley, and District Clerk Jane Mann to complain about the reenactment of "the murder of George Floyd at the hands of Derek Chauvin." (A356-61.) He described this behavior as "repulsive," "abhorrent," "nauseating," "unacceptable," and racist. (*Id*.) He asked that the students be held accountable for their actions and identified Leroy by name. (A356-61.) Mr. Parks indicated he had contacted the NAACP and was reaching out to the Director of Health and Human Services for Sullivan County. (A356-61.) Superintendent Evans explained that the District was aware of the posts, was conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (A356-61.) He assured Mr. Parks the District was taking the matter very seriously and that racism would not be tolerated by the District. (*Id.*)

At 1:40 p.m., community member Maritza Joya emailed Superintendent Evans and Principal Davis to advise she "came across disturbing photos of some [ ] students mocking/posing in a way that is very disrespectful to the BIPOC+

17

community." (A363.) Her email continued:

> Acting in a way that picks fun at a murder over another human is not okay. This act is racist and hateful in every type of way. This can not [sic] be tolerated with in [sic] our community. You people as a district need to hold your students accountable for their actions. I truly hope that you will do right and hold them accountable for their behavior.
>
> This community is depending on you to make this right. (*Id.*)

Superintendent Evans explained that the District was aware of the posts and conducting an investigation, and that all cases involving student discipline are confidential and cannot be discussed. (A-363.) He assured Ms. Joya the District was taking the matter very seriously, that all students involved would be held accountable, and that racism would not be tolerated by the District. (*Id.*)

At 9:52 p.m., Kelsie Nolan emailed Superintendent Evans and Principal Davis to report "abhorrent behavior" by District students. (A-365.) She wrote:

> I am ashamed and embarrassed to have any association with a town where people are allowed to behave in such a way as displayed online. If they are willing to post such egregious, horrifying, racist things online, I can only imagine what is said in private and even in school amongst friends. I have heard several reports of people saying these particular three kids have a pattern of saying antisemitic, homophobic, and obviously racist things….
>
> These 3 students are displaying sociopathic tendencies mixed with classic small town racism veiled as ignorance. It is clear *you all on the administrative level are not doing enough to prevent racism* and the intense level of moronic behavior displayed here. If this is a repeated problem that is being handled by shunning kids reporting it, *you are all failing in*

18

*shaping the next generation.* It is lazy and unethical to continue to allow these students to bully, harass, and demean other students, God help the word if these 3 even dream of working in law enforcement. (A-365.)

Ms. Nolan called for: (1) swift severe action against these students, (2) an anti-racism education for all students and faculty; and (3) a plan as to how to properly punish and re-educate students who display racist, homophobic, or anti-Semitic rhetoric or action in the future. (A-365.) Superintendent Evans responded as he did to the prior emails. (A-365.)

At 11:24 p.m., Catherine Skalda emailed Superintendent Evans, Principal Davis, and High School Guidance Counselor Christian Towsley to report "disturbing photos" that a group of students posted on social media. (A-367.) She requested the District address the matter appropriately (*Id.*) Superintendent Evans responded as he had to the other emails. (A-367.)

On April 21, Elena Haskins emailed Superintendent Evans and Principal Davis to report "disturbing behavior" from District students and identified Leroy by name. (A-369-71.) She reported that images were circulating social media, and she described them as "extremely disrespectful and mocking a devastating and racist murder." (*Id.*) Superintendent Evans responded as he did previously. (A-369-71.)

Jay Quintance, the President of SUNY Sullivan Community College, emailed Superintendent Evans to report the incident, and identified Leroy by name.

19

(A-373-74.) Mr. Quintance inquired as to whether any of the students involved had visited his campus and what consequences they would face for their "disgusting display of hate." (*Id.*)

Superintendent Evans and Principal Davis responded to most of the emails they received, which took time away from their regular District operations. (S*ee gen.*, A-472-79.)

### C. The Photos Circulating Social Media Not Only Yielded Angry Phone Calls from the Community; the Substantial Disruption to the School Took Many Other Forms Including Interruptions with Teacher Instruction, a Planned Student Protest, a Police Presence on School Grounds, and Media Inquiries and Attention

On the evening of April 19, Superintendent Evans and Principal Davis discussed the emails they had received, the comments and threats posted on social media, and safety concerns in their school. (A-472-73, ¶9; A-481, ¶7; *see also* A-272-73.) For the safety of the students involved, they requested Leroy and the others not come to school the following day, but requested they come in to be interviewed in connection with the investigation. (A-472-73, ¶9; A-481, ¶¶7-8; *see also* A-134-135; A-167-68; A-183-84; A-185; A-223-24; A-228; A-272-73; A279-80.)

The photos were widely disseminated throughout the community, and a major topic of discussion throughout the school day, including during class time. (A-278; A-474, ¶13; A-481-82, ¶9; A-485, ¶5.) Students discussed the photos both during and in between classes. (A-278; A-474, ¶13; A-481-82, ¶9; A-485, ¶5.) High school

staff and teachers felt compelled to hold discussions with students in their classrooms about the social media posts, which interrupted their regular periods of instruction. (A-474, ¶13.) District administrators were approached by multiple staff members who requested to know how the District planned to respond to the unrest created by the photos. (A-474, ¶13; A-481-82, ¶9.)

District administrators also learned of a student protest, which students planned to livestream during the school day and on school grounds to express their disagreement with the images on social media and their connotations. (A-278; A-474, ¶14; A-482, ¶10; A-485, ¶6.)

In response to the disruption, as well as the concerns expressed to District administrators and staff, the administrative team planned and coordinated an assembly for students in grades 7-12 in the gymnasium of the school to address the photographs and the resulting disruption. It was attended by all 7-12 grade students, teachers, guidance counselors, and administrators who were in the building that day (April 20, 2021). (A-474, ¶15; A-482, ¶11; -485, ¶7.)

Superintendent Evans purposefully scheduled the assembly at the same time as the planned student protest to avoid the disruption he anticipated it would create and to prevent students from leaving school grounds, which would have created further security and safety concerns. (A-278; A-474-75, ¶16.)

Although District officials believed the assembly was necessary under the

circumstances, it still interrupted approximately 200 students' class schedules and interfered with Middle School and High School teachers' ability to provide instruction to their students. (A-474-75, ¶16.)

During the assembly, Superintendent Evans informed the students that the District was aware of the posts, was taking the matter seriously and working to address racism, that an investigation was occurring, and that student discipline is a confidential matter that cannot be discussed. (A-278-79; A-474, ¶17; A-482, ¶12; A-485, ¶8.) District administrators also informed students that school counselors would remain available for anyone who needed counseling in relation to the circulation of the photos. (A-574, ¶17.)

After the assembly, some students held a demonstration in the gymnasium: they knelt for nine minutes to symbolize the nine minutes Derek Chauvin held his knee on the neck of George Floyd until he died—the incident that Leroy and his friends had mimicked. As the demonstration required student supervision, Mr. Towsley remained in the gymnasium with the students to supervise it. (A-574, ¶18; A-485, ¶8; A-505, ¶105; *see also* A-279.) This also caused a disruption to these students' schedules. (*Id.*)

After the demonstration ended, the remaining students relocated to the school's health room where they engaged in a discussion about the photos, racism, insensitivity, and George Floyd. (A-485, ¶ 9.) Mr. Towsley supervised this follow-

22

up discussion while other District personnel patrolled the hallways. (*Id.*) New York State Trooper and law enforcement officers from the Sheriff's Department remained on school grounds throughout the day, which prompted further inquiries from concerned parents. (A-74, ¶19.)

Also on April 20, Superintendent Evans released an official statement to the school community, which he posted on the District's website. He indicated the District was aware some students had posted inappropriate photos and comments on social media, and that the District takes such matters very seriously. He explained that the District was investigating the matter but all cases involving student discipline are confidential and cannot be discussed. Evans also apologized on behalf of the District for the student behavior and stated that "racism cannot and will not be tolerated" by the District. (A-376; A-475-76, ¶20.) Superintendent Evans felt compelled to address the school community directly given the large number of complaints the District received from students and parents. (A-475, ¶ 20.)

By April 21, 2021, a News12 story broke about the photos, which prompted various requests by the media to the District, further interrupting its operations. In May 2021, the District held two days of training regarding implicit bias. (A-478-79; A-507, ¶114.)

**D. While Managing the Substantial Disruption to the Learning Environment, the District Also Commenced an Investigation on April 20, 2021**

On April 20, 2021, Superintendent Evans and Principal Davis began an investigation. (A-476, ¶22; A-482, ¶13.) They interviewed several students (in the presence of their parents/guardians), including Leroy, Student A, and Student B, who all claimed the posting was a joke. (A-476, ¶23; *see also* A-207-08; A-275; A-406; A-409; A-411; A-419.)

Leroy and his father, Gordon Leroy, met with Superintendent Evans and Principal Davis in Evans' office. (A-476, ¶23; *see also* A-169-70; A171-72.) Leroy admitted to posting the April 19 Photo as a joke. (A-275; A-406; A-419; A-476, ¶23.) Superintendent Evans explained the issue was very serious, it was viewed as racist, and it caused a significant disruption throughout the school district. He also advised Leroy would receive a letter suspending him for five days and that he may have to undergo a Superintendent's hearing. (A-407; A-476, ¶24.)

Superintendent Evans and Principal Davis also interviewed Student A. (A-64; A-476, ¶22.) Student A informed them he had added the BLM Logo. (A-207; A-276; A-419; A-476, ¶¶22, 25.) Student B said Student A posted the photo with the BLM logo, and that he and Leroy re-posted the photo afterwards. (A-411-12; A-476, ¶26.)

On April 21, 2021, Leroy was suspended from school for five days. (A-380; A-477, ¶28.)

### E. The District Hired an Attorney to Investigate the Matter and Provide a Report Regarding Potential Discipline

On April 21, the District hired attorney Bethany Centrone (legal counsel for Capital Region BOCES) to investigate the matter. (A-383; A-477, ¶29.) She interviewed Superintendent Evans, who stated addressing the posts had been all consuming and he had to work to ward off a student protest against the posts (A-383-86.) She learned from interviewing students that since the Snapchat posts were uploaded "everyone has been talking about it" and it was interfering with the ability to do their schoolwork. (A-386-87.)

On April 23, 2021, Centrone issued a report that concluded there was sufficient evidence to determine Leroy engaged in behaviors that violated the Code of Conduct. (A-382-90; A-477, ¶30.) She determined the following Code of Conduct provisions were implicated:

> Article Vl(A-)(5) - Engaging in any willful act which disrupts the normal operation of the school community.
>
> Article IV(C)(3) - Display or use of personal electronic devices ... in a manner that is in violation of district policy.
>
> Article IV(E)(4) - Discrimination, which includes using race, color ... to deny rights, equitable treatment or access to facilities available to others.
>
> Article IV(E)(5) - Harassment, which includes a sufficiently severe action... directed at an identifiable individual or group which [is] intended to be, or which a reasonable person would perceive as ridiculing or demeaning. Harassment is also the creation of a hostile environment.

25

> Article IV(H) - Engage in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function.

(A-388-89.)

Centrone's report also set forth her investigatory findings. (A-389.) She found Leroy admitted to being involved in the wrongful conduct and, at a minimum, had asked Student B to send him the photo so he could post it. (*Id.*) She noted: "It is clear from the reaction of the community to the posts that a reasonable person would perceive the post as ridiculing or demeaning. While the students stated that they intended the posts to be funny or a joke, by their nature, the posts are targeted at African Americans and are discriminatory." (A-389.)

Centrone found Superintendent Evans' description of the disruption he was required to address following the posting of the photos "sufficiently demonstrates that the educational process has been substantially disrupted since April 19, 2021." (A-389; A-510, ¶131.)

Centrone concluded her "investigation revealed sufficient evidence to determine the students engaged in behaviors that violated the District's Code of Conduct." (A-390; A-477, ¶30.) Accordingly, she recommended the students be referred to a Superintendent's hearing to determine if additional discipline was warranted. (A-390; A-477, ¶30.)

26

**F. Based on the Investigator's Recommendation, the Superintendent Charged Plaintiff with Violating the Code of Conduct and Scheduled a Superintendent's Hearing**

Based on the recommendation from Centrone, Superintendent Evans charged Leroy with Code of Conduct violations for "posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which have resulted in a substantial disruption to the school environment." (A-456-57; A-477, ¶31.) The charges were consistent with those Centrone recommended in her investigation report.  (A-388-389; A-456-57.)

A Superintendent's hearing was scheduled for April 27, 2021, and Kate Reid served as a Hearing Officer. (A-456-57; A-477, ¶¶31-32.) Leroy voluntarily testified under oath during the hearing. (A-149; A-152; A-477-78, ¶33.) He admitted he was in the April 19 Photo, and that he posted it on social media with the caption "Cops got another." (A-261.) He admitted he took the March 25 photo during his first period English class. (A-264-65.) And he admitted he understood why the statement was insensitive and may have been perceived that way. (A-152; A-268.)

Superintendent Evans testified. When asked about disruption, he explained that he and other District employees received a flurry of emails and communications from staff, students, community members, and people outside of the community. (A-278.)

27

**G. After the Superintendent's Hearing, the Hearing Officer Found Plaintiff Guilty of Two Charges and Recommended Additional Suspension; Superintendent Evans Adopted Her Findings and Included a Suspension from Extracurricular Activities**

On April 28, 2021, Hearing Officer Reid issued a *Findings of Fact and Recommendation*, in which she memorialized her findings and recommended Leroy be suspended through May 21 with the option to return early on May 10 if he signed a student contract. (A459-62; A478, ¶¶34-35.) She considered the disruption the photographs caused to the school environment. (A459-62.)

In her Findings of Fact and Recommendation, the Hearing Officer concluded:

> The Superintendent testified in great detail regarding the disruption to the school environment created by both of the pictures posted by Case on social media. The posts drew significant attention from the news media (both television and newspaper) and the community that necessitated considerable response from the Superintendent and the Building Principal. The Superintendent needed to intervene because students at the Middle/High School planned a demonstration to protest the posts, which they uniformly perceived as racist. The postings necessitated that the Superintendent schedule an assembly for students in grades 7-12 to explain that the District was taking the matter seriously and working to address racism in the District. All told, the posts resulted in substantial interruptions in instruction and required substantial attention and intervention by multiple school administrators.

(A459-60.)

Based on those findings, the Hearing Officer found the District sustained its burden regarding Charges 1 and 5 by providing competent and substantial evidence demonstrating two Code violations. (A-460; A-478, ¶34.) She determined:

28

> Any reasonable person would construe the content of both photos as racially insensitive, particularly in light of the close proximity between the posting of the photos and the Derek Chauvin trial. Case's professed ignorance of the trial and the connotations of the photo do not excuse his actions. Any reasonable student of Case's age and maturity should have been aware that the photos would be construed as a racially insensitive mockery of the murder of George Floyd. *Case either knew or should have known that posting this picture would create a substantial disruption of the school environment.*

(A-460 [emphasis added].)

The Hearing Officer also concluded that Superintendent Evan's testimony "established Plaintiff's actions resulted in multiple days of disruption to the school district; considerable interruptions in instruction; [and] great distress on the part of multiple students and community members." (A-460.)

The Hearing Officer notably determined Leroy's actions "resulted in allegations that the District, itself, was condoning racism" and that "[t]hese allegations have harmed the District's relationship with its community and will need to continue to be addressed by the District's administration, long after the conclusion of this hearing process." (A-460.)

After reviewing the Hearing Officer's recommendations and the full hearing record, Superintendent Evans accepted the Hearing Officer's findings and suspended Leroy for a period of instruction through May 21, 2021, and from non-academic, extracurricular activities, for the remainder of the school year. (A-464-65; A-478, ¶36; A-513, ¶152.) He permitted Leroy to return from suspension on

29

May 10, 2021, after he signed a contract of conduct. (A-464-65; A-478, ¶37.)

Leroy appealed Evans' decision to the Board, which affirmed it. (A-478, ¶38.) The next step would have been to appeal the Board's decision to the Commissioner of Education, but Leroy never took this step; instead he filed a lawsuit. (A-478, ¶39.)

Leroy was permitted to attend the high school graduation, after obtaining injunctive relief from Judge Julian Schreibman of the New York State Supreme Court, County of Sullivan. (A-35, ¶4; A-159.)

## SUMMARY OF ARGUMENT

> Conduct by a student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is not immunized by the constitutional guarantee of freedom of speech.

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 186 (2021) (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)).

*Mahanoy* absolutely left open a school's right to discipline students for off-campus speech. While that right may be diminished because of the forum in which it takes place, the use of social media brings outside speech into the school, blurring the on-campus/off-campus distinction. When Leroy broadcast his racist "joke" to the majority of his classmates, it instantaneously and effectively transmitted through the schoolhouse gate.

Appellant erroneously relies on the concurring opinion in *Mahanoy*, which far more narrowly circumscribes a school's right to regulate off-campus speech than the majority holding. *Id.* at 188 ("The school's regulatory interests remain significant in some off-campus circumstances."). The Court's majority unquestionably rejected the Third Circuit's rigid prohibition on regulation of off-campus speech, and it left open for other courts to decide the various ways in which "ordinary First Amendment standards must give way off campus to a school's special need to

31

prevent, *inter alia*, a substantial disruption of learning-related activities or the protection of those who make up a school community." *Id.* at 189 ("Neither do we now know how such a list might vary, depending upon a student's age, the nature of the school's off-campus activity, or the impact upon the school itself.").

The cursing cheerleader in *Mahanoy* engaged in speech that criticized "the rules of [her] community." *Id.* It was not "obscene," and it did not cause "the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action." *Id.* at 192 (citing *Tinker*, 393 U.S. at 514).

This case is different. Leroy staged a re-enactment of the infamous execution of a Black man and disseminated it to the majority of his high school class through social media, with the caption, "Cops got another." He did not do it to make any lofty political statement; it was a "joke."

Leroy's post not only went instantly viral in the community, it immediately arrived on the doorstep of the school. Within hours, the administrators and teachers were flooded with emails complaining about racism in the school district, concerns about safety, fears, and calls for action. The barrage of emails, phone calls, and text messages continued into the next day from concerned and angry students, parents, community members, and local organizations. The safety and security threat was so grave that it required the presence of New York State and local law enforcement

32

throughout the day. Leroy and the other boys were compelled to remain at home for their safety. Discussions among students and faculty interrupted classroom instruction. Students planned to livestream a protest and then held a sit-in. The Superintendent was compelled to hold an impromptu assembly. Students required counseling. Then the media brought significantly more attention to the matter, and the disruptions continued throughout the remainder of the year. *Tinker* and *Mahanoy* allow schools to regulate speech that causes such a substantial disruption in school. If there is a case for substantial disruption, this is it.

The Court should disregard Leroy's viewpoint discrimination claim, which was never raised below and unpreserved for appellate review. Regardless, this new theory of liability fails as Leroy's actions and his dissemination of offensive material was the cause of the disruption; the outrage by others was the effect. Such viewpoint-based claims are a poor fit for the school environment, particularly here where teaching tolerance and respect are fundamental to the educational mission. So too, Appellant's unpreserved "heckler's veto" argument (based on the *Mahanoy* concurrence and not the holding) does not apply in the school context, as *Tinker* and *Mahanoy* permit regulation based on the disruption caused by the student's speech.

Appellant abandoned his previously-asserted claims for violations of state constitutional law and defamation, and for injunctive relief. (SPA-10, 19-20.) "An argument not raised in an appellate brief is deemed abandoned and lost." *United*

*States v. Joyner,* 313 F.3d 40, 44 (2d Cir. 2002). This Court should also affirm the dismissal of the official capacity claim against John Evans, since it was duplicative of the claim asserted against the District itself.

# ARGUMENT

## POINT I: *MAHANOY* PERMITS SCHOOLS TO REGULATE OFF-CAMPUS SOCIAL MEDIA SPEECH IF IT CAUSES A SUBSTANTIAL DISRUPTION TO THE EDUCATIONAL ENVIRONMENT

The rubric set forth in *Mahanoy* compels the conclusion that Leroy's discipline did not violate the First Amendment. In *Mahanoy*, a student who did not make the varsity cheerleading squad posted a photo on Snapchat in which she raised her middle finger with the caption, "Fuck school fuck softball fuck cheer fuck everything." *Mahanoy*, 594 U.S. at 185. The photo eventually reached school staff, who suspended her from cheerleading because the posts used profanity in connection with a school extracurricular activity and therefore violated team and school rules. *Id.*

Although the Court held the school violated the First Amendment under that limited circumstance, it recognized a "school's regulatory interests remain significant in some off-campus circumstances." *Id.* at 188. The Court declined to set any bright-line rule and left it for "future cases to decide," as the specific facts merely provided "one example" of when a school may not discipline for off-campus speech. *Id.* at 190. The Court weighed the student's free speech rights against the school's interest in teaching good manners and punishing the use of vulgar language, and decided the student's speech outweighed the school's regulatory interest in that instance. *Id.* at 189-90. While the Court found that schools have a "diminished" right

35

to regulate off-campus speech, the holding was decidedly premised on the absence of any evidence that the speech "caused substantial disruption of learning-related activities or the protection of those who make up a school community." *Id.* at 189.

The application of *Tinker's* substantial disruption standard to this case is not circumscribed by the Supreme Court's restricted holding in *Mahanoy*. *See Tinker*, 393 U.S. at 513. Under *Tinker*, discipline for student speech must be caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.,* 494 F.3d 34, 38 (2d Cir. 2007). But discipline is warranted where student conduct would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 508, 511–14; *see also Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 112–13 (2d Cir. 2012). Courts recognize that school administrators should be given leeway to address any potential disruption before it manifests itself, and "under *Tinker*, it is the objective reasonableness of the school administrators' response, rather than the student's private intentions, that are relevant." *Cuff ex rel. B.C.*, 677 F.3d at 114.

"The question [under *Tinker*] is not whether there has been actual disruption, but whether school officials 'might reasonably portend disruption' from the student expression at issue." *Doninger v. Niehoff,* 527 F.3d 41, 51 (2d Cir. 2008) (citing *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001); *DeFabio v. E.*

*Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 481 (E.D.N.Y. 2009), *aff'd,* 623 F.3d 71 (2d Cir. 2010)).

In the context of *Tinker*'s substantial disruption test, "School authorities are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission, because they have the relevant knowledge of and responsibility for the consequences." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877–78 (7th Cir. 2011). In this vein, this Court has always been mindful that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *See Wisniewski,* 494 F.3d at 40 (quoting *Wood v. Strickland,* 420 U.S. 308, 326 (1975)).

Appellant reads the *Mahanoy* holding too narrowly. The *Mahanoy* holding did not wipe out these fundamental principles of school First Amendment jurisprudence, nor did it eliminate a school's ability to discipline off-campus speech that causes a material and substantial disruption to school operations. The district court correctly held that the fact that Leroy's speech occurred off campus is relevant to his First Amendment claim. But it is not dispositive.

The Third Circuit in *Mahanoy* held as a matter of first impression that *Tinker* does not apply to off-campus speech and therefore did not justify punishing the student. *See Mahanoy*, 964 F.3d 170, 191 (3d Cir. 2020), *aff'd but criticized*, 594

U.S. 180 (2021). Although the Supreme Court affirmed the finding that the school district violated the student's First Amendment rights by disciplining her for her off-campus social media rant, it categorically rejected the notion that *Tinker* can never apply to off-campus speech. *Id.* at 188. On the contrary, the Court found "the school's regulatory interests remain significant in some off-campus circumstances." *Id.* Those circumstances include the type of substantial disruption to school activity that satisfies *Tinker*'s demanding standard. *Id.* at 192–93. Thus, while the school's discretion to regulate speech is "diminished" when speech takes place off campus, the Court unequivocally rejected the Third Circuit's notion that "the special circumstances that give schools additional license to regulate student speech always disappear" when the speech takes place outside of school. *Id.* at 188.

While the *Mahanoy* Court identified some examples of off-campus speech in which the school's regulatory interests remain "significant," the Court noted the list was compiled by the parties and the *amici*, and was by no means exhaustive. *Id.* at 189. The Court explicitly declined to circumscribe the situations when schools may regulate off-campus speech:

> Thus, we do not now set forth a broad, highly general First Amendment rule stating just what counts as "off campus" speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a school community.

*Id.*

Notably, courts permit schools to regulate off-campus speech that involves bullying, harassing, targeting, or threatening particular students or teachers who happen to attend the same school. *See id.* at 188; *see also Wisniewski,* 494 F.3d at 38; *Doninger*, 527 F.3d 41; *Bradford v. Norwich City Sch. Dist.*, 54 F. Supp. 3d 177 (N.D.N.Y. 2014). This is necessarily because the targeting of individuals is likely to cause a substantial disruption to the school. *See, e.g., Wisniewski*, 494 F.3d at 39 ("We have recognized that off-campus conduct can create a foreseeable risk of substantial disruption within a school.") (citing *Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1052 (2d Cir. 1979); *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 625 (8th Cir. 2002); *Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1075 (5th Cir. 1973); *J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.*, 757 A.2d 412, 421 (Pa. Commw. Ct. 2000), *aff'd*, 569 Pa. 638, 807 A.2d 847 (2002)).

In *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350 (6th Cir. 2023), the plaintiff created a fake Instagram account in which he and his friends impersonated one of their teachers. They added graphic, harassing and threatening content. *Id.* at 354. Since the plaintiff "bore some responsibility for the speech and the speech substantially disrupted classwork (or Defendants reasonably believed the speech would disrupt classwork)," the court held the defendants could discipline the student for the off-campus speech. *Id.* at 358.

39

The principle that ties these cases to *Tinker* is the likelihood that bullying or harassing an individual who happens to attend the same school may lead to a substantial disruption of learning-related activities or the protection of those who make up a school community. *See Mahanoy*, 594 U.S. at 189.

Leroy's conduct was arguably more likely to cause a substantial disruption and invade the rights of others. Although not directed at a particular individual in the school, Leroy's post targeted a class of people who reasonably felt bullied, harassed, and unsafe in school. The photo did not just imitate the murder of an unarmed Black man, it celebrated it with a "thumbs up," a smile, and Leroy's added caption: "Cops Got Another." In posting the photo, Leroy targeted a race of people and broadcast it to the majority of his classmates. If anything, his actions were more likely to cause a substantial disruption in the school than the bullying of a single person. It makes little sense under *Tinker* to allow a school to discipline the off-campus bullying of a single individual who happens to attend the same school while foreclosing the school from disciplining a student who causes a disruption by targeting a group of people.

Appellant's suggestion that "no one interpreted Leroy's social media post as a threat of violence" is misleading, as students expressed feeling unsafe in school. It is not unreasonable for students, particularly Black students, to view the re-enactment of the murder of a Black man with a "thumbs-up" as a threat of violence

40

towards Black people. Towards them.

Appellant also argues the school has a heavy burden to justify the regulation of political or religious speech. But this was neither. Leroy and his friends claim to have intended the post as a "joke." (A-207-08, 275 406, 409.) The cheerleader in *Mahanoy* was at least criticizing the team, the coaches, and the school, which the Court characterized as "rules of the community in which B.L. forms a part." *Mahanoy*, 594 U.S. at 191. Jokes may be protected speech, but the value of the speech inherent in this joke cannot outweigh the school's interest in preventing disruption and protecting its students.

Leroy actually denied an intention to make any kind of statement about George Floyd (or otherwise). *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). He had the burden to demonstrate conduct "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974)). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] has asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would

be understood by those who viewed it." *Id.* (cleaned up).

Leroy disavowed an intent to communicate a message through the photograph or his Snapchat post. (A-95-98.) In doing so, he disavowed, or at least diminished, the expectation of First Amendment protection. *See Zalewska v. Cnty. of Sullivan, New York*, 316 F.3d 314, 319 (2d Cir. 2003) (In the school context, "Action attempting to communicate such a 'vague and unfocused' message is afforded minimal if any First Amendment protection."); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 207 (2d Cir. 2004) (KKK masks not expressive conduct under First Amendment); *see also Cheadle on behalf of N.C. v. N. Platte R-1 Sch. Dist.*, 555 F. Supp. 3d 726, 734 (W.D. Mo. 2021) (student's photo depicting her drinking alcohol not expressive conduct under First Amendment), *appeal dismissed*, 2021 WL 7186863 (8th Cir. Nov. 2, 2021); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 53 (2d Cir. 2016) (gun purchase not expressive conduct).

Appellant notes that schools have an interest in protecting unpopular expression, citing the *Mahanoy* concurrence. But what is the unpopular expression at issue here? The execution of George Floyd was something to be celebrated? Something to poke fun at? If this photo had been taken in the school parking lot and then posted on Snapchat, no one would question the school's ability to discipline Leroy. *See e.g., Morse v. Frederick*, 551 U.S. 393 (2007) (school discipline permitted of student who held banner with phrase "Bong Hits 4 Jesus" at school

function).

Yet there was no functional difference; the impact was the same because it was spread through the same medium as it would have in that circumstance. Social media has changed the boundaries of the schoolhouse gates. Students can post on social media from anywhere and affect the school environment as if they were in school.

Appellant praises the 45-year-old *Thomas* case for its dicta. 607 F.2d at 1050. But *Thomas* involved an underground publication that the students "diligently labored" to keep out of school and there was no evidence of a substantial disruption. *Id.* This Court has historically acknowledged the rights of school administrators to discipline a student for off-campus speech. In *Doninger*, the plaintiff posted a blog that called school administrators "douchebags," encouraged students to contact an administrator "to piss her off more," and contained misleading information about a school event from which school officials "might reasonably portend disruption." 527 F.3d at 51. This Court denied the plaintiff's preliminary injunction because "it was reasonably foreseeable that her posting would reach campus where it would create a foreseeable risk of substantial disruption within the school environment. *Id.* ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place.").

*Mahanoy* did not overrule *Doninger*, as Appellant suggests. The Snapchat

post in *Mahanoy* was arguably less offensive and certainly less likely to cause disruption than the call to action in the *Doninger* blog. *Id.* at 184-85. In fact, Justice Alito's dissent distinguished *Doninger* and other similar cases that involved criticism of administrators, teachers, and other staff members from *Mahanoy* which "simply involve[d] criticism (albeit in a crude manner) of the school and an extracurricular activity." *Mahanoy*, 594 U.S. at 209. The facts of *Doninger* are surely different, but the principle for which the district court cited it stands: that "Defendants reasonably foretold a substantial disruption given the barrage of emails they received the night the photo was posted from students and community members alike." (SPA-17.)

Appellees recognize off-campus speech is subject to heightened scrutiny under *Mahanoy*. But in the age of social media that blurs the line between on- and off-campus speech, schools must be permitted to regulate the conduct of their students when it creates an anticipated or actual substantial disruption or threatened harm, as it did here.

**POINT II:    APPELLANT'S SNAPCHAT POST CAUSED A SUBSTANTIAL DISRUPTION TO THE EDUCATIONAL ENVIRONMENT**

Appellant's assertion that the disruption is "not meaningfully different" from that in *Mahanoy* ignores the record in this case. The disruption here was so overwhelming and severe that it grinded the regular school day to a halt. This is in

stark contrast to *Mahanoy* or any of the other cases Appellant cites.

Livingston Manor is a small town, with one school for K-12 and 420 students; Leroy's senior class had only 40 students. District administrators were immediately and continually flooded with emails and phone calls from concerned and angry students, parents, community members, neighboring school administrators (including the President of SUNY Sullivan), and local organizations, such as SARE (Students Against Racism in Education).

Appellant's effort to minimize the extent of the disruption by counting and paraphrasing emails in their appendix ignores the relative enrollment of the school, the size of the community, the fervor of the communications and the disruption they forecasted, and the time it took for educators to review and respond to them and address and quell the disruption.

The response led to concerns for the safety of several students, including Leroy. Talk of the racist posts permeated the classrooms and hallways. Staff members demanded to know how the District planned to respond to the unrest created by the posts. Students planned to livestream a protest, prompting further concern about student safety. The administration was compelled to break from classroom instruction to hold an impromptu assembly for grades 7-12 to prevent students from leaving school grounds in the planned vigil, which would have created more disruption and safety and security concerns. Staff time was needed to supervise the

students' sit-in vigil. The matter prompted State and local law enforcement presence at the school for the day, which caused further inquiries from concerned parents. And District officials spent time addressing the media attention and ongoing community concerns.

The *Mahanoy* cheerleader caused no such disruption. *Mahanoy*, 594 U.S. at 192 ("But we can find no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action.") The record showed that discussion of the matter "took, at most 5 to 10 minutes of Algebra class for 'just a couple of days' and that some of the members of the cheerleading team were 'upset' about the content of B.L.'s Snapchats." *Id.* But the coach testified she did not have "any reason to think that this incident would disrupt class or school activities other than the fact that kids kept asking . . . about it." *Id.* That was it. Accordingly, the Court held "[t]he alleged disturbance [did] not meet *Tinker's* demanding standard." *Id.* at 193. Appellant's comparison of the facts of these two cases strains credulity, to say the least.

Leroy cites other cases where the defendants could not demonstrate a substantial disruption. In *C1.G on behalf of C.G. v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022), the plaintiff was disciplined for his off-campus Nazi-related hate speech. On a motion to dismiss standard, the court found that the "Complaint alleges no reasonable forecast of substantial disruption or actual disruption," and accordingly

46

cannot be dismissed at this stage." *Id.* at 1279. While some of the facts are similar, there was notably less disruption in *Siegfried* than here. *Id.* at 1278 (a few parents emailed about it but only one email was identified, one family complained it scared, angered and saddened them, and one "advisory period" was used to discuss the post). The Tenth Circuit viewed the disruption with too narrow a lens under *Mahanoy*, and the facts here demonstrate far more anticipated and actual disruption that warranted the discipline. Appellant also references *Wang v. Bethlehem Cent. Sch. Dist.*, No. 121CV1023 (LEK)(DJS), 2022 WL 3154142 (N.D.N.Y. Aug. 8, 2022), another case decided on a pre-answer motion to dismiss. There the plaintiff's creation of a social media "Bracket" seeking to identify "the two most liked or admired girls" communicated to a small group of friends and included no abusive language, did not, on the pleadings, suggest a substantial likelihood of disruption. And in *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011), there was "no dispute" among the parties that the plaintiff's speech "did not cause a substantial disruption in the school"; accordingly, the court found there were no facts to support "the conclusion that a forecast of substantial disruption was reasonable." *Id.* at 928; *see also Chandler v. Tech. Coll. of Lowcountry*, No. 9:22-CV-01969-DCN, 2022 WL 2670806, at *5 (D.S.C. July 11, 2022) (nursing college student's Facebook posts complaining about vaccine requirements did not allege substantial disruption). As for Leroy's reliance on *Thomas*, 607 F.2d at 1052, "there was simply no threat or

forecast of material and substantial disruption within the school" as evidenced by the fact that "school officials were content to do nothing at all for six full days, until called to action by the school board president." *Id.* at 1052, n.17.

Leroy attempts to distance himself from igniting the flame of disruption with his Snapchat post by blaming the District for the disruption because of its efforts to quell it. Superintendent Evans and others responded to emails, calls, and other inquiries, and scheduled an assembly to prevent a demonstration that was likely to create a safety and security problem with unsupervised minors leaving school grounds. This was a response; not the cause of the disruption.

Leroy's assertion that he only shared the April 19 Photo (with caption) with "a discrete circle of friends" is untrue. He posted it on his Snapchat story, making it visible to all of his Snapchat friends—approximately 60-100 people, largely consisting of Livingston Manor High School students. The District is small; there is one school building that houses grades pre-K through 12, with only 200 students between the 7th and 12th grades. By posting the April 19 Photo on his Snapchat story, Leroy made the photo readily available to a large chunk of the student body.

Simply put, if *Mahanoy* falls at one end of the spectrum of off-campus speech, this case falls decidedly at the other end. Because the District did not violate Leroy's First Amendment rights when it disciplined him for his racist Snapchat Post that substantially disrupted—in fact upended—the learning environment, Leroy's First

Amendment claims fail as a matter of law.

**POINT III:  THE COURT SHOULD NOT ENTERTAIN APPELLANT'S VIEWPOINT DISCRIMINATION AND HECKLER'S VETO ARGUMENTS THAT WERE NOT RAISED BELOW AND DO NOT APPLY**

### A. The Claims Are Unpreserved for Appeal

This Court should disregard Appellant's viewpoint discrimination and "heckler's veto" arguments because they are unpreserved for appeal. *Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021) ("Where the claimant is represented by counsel before the district court, the claimant must present the relevant legal arguments in that forum in order to preserve them for appellate review.") (collecting cases); *Tripathy v. McKoy*, 103 F.4th 106, 118 (2d Cir. 2024) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed forfeited.") (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001)); *Goldman v. Rio*, 788 F. App'x 82, 84 (2d Cir. 2019) ("conclusory, one-sentence argument is insufficient to preserve any issue for appellate review") (collecting cases).

Arguments not presented to the district court "are considered waived or forfeited and generally will not be considered for the first time on appeal." *Greater New York Mut. Ins. Co. v. Burlington Ins. Co.*, No. 23-892, 2024 WL 1827249, at *1 (2d Cir. Apr. 26, 2024) (quoting *United States v. Gomez*, 877 F.3d 76, 94-95 (2d

49

Cir. 2017)); *see also Bey v. City of New York*, 999 F.3d 157, 169 (2d Cir. 2021) (Second Circuit does "not ordinarily entertain arguments raised for the first time on appeal") (collecting cases); *United States v. Keshner*, 794 F.3d 232, 234 (2d Cir. 2015) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.").

Although the Second Circuit may exercise discretion to entertain new arguments "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding," the Second Circuit "normally will not exercise that discretion where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *Singh v. Mem'l Sloan Kettering Cancer Ctr.*, No. 23-63-CV, 2024 WL 4586396, at *2 (2d Cir. Oct. 28, 2024) (quoting *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 615 (2d Cir. 2016)).

Appellant may not raise these claims before this Court when they were never presented to the district court.

## B.  Viewpoint Discrimination is Inapplicable

Viewpoint discrimination is "when the government seeks to regulate speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Kristoffersson on behalf of R.R. v. Port Jefferson Union Free Sch. Dist.*, No. 22-CV-01741 (JMA) (ARL), 2023 WL 6119710, at *5

(E.D.N.Y. Sept. 18, 2023), *aff'd*, No. 23-7232-CV, 2024 WL 3385137 (2d Cir. July 12, 2024) (quoting *A.M. ex rel. McKay v. Taconic Hills Cent. Sch. Dist.*, 510 F. App'x 3, 8 (2d Cir. 2013)). Such claims generally involve actions by government officials taken to censor or prohibit a message from being communicated at a future time and place, based on the content of that message. *See Wang*, 2022 WL 3154142, at *23 (citing *Peck v. Baldwinsville Cent. School Dist.,* 426 F. 3d. 617, 622 (2d Cir. 2005) (alleged viewpoint discrimination where school prevented student from displaying poster containing religious imagery at assembly); *McKay*, 510 F. App'x at 6. "This necessarily requires a reasonable inference that the government action prevented spread of the viewpoint in the future, rather than merely an objection to viewpoints stated in the past." *Id.* Appellant has not challenged the prospective application of a school district policy.

Viewpoint discrimination does not apply in this context. It cannot be disputed that schools may discipline students for engaging in acts of racial discrimination. State, federal, and local laws not only prohibit racial discrimination in public schools, they mandate anti-discrimination policies and practices. *See, e.g.* 42 U.S.C. § 2000d; N.Y. Exec. Law § 296(4); N.Y. Educ. Law § 12.

In this light, the special characteristics of the school environment permit regulation of viewpoints that demean or contain discriminatory messages towards other students. *See L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854,

51

878 (1st Cir. 2024) (denying preliminary injunction to student who challenged dress code that prohibited him from wearing shirt saying, "There Are Only Two Genders" or even "Only Two"). "Part of a public school's mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in terms of debate highly offensive or highly threatening to others." *Id.* (quoting *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, 1233 (D. Kan. 1998), *aff'd*, 206 F.3d 1358 (10th Cir. 2000) (cleaned up; emphasis in original)); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 438 (4th Cir. 2013) ("The record contains ample evidence from which the school officials could reasonably forecast that all of these Confederate flag shirts would materially and substantially disrupt the work and discipline of the school.") (citing *Tinker*, 393 U.S. at 513); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010) (same); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008) ("that school officials determined the Confederate flag to be offensive to African-American and other students . . . does not negate [their] reasonable belief that the flag was also disruptive and would cause substantial and material interference with schoolwork and school discipline.").

Leroy's post was far more inflammatory and likely to incite disruption than either of the shirts at issue in those cases. If he had staged the mock George Floyd murder in the school parking lot, posted his "Cops Got Another" photo on the wall of the school, or worn a t-shirt with the April 19 Photo, the school would be *required*

52

to take action. This would not be viewpoint discrimination; it would be the enforcement of anti-discrimination laws and policies and an effort to avoid the distractions from the learning process they would cause, *i.e.*, to prevent a substantial disruption to the educational environment. A school district is subject to liability if it turns a blind eye to discrimination in schools. It is no different where (as here) the First Amendment permits schools to regulate off-campus student conduct that is likely to cause a substantial disruption.

Appellant offensively refers to outraged members of the community as "**the mob** objecting to Leroy's snap," (p. 35 (emphasis added)), and characterizes the objections to his racist social media post as "expressions of support for a so-called 'antiracist'…. *** extreme, far left ideology." (p. 37.) Leroy's post certainly does not "appear[] to comment on the impunity with which police engage in brutality and similar misconduct," as Appellant's brief suggests. (p. 38; *see also* p. 46 ("his message is more readily viewed as anti-cop than racist…").) While Leroy's friends admitted they knew they were staging a mock George Floyd murder, Leroy refused to even admit he knew what they were staging until afterwards. (A-268-69.) The Hearing Officer from his Superintendent's Hearing found his professed ignorance to be uncredible. (A-461-462; A-478, ¶ 40.)

Appellant complains about the absence of evidence of discipline of "the other students who participated in the email barrage or those who organized the in-school

protest." (p 45.) This is because no such issue was raised or litigated in the district court. Leroy and his friends caused the disruption; others reacted to it. Their complaints about feeling unsafe in their school and their response to an overt act of racism is not something that warrants punishment of them.

As the district court held, "The District has an interest in maintaining order within its schools, promoting tolerance and respect, and ensuring students feel comfortable and secure within the school environment." (SPA-19.) Whether on or off-campus, disciplining a student for an overt act of racism is not the promotion of a far-left agenda; it is consistent with the educational mission of a school. Appellant's *amici* generally agree. *See* Brief for the ACLU as Amicus Curiae, p. 3 ("They were also right to emphasize that 'racism cannot and will not be tolerated' by the District."); Brief of First Amendment Scholars, pp. 19-20 ("Livingston Manor did what public schools do best—educate students about the thoughtful exercise of their First Amendment rights on the pathway to responsible digital citizenship.") Appellant's suggestion that Leroy suffered a constitutional injury <u>because of</u> "Defendants['] pedagogical decision to hold an assembly and host a protest," (p. 43), misunderstands the mission of an educational institution.

The District's reasonable determination that Leroy's post was racially inflammatory and likely to portend a substantial disruption in school nullifies Appellant's viewpoint discrimination claim.

### C. Heckler's Veto is Inapplicable

Entrenched in First Amendment jurisprudence is the notion "that the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.")). Accordingly, "courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy Area Sch. Dist.*, 594 U.S. at 187 (citing *Hazelwood Sch. Dist.*, 484 U.S. at 266).

Considering a school's "special characteristics," applying the so-called "heckler's veto" is inappropriate here. Indeed, this Court has noted, "The difficult constitutional problems raised by 'the heckler's veto' . . . becomes particularly acute in a public school, where the threshold of disturbance which may justify official intervention is relatively low." *Eisner v. Stamford Bd. of Ed.*, 440 F.2d 803, 809 n.6 (2d Cir. 1971) (internal citation omitted).  In *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, the plaintiff school teacher was "a self described pedophile" and an active member of NAMBLA, whose "stated primary goal is to bring about a change in the attitudes and laws governing sexual activity between men and boys." 336 F.3d

55

185, 189 (2d Cir. 2003). When Melzer's membership in NAMBLA went public, it "became the center of heated discussion" in the school community and caused students, parents, and community members to protest and call for Melzer's termination. *Id.* at 191. Melzer was terminated based on the school community's reaction and inevitable serious disruption to the operations of the school. *Id.* at 191-92. Melzer argued "that allowing disruption caused by the public furor over his NAMBLA-related activities to justify his termination amounts to an impermissible heckler's veto." *Id.* at 199. This Court rejected that argument concluding:

> Melzer's position as a teacher leaves him somewhat beholden to the views of parents in the community. Parents are not outsiders seeking to heckle Melzer into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function. *Any disruption created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the [Pickering] balancing test and which may outweigh a public employee's rights*. In consequence, we do not perceive an impermissible heckler's veto implicated in this case.

*Id.* (emphasis added).

This Court subsequently confirmed application of the heckler's veto is limited: "Where a Government employee's job quintessentially involves public contact, *the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations*." *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006)

56

(emphasis added) ("Our cases make clear, then, that the district court's dichotomy between the defendants firing the plaintiffs 'out of a concern for potential disruption' as against their doing so 'for reasons of public perception' or 'in response to the content of plaintiffs' speech, is a false one.'") (internal citation omitted). Appellant ignores this limitation on the heckler's veto doctrine.

While neither *Melzer* nor *Locurto* involved student speech (although *Melzer* involved a school teacher), these cases establish the heckler's veto doctrine is limited especially where, as here, the speech results in substantial disruption to school operations. Indeed, limitation of applicability of the heckler's veto is more apt in the context of a student's already limited freedom of speech in light of the "special characteristics" of the school environment where the record demonstrates numerous students, parents, school staff members, and community members were affected by Leroy's actions.

The Ninth Circuit, in *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764 (9th Cir. 2014), explained that the "heckler's veto" doctrine is a poor fit in the context of school speech because it is inconsistent with *Tinker's* substantial disruption test. *Id.* at 777-78. The inconsistency stems from the fact that *Tinker*'s substantial disruption test focuses on the likely result of the speech rather than the speaker's intent: "In the school context, the crucial distinction is the nature of the speech, not the source of it. The cases do not distinguish between 'substantial

57

disruption' caused by the speaker and 'substantial disruption' caused by the reactions of onlookers or a combination of circumstances." *Id.* at 778 (collecting cases). On the contrary, "the *Tinker* rule is guided by a school's need to protect its learning environment and its students, and courts generally inquire only whether the potential for substantial disruption is genuine." *Id.* (collecting cases); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38, 38 n.11 (10th Cir. 2013) ("Plaintiffs note that most disruptions occurred only because of wrongful behavior of third parties and that no Plaintiffs participated in these activities. . . . This argument might be effective outside the school context, but it ignores the 'special circumstances of the school environment' where the government has a compelling interest in protecting the educational mission of the school and ensuring student safety."). Appellant has cited no legal authority for applying the heckler's veto doctrine in a student speech case.

Even if the heckler's veto doctrine were applied to this case, it still does not provide a basis to disturb the district court's dismissal of the First Amendment retaliation claim. As detailed above, this is not a case where a school district disciplined a student based on a mere desire to avoid the discomfort and unpleasantness that accompanies an unpopular viewpoint, or simply because members of the community were offended. On the contrary, Leroy's April 19 Post created a very real substantial disruption, as evidenced in the record before this

Court, and is not protected under *Tinker*. Put differently, the heckler's veto doctrine does not wipe out the overwhelming evidence of substantial disruption that permitted the District to discipline Leroy in accordance with *Tinker*.

**POINT IV:   THE COURT SHOULD AFFIRM DISMISSAL OF THE
CLAIMS AGAINST SUPERINTENDENT JOHN EVANS
AS THEY ARE DUPLICATIVE OF APPELLANT'S CLAIMS
AGAINST THE SCHOOL**

Leroy named Superintendent John Evans in his official capacity only. (A-20.) Such official capacity claims are duplicative of the claims against the District and, therefore, must be dismissed as a matter of law. *See Rodriguez v. City of Rochester*, 624 F. App'x 16, 18 (2d Cir. 2015). Because the district court dismissed the claims on the merits, it did not address this argument.

This principle applies in the public school context, specifically to dismiss official-capacity claims against school administrators, such as Superintendent Evans. *See e.g. Z.F.X. by Vankesteren v. Riverhead Cent. Sch. Dist.*, No. CV 20-962 (GRB)(ST), 2021 WL 1238842 (E.D.N.Y. Apr. 2, 2021); *Rutherford v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778 (KMK), 2019 WL 1437823 (S.D.N.Y. Mar. 29, 2019) (dismissing official capacity claims against individual defendants as "wholly redundant" to plaintiff's claims against school district).

## CONCLUSION

For the reasons set forth above, Defendants-Appellees respectfully submit that this Court should deny this appeal and affirm the district court's decision in its entirety, together with awarding Defendants-Respondents the costs of this appeal and such other relief as this Court deems just, equitable, and proper.

Dated:  Carle Place, New York
       November 13, 2024

SOKOLOFF STERN LLP
*Attorneys for Defendants-Respondents*

By: _____
Steven C. Stern
Chelsea Weisbord
Mark A. Radi
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500

60

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)

I hereby certify that:

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 13,769 words, excluding the parts of the brief exempted under Fed. R. Civ. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:  Carle Place, New York
         November 13, 2024

SOKOLOFF STERN LLP
*Attorneys for Defendants-Respondents*

By:  _____
     Steven C. Stern
     179 Westbury Avenue
     Carle Place, New York 11514
     (516) 334-4500

61